**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

UNITED STATES OF AMERICA

    v.                                                 CASE NO. 6:17-cr-00018-ORL-40KRS

NOOR ZAHI SALMAN,

        Defendant.

**NOOR ZAHI SALMAN'S MOTION FOR CHANGE OF VENUE AND
INCORPORATED MEMORANDUM OF LAW**

COMES NOW the Accused, Noor Zahi Salman, by undersigned counsel, and moves this Honorable Court to change the venue in the above case.[1] This request is made pursuant to the Fifth Amendment's Due Process Clause, the Sixth Amendment, and Federal Rule of Criminal Procedure 21(a). In support of her request, Ms. Salman shows this Honorable Court as follows:

**Statement of Facts**

Noor Zahi Salman (Ms. Salman) was arrested on January 16, 2017, amid a storm of publicity with media reports of the "worst mass shooting in U.S. history."[2] She was charged with aiding and abetting Omar Mateen's attempted provision and provision of material

---

[1] Ms. Salman brings this motion at this time in accordance with the Honorable Court's Scheduling Order. Ms. Salman requests leave to supplement or amend her motion for change of venue as the trial date approaches and jury questionires are recived.

[2] Hal Boedeker, *Orlando's dark day: The shock set in early*, Orlando Sentinel (June 12, 2016 11:15 AM) ("In these unfolding stories, local viewers simply wanted information. The stations helped explain a confusing and dangerous situation through interviews with witnesses and scenes outside the club. The TV stations did a public service in those early hours and cleared their Sunday morning schedules to cover the story. The Orlando mass shooting became the top story on cable news channles; CNN, MSNBC and Fox News Channel offered a string of analyses….For Orlando, it's a local story. Blood donations are needed, the FBI wants to talk to club patrons, and the region has to get through a terrible day – one we'll never forget.").

1

support to the Islamic State of Iraq and the Levant, in violation of 18 U.S.C. §§ 2339B(a)(1)-(2), and with obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3).

The continued and constant media coverage, along with Orlando Police Chief John Mina's (Chief Mina) statements have infected this community sufficiently to prejudice a significant portion against Ms. Salman. The bias created in the media and by Chief Mina's statements warrant a change of venue, as both appropriate and necessary.

## **Argument and Citation to Authority**

In order to insure a defendant's right to a fair trial which is free from prejudice, Federal Rule of Criminal Procedure 21(a) provides:

> For Prejudice. Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

This Rule permits a defendant to request a change of venue in a criminal case when he believes a fair and impartial jury cannot be obtained in the district where the alleged crime was committed.

District courts have discretion when deciding whether to change venue due to prejudicial pretrial publicity. *Ehrlichman v. Sirica*, 419 U.S. 1310, 1312 (1974); *U.S. v. Williams*, 523 F.2d 1203, 1208 (5th Cir. 1975).[3] The standards governing a change of venue derive from the due process clause of the Fourteenth Amendment, which safeguards a defendant's Sixth Amendment right to be tried by "a panel of impartial, 'indifferent' jurors." *Coleman v. Kemp*, 778 F.2d 1487, 1542 (11th Cir. 1985), cert. denied, 476 US. 1164 (1986)

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), this Court adopted all decisions of the former Fifth Circuit handed down prior to October 1, 1981 as binding precedent.

(citing *Irvin v. Dodd*, 366 U.S. 717, 722 (1961)). Furthermore, the Supreme Court of the United States recognizes instances where a trial court may be unable to seat an impartial jury, due to prejudicial pretrial publicity or inflamed community atmosphere. In such situations, due process requires that the trial court grant a defendant's motion for a change of venue. *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963); *see also Coleman*, 778 F.2d at 1542. Granting motions to transfer venue in these situations guarantees the fundamental fairness of the defendant's trial. *Id*; *see also Murphy v. Florida*, 421 U.S. 794, 799 (1975).

