UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                                   CASE NO. 6:17-cr-18-Orl-40KRS

NOOR ZAHI SALMAN

**UNITED STATES' RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION FOR CHANGE OF VENUE**

The United States responds in opposition to the defendant's motion to change venue. Doc. 106. The defendant has not met her heavy burden to establish that negative pretrial publicity will cause her prejudice.

The Middle District of Florida, Orlando Division, is a large, diverse district that spans five counties. The defendant's claim that the parties cannot select 12 impartial jurors because of pretrial media is completely baseless. In addition, the defendant did not show that she has endured the pervasive and inflammatory publicity that would cause prejudice. She also failed to establish that negative news about her has saturated this district since the attack in June 2016. By the time of trial, a sufficient "cooling off" period will have occurred reducing the level of media attention, and any remaining pretrial publicity issues will be addressed during *voir dire*. The media attention here does not

rise to the extreme and rare circumstances where venue has been transferred, and the trial should remain in this district.

## I. PROCEDURAL HISTORY

On June 12, 2016, the defendant's husband Omar Mateen killed 49 people and injured more than 50 others at Pulse nightclub in Orlando, Florida on behalf of the Islamic State of Iraq and the Levant. On January 12, 2017, a grand jury in the Middle District of Florida, Orlando Division, indicted the defendant for aiding and abetting the attempted provision and provision of material support to a foreign terrorist organization and obstruction of justice, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2 and 18 U.S.C. § 1512(b)(3), respectively. Doc. 1. On January 17, 2017, the defendant was arrested in the Northern District of California and subsequently brought to the Middle District of Florida where trial is scheduled for March 1, 2018. Docs. 12, 36, 49.

On September 1, 2017, the defendant filed her motion to transfer venue outside of Orlando. Doc. 106. In the motion, the defendant claims that because of social media posts by a local law enforcement official and other negative pretrial publicity, she has been prejudiced, and this Court should change the trial venue. *Id.* at 4-15. The relevant Supreme Court and Eleventh Circuit case law, however, do not support her request.

## II. MEMORANDUM OF LAW

Federal Rule of Criminal Procedure 21 governs venue transfer, and instructs that a "court must transfer the proceeding . . . to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). "The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury." *Skilling v. United States*, 561 U.S. 358, 377 (2010). "By constitutional design, that trial occurs 'in the State . . . where the . . . Crimes . . . have been committed.'" *Id.* at 377-378. (quoting Art. III, § 2, cl. 3). A proceeding may be transferred "to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Id.* (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). A defendant is entitled to the transfer of venue if she can demonstrate either "actual prejudice" or "presumed prejudice." *Gaskin v. Sec'y, Dep't of Corr.*, 494 F.3d 997, 1004-05 (11th Cir. 2007).

The defendant here seeks to transfer venue based on inherent or presumed prejudice. Doc. 106 at 3. To determine if the defendant has established presumed prejudice, the court examines whether the pretrial publicity is sufficiently prejudicial and inflammatory, and whether the negative publicity has saturated the community in which the trial is to be held.

3

*See Price v. Allen*, 679 F.3d 1315, 1322 (11th Cir. 2012); *Gaskins*, 494 F.3d at 1004-1005; *Spivey v. Head*, 207 F.3d 1263, 1270-71 (11th Cir. 2000). As to the saturation prong, appellate courts review whether "a substantial number of the people in the relevant community could have been exposed to some of the prejudicial media coverage" and "the effects of the media saturation continued until the trial." *See Heath v. Jones*, 941 F.2d 1126, 1135 (11th Cir. 1991) (holding that because there was a "cooling off" period, the defendant failed to establish that failure to change venue was a constitutional violation). Prejudice, however, is not presumed simply because the community was aware of the defendant's alleged misconduct. *See United States v. De La Vega*, 913 F.2d 861, 865 (11th Cir. 1990).

The Eleventh Circuit described the rare and extreme circumstances where a defendant can establish the heavy burden of transferring venue because of pretrial publicity:

> The presumed prejudice principle is rarely applicable, and is reserved for an extreme situation. Where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community, jury prejudice is presumed and there is no further duty to establish bias.

*Gaskin*, 494 F.3d at 1004 (emphasis removed) (quoting *Meeks v. Moore*, 216 F.3d 951, 960-61(11th Cir. 2000)). "In short, the burden placed upon the petitioner

4

to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one." *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir. 1985).

