FILED

2017 OCT 16 PM 3: 38

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

NOOR ZAHI SALMAN,

        Defendant.

CASE NO. 6:17-cr-00018-ORL-40KRS
**UNDER SEAL**

### DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION TO EXCLUDE TWO DEFENSE WITNESSES (DOC. 120)

Noor Zahi Salman, by and through her undersigned counsel, hereby files her Response to the Government's Sealed Motion to Exclude Two Defense Witnesses. *See* Doc. 120. In support thereof., Ms. Salman states the following:

**I.    Background**

The Government seeks to exclude two of Salman's expert witnesses, Dr. Jacquelyn Campbell and Dr. Bruce Frumkin.

    **A.    Dr. Jacquelyn Campbell**

Dr. Campbell will offer her expert opinion that Noor Salman was a severely abused woman who realistically feared for her life from Omar Mateen. Dr. Campbell Report, attached as Ex. 1. This testimony is relevant to show why Salman did not discover Mateen's plans despite Mateen's behavior and to explain why Salman might have initially withheld negative information about Mateen when first questioned by law enforcement. Dr. Camp-

1

bell's opinion is based on the following: 1) her interview with Salman; 2) her review of relevant evidence in the case; 3)Salman's diagnosis with PTSD; 4) Salman's score on Dr. Campbell's Danger Assessment tool; and 5) Dr. Campbell's "own research including interviewing more than 2000 abused women." *Id.* Dr. Campbell has "conducted research in domestic violence and physical and mental health outcomes (PTSD and depression) including risk of homicide from domestic violence for more than 25 years with 245 publications in refereed journals and 7 books and [is] an elected member of the National Academy of Medicine, National Academy of Science." *Id.*. She has "been certified as an expert in domestic violence in 11 different courts in the US." *Id.*

### B.  Dr. Bruce Frumkin

Dr. Bruce Frumkin will offer his expert opinion that, because of her mental condition and psychological characteristics, Noor Salman is more vulnerable than the general population to falsely confessing in the face of the interrogation tactics used by the FBI. Dr. Frumkin's Report, attached as Ex. 2. This testimony is relevant to the key issues of whether Salman's statements to the FBI were reliable or voluntary. In reaching his conclusions, Dr. Frumkin relied on his interview of Salman; a bevy of psychological tests; the Gudjonsson Suggestibility Scale 1 (GSS); and his review of some of the evidence in this case, including Salman's alleged statements to the FBI and the FBI's interrogation of Neamul Huq. *Id.* He has over 30 years' experience in forensic psychology, has "conducted more than 700 disputed confession-related evaluations," and has "testified more than 100 times in such cases describing the defendant's vulnerabilities both in terms of Miranda capacity and false confessions compared to others." *Id.*; *see also* Dr. Frumkin's CV, attached as Ex. 3.

## II. Legal Authority

Under Rule 702, district courts perform a "gatekeeping" role concerning the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). Under *Daubert*, courts in the Eleventh Circuit consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted).

Under the qualifications prong, "experts may be qualified in various ways," including by scientific training, education, and experience. *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004).

The reliability prong concerns "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. The district court may consider "(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 593-94). None of these factors is conclusive, and the "list is not exhaustive." *Seamon v. Remington Arms Co., LLC (In re Estate of Seamon)*, 813

F.3d 983, 988 (11th Cir. 2016). In determining reliability, the court must focus "solely on principles and methodology, not on the conclusions" generated. *Daubert*, 509 U.S. at 595.

"Finally, the third prong—helpfulness, or fit —'goes primarily to relevance.'" *Seamon*, 813 F.3d at 988 (quoting *Daubert*, 509 U.S. at 591). "The 'basic standard of relevance . . . is a liberal one,' but if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry' it should be excluded because there is no 'fit.'" *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) (quoting *Daubert*, 509 U.S. at 587, 591-92)).

