# EXHIBIT 2



# FORENSIC AND CLINICAL PSYCHOLOGY ASSOCIATES, P.A.

7241 S.W. 63rd AVE., SUITE 203A
SOUTH MIAMI, FL 33143
TELEPHONE (305) 666-0068
FAX (305) 666-8283
BFrumkin@aol.com

July 17, 2017

Ms. Catherine McDonald, Managing Attorney
Constitutional Law Center for Muslims in America
833 East Arapaho Road, Suite 102
Richardson, TX 75081

                Re: United States v. Noor Zahi Salman
                Case #: 6:17-cr-18-Orl-40KRS

Dear Ms. McDonald:

As you are aware, on July 9, 2017 I conducted an evaluation of 31 years old, Noor Salman (DOB: 5/26/86) at the Sumpter County Detention Center in Bushnell, Florida. She was detained there under an alias. Ms. Salman is being tried at the United States District Court, Middle District of Florida, Orlando Division, on charges of obstruction of justice and aiding and abetting her husband, Omar Mateen, in the Pulse nightclub mass shooting in Orlando on June 12, 2016. The purpose of the evaluation was to assess Ms. Salmon's psychological functioning as it pertained to her competency to have waived her Miranda rights at the time of her interrogation and whether she had any psychological vulnerabilities which made her more vulnerable to giving a false confession compared to others in light of her interrogation.

Ms. Salman was seen for a total of eight hours, ninety minutes of which consisted of self-administered testing time. Prior to the evaluation she was informed that the results of the evaluation were to be given to her defense attorneys so they could better plan for her case.

In addition to a clinical interview, the following psychological tests were administered to Ms. Salman: a) Comprehension of Miranda Rights (CMR), b) Comprehension of Miranda Rights-Recognition (CMR-R), Function of Rights in Interrogation (FRI), Wechsler Adult Intelligence Scale-IV (WAIS-IV), Minnesota Multiphasic Personality Inventory-2: Restructured Form (MMPI-2:RF), Gudjonsson Suggestibility Scale 1 (GSS 1), 16 Personality Factor (16 PF), Word Recognition Test (WRT).

The following materials were also reviewed: a) Taped FBI interviews with Neamul Sakibul Huq, nicknamed Nemo, a friend of Mr. Mateen, b) Fort Pierce and FBI reports, c) Ms. Salman's educational records, d) Jacqueline Campbell's Declaration of March 7, 2017 including the

1

Danger Assessment scoring sheet, and e) Ms. Salman's handwritten statements to the FBI, signed Advice of Rights form, and Consent to Interview with Polygraph form.

Per your request, I am summarizing the results of my evaluation of Ms. Salman. On the WAIS-IV, she obtained a Verbal Comprehension Index score of 100 (50%), a Perceptual Reasoning Index score of 79 (lower 8%), a Working Memory Index score of 80 (lower 9%), and a Processing Speed Index score of 86 (lower 18%). Her Full Scale IQ score was 84 and is at the Low Average (lower 14%) range of intelligence. Because of the statistically and clinically significant differences between her Verbal Comprehension Index and her other Index scores, the Full Scale IQ score is not particularly meaningful. Verbal Comprehension is much more relevant to issues pertaining to knowing and intelligent use of Miranda warnings and her score falls squarely in the Average range. Ms. Salman has a history of being placed in special education classes in school. Although the school believed her academic difficulties were due to English not being her primary language, based on her reported family history (her father spoke English to her growing up) and the results from the WAIS-IV, I disagree with that assessment.

Ms. Salman was administered three specialized tests (CMR, CMR-R, FRI) to help assess current knowing and intelligent waiver of her rights. She did fairly well on these tests. There is nothing intrinsic in her intellectual functioning nor her current Miranda understanding and appreciation that puts her at risk for not having been able to make a knowing and intelligent waiver of her rights at the time she was administered them by law enforcement. Nevertheless, during the session, Mr. Salman's mood was quite labile and she had difficulty sustaining her concentration and attention. She has difficulty handling stress. She does not remember her Miranda rights being read to her. It is quite likely that when read the warnings, she was not attentive and she would not have been able to incorporate what was read to her into her memory. This would have made it difficult for her to invoke her rights at any time.

Throughout the interview, Ms. Salman said "I'm not crazy." Her emotional display shifted frequently from crying to shouting to laughter. She described depression beginning at age 16 and although never thought about suicide, often felt despondent and described finding it difficult to get out of bed. She described her emotions "like a yo-yo."