Courts observe two tests for change of venue motions based upon prejudicial pretrial publicity: "actual prejudice," as discussed in *Irvin v. Dodd*, *supra*, and "inherent prejudice," as explained in *Murphy v. Florida*, *supra*. *See also United States v. Campa*, 459 F.3d 1121, 1143 (11th Cir. 2006). *Coleman v. Zant*[4] sets forth the Eleventh Circuit's standards governing motions for change of venue. To justify a change of venue under Rule 21(a), defendants must meet one of these two standards.

Actual prejudice occurs when "the prejudice actually enters the jury box and affects the jurors." *Heath v. Jones*, 941 F.2d 1126, 1134 (11th Cir. 1991). To determine if actual prejudice occurred, courts examine the totality of the circumstances and the extent of the prejudice. In order for a petitioner to prevail under the standard of "actual prejudice," he must demonstrate that some jurors who served on his jury had preconceived notions as to his guilt that they could not lay aside. *Johnson v. Kemp*, 759 F.2d 1503, 1510 (11th Cir. 1985).

Ms. Salman's challenge to venue in this instance rests on the second test, the "inherent prejudice" standard. To establish that pretrial publicity prejudiced an accused

---

[4] 708 F.2d 541, 544 (11th Cir. 1983).

without an actual showing of prejudice in the jury box, she must show: "(1) that widespread, pervasive prejudice against [her] and prejudicial pretrial publicity saturates the community where [she] is to be tried and (2) that there is a reasonable certainty that such prejudice will prevent [her] from obtaining a fair trial by an impartial jury." *Campa*, 459 F.3d at 1143; *see also Rideau v. Louisiana*, 373 U.S. 723 (1963); *Bundy v. Dugger*, 850 F.2d 1402, 1424 (11th Cir. 1988); *Coleman*, 778 F.2d at 1490.

The inherent prejudice standard, like the actual prejudice standard, requires courts to examine the totality of the circumstances in determining the extent of the prejudice. *See Coleman*, 778 F.2d at 1491. The Eleventh Circuit emphasizes that "no single factor is dispositive" in examining the totality of the circumstances. *Id.* at 1538 (holding that the Court "weighed each element of the prejudicial publicity, taking into consideration the pervasiveness of the circulation thereof, and how that publicity contributed to the totality of the circumstances.").

The inherent prejudice principle is reserved for an "extreme situation" and "[t]he burden placed upon the [defendant] to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one." *Campa*, 459 F.3d at 1143 (internal quotation omitted). However, the present case presents an "extreme situation" meeting this bar; Ms. Salman can carry her burden to show how pretrial publicity has deprived her of her right to a fair trial before an impartial jury.

Ample evidence establishes the existence of negative pre-trial publicity in this case. Specifically, Chief Mina made repeated disparaging statements and proclamations of Ms. Salman's guilt, which received intense and widespread prejudicial publicity in the local

4

press. Chief Mina's statements concerning Ms. Salman create the very real danger of community saturation, to the point where it is impossible to seat an impartial jury in Orlando.

### A. Local Law Enforcement's Prejudicial and Inflamatory Comments and Statements Regarding Ms. Salman's Guilt and Criminal Proceedings

In their change of venue analyses, courts look to statements of local law enforcement. In *Shepherd v. Florida,* the Supreme Court found that "[n]ewspapers published as a fact, and attributed the information to the sheriff, that these defendants had confessed. No one, including the sheriff, repudiated the story." *Shepherd v. Florida*, 341 U.S. 50, 51 (1951). The Court noted that "[i]t is hard to imagine a more prejudicial influence than a press release by the officer of the court charged with defendants' custody stating that they had confessed, and here just such a statement, unsworn to, unseen, uncross-examined and uncontradicted, was conveyed by the press to the jury." *Id.* at 52.