The Supreme Court has rejected the proposition that "juror exposure to . . . news accounts of the crime alone presumptively deprives the defendant of due process." *Skilling*, 561 U.S. at 381 (quoting *Murphy v. Florida*, 421 U.S. 794, 798-799 (1975)). In *Skilling v. United States*, the Supreme Court provided a framework to determine whether pretrial publicity warrants transferring venue. 561 U.S. 358 (2010). There, the defendant was a longtime Enron executive who was charged with crimes related to the collapse of the Houston-based company. *Id.* at 367. Despite the negative pretrial publicity faced by the defendant, the Supreme Court found that no presumption arose and affirmed the decision to hold the trial in Houston. *Id.* at 385.

Given the high-profile nature of the trial, the Court explained that "[p]rominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." *Id.* at 381 (emphasis in original) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Reynolds v. United States*, 98 U.S. 145, 155-156 (1879)). "But 'pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial.'" *Id.* at 384 (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976)). The Court held that the

5

presumption of prejudice "attends only the extreme case" and set forth factors as guideposts in reaching its conclusion. *Id.* at 382-384; *see Price v. Allen*, 679 F.3d 1315, 1321-22 (11th Cir. 2012) (discussing the *Skilling* factors).

The Court began its analysis by reviewing the size and characteristics of the community where the crime occurred and found that with a large, diverse jury pool in Houston, "the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id.* at 382. Second, the news did not report about a "smoking gun," such as a confession, or "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* at 382-383. Third, the length of time that had passed since the crime until the date of trial weighed against transfer. *Id.* at 383. Fourth, the jury's verdict was important because the defendant was acquitted of some of the charges. *Id.* at 383-384. In addition, *voir dire* and an extensive screening questionnaire were used to inspect prospective jurors' connections to Enron. *Id.* at 384. The Court ultimately held that the case was properly tried in the same district where the crime occurred despite the extensive media coverage. *Id.*

### III. ARGUMENT

Much of the same analysis used in *Skilling* applies here, with the exception of an analysis of the jury's verdict, which obviously could only be

done by the appellate court. None of the Supreme Court's factors support transferring venue, and the defendant did not meet her heavy burden in showing a presumption of prejudice. In addition, by the time of trial, there will be a "cooling off" period of media attention, and *voir dire* will allow this court to address any negative publicity issues with potential jurors.

    1. *The Characteristics and Size of this District Weigh Against Transfer*

The defendant failed to address the first *Skilling* factor. Despite the negative publicity the defendant claims she received in Orlando, the large size and varying characteristics of the Middle District of Florida weighs against a finding of presumed prejudice. The jury pool will be selected not only from Orlando and the Orange County area but also from Seminole, Brevard, Volusia, and Osceola counties. In 2010, these counties had a population of: 1,145,956, 422,718, 543,376, 494,593, and 268,685, respectively.[1] In total, the Middle District of Florida, Orlando Division, has over 2.8 million people. Given the size of this district, there will be a large, diverse pool of qualified jurors with varied educational backgrounds, socioeconomic statuses, religious beliefs, and sources of where the potential jurors find their news and updates on current events.

---

[1] This data was obtained from Wikipedia, which referenced the 2010 United States Census Bureau for each county.

The defendant's hollow assertion that this Court cannot find fair and impartial jurors in the Middle District of Florida, given its characteristics and size, holds no merit. *See Skilling*, 561 U.S. at 382 (finding that because Houston had 4.5 million eligible jurors this factor weighed against transfer); *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (potential for prejudice was mitigated because "metropolitan Washington [D.C.] statistical area . . . has a population of over 3 million"); *United States v. Tsarnaev*, 157 F. Supp. 3d 57, 60 (D. Mass. Jan 15, 2016) (holding that the region from which jury was drawn had five million people who received their news from a variety of sources which weighed against a finding of presumed prejudice). As such, this factor weighs against transfer.

> 2. *The Nature and Extent of the Media Coverage Weighs Against Transfer*
>> a. *Failure to Show Prejudicial and Inflammatory News Coverage*

The defendant did not demonstrate the pervasive and inflammatory negative reporting about her that would warrant transferring the trial location. In addition, there is no sampling or analysis of local and national media's portrayal of the defendant since June 2016 that would demonstrate a saturation of negative pretrial publicity. Instead, her arguments primarily revolve around alleged prejudice caused by social media posts from one local law enforcement official in Orlando.