### III. Argument

#### A. Dr. Campbell

The Government asserts that Dr. Campbell is not qualified to offer an opinion "that a woman actually was abused." Doc. 120 at 7. The Government does not cite any case law or research in support of this assertion. The Government instead bases its claim on the fact that Dr. Campbell's Danger Assessment tool is validated only to predict future violence. *Id.*

At the outset, even apart from the Danger Assessment, Dr. Campbell is qualified to offer an opinion about whether Salman was a victim of domestic violence. As her curriculum vitae shows, Dr. Campbell has extensive experience recognizing the signs of abuse, including clinical experience. Dr. Campbell's CV, attached as Ex. 4. Dr. Campbell has conducted her "own research including interviewing more than 2000 abused women and the family members of women who had been killed by their partners." Ex. 1. She has studied "domestic violence and physical and mental health outcomes (PTSD and depression) . . . for more than 25 years with 245 publications in refereed journals and 7 books." *Id.* And she has "been certified

as an expert in domestic violence in 11 different courts in the US." *Id.* To assert, as the Government does, that Dr. Campbell is not "qualified" to offer an opinion on whether "a woman actually was abused" is not plausible on its face. *United States v. Lavictor*, 848 F.3d 428, 443 (6th Cir. 2017) ("Courts have consistently allowed expert witnesses to testify concerning domestic violence even in circumstances where the research is not supported by exhaustive statistical evidence."); *United States v. Alzanki*, 54 F.3d 994, 1006 (1st Cir. 1995) (allowing an expert to testify, "[b]ased on her general research and her personal interaction with hundreds of victims of sexual abuse," that an abuse victim's "behavioral response to the nonsexual abuse administered by the [defendants] was *consistent with the behavior of abuse victims generally*") (emphasis in original).

The Government also contends that Dr. Campbell is not "qualified" to testify that Salman was abused based on the Danger Assessment tool. Doc. 120 at 7-8. Relatedly, the Government argues that Dr. Campbell's methodology is not reliable to demonstrate that Ms. Salman was abused in the past. *Id.* at 8. Both contentions are based on the fact that the Danger Assessment tool is validated to predict future domestic violence.[1] The Government's argument, however, misconstrues how the Danger Assessment works. The Danger Assessment takes a snapshot and shows whether a domestic violence victim is at risk of homicide. The Defense argues that Salman did not discover Mateen's plans, in part because she was afraid of violence if she questioned him. Dr. Campbell will testify as to whether Salman's fear was objectively reasonable. Ex. 1. Moreover, Dr. Campbell's testimony is based not just on the Danger Assessment but also on her experience interviewing thousands of domestic violence

---

[1] The Government concedes that the Danger Assessment tool is validated to predict future violence.

5

victims and writing books and articles on the subject, combined with her reviewing evidence in this case and speaking with Salman. Ex. 1; *see Lavictor*, 848 F.3d at 443; *Alzanki*, 54 F.3d at 1006. Under Rule 702 and *Daubert*, an expert can be qualified based on experience and training. *See Frazier*, 387 F.3d 1244, 1260-61.

Dr. Campbell's opinion is not unreliable merely because she relied in part on Dr. Chamberlain's diagnosis of PTSD. In the Eleventh Circuit, "[t]he facts and data upon which an expert may rely in reaching an expert opinion includes the opinions and findings of other experts, if experts in their respective field would reasonably rely on other expert's opinions and findings." *Christiansen v. Wright Med. Tech., Inc. (In re Wright Med. Tech., Inc.)*, 127 F. Supp. 3d 1306, 1320 (N.D. Ga. 2015) (citing *United States v. Winston*, 372 F. App'x 17, 20 (11th Cir. 2010)); *see also Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts, such expert must make some findings and not merely regurgitate another expert's opinion.") (internal citations and quotations omitted).