Recently, predating the Pulse shootings, she described infrequently hearing kicking, scratching, banging sounds when no one is around. She denied other types of auditory hallucinations except ringing in her ears. She denied visual and tactile hallucinations but stated since her arrest, she smells her deceased grandfather and her father's cologne. She scratches herself when nervous. She did this during the session, resulting in red areas around her arms. She exhibited unusual behaviors. For example, she said refused to eat her lunch in front of me, stating that she gets too anxious eating in front of others, particularly if she is unable to brush her teeth immediately after a meal. She said she felt anxious when left alone in the interview room at the jail for several minutes while I went to speak to corrections. Ms. Salman says she has routines she is unable to vary without getting tremendous anxiety. For example, she must do 60 "crunches before she goes to bed and has to call her son at exactly 3:00 P.M. every day. Ms. Salman said her "OCD

(obsessive compulsive disorder)" is so severe that when at home and someone moves some household article a few inches, she cannot feel at ease until she moves it back in its place. She thinks constantly about "perfection" whereby she dwells on what she might say to someone.

Individuals with mental disorders (as are those with intellectual deficiencies) are over represented in those who have been found to have falsely confessed. It appears that Ms. Salman has a significant mental disorder. The MMPI-2:RF was administered to better assess the nature and quality of Ms. Salman's functioning. Although there was no evidence she attempted to exaggerate or minimize psychological problems, Ms. Salman had a moderately elevated True Response Inconsistency score (TRIN-r) meaning that she had a tendency to respond to items True regardless of content. This yea-saying tendency is likely due to her being acquiescent but unfortunately, this response pattern made it difficult to interpret the other scales on the test.

The 16 PF was also administered to Ms. Salman. Ms. Salman chose the "?" option 1/3 of the time for the 185 questions. She was so noncommittal in her response set that this test could not be appropriately interpreted.

There are a number of factors that place Ms. Salman at greater risk for falsely confessing compared to others. Apart from having a mental disorder, she is a highly suggestible individual to the types of interrogation tactics law enforcement almost always use to extract confessions from those they believe are guilty.

The GSS 1 was administered to measure her interrogative suggestibility. She is no more likely to give in to leading or misleading information compared to the average person (Yield 1 at the 75% range). Yet when pressured that she gave the wrong answer in answering questions about a story that had been read to her, she subsequently yielded 13 times to the 15 questions asked. (Yield 2 at the 95% range). Her Shift score quite high, whereby she shifted to a different response, regardless as to whether she got the question right or wrong, (Shift at the 99% range). Her Total Suggestibility Score, which is the sum of Yield 1 and Shift was at the upper 99% range. Even when her scores were compared to an intellectually deficient forensic sample undergoing a disputed confession-related evaluation, her Yield 2 and Shift scores were at the 97% and 99% range respectively.

Other factors that are relevant to vulnerability to falsely confessing compared to others are Ms. Salman's documented history of abuse from her husbands, anxiety, and impaired memory. Although Ms. Salman was adamant that she did not knowingly aid or abet her husband or obstruct justice, she said that after the hours of questioning with law enforcement telling her that they knew she aided her husband, and according to her, threats that her son would be taken away and would be raised in a "Christian home," she said she eventually relented and signed the statements so she could be allowed to go home.

I have attached my vita to this report. I have conducted more than 700 disputed confession-related evaluations and have testified more than 100 times in such cases describing the

3

defendant's vulnerabilities both in terms of Miranda capacity and false confessions compared to others. I often discuss this in light of relevant research in these areas..

Prior to offering my final opinion, I do need to review Dr. John Chamberlain's report and have a copy of his raw psychological test data. I understand he administered the MMPI-2. I also need to meet with Ms. Salman again to readminister the MMPI-2:RF and the 16 PF. I likely will also need to speak to relevant third parties related to Ms. Salman's mental health and domestic violence history. I am scheduled for surgery on August 3, 2017 and will be unavailable to meet with Ms. Salman again until sometime in October.

Thank you for the opportunity to consult with you on this case. If I can provide any additional information, please let me know.

Respectfully,

I. Bruce Frumkin, Ph.D., ABPP
Clinical Psychologist

Diplomate in Forensic Psychology
American Board of Professional Psychology

cc. Linda Moreno
Charles Swift

4