The Eleventh Circuit has found a change of venue is warranted where "there was an overwhelming showing in the press of [the petitioner's] guilt before his trial ever began." *Coleman*, 778 F.2d at 1538-39 ("As soon as petitioner Coleman and his co-indictees were identified as suspects in the case, law enforcement officials announced that circumstantial evidence against the suspects was "overpowering," and that "there's no point in looking for anybody else." The press revealed that the suspects' finger-prints had been found at the scene of the crime….All of the foregoing was widely reported in all of the newspapers serving Seminole County, and in what the record discloses of the broadcast media. It was repeated time and again."). The *Coleman* court further held "there was publicity that was either calculated to provoke hostility or reflective of an atmosphere of hostility; including, *inter alia*, . . . other egregious remarks by the county's chief law enforcement officer, Sheriff

5

White" and "the newspaper description of the defendants as smirking and other characterizations of remorselessness and other derogatory characterizations …." *Coleman*, 778 F.2d at 1538-39.

The Eleventh Circuit rejected the government's argument to outweigh the prejudice that "there was overwhelming evidence of the petitioner's guilt." *Coleman*, 778 F.2d at 1540-41. Even though the court believed "that there was, in fact, overwhelming evidence of the petitioner's guilt adduced at trial," it found "that fact cannot be dispositive in assessing petitioner's change of venue claim," citing *Rideau*. *Coleman*, 778 F.2d at 1540-41. The Court explained:

> To hold otherwise would mean an obviously guilty defendant would have no right to a fair trial before an impartial jury, a holding which would be contrary to the well-established and fundamental constitutional right of every defendant to a fair trial. In *Irvin v. Dowd*, the Supreme Court noted that a "fair trial in a fair tribunal is a basic requirement of due process" and stated that "this is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies."

*Coleman*, 778 F.2d at 1540-41 (citing *Irvin v. Dodd*, 366 U.S. 717, 722 (1961)).

In this case, much like law enforcment officers in *Shepherd* and *Coleman*, the Orlando Police Department (OPD) and Chief Mina saturated the Orlando community with prejudice by way of their official statements proclaiming Ms. Salman's guilt.[5]  *Shepherd*, 341 U.S. at 52; *Coleman,* 778 F.2d at 1538-39.

---

[5] Prejudicial statements were not limited to Orlando Police Department and its Chief, but were also made by a member of the Senate Intelligence Committee, U.S. Senator Angus King (Senator King), who was briefed on the investigation. Senator King stated "It appears [Ms.Salman] had some knowledge of what was going on. She definitely is, I guess you would say, a person of interest right now and appears to be cooperating and can provide us with some important information." Rick Neale & John Bacon, *'This is not a drill':Docs detail night in Orlando ER*, USA Today (June 14, 2016 updated 12:12 a.m.).

Notably, in an interview for the Orlando Political Observer on May 30th of this year,[6] Chief John Mina stated that

> Well, I will say that based on the information that I have, that I have received from the FBI, that she certainly could have, could knew about it and could have done something to prevent that, so I, my belief that she needs to be held accountable for those 49 deaths and for all those people that were injured and for this huge tragedy that we had here in Orlando.

Interview with Doug Kaplan, Orlando Political Observer (50 of 50 Influencers) in Orlando, Fla. (May 30, 2017 at 04:00). When asked when a wife should report on her husband in the context of Salman's circumstances, Chief Mina responded "certainly if she knew about what he was capable of planning, and you know, that should be reported immediately to the authorities." *Id.* at 04:38.

The Orlando Police Department made prejudicial statements throughout the criminal proceedings to date. On the day Ms. Salman was arrested, the Orlando Police Department stated on its Facebook page:

> Today, the FBI arrested the wife of Pulse Orlando shooter on federal charges of Aiding and Abetting by providing material support to a terrorist organizaiton and Obstruction of Justice.
>
> We are grateful to our federal law enforcement partners, FBI – Federal Bureau of Investigation and U.S. Attorney's Office Middle District of Florida Tampa for bringing this to fruition.
>
> See OPD Chief John Mina's statement below. We will never forget the beautiful lives lost at #Pulse.