According to the motion, Chief Mina with the Orlando Police Department posted comments on social media about the defendant that were "shared" and "liked" by others as well as reported by other media outlets. Doc. 106 at 8.  The defendant claims that hundreds of people, in a community of millions, shared social media posts and thus infected the Middle District of Florida. *Id.* at 8-9.  Chief Mina's comments about the defendant and the status of the criminal proceedings do not rise to the "blatantly prejudicial information" that would cause prejudice to this entire district. *See Price v. Allen*, 679 F.3d 1315, 1322 (11th Cir. 2012) (applying *Skilling* and concluding that the news articles submitted to the court were not "published near to or during trial, and the articles he submitted did not contain anything equivalent to a confession or blatant prejudicial information that weighed in favor of a finding of prejudicial pre-trial publicity"); *United States v. Lehder-Rivas*, 955 F.2d 1510, 1524 (11th Cir. 1992) (pretrial publicity characterizing the defendant as a "drug kingpin" and "narco-terrorist" and references to his fascination with the Third Reich, although unfavorable, "did not reach the extreme levels required to trigger a finding of presumed prejudice").  His statements would need to be sufficiently prejudicial and inflammatory to support moving venue, such as broadcasting a defendant's recorded confession through the media, which did not happen here. *Compare Skilling*, 561 U.S. at

9

382 (acknowledging that new stories were "not kind" but that they were not a confession or other prejudicial information that a juror could not reasonably forget); *with Rideau v. Louisiana*, 373 U.S. 723 (1963) (televising videotaped confession by defendant over a local television station to audiences of 24,000, 52,000, and 29,000 in a community of 150,000); *Coleman*, 778 F.2d at 1491, 1538-1541 (reporting defendant's confession in widely circulated newspaper in small community contributed to finding of prejudice). Moreover, the allegations that the media made mistakes in its reporting, including a series of text messages and one statement by the defendant, are factual in nature and fall well below the level of pervasive and inflammatory coverage that would cause prejudice. *See United States v. Campa*, 459 F.3d 1121, 1144 (11th Cir. 2006) (explaining that "[p]rejudice against a defendant cannot be presumed from pretrial publicity regarding peripheral matters that do not relate directly to the defendant's guilt for the crime charged," and finding that "the few articles that did relate to the defendants and their alleged activities in particular were too factual and too old to be inflammatory or prejudicial"); *Spivey v. Head*, 207 F.3d 1263, 1270 (11th Cir. 2000) (finding that the defendant did not satisfy his burden in showing that pretrial publicity was prejudicial because most of the articles were "factual accounts of the criminal events and are neither sufficiently prejudicial nor inflammatory to make the

necessary showing," despite some articles containing "prejudicial elements"); *United States v. De La Vega*, 913 F.2d 861, 865 (11th Cir. 1990) (ruling that the 330 articles submitted by the defendants were "largely factual in nature and could not have created the sort of inflamed community atmosphere" sufficient to presume prejudice in the Miami-Dade community of 1.8 million people).

Furthermore, the comparison of *Shepherd v. Florida* and *Coleman v. Kemp* to the nature of the publicity the defendant has received is also misplaced. 341 U.S. 50 (1951); 778 F.2d 1487 (11th Cir. 1985). In *Shepherd*, a Caucasian girl claimed that she was raped at gunpoint by four African Americans in 1949. *Id.* at 50. The shocking racial prejudice in the community, including mobs who gathered at the jail to confront the defendants, and a confession that was reported in the press but not admitted into evidence at trial weighed in favor of the defendant's motion to transfer in that case. *Id.* at 51-55. Similar issues simply do not exist here.

The extreme nature of law enforcement officials' public statements in *Coleman* is also easily distinguishable from the instant case. In *Coleman*, the Eleventh Circuit reviewed the disturbing and outrageous comments made by law enforcement officials as well as other pretrial media. 778 F.2d at 1491-1537. There, the Sheriff of a small community continuously made hostile statements to the press, including that he wanted to put the defendants in an

"oven" and "precook them for several days," called them "lower than animals," and discussed how "lynching has crossed the mind of everybody." *Id.* at 1501, 1520. This type of pervasive news flooded a county that, at that time, had a population of only 7,059 people with 2,117 households. *Id.* at 1491. The inflammatory statements and publicity that caused prejudice in *Coleman* do not resemble the statements made by officials or contained in news reports in this case, nor could any statements by officials at issue here have reached the same proportion of the population as at issue in *Coleman*.