The Government objects to Dr. Campbell's use of Salman's PTSD diagnosis by citing *In re Conagra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014) for the proposition that an expert may not rely solely on the opinion of another expert in reaching his opinion. Doc. 120 at 8. This reliance is misplaced, though, because the *Conagra* court held only that an expert may not regurgitate or parrot another expert's opinion as his own opinion. *Conagra*, 302 F.R.D. at 556. The *Conagra* court excluded an expert opinion that consisted "merely of repeating figures generated by studies conducted by other experts." *Id.*

Here, Dr. Campbell relied partially on Dr. Chamberlain's diagnosis of PTSD, but she

conducted her own analysis to conclude Salman was abused and at risk of future violence. Ex. 1. Experts in Dr. Campbell's field reasonably rely on medical diagnoses in determining whether someone is a victim of domestic violence. To the extent the Government contends that Dr. Campbell is not qualified to offer an opinion about the relationship between PTSD and abuse, the Government's argument is simply incorrect, because Dr. Campbell has conducted extensive research into the connection between "domestic violence and physical and mental health outcomes[, including] PTSD and depression." Ex. 1.

The Government argues that Dr. Campbell's testimony would not be helpful to the jury because, according to the Government, whether Mateen abused Salman is not at issue. The Government assumes that Salman's fear of future violence could be relevant only to a coercion defense. Doc. 120 at 9. To be clear, though, Salman does not intend to make a coercion defense. The Defense maintains that Salman did not know about Mateen's plans and, in any case, did not do anything with the intent to assist him.

Salman's abuse is relevant not to show that Salman was coerced, but rather to help explain why she did not discover Mateen's plan. One of the major issues in this case is whether Salman was aware of Mateen's intent to provide material support to ISIS. The Government proposes to show this in part by presenting evidence that she knew he was watching violent videos, including ISIS recruitment videos; had purchased a rifle; and had made other odd purchases. Salman was afraid about asking Mateen too much about these behaviors because of his violence toward her. Also, because of her abuse, Salman was less likely to be privy to Mateen's plan. It is common sense that abusers do not share their most intimate schemes with their victims. Finally, Dr. Campbell's testimony is relevant to the obstruction

charge, because it could be used to explain why Salman might instinctively withhold negative information about Mateen or defend him. Especially given the low bar set by Rule 402, Dr. Campbell's testimony is relevant. *See Lavictor*, 848 F.3d at 442 (noting that "[t]he relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'") (quoting *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196-97 (9th Cir. 2014)); *see also Horowitch v. Diamond Aircraft Indus., Inc.*, 2009 U.S. Dist. LEXIS 108916, at *11-12 (M.D. Fla. Nov. 8, 2009) ("The standard for relevance under the Federal Rules of Evidence sets a very low bar.").

The Government also argues that Dr. Campbell's testimony is unhelpful because Dr. Campbell relies, in part, on Salman's answers to the questions on the Danger Assessment tool. But Dr. Campbell's testimony is not unhelpful merely because she partially relied on information Salman provided. Doc. 120 at 9-10. On the contrary, "*Daubert* and Rule 702 precisely allow for this type of expert testimony to be admitted." *Costanza v. Vulcan Ladder Co.*, 2017 U.S. Dist. LEXIS 26624, at *5 (N.D. Ind. Feb. 27, 2017). The Advisory Committee Note to Rule 702 provides:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the [Rule] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

FED. R. EVID. 702, advisory committee's note (2000 amends.); *see also United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988) ("[W]here the expert's testimony has a reasonable factual basis, a court should not exclude it. Rather, it is for opposing counsel to inquire into the expert's factual basis.").

charge, because it could be used to explain why Salman might instinctively withhold negative information about Mateen or defend him. Especially given the low bar set by Rule 402, Dr. Campbell's testimony is relevant. *See Lavictor*, 848 F.3d at 442 (noting that "[t]he relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'") (quoting *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196-97 (9th Cir. 2014)); *see also Horowitch v. Diamond Aircraft Indus., Inc.*, 2009 U.S. Dist. LEXIS 108916, at *11-12 (M.D. Fla. Nov. 8, 2009) ("The standard for relevance under the Federal Rules of Evidence sets a very low bar.").