---

[6] The Orlando Political Observer states, on its website, that it is "read by the most powerful and influential members of the Central Florida Community." *Who Read OPO?*, Orlando Political Observer, http://orlando-politics.com/who-reads-opo/. Indeed, the Orlando Political Observer gets "the sit-downs with leaders from the Governor's mansion all the way down to the City Commission." *Id.*

7

>   #OrlandoUnited[7]

The Facebook statement then included Chief Mina's statement:

>   Today, the FBI took Noor Salman, the wife of Pulse nightclub gunman Omar Mateen, into custody on charges of Aiding and Abetting by providing material support to a terrorist organization and Obstruction of Justice.
>
>   I am glad to see that Omar Mateen's wife has been charged with aiding her husband in the commission of the brutal attack on the Pulse nightclub. Federal authorities have been working tirelessly for more than seven months, and we are grateful that they have seen to it that some measure of justice will be served in this act of terror that has affected our community so deeply.
>
>   Nothing can erase the pain we all feel about the senseless and brutal murders of 49 of our neighbors, friends, family members and loved ones. But today, there is some relief in knowing that someone will be held accountable for that horrific crime.[8]

This Facebook post was "shared" 112 times (to date), and 520 individuals "liked" the post, with mutlitple individuals "commenting" on the posting.[9] These statements were not regarding peripheral matters to Ms. Salman's case; rather, they directly relate to Ms. Salman's purported guilt. *See Campa*, 459 F.3d at 1144 (holding that "[p]rejudice against a defendant cannot be presumed from pretrial publicity regarding peripheral matters that do not relate directly to the defendant's guilt for the crime charged"). Further, the language in this post is highly inflammatory, and made to invoke strong emotional responses to the horrific massacre at the Pulse Night Club.

---

[7] Orlando Police Department, Facebook (January 16, 2017), https://www.facebook.com/orlandopolicedepartment/posts/10154303483075878:0.
[8] *Id.*
[9] *Id.*

Following the initial bond proceedings where California Magistrate Judge Donna M. Ryu ordered the conditional release of Ms. Salman, the Orlando Police Twitter account tweeted Chief Mina's statement:

> I am disappointed that Noor Salman, charged by federal authorities for obstruction of justice and aiding and abetting her husband Omar Mateen in the commision of the brutal attack on the Pulse nightclub, will be released from Federal custody pending a trial.
>
> Nothing can erase the pain we all feel about the senseless and brutal murders of 49 of our neighbors, friends, family members and loved ones. But I have full faith that she will ultimately be brought to justice and I remain grateful to federal authorities, who worked tirelessly on this case for months to see that some measure of justice be served in this act of terror that has affected our community so deeply.[10]

This tweet was "retweeted" 117 times and "liked" and "commented" on by multiple individuals.[11] Following the revocation of bail, Chief Mina tweeted "Great work by @USAO_MDLF," citing the U.S. Attorneys' Office for the Middle District of Florida, and retweeting Orlando Sentinel reporter Gal Tziperman Lotan's tweet ".@ChiefJohn Mina: "I have full faith that Salman will ultimately be brought to justice. Judge revoked her bail bit.ly/2muGfTA."[12] This tweet was shared 14 times, and "liked" and "commented" on by multiple individuals.[13] Again, the language in the statements reflects an atmosphere of hostility, much like that found sufficient for a change in venue in *Coleman*. See *Coleman*, 778 F.2d at 1538-39.