The media after the Boston Marathon bombing and that district court's application of *Skilling* is more aligned with the facts and issues presented here. In *United States v. Tsarnaev*, the defendant—charged with offenses arising out of the bombing at the Boston Marathon—argued that the negative publicity necessitated a different venue. 157 F. Supp. 3d 57 (D. Mass. Jan 15, 2016).[2] The defendant claimed that the inflammatory news reports, including local media, local events, and information posted on social media proved that the District of Massachusetts was an improper venue for trial. *Id.* at 59. Despite

---

[2] The defendant in *Tsarnaev* filed a series of motions to change venue, including petitions for writ of mandamus. *See United States v. Tsarnaev*, 2014 WL 4823882 (D. Mass. Sept 24, 2014) (denying first motion to change venue); *United States v. Tsarnaev*, 2015 WL 45879 (D. Mass. Jan. 2, 2015) (denying second motion to change venue); *In re Tsarnaev*, 775 F.3d 457 (1st Cir. 2015) (denying first petition for writ of mandamus); *United States v. Tsarnaev*, 2015 WL 505776 (D. Mass. Feb. 6, 2015) (denying third motion to change venue); *In re Tsarnaev*, 780 F.3d 14 (1st Cir. 2015) (per curiam) (denying second petition for writ of mandamus).

the incredible amount of pretrial publicity directed towards the defendant and victims, the district court rejected the attacks on venue and held that the case was properly tried in the city where the terrorist attack occurred. *Id*. at 71.

The defendant's main argument revolved around "the extent and nature of the publicity concerning the case itself and the events at issue in it." *Id.* at 60.  Applying the *Skilling* factors, the district court reviewed the large and diverse population in the Eastern District of Massachusetts that included "about five million people living not just in Boston, but also in smaller cities and towns, encompassing urban, suburban, rural, and coastal communities." *Id.*  This factor weighed against transfer. *Id.*

The district court also addressed the nature of the publicity. *Id.* Acknowledging the widespread media attention about the Boston Marathon bombing, it explained that "[t]his was not a crime that was unknown outside of Boston.  To the contrary, media coverage of the bombings when they occurred was broadcast live around the world over the Internet and on television." *Id.* at 60.  And similar to here, "there is no reason to think that if the trial had been moved to another district, the local media in that district would not also have given it attentive coverage." *Id.* at 61.  The court also examined some of the positive coverage about the defendant and found that the defendant's claims of social media saturation were "overblown." *Id.* at 62,

66-67. The nature of the press coverage did not prejudice the defendant, and the passage of time—approximately two years since the attack—also weighed against transfer. *Id.* at 63, 67 (citing *In re Tsarnaev*, 780 F.3d at 22). The court rejected the defendant's venue arguments and held that despite the negative wave of pretrial publicity, he "failed to demonstrate that [it was] one of the rare and extreme cases where prejudice must be presumed so as to override the constitutional norms requiring criminal trials to be held in the State where the crimes were committed." *Id.* at 71 (citations omitted).

Analogous to *Skilling* and *Tsarnaev*, the defendant may have received what she views as negative media attention, but the underwhelming negative publicity described in her motion does not trigger the rare and extreme situation establishing prejudice. Like the defendants in those cases, she did not demonstrate that the nature of the publicity has been inflammatory or pervasive. Further, the events at issue are well known nation-wide, and "there is no reason to think that if the trial had been moved to another district," that the case would not be well and similarly covered. 157 F. Supp. 3d at 61; *see also* Doc. 106 at 1 n.2 (referencing coverage on multiple national networks); id. at 12-13 & n.20 (referencing negative coverage in the New York Post and the Los Angeles Times). As such, the defendant has not met her burden, and this factor weighs against transfer.

### b. *Failure to Show Saturation of Negative Pretrial Publicity*

The defendant also failed to show a saturation of negative publicity about her in this district. The United States acknowledges the blitz of media in June 2016 about Omar Mateen and the Pulse nightclub attack, but that is distinguishable from negative publicity about the defendant. There is no analysis illustrating the number of news reports discussing the defendant, how many of those were negative versus positive, when they were reported, where that media was shown or published, and the number of alleged viewers. Indeed, there is minimal to no proof submitted by the defendant showing a saturation of negative media about her in this district. *See Gaskin v. Sec. Dep't of Corr.*, 494 F.3d 997, 1004 (11th Cir. 2007) (despite pointing to articles published in the local newspaper that were somewhat prejudicial or inflammatory, the defendant did not "present strong enough evidence that prejudicial and inflammatory pretrial publicity saturated the community").