The Government also argues that Dr. Campbell's testimony is unhelpful because Dr. Campbell relies, in part, on Salman's answers to the questions on the Danger Assessment tool. But Dr. Campbell's testimony is not unhelpful merely because she partially relied on information Salman provided. Doc. 120 at 9-10. On the contrary, "*Daubert* and Rule 702 precisely allow for this type of expert testimony to be admitted." *Costanza v. Vulcan Ladder Co.*, 2017 U.S. Dist. LEXIS 26624, at *5 (N.D. Ind. Feb. 27, 2017). The Advisory Committee Note to Rule 702 provides:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the [Rule] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

FED. R. EVID. 702, advisory committee's note (2000 amends.); *see also United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988) ("[W]here the expert's testimony has a reasonable factual basis, a court should not exclude it. Rather, it is for opposing counsel to inquire into the expert's factual basis.").

The Government's reliance on *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996) and *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998) is misplaced, because those cases held at most that an expert may not testify directly about a witness's credibility. Doc. 120 at 10. In *Beasley*, the court held that it was not an abuse of discretion to exclude expert testimony that a witness "was a psychopath who had no conception of the truth." *Beasley*, 72 F.3d at 1528. In *Snowden*, similarly, the court held that admitting expert testimony that 99.5% of children tell the truth about sexual abuse was improper and made the trial fundamentally unfair for the defendant. *Snowden*, 135 F.3d at 737. The *Snowden* court did not address any other testimony. Although she relied on Salman's answers on the Danger Assessment tool, Dr. Campbell will not testify directly about Salman's credibility.

Dr. Campbell's testimony is in accordance with the expert testimony approved in *Costanza*. In *Costanza*, a civil defendant sought to exclude the plaintiff's expert testimony "by arguing [the expert] incorrectly relied on the testimony of the [p]laintiff's two sons and the testimony of the [p]laintiff who . . . has at times a limited memory of every moment of the accident." *Costanza*, 2017 U.S. Dist. LEXIS 26624, at *5. The court rejected this argument, because it was "entirely appropriate for [the expert] to rely on the [p]laintiff's version of events, along with accompanying testimony and materials in forming his expert testimony." *Id.* at *6. The *Costanza* defendant wanted the court to "jump the gun, and make a credibility determination at the *Daubert*/Rule 702 admissibility stage, before making a reliability determination." *Id.* It is the jury's job to determine whether the version of the events an expert relies on is credible.

Here, too, Dr. Campbell does not seek to testify that Salman told the truth. She only

proposes to testify that "Noor Salman is a severely abused women who was in realistic fear for her life from her abusive husband Mateen." Ex. 1. Salman's behavior is "entirely consistent" with an abuse victim's behavior, and Mateen's behavior is "entirely consistent" with an abuser's behavior. *Id.* She will also testify that Salman's answers on the Danger Assessment and her behaviors during their interview indicate that Salman's life was at risk from Mateen's abuse. *Id.* It is the jury's job to determine which "version of the facts" is most credible. FED. R. EVID. 702, advisory committee's note (2000 amends.). The Government—not Salman— wants this Court to make a credibility judgment.

Therefore, Dr. Campbell is qualified to testify that Salman was abused and in fear of her life from Mateen, and her expert testimony is reliable and likely to assist the jury.

### B. Dr. Frumkin

The Government concedes that Dr. Frumkin is qualified to offer his opinion as a forensic psychologist. Doc. 120 at 10 n. 5. The Government also acknowledges "that Dr. Frumkin's use of the [Gudjonsson Suggestibility Scale 1 (GSS)] 'appear[s] to have been conducted in accordance with' standard practice and that Salman's score on the GSS 'suggest[s] an increase [sic] risk of susceptibility relative to others.'" *Id.* at 12 n. 7.

The Government nevertheless disputes the reliability and helpfulness of Dr. Frumkin's testimony by maintaining that he does not identify a specific disorder and that his analysis is merely based on Salman's personality traits, which it claims are within the jury's ken.[2] Doc. 120 at 11.

---

[2] The Government takes issue with Dr. Frumkin's statement that Salman has a documented history of abuse. But again, an expert is entitled to believe his client's version of the facts. FED. R. EVID. 702, advisory committee's note (2000 amends.).