---

[10] Orlando Police (@OrlandoPolice), Twitter (March 1, 2017 2:52 p.m.).
[11] *Id.*
[12] Chief John Mina (@ChiefJohnMina), Twitter (March 10, 2017).
[13] *Id.*

9

The Orlando Police Department and Chief Mina's statements have not only been shared via Facebook and Twitter, but have been widely reported by the press and other media outlets. For example, the Orlando Sentinel reported that Chief Mina, who "expressed his disappointment when the California judge ordered [Ms. Salman's] release," was "heartened by the news" that the Middle District of Florida had denied bail for Ms. Salman.[14] These statements are not from an out-of-state, irrelevant law enforcement officer, but from the chief law enforcement officer of the Orlando community—the official who guided the officers that arrived on the scene of the horrific shooting; the official in charge of the officers who initially seized Ms. Salman during and immediately following the shooting; the official who has been lauded nationally and "traveled around the world to discuss with police groups how his department responded" to the Pulse Night Club shootings.[15] Here, the chief law enforcement officer of Orlando gavelled the guilt of Ms. Salman to the Orlando community, by communicating his clear and unambiguous belief in her guilt for aiding and abetting Omar Mateen and engaging in obstruction of justice.

The presence of a sufficient "cooling period" is also pertinent to a court's analysis. The Eleventh Circuit rejected the government's argument "that there was a substantial 'cooling off' period between the commission of the crimes and [petitioner's] trial" in *Coleman*. *Id.* at 1540-41. The Court found that "[a]lthough there was some slackening of the publicity from July until November, several factors persuade us that there was not a sufficient change in the nature or amount of the publicity to conclude that 'the feelings of

---

[14] Gal Tziperman Lotan, *Judge: Pulse shooter Omar Mateen's widow, Noor Salman, will stay in jail*, Orlando Sentinel (March 10, 2017 5:25 p.m.).
[15] David Harris, *Police Chief John Mina travels the world to disucss Orlando's response to Pulse nighclub massacre*, Orlando Sentinel (March 24, 2017 6:15 p.m.).

revulsion that create prejudice have passed.'" *Id.* at 1541 (citing *Patton v. Yount*, 467 U.S. 1025 (1984)).

As in *Coleman*, there has been no "cooling off" period in pretrial publicity between the commission of the Pulse Night Club attack and Ms. Salman's current trial proceedings. *See Coleman,* 778 F.2d at 1541. The Orlando Police Department posted its statement, along with Chief Mina's statement about Ms. Salman's arrest, on Facebook on January 16, 2017.[16] The Orlando Police Department tweeted out Chief Mina's response to Ms. Salman's conditional release on March 1, 2017.[17] Chief Mina tweeted out his response to Ms. Salman's release being revoked on March 10, 2017.[18] Finally, Chief Mina was interviewed about the Salman case on May 30, 2017 where he told the Orlando community that he believes Ms. Salman is guilty.[19] The coverage by the local and national media, discussed below, also closely follows every proceeding in Ms. Salman's case. Such circumstances provide evidence that there has been no sufficient "cooling off" period to show "the feelings of revulsion that create prejudice, have passed." *Coleman*, 778 F.2d at 1540-41 (internal quotations and citations omitted).

Courts also factor in the difficulty of the jury to acquit in the face of prejudicial and inflammatory exposure ". . . . when there is such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience." *United States v. McVeigh*, 918 F. Supp. 1467, 1473 (W.D. Okla.

---

[16] Orlando Police Department, Facebook (January 16, 2017), https://www.facebook.com/orlandopolicedepartment/posts/10154303483075878:0.
[17] Orlando Police (@OrlandoPolice), Twitter (March 1, 2017 2:52 p.m.).
[18] Chief John Mina (@ChiefJohnMina), Twitter (March 10, 2017).
[19] *See* Harris, *supra* note 15.

11

1996). Chief Mina's statements, along with the Orlando Police Department's statements which have been discussed in local and national media coverage, push a false narrative that someone other than Mateen himself must be held accountable for the deaths and injuries at the Pulse Night Club. These statements create an environment in which the Orlando community feels a personal stake in Ms. Salman's criminal proceedings. It would take a very "sturdy and fortright" individual with the ability to "face and live down the odium" among his affected community members to vote for an aquittal of Ms. Salman at this point. *Shepherd*, 341 U.S. at 55; *see also McVeigh*, 918 F. Supp. at 1473.