The defendant also ignores the positive press she has received and incorrectly claims that press reports have been "one sided." Doc. 106 at 12. For example, the motion did not mention her interview with the New York Times. On November 1, 2016, the New York Times published an article about a lengthy interview with the defendant entitled, "Orlando Gunman's Wife Breaks Silence: 'I Was Unaware.'" In the article, she denied being

aware of her husband's plans, discussed being a mother, and claims she was abused. It is unreasonable to claim that Chief Mina's comments saturated this district when the number of his followers pales in comparison to the reach and exposure of the New York Times. The defendant's attorneys have also made statements to the media portraying her in a positive light and characterizing the government's case against the defendant as weak, but the motion fails to acknowledge this type of publicity.[3] These interviews with the press, months after the attack, undercut the defendant's complaints about the continued media coverage, given her own participation in coverage. Doc. 106 at 11.

Nonetheless, the significant length of time that has passed since the date of the crime and her arrest weighs against transferring venue. *See Skilling*, 561 U.S. at 383 (analyzing the amount of time that occurred between the collapse of Enron and the trial). By the time of trial, it will be approximately 20 months from the date of the crime and 13 months from the date of the defendant's arrest. Similar to *Skilling*, the decibel levels of media reporting in this case have calmed down since the attack, and the continuing "cooling off" will minimize any potential prejudice. *See Lehder-Rivas*, 955 F.2d at 1524 (determining that "[t]he substantial lapse of time between the peak publicity

---

[3] *See* https://www.youtube.com/watch?v=ReC98D4zbKs, AP Archive, *Orlando Shooter's Wife to go Free Before Trial*, March 1, 2017 (published March 6, 2017).

and the trial" weighed against a finding of prejudice where the majority of the news reports were between February 1987 and April 1987 followed by much fewer news articles from May 1987 to October 1987 when the trial took place); *Heath v. Jones*, 941 F.2d 1126, 1135 (11th Cir. 1991) (finding that "cooling off" period occurred where the crime was in August 1981 and there was minimal coverage from June 1982 until February 1983 when the trial began). The defendant did not establish a saturation of negative publicity, and this factor also weighs against transfer.

### 3. *The Voir Dire Process Will Address Negative Publicity Prior to Trial*

The Pulse nightclub attack was widely reported by the national news and cable networks, and the media attention would continue to follow the case if it were transferred. As discussed in *Skilling* and *Tsarnaev*, the defendant is not entitled to jurors who are unaware of her or the attack. Rather, she is entitled to a fair and impartial jury, which the juror questionnaires and *voir dire* process in the Middle District of Florida will ensure. *See Reynolds v. United States*, 98 U.S. 145, 155-156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."); *Skilling*, 561 U.S. at 384 (explaining

that impact on the community required a "careful identification and inspection of prospective jurors," and the juror questionnaire and *voir dire* were "well suited to that task"). Accordingly, the *Skilling* factors weigh in favor of trying this case in Orlando, and the defendant has not overcome her heavy burden.

## IV.   CONCLUSION

For all of the foregoing reasons, the United States asks that this Court to deny the defendant's motion to transfer venue.

                Respectfully submitted,

                W. STEPHEN MULDROW
                Acting United States Attorney

By:

| *s/ James D. Mandolfo* | *s/ Sara C. Sweeney* |
|---|---|
| James D. Mandolfo | Sara C. Sweeney |
| Assistant United States Attorney | Assistant United States Attorney |
| Florida Bar No. 96044 | USA No. 119 |
| 400 N. Tampa Street, Suite 3200 | 400 W. Washington Street, Ste 3100 |
| Tampa, Florida 33602 | Orlando, Florida 32801 |
| Telephone: (813) 274-6000 | Telephone: (407) 648-7500 |
| Facsimile:  (813) 274-6358 | Facsimile:  (407) 648-7643 |
| E-mail:  James.Mandolfo@usdoj.gov | E-mail:    Sara.Sweeney@usdoj.gov |

U.S. v. NOOR ZAHI SALMAN             Case No. 6:17-cr-18-Orl-40KRS

### CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

    Charles D. Swift, Esquire (counsel for Defendant)
    Fritz J. Scheller, Esquire (counsel for Defendant)
    Linda Moreno, Esquire (counsel for Defendant)

    *s/ Sara C. Sweeney*
    Sara C. Sweeney
    Assistant United States Attorney
    USA No. 119
    400 W. Washington Street, Suite 3100
    Orlando, Florida 32801
    Telephone: (407) 648-7500
    Facsimile: (407) 648-7643
    E-mail: Sara.Sweeney@usdoj.gov

    *s/ James D. Mandolfo*
    James D. Mandolfo
    Assistant United States Attorney
    Florida Bar No. 96044
    400 N. Tampa Street, Suite 3200
    Tampa, Florida 33602
    Telephone: (813) 274-6000
    Facsimile: (813) 274-6358
    E-mail: James.Mandolfo@usdoj.gov