The Government's suggestion that an expert may not testify about psychological personality traits is not supported by law. In *United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985), the Eleventh Circuit reversed a conviction because a district court excluded expert testimony that a defendant's "handwritten confession was . . . characteristic of her highly suggestible personality." In *Roark*, a defendant who made incriminating statements sought to introduce testimony from a psychologist that she "was extremely susceptible to suggestions and that someone with her level of suggestibility could be 'suggested' into making up untrue stories." *Id.* The district court excluded the testimony because it did not believe that the psychologist's testimony would or could "assist the jury in deciding the issue of who to believe." *Id.* The Eleventh Circuit disagreed. Citing Rule 702, it reasoned that the expert's

> testimony was to be directed toward a fact at issue: whether [defendant] voluntarily inculpated herself in the robbery. As a medical doctor specializing in psychiatry, [the expert] was presumably qualified to assist the jury in reaching a factual conclusion. His testimony was designed to help the trier of fact determine whether it was more or less probable that [defendant] was somehow psychologically coerced into making the inculpatory statements. His testimony was thus certainly relevant to the issue of what weight the jury should give [defendant]'s incriminating statements.

*Id.* The Court concluded that excluding this testimony was harmful error and remanded for a new trial. *Id.*[3]

The psychological testimony at issue here and in *Roark* is completely different from

---

[3] The Government tries to distinguish *Roark* by noting that the expert testified the defendant suffered from "a condition known as 'compulsive compliance'" and may have been "in a state of hypnosis." Doc. 120 at 14; *Roark*, 753 F.2d at 994.. There is no indication, however, that the *Roark* court considered these particular conditions—which the court characterized as "a highly suggestible personality"—crucial to its conclusion. Regardless, Dr. Frumkin will testify that Salman, because of a psychological condition, was highly suggestible compared with others. Ex. 2.

the testimony rejected in *United States v. Adams*, 271 F.3d 1236, 1246 (10th Cir. 2001), in which the expert did little more than "vouch for the credibility of another witness." In *Adams*, the court rejected expert testimony that a defendant had lied to protect his girlfriend, because the "defendant's recantation that he lied in order to protect his girlfriend is precisely the type of explanation that a jury is capable of resolving without expert testimony." *Id.* In other words, the defendant had a common-sense motive for lying, rather than a psychological condition that made him more vulnerable to falsely confession compared with others, or a mental disorder. *See United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996) ("It was precisely because juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions that the testimony would have assisted the jury in making its decision.").

Other courts have also permitted expert testimony about personality characteristics contributing to false confessions. *See United States v. Raposo*, 1998 U.S. Dist. LEXIS 19551, at *14 (S.D.N.Y. Dec. 14, 1998); *see also State v. Stringham*, 2003-Ohio-1100, 2003 Ohio App. LEXIS 1055, *39-50 (Ct. App.) (allowing an expert "to testify about the psychological traits, diagnoses, or characteristics observed in people who voluntarily, yet falsely, implicate themselves in crimes."). In *Raposo*, the defense sought "to offer expert testimony on the psychological characteristics of [d]efendant that may render him more prone to making a false confession than the general population." *Id.* The government conceded that the expert was qualified but contended that "no evidence was offered to show that the results from these tests can be correlated to the likelihood of making a false confession." *Id.* at *14-*15. It also argued that the tests were not relevant to the voluntariness issue. *Id.* at *15. The court disa-

greed:

> As an expert in clinical psychology, Dr. Drob is qualified to interpret the significance of a psychological characteristic to a person's behavior in a given situation. The definition of clinical psychology is "the application of the findings and principles of general psychology to the problems, difficulties, and mental illnesses of actual people." Dr. Drob testified in considerable detail on the application of the test results in this manner, and on the relevance of the trait measured by the particular test, to the questions before the Court such as the Defendant's psychological state during a custodial interrogation. Moreover, Dr. Drob's expert testimony, based on the hearing, appears as if it would be helpful to the jury in understanding that *an individual with a certain psychological profile could be more susceptible than other members of the general population to making a false confession.*

*Id.* (internal citations removed) (emphasis added). Here, the Government cites no authority for its blanket assertion that personality characteristics that may lead to a false confession are within the ken of the jury. *C.f. Hall*, 93 F.3d at 1345. Mandatory authority contradicts its assertion. *Roark*, 753 F.2d at 994.