### B. Widespread Prejudicial and Inflammatory Coverage By the Media

The tome of the coverage by local and national media necessitates a change of venue. The Supreme Court in *Shepherd v. Florida* observed:

> But if freedoms of press are so abused as to make fair trial in the locality impossible, the judicial process must be protected by removing the trial to a forum beyond its probable influence. Newspapers, in the enjoyment of their constitutional rights, may not deprive accused persons of their right to fair trial.

*Shepherd*, 341 U.S. at 52-53. Press reports have been so one sided as to make a fair trial in Orlando impossible for Ms. Salman. As Ms. Salman "moved to the center of attention in the criminal investigation [], she was pilloried in social media and in print after investigators said they were looking into what role, if any, she played in the shooting rampage."[20] The front page of the New York Post displayed a picture of Salman and the headline "'She could have

---

[20] Jenny Jarvie and Rong-Gong Lin II, *Here's what we know about Noor Salman, the widow of the Orlando gunman*, Los Angeles Times (June 15, 2016 6:56 p.m.).

12

saved them all.' The paper [] went on to call Mateen a 'monster' and describe Salman as 'attuned to his desire for mass bloodshed."[21]

The number of news articles implying Ms. Salman's guilt are many. The Orlando Sentinel dedicated its website and thread to the Pulse Orlando Nightclub Shooting.[22] It details the coverage, the victims, the shooter, the investigation, the survivors, the reaction, the politics, and the commentary.[23] To enumerate all the articles relating to Ms. Salman's investigation, indictment, arrest, and trial proceedings would require pages and pages of exhibits appended to this Motion.

Much of the information contained in police and F.B.I. reports found its way into the press in the days following the attack. This information was in many cases incomplete, and at times either exaggerated or false. For example, the press reported that officials revealed that "Salman texted Mateen, 'Where are you? Are you okay?' Mateen texted back in reply 'Did you hear what happened?' Salman texted the response, 'No, what happened?' Mateen sent a final text stating, 'Love you babe.'" Numerous news outlets covered this exchange.[24] However, the government's production in discovery demonstrates that this exchange, leaked in the press, is incomplete and misleading. The complete exchange is as follows:

    4:27:11 – **Salman** – "Where are you?"

---

[21] *Id.*
[22] Pulse Orlando Nightclub Shooting, Orlando Sentinel, http://www.orlandosentinel.com/news/pulse-orlando-nightclub-shooting/.
[23] *Id.*
[24] *Reports: Omar Mateen texted his wife during the shooting rampage*, Palm Beach Post (June 16, 2016 7:21 p.m.); *"I love you, babe," terrorist reportedly texted to wife while committing worst mass shotting in U.S. history*, New York Times (June 17, 2016); Ayman Mohyeldin & Pete Williams & Phil Helsel, *Orlando Gunman Omar Mateen and Wife Exchanged Texts During Rampage*, NBC News (June 17, 2016 11:34 a.m.); Ruth Sherlock, *Omar Mateen's text message exhange with wife during Orlando attack revewaled: 'I love you babe'*, The Telegraph (June 17, 2016 11:11p.m.).

13

    4:27:33 – **Mateen** – "Everything ok?"

    4:27:58 – **Salman** – "Your mom I'd [sic] worried and so am i"

    4:28:25 – **Salman** – "You know you work tomorrow right?"

    4:28:28 – **Mateen** – "You heard what happened"

    4:28:34 – **Salman** – "????"

    4:28:52 – **Salman** – "What happened?!"

    4:29:22 – **Mateen** – "I love you babe"

    4:29:43 – **Salman** – "Habibi what happened?!"

    4:31:06 – **Salman** – "Your mom said that she said to come over and you never did."

The Orlando Sentinel also reported that Ms. Salman "told investigators that she drove him to the site of the massacre, Pulse nightclub, at least once before."[25] The veracity of the information is undermined by the government's own discovery production. The incomplete and at times false nature of the leaks resulted in media reports theorizing and questioning Ms. Salman's foreknowledge of the horrific shooting, thereby exposing the jury pool in Orlando to prejudice grounded in misleading media accounts.