The Government also critiques Dr. Frumkin's use of the GSS. But recently, courts have accepted using the GSS to show that individuals are more prone to falsely confessing than the general population. *Harris v. City of Chi.*, 2017 U.S. Dist. LEXIS 85548, at *41 (N.D. Ill. June 5, 2017); *see also State v. Romero*, 81 P.3d 714, 719 (Or. 2003) (rejecting exclusion of the GSS "on the basis of a lack of scientific reliability" after applying a more restrictive standard derived from *Frye*). In *Harris*, Dr. Richard Leo sought to testify about a civil rights plaintiff's score on the GSS. *Harris*, 2017 U.S. Dist. LEXIS 85548, at *40. The plaintiff alleged that a jury convicted of her of murdering her son based on a false confession secured by the defendants. *Id.* at *2. Based on the plaintiff's GSS results, Dr. Leo testified:

13

"As a result of the personality traits identified by Dr. Frumkin, [plaintiff] was at that time highly vulnerable to making and/or agreeing to a false and/or unreliable confession in order to please her interrogators, especially the longer and/or more intense the interrogation(s) last." *Id.* at *41. The court concluded that, "[b]ased on his background in psychology and familiarity with the Gudjonsson Suggestibility Scales test and how it is scored, Dr. Leo's reliance on Dr. Frumkin's calculation of [p]laintiff's tests scores complies with Rule 702, which allows experts to rely on sufficient facts or data." *Id.* at *41-*42. Recent peer-reviewed research removes any doubt about the reliability of the GSS to demonstrate increased susceptibility to making a false confession. *See generally* A United States Sample for the Gudjonsson Suggestibility Scales, attached as Ex. 5.

The Government does not seriously dispute the reliability of the GSS but cites *United States v. Norrie*, 2013 U.S. Dist. LEXIS 42051, at *36 (D. Vt. Mar. 26, 2013) for the proposition that "results on the GSS are less important than the actual events of the law enforcement interview." Doc. 120 at 12. The Government's reliance on *Norrie* is misplaced, though, because, in *Norrie*, the factual basis of the expert's testimony was contradicted by a video of the interrogation. The *Norrie* court excluded the expert's testimony because the expert's "characterization of [d]efendant's behavior and intellectual deficits in the face of law enforcement questioning [was] demonstrably inconsistent with the interviews themselves." *Norrie*, 2013 U.S. Dist. LEXIS 42051, at *35. Here, there was no video, because the FBI, in violation of its own policy, failed to record Salman's interrogation. Thus, Dr. Frumkin was entitled to rely on his client's recollection of the interrogation and his own knowledge of the tactics generally used, informed by his review of the evidence in this case, including the in-

terrogation of Huq and Salman's own statements. *Sanders v. City of Chi. Heights*, 2016 U.S. Dist. LEXIS 57704, at *18 (N.D. Ill. May 2, 2016) ("[A]lthough an expert cannot rely on facts that are clearly contradicted by undisputed evidence, an expert may rely on his client's version of the facts when forming his opinions.").

Contrary to the Government's implication, nothing in *United States v. Jacques*, 784 F. Supp. 2d. 59, 65-66 (D. Mass. 2011) stands for the blanket proposition that interrogation techniques cannot contribute to a false confession. Doc. 120 at 13. In *Jacques*, the defendant proffered testimony from a political science professor that certain interrogation techniques "increased the likelihood of a false confession." *Jacques*, 784 F. Supp. 2d. at 64. The *Jacques* "[d]efendant suffered from no psychological or other disability, and, if he had, [the professor] would have been unqualified to opine about it." *Id.* To show that interrogation techniques could lead to false confessions, the professor primarily cited to law review articles. *Id.* The court found that his testimony "lacked any objective basis for support whatever." *Id.* Here, in stark contrast, the Government acknowledges that Dr. Frumkin is an expert on forensic psychology. His opinion about the techniques the FBI used is informed by his review of the evidence in the case, including Salman's statement and his interview with Salman, as well as his experience conducting "more than 700 disputed confession-related evaluations." Ex. 2.