    The one-sided and incomplete information from law enforcement immediately following the attack, where the emotions and interest of the Orlando community were at their peak, combined with the inflammatory and emotional language continuously utilized by the media as the investigation and criminal trial proceeded, showcases the prejudice. In the months following the attack, the news coverage has not sufficiently cooled down; rather, it

---

[25] Del Quentin Wilber & Rene Stutzman, *Federal grand jury investigating Orlando nightclub rampage*, Orlando Sentinel (June 15, 2016 7:04 p.m.).

remains constant, and there are no indications that the feelings of revulsion creating prejudice in the initial reporting have passed. *See Coleman*, 778 F.2d 1487. For example, the news coverage peaked again on the anniversary of the shooting this past June and resumes with any hearing in this case, no matter how mundane.

### C. The jury questionnaires, voir dire, and any prophylactic measures will be relevant to determining whether to grant this motion.

Ms. Salman submits her motion for a change of venue now in order to comply with this Court's Amended Scheduling Order, thereby preserving her objections. In so doing, counsel for Ms. Salman are mindful of this Court's jury questionnaire. Ms. Salman recognizes this Court's dedication to formulating the content of the jury questionnaires to attempt to safeguard from jury prejudice. Ultimately, the responses to the extensive jury questionnaire ordered by this Court will either confirm the existence of widespread community bias, or conclusive demonstrate that, despite the prejudicial news media and prejudicial official statements, an unbiased jury can be selected in the Orlando area. Accordingly, Ms. Salman respectfully submits that this Motion be taken up after the results of the jury questionnaires are reviewed, and that she be allowed leave to supplement or amend this Motion at that time. Withholding ruling on this Motion is appropriate in order to incorporate the content of the jury questionnaires in the Court's ruling, and to determine if traditional prophylactic measures during voir dire will overcome prejudice and ensure a fair trial.[26]

---

[26] *United States v. Campa*, 459 F.3d 1121, 1143 (11th Cir. 2006) ("Once the defendant puts forth evidence of the pervasive prejudice against him, the government can rebut any presumption of juror prejudice by demonstrating that the district court's careful and thorough voir dire, as well as its use of prophylactic measures to insulate the jury from outside influences, ensured that the defendant received a fair trial by an impartial jury.").

**Conclusion**

The Orlando Police Department and its Chief's official statements have prejudiced Ms. Salman, and she therefore moves for a change of venue to outside of Orlando. These statements go directly to Ms. Salman's presumed guilt, and use inflammatory language aimed at rousing the emotions of the Orlando community. In addition, the immediate news coverage following the shooting so prejudiced Ms. Salman in its incomplete and at times false, misleading, and exaggerated reports, that Ms. Salman cannot receive a fair trial in Orlando. Furthermore, the constant news coverage saturating the community will only increase as the trial date nears, so that the Court will be hard-pressed to find untainted jurors. Ms. Salman desires a fair trial from a fair tribunal, and as such, moves for a change of venue.

Respectfully submitted this 1st day of September, 2017.

By: /s/ *Charles Swift*
Charles D. Swift, Pro Hac
Texas Bar No. 24091964
*Pro Hac* Attorney for Noor Salman
833 E. Arapaho Rd., Suite 102
Richardson, Texas 75081
(972) 914-2507

Linda Moreno
Linda Moreno, P.A.
Florida Bar No. 0112283
Attorney for Noor Salman
511 Avenue of the Americas, No. 312
New York, New York 10011
(813) 247-4500

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the Motion for a Change in Venue was sent by CM/ECF delivery on September 1, 2017, to, all counsel or parties of record on the service list.

By: /s/ *Charles Swift*
Charles D. Swift, Pro Hac
Texas Bar No. 24091964
*Pro Hac* Attorney for Noor Salman