The Government's more general critique that Dr. Frumkin's report did not contain enough information about the actual interrogation tactics used by the FBI is misplaced for similar reasons. Doc. 120 at 13. Dr. Frumkin did, in fact, consider the interrogation tactics used by the FBI in reaching his opinion. As part of his preparation, he interviewed Salman, reviewed evidence in this case, and watched the FBI's interrogation of Neamul Huq to see

how the FBI treated other persons of interest in the investigation. Ex. 2. The Government might disagree about what happened during the interrogation, but "experts sometimes reach different conclusions based on competing versions of the facts." FED. R. EVID. 702, advisory committee's note (2000 amends.).

The Government takes issue with the fact that Dr. Frumkin reached different conclusions than its own expert. Doc. 120 at 12-13. This may be because, unlike the Government's expert, Dr. Frumkin actually spoke with Salman and performed the tests himself. Regardless, an expert's opinion is not excludable merely because it is different from another expert's opinion. *McIntosh v. Monsanto Co.*, 462 F. Supp. 2d 1025, 1032 (E.D. Mo. 2006) ("Here, [defendant] . . . claims that [plaintiff's expert's] testimony is unreliable because he does not reach the same conclusions as [defendant's] experts . . . . This argument goes to the weight, not the admissibility, of [the expert's] testimony, which [defendant] may properly challenge on cross-examination. I cannot, however, exclude [the expert's] testimony merely because [defendant] and its experts disagree with his conclusions."). Dr. Frumkin did consider the data the Government referenced, but he reached a different overall conclusion. *See* Ex. 2; Dr. Frumkin's Supplemental Report, attached as Ex. 6. After all, Dr. Frumkin conducted the very tests that the Government complains he failed to consider.

Finally, the Government asserts that "the mere contention that 'people often confess to crimes which they did not commit' is not enough to warrant admission when an expert cannot tie that fact to whether a defendant could have falsely confessed in a particular case."[4]

---

[4] The Government cites *Stano v. Dugger*, 883 F.2d 900, 909 (11th Cir. 1989) for this proposition. *Stano*, however, was vacated on *en banc* review and is no longer good law. Stano, 883 F.2d at 923 ("The previous panel's opinion is hereby VACATED").

Doc. 120 at 13. This is a strawman argument. Dr. Frumkin will testify—based on the GSS, a comprehensive psychological analysis, and his interview with Salman—that Salman had a psychological condition that made her more vulnerable to falsely confessing relative to others, especially when confronted with the interrogation techniques the FBI used in this case. Ex. 2. Thus, the Government's attempt to exclude Dr. Frumkin's testimony under "*Daubert*'s helpfulness requirement is based on a faulty and restrictive premise." *Harris v. City of Chi.*, 2017 U.S. Dist. LEXIS 85548, at *49 (N.D. Ill. June 5, 2017). Courts have, in fact, allowed expert testimony about false confessions when it would "let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fits the facts of the case being tried." *Hall*, 93 F.3d at 1345; *see also Raposo*, 1998 U.S. Dist. LEXIS 19551, at *14 (holding that an expert psychologist's testimony "would be helpful to the jury in understanding that an individual with a certain psychological profile could be more susceptible than other members of the general population to making a false confession"); *United States v. West*, 813 F.3d 619, 624 (7th Cir. 2015) ("Evidence bearing on the trustworthiness of a confession is generally relevant and admissible absent some specific reason to exclude it, such as unfair prejudice or juror confusion.").

The Government's reliance on *United States v. Benally*, 541 F.3d 990, 995 (10th Cir. 2008) fails, because the Government ignores the *Benally* court's primary reasoning. Doc. 120 at 14. In *Benally*, the proposed expert did not discuss the circumstances surrounding the defendant's purported confession. *Benally*, 541 F.3d at 995. She did not highlight the defendant's personal characteristics or even interview him. *Id.* In excluding the expert's testimony, the court reasoned that the expert "would only have testified generally about the conditions

known to cause false confessions, which would have included a discussion about the effects of conditions not at issue here, such as torture, in order to establish 'the counterintuitive notion that false confessions do in fact occur.'" *Id.* (internal citations removed). The *Benally* court concluded that the trial court did not err in holding that the limited relevance of that this testimony was substantially outweighed by its prejudicial effect. *Id.*

Here, Dr. Frumkin engaged with the facts of this case and offered his opinion—based on Salman's psychological characteristics—that Salman was more vulnerable to false confession as compared with the general population, especially in light of the FBI's interrogation techniques. Ex. 2; *see Roark*, 753 F.2d at 994. He will not testify about Salman's credibility. Unlike the expert in *Benally*, Dr. Frumkin considered the specific FBI tactics used in this case, as recounted by Salman and exhibited in the FBI's interrogation of Huq. Ex. 2. Moreover, crucial aspects of Salman's statements are not consistent with the objective evidence. For instance, it appears based on location data that neither Mateen nor Salman went to the Pulse Nightclub before Mateen went there alone on the evening of June 11, 2012. *C.f. Benally*, 541 F.3d 990, 995 (faulting the expert for not considering the "circumstances surrounding [the defendant's] confession"). Unlike the expert in *Adams*, Dr. Frumkin will not testify merely that Salman had a common-sense motive for making false inculpatory statements. Instead, he will testify that Salman's psychological characteristics are consistent with someone more prone to falsely confessing than the general population. Ex. 2; *see United States v. Shay*, 57 F.3d 126, 133 (1st Cir. 1995) (noting that a jury "plainly was unqualified to determine without assistance the particular issue of whether [defendant] may have made false statements against his own interests because he suffered from a mental disorder.") (emphasis

in original).[5] Thus, this case is far more similar to *Hall*, *Shay*, and *Roark*, in which psychologists who interviewed the defendants testified that they were more likely to falsely confess as compared to the general population based on their psychological characteristics and the facts of the case.

Therefore, Dr. Frumkin is qualified to testify that Salman had the psychological characteristics of someone more likely to false confess than the general population. His testimony is reliable and likely to assist the jury. This Court should not exclude it.
/s/ *Charles D. Swift*
Charles D. Swift, Pro Hac Attorney for Noor Salman
Constitutional Law Center for Muslims in America
833 E. Arapaho Rd., Suite 102
Richardson, TX 75074
cswift@clcma.org
(972) 914-2507

/s/ *Linda Moreno*
Linda Moreno, Esq.
Linda Moreno P.A.
P.O. Box 10985
Tampa, Florida 33679
Phone: (813) 247-4500
Fax: (855) 725-7454
lindamoreno.esquire@gmail.com

---

[5] The Government tries to distinguish *Shay* by stating that the expert in *Shay* identified a specific mental disorder. Doc. 120 at 14. But the expert in *Shay* simply testified that the defendant "suffered from a mental disorder that caused him to make grandiose statements similar in nature to the statements that the government was seeking to use against him." *Id.* at 133. Although the expert named the disorder, that fact was not crucial to the court's reasoning. Here, Dr. Frumkin testified that Salman had a mental disorder that made her more susceptible to suggestions by law enforcement. *See Roark*, 753 F.2d at 994.

19

## CERTIFICATE OF SERVICE

On October 16, 2017, I filed the forgoing with the clerk of the court via hand delivery and provided a copy of same to counsel for the government.

*(s) Fritz J. Scheller*
FRITZ J. SCHELLER
Florida Bar Number 183113
Fritz Scheller, P.L.
200 East Robinson St., Suite 1150
Orlando, Florida 32801
Telephone: 407-792-1285
Facsimile: 407-513-4146
Email: fscheller@flusalaw.com
