# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                                                      CASE NO. 6:17-cr-00018-ORL-40KRS

NOOR ZAHI SALMAN,

        Defendant.

## DEFENDANT'S OMNIBUS MOTION *IN LIMINE*

Defendant Noor Salman respectfully gives notice of her intent to offer the following documentary and physical evidence at trial and provides this Court with the underlying basis for the admission:

1. Testimonial Evidence of Omar Mateen's use of fabricated visits with Nemo as a cover story prior to June 11, 2016
2. Evidence of Omar Mateen's secret sexual activities
3. Evidence of Omar Mateen's domestic violence towards Ms. Salman
4. The medical records pertaining to Ms. Salman
5. Ms. Salman's texts the morning of June 12, 2016

Salman requests that this Court exclude the following evidence and provides the reasons it should be excluded:

1. Spending and wealth evidence, including luxury items, WIC Records, Jackson Hewitt Records
2. Purely religious evidence, mosque records and "Muslim" clothing description by Deputy Chief Frank Amandro of the Fort Pierce Police Department when ordering Ms. Salman out of her home the morning of June 12, 2016
3. Pulse nightclub attack evidence, including the 911 calls and the Pulse video
4. Evidence of Ms. Salman at a shooting range in 2014
5. G4S Records
6. Mateen's 911 call

INTRODUCTION

The Court must decide whether to admit or exclude evidence in this case against the backdrop of the charged offenses. In the Indictment, the Government alleges that, from April 2016 through June 12, 2016, Ms. Salman aided and abetted Mateen's attempted provision and provision of material support or resources to the Islamic State of Iraq and the Levant (ISIL) in violation of 18 U.S.C. § 2339B, and on June 12, 2016, Ms. Salman obstructed justice in violation of 18 U.S.C. § 1512(b)(3) by misleading Officers of the Fort Pierce Florida Police Department and Special Agents of the Federal Bureau of Investigation (FBI) in order to prevent them from communicating to agents of the FBI and United States Department of Justice (DOJ) and judges information relating to the attack on June 12, 2016, at the Pulse nightclub.

To prove aiding and abetting, the Government must show that Ms. Salman intentionally "associated with the criminal venture, participated in it as something [she] wished to bring about, and sought by [her] actions to make it succeed." *United States v. Longoria*, 569 F.2d 422, 425 (5th Cir. 1978). It is not sufficient to show that Ms. Salman was simply present at the scene of a crime or knew about it. Eleventh Circuit Pattern Jury Instructions (Criminal Cases), 2010. In other words, the Government must show that the Defendant was a willful participant in the crime and not merely a knowing spectator. *Id.*

To show that Mateen committed the underlying crime, 18 U.S.C. § 2339B, the Government must show that he (1) knowingly provided material support or resources to a Foreign Terrorist Organization, and (2) did so knowing that the organization was a designated terrorist organization or that the terrorist organization has engaged or engages in terrorist activity or that the organization has engaged or engages in terrorism. The Defense has offered to stipulate

2

that Mateen provided material support for ISIL if the Court excludes the Government's terrorism expert.

To show that Ms. Salman violated 18 U.S.C. § 1512(b)(3), the Government must show that (1) Ms. Salman knowingly engaged in misleading conduct toward another person, (2) with the intent to hinder, delay, or prevent the communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense.

The Government's theory of each offense is not apparent from the Indictment. Doc. 1. In its response to Defendant's motion for a bill of particulars, however, the Government explained its theory that Ms. Salman aided and abetted Mateen by allegedly (1) providing a cover story for Mateen; (2) casing potential locations for an attack; and (3) engaging in spending in advance of the attack.

The Government stated that Salman obstructed justice by allegedly (1) stating to Officers of the Fort Pierce, Florida, Police Department that Mateen would not have engaged in violence unless he was protecting himself; (2) stating to Special Agents of the FBI that Mateen left their apartment on June 11, 2016, to have dinner with a friend; (3) stating to FBI Special Agents that Mateen had only one firearm; (4) stating to FBI Special Agents that Mateen was not radical or extreme in his beliefs; (5) stating to FBI Special Agents that she did not see Mateen with a gun when he left their residence; (6) stating to FBI Special Agents that Mateen did not access the internet at their residence and had deleted his Facebook account a long time ago; (7) stating to FBI Special Agents that she was unaware that Mateen was planning to conduct a violent terrorist attack; and (8) deleting text messages on her phone on the night of Mateen's attack, including one informing him of the cover story she had devised.

EVIDENCE TO ADMIT

I.    Testimonial evidence of Omar Mateen's use of fabricated visits with Nemo as a cover story prior to June 11, 2016; evidence of Mateen's illicit, secret sexual activities; and evidence of Omar Mateen's domestic violence towards Ms. Salman.

In investigating the Pulse nightclub attack, the FBI interviewed Mateen's friend "Nemo."[1] The final interview was video-recorded. During this interview, Nemo told the FBI that Mateen would tell Salman that he was going to see Nemo when, actually, Mateen was going to cheat on Salman. Nemo explained as follows:

**Nemo**: He used to make excuses to his family that, 'I'm going to a certain place—' or, to his wife, that, 'I'm going to a certain place, and I'm going to go see Nemo.' But in fact, he would go somewhere else. . . . So, he would make excuses of coming to visit me, but he ended up going to other places. You know what I mean? And this is a statement he made to me, because he had a bad habit of—he was married, he was married, but he went behind his wife's back and did a lot of stuff on the side on whatever website… Plenty of Fish or wherever it was. Arablounge. He even mentioned Craigslist to me. Hooking up with women. Hooking up with older women.

**FBI Agent**: And you're saying—So he would tell—

**Nemo**: He would tell—

**FBI Agent**: —that he was going with you, but he's going to hook up with chicks.

**Nemo**: He told me that. Yeah.

In addition to interviewing Nemo, the FBI interviewed more than ten women Mateen met through the websites Plenty of Fish, Arablounge, and elsewhere during his marriage to Ms. Salman. Of these women, at least four met with Mateen in person. On each of these occasions, Mateen attempted to initiate a sexual relationship. On at least one occasion, Mateen succeeded in cultivating a romantic relationship with a woman between June 2015 and March 2016 while married to Ms. Salman. In addition to Mateen's attempts to establish secret sexual relationships,

---

[1] This motion uses only Nemo's nickname to protect his privacy.

documentary evidence establishes that Mateen regularly contacted escorts seeking sexual services during his marriage to Ms. Salman.

The Defense intends to offer Nemo's testimony concerning Mateen's prior statement admitting he had deceived Ms. Salman and other family members by telling them that he was going to see Nemo under Fed. R. Evid. 404 (b). This evidence is relevant to rebut the Government's allegation that Ms. Salman aided and abetted Mateen's attack by fabricating a cover story for Mateen that he was going to see Nemo on the night of the attack and later lied to law enforcement by telling them that Mateen had told her that he was going out with Nemo.[2] The evidence is not barred by Rules 404(b) or by Rule 802 for the following reasons.

A.      Fed. R. Evid. 404(b)

Rule 404(b)(2) prohibits evidence of a crime, wrong, or other act for purposes of proving a person's character in order to show that on a particular occasion the person acted in accordance with the character, but permits such evidence for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. The Eleventh Circuit has explained that, functionally, 404(b) operates not as a rule of exclusion but rather as a rule of "inclusion which allows such evidence unless it tends to prove only criminal propensity." *United States v. Cohen*, 888 F.2d 770, 776 (11th Cir. 1989). As such, "the list provided by the rule is not exhaustive and 'the range of relevancy outside the ban is almost infinite…'" *Id.* (citing McCormick, Evidence § 190 at 448 (Cleary ed. 1972)).

---

[2] The Government contends that, after speaking to her mother-in-law, Salman aided and abetted the attack by sending two text messages. At 5:55 P.M, Ms. Salman texted, "If ur mom calls say nimo invited you out and noor wants to stay home." A second text added, "She asked where you were xoxo. Love you." The Defense contends that Ms. Salman simply told Mateen to let his mother know where Salman believed he was—having dinner with Nemo. Nemo's testimony that Mateen regularly told Salman that he was meeting Nemo when he was actually going to meet other women is relevant to the Defense's contention.

Although, 404(b) evidence is typically offered by the prosecution, it equally permits the defense to enter such evidence. *Id.* Where the evidence is offered by the defendant, the standard is "relaxed." *Id.* When offered by the defendant, if "the proffered evidence is shown to have a special relevance to a disputed issue, the court must balance the probative value against the possibility of unfair prejudice." *Id.* Where "there is simply no other practical means to prove the point, then the need factor points strongly toward receipt" of such evidence. *Id.*

Here, Ms. Salman offers Nemo's testimony of Mateen's statements to show Mateen's opportunity and ability to use the cover story of going to see Nemo without Ms. Salman's participation or knowing assistance. The issue of whether Ms. Salman created a cover story for Mateen on the night of June 11, 2016, is central to the Government's theory of aiding and abetting, meeting the special relevance requirement. Further, there is no danger of unfair prejudice because Mateen was allegedly Ms. Salman's co-actor. As the *Cohen* court explained, in holding the denial of similar evidence was an abuse of discretion, evidence of an alleged co-actor's bad acts "is not the type that will inflame the jurors" when "it is offered to prove a fact pertinent to the defense." *Id.* at 776-77. Finally, there is no other practical means for offering the evidence of Mateen's prior cover story use. Ms. Salman cannot provide testimony that Mateen previously used Nemo as a cover story, because she lacks any knowledge of what Mateen actually did on those occasions. Thus, Nemo's testimony regarding Mateen's statements is the most probative evidence on Mateen's use of the cover story he was going to visit Nemo on June 11, 2016.

B.   Mateen's statements to Nemo that he fabricated visits with Nemo as a cover story are admissible to show identity under Fed. R. Evid. 404(b) and Fed. R. Evid. 807.

The use of Mateen's statements does not constitute hearsay for the purpose of showing Mateen's opportunity and ability to use Nemo as a cover story independently of Ms. Salman. For

Mateen to have the opportunity and ability to use the cover story, it is not necessary to credit the truth of the matter asserted by Mateen. Instead, opportunity and ability are established by the fact that Mateen told Nemo about his use of the cover story. Mateen's telling Nemo of the cover story does not require Mateen's statement to be true. Regardless of whether Mateen had actually used the cover story, the fact that he told Nemo provides the opportunity and ability to use the cover story in the future, because Nemo was aware of the potential that Mateen would use him for a cover story under circumstances where he would not contradict it. Thus, it is not necessary to credit the truth of the matter asserted—Mateen actually utilized the cover story with Ms. Salman and his family prior to June 11, 2016—in order to establish Mateen had the opportunity and ability to use the cover story on June 11, 2016.

Ms. Salman also, however, also seeks to offer Mateen's fabrications before June 11, 2016, as evidence of Mateen's unique identity in fabricating a cover story the night of June 11, 2016, based on the similarity with his prior use of the cover story with Ms. Salman and his family. Identity evidence may be admitted under Rule 404(b) where the similarities are such as to mark the handiwork of an individual. *See United States v. Lail*, 846 F.2d 1299, 1301 (11th Cir. 1988). So called *modus operandi* evidence requires a close connection to the prior bad act and the act in question, so as to uniquely mark it to the individual. *Id.* Here, Mateen's prior use of the cover story involving Nemo provides such a unique *modus operandi*. Looking at the circumstances, Mateen used the cover story to hide activities of which he did not want Salman to be aware—namely, his secret sexual pursuits outside of their marriage. Indeed, it would be an extraordinary coincidence that Ms. Salman created a cover story using Nemo for Mateen when Mateen had fabricated an identical cover story to hide his illicit sexual activities.

The truth of the matter asserted in the statement is admissible under Rule 807. Rule 807 permits the admission of a hearsay statement even if the statement is not specifically covered by a hearsay exception if: (1) the statement has "equivalent circumstantial guarantees of trustworthiness"; (2) it is "offered as evidence of material fact"; (3) it is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts"; and (4) "admitting it will best serve the purposes of these rules and the interests of justice." Fed. R. Evid. 807(a). Rule 807 requires prior notice of the intent to offer the statement and its particulars to the opposing party.[3] Fed. R. Evid. 807(b).

The first requirement—equivalent circumstantial guarantees of trustworthiness—focuses on the declarant and requires circumstantial guarantees of trustworthiness. *See Rivers v. United States*, 773 F.3d 1306, 1314 (11th Cir. 2015). The Eleventh Circuit has explained that Rule 807(a) does "not simply [ask] for circumstantial guarantees of trustworthiness, but for guarantees that are equivalent in significance to the specific hearsay exceptions enumerated in Federal Rules of Evidence 803." *Id.* Such a guarantee is present here. Mateen's statements to Nemo are similar to the recognized hearsay exception for statements against penal interest. Mateen's admissions of lying to Ms. Salman and his family in order to cover his sexual affairs are not in his interest. Indeed, by relating this to Nemo, Mateen risked discovery of his illicit sexual pursuits.

The Eleventh Circuit has further enumerated multiple factors that bear on the circumstantial guarantees of trustworthiness, including: (a) "the probable motivation of the declarant in making the statement," (b) "the circumstances under which [the statement] was made," (c) "the knowledge and qualifications of the declarant," (d) "the existence of corroborating evidence," (e) "circumstances in which the declarant made the statement and the

---

[3] Defendant's motion serves as notice to the Government of its intent to offer Nemo's testimony under Rule 807.

incentive he had to speak truthfully or falsely," (f) the "totality of the circumstances surrounding the making of the statement and those rendering the declarant particularly worthy of belief," and (g) "whether the declarant had 'clear motivation' to lie or mislead." *Id.* at 1315 (internal citations omitted).

Admission of Mateen's statements to Nemo is supported by each of the above factors. First, Mateen's motivation in making the statement to Nemo supports its trustworthiness. Mateen needed to inform Nemo of his use in a cover story of order to ensure that Nemo would not compromise his use of the cover story by inadvertently informing Mateen's family or Ms. Salman that he and Mateen did not get together when Mateen claimed they had. Second, the circumstances also support the statements' trustworthiness because Nemo is the logical person to whom Mateen would relate his use of the cover story. Third, Mateen, the declarant, certainly had direct knowledge of the falsities that he was telling his family and Ms. Salman. Fourth, Mateen's statements to Nemo are corroborated by the FBI's investigation, which uncovered multiple women Mateen met through the website Plenty of Fish, Arablounge, and others. Of these women, at least four met with Mateen in person, including an older woman he attempted to have an affair with and another woman with whom he did have a romantic relationship between June 2015 and March 2016. The corroboration makes clear that Mateen was not simply bragging about something he was not doing, but was, in fact, attempting to engage in multiple affairs outside his marriage, requiring a cover story for his activities. Fifth, Mateen had strong incentive to speak truthfully to Nemo, as his cover story depended on Nemo's knowledge of its use. Sixth, the totality of the circumstances render Mateen's statements particularly worthy of belief because telling Nemo about his deception was necessary in order for the deception to be carried out and Mateen's statements regarding his illicit affairs are corroborated as stated above. Finally, Mateen

had no motivation to lie or mislead Nemo and every incentive to tell him the truth regarding his use of Nemo as a cover story, because Nemo's participation was potentially necessary. Taken together, these factors establish the trustworthiness of Mateen's statements to Nemo.

The second requirement of the residual hearsay exception is that Mateen's statements are being offered as evidence of a material fact. To fulfill this requirement, the Court need not look further than the Government's theory that Ms. Salman aided and abetted by created a cover story. The fact that Mateen had previously used this cover story is certainly material to the determination of Ms. Salman's guilt or innocence on aiding and abetting.

As for the third requirement, Mateen's statements to Nemo are more probative than any other evidence Ms. Salman can present on this issue. Ms. Salman cannot call Mateen, because he is deceased. Further, Ms. Salman cannot personally provide testimony that Mateen previously used Nemo as a cover story, because she lacks any knowledge of whether or not Mateen actually visited Nemo on the prior occasions when Mateen told her that he was going to see Nemo. Mateen's statements are therefore the most probative evidence on Mateen's use of the cover story that he was going to visit Nemo on June 11, 2016.

Finally, admitting Mateen's statements serves the interests of justice. The Supreme Court has consistently struck down rules that effectively prohibited offering witness testimony because of crucial exculpatory evidence based on presumptions of unreliability. *See, e.g.*, *Washington v. Texas*, 388 U.S. 14 (1967) (striking down a statute prohibiting one co-defendant from testifying for another co-defendant); *Rosen v. United States*, 245 U.S. 467 (1918) (striking down a statute that made an individual convicted of forgery incompetent as a witness). Similarly here, interpreting Rule 807 to prohibit the admission of Mateen's statements to Nemo for the truth of

the matter asserted does not serve the interest of justice because it deprives Ms. Salman of essential exculpatory testimony.

II.   Ms. Salman's medical evaluation and her statements therein are admissible under Fed. R. Evid. 803(6), (4)

Ms. Salman seeks to admit Dr. C.'s[4] evaluation of Ms. Salman, including her statements made to Dr. C. for the purpose of medical diagnosis. Dr. C.'s evaluation is admissible under Rule 803(6) as a business record. Although the evaluation was performed at court direction, the purpose of the evaluation makes it a medical record rather than a forensic document. The magistrate judge ordered the evaluation to determine whether treatment was necessary as a condition of pretrial release.[5] Thus, unlike ordinary court-directed evaluations—which determine competency to stand trial, etc.—Ms. Salman's evaluation was for the purpose of medical diagnosis. Subject to foundation, Dr. C.'s evaluation constitutes a business record, because it was prepared in his ordinary course of business in evaluating any patient for treatment. *Doali-Miller v. SuperValu, Inc.*, 855 F. Supp. 2d 510, 517 (D. Md. 2012) ("[R]ecords kept by hospitals and doctors often fit the [Rule 803(6)] exception and are routinely admitted.") (quotation omitted); *id.* ("[I]t is a 'regular practice' of medical providers to make records of their examinations of patients.").

Ms. Salman's statements contained in the report are admissible under Rule 803(4). Rule 803(4) permits the admission of a statement that is made for—and is reasonably pertinent to—medical diagnosis or treatment, and describes medical history, past or present symptoms or sensations, their inception, or their general cause. Fed. R. Evid. 803(4). Ms. Salman made these

---

[4] The Court has previously received Dr. C.'s evaluation. Salman identifies Dr. C. only by the initial of his last name to protect his privacy.
[5] Transcript of Detention Hearing on February 1, 2017, in the United States District Court for the Northern District of California before Magistrate Judge Donna M. Ryu, previously provided to the Court, at pp. 33-37.

statements pursuant to Magistrate Judge Ryu's order that Ms. Salman be evaluated for the purpose of determining whether treatment was appropriate under any conditions of pre-trial release. Because the purpose of the evaluation was treatment, Ms. Salman's statements meet the first requirement that the statements be made for and be reasonably pertinent to medical diagnosis or treatment. Further, Ms. Salman's statements concerning domestic violence falls within Rule 803(4) as a description of medical history and general cause for her symptoms. *See United States v. Belfast,* 611 F.3d 783, 819 (11th Cir. 2014) (recognizing the broad range of statements indicating abuse as admissible so long as they are not being used to meet a legal standard).

III.    Ms. Salman's text messages the morning of June 12, 2016, are admissible as non-hearsay or under an exception to the rule against hearsay.

Ms. Salman's text messages the morning of June 12, 2016, are offered to rebut the element of knowledge of Mateen's plans for both the aiding and abetting and the obstruction of justice charges. At 2:42 A.M. on June 12, 2012, Salman texted Mateen, "Habibi where are you?" Later, around 4:30 A.M., after Salman received a call from her mother-in-law, Salman and Mateen exchanged the following text messages:

> 4:27:11 – **Salman** – "Where are you?"
> 4:27:33 – **Mateen** – "Everything ok?"
> 4:27:58 – **Salman** – "Your mom I'd [sic] worried and so am i"
> 4:28:25 – **Salman** – "You know you work tomorrow right?"
> 4:28:28 – **Mateen** – "You heard what happened"
> 4:28:34 – **Salman** – "????"
> 4:28:52 – **Salman** – "What happened?!"
> 4:29:22 – **Mateen** – "I love you babe"
> 4:29:43 – **Salman** – "Habibi what happened?!"
> 4:31:06 – **Salman** – "Your mom said that she said to come over and you never did."

Subject to establishing a foundation, the text messages are admissible as non-hearsay statements; then-existing mental, emotion, or physical condition; and excited utterances.

i.      "Habibi where are you?" and "Where are you?"

Ms. Salman's initial text messages are questions, not statements. Thus, they do not constitute hearsay. *See United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) (holding that questions are not assertive, and therefore are not capable of being hearsay). Like the Court's examples in *Rivera,* Ms. Salman's questions do not contain assertions capable of being true or false, and, as such, are not hearsay. *Id.*

Further, even if the text messages were statements, they would fall within the then-existing mental or emotional condition exception to hearsay under Fed. R. Evid. 803(3). Rule 803(3) permits the admission of a statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional condition (such as mental feeling). As the Eleventh Circuit explained in *United States v. Duran Samaniego*, brief statements relating to a mental state are permitted under Rule 803(3) so long as they do not include an explanation for the reason for that belief. *See* 345 F.3d 1280, 1282 (11th Cir. 2003) (comparing the statement "I'm scared" and "I'm scared because someone threatened me."). Ms. Salman's text messages at 2:42 A.M. and again at 4:27 A.M. likewise do not contain explanations which would not be covered by Rule 803(3), but merely denote her mental state of ignorance of Mateen's whereabouts and concern.

ii.      "Everything ok?"

Mateen's text message is similarly admissible because it is non-hearsay, as it is a question and not a statement. *Rivera*, 780 F.3d at 1092. Further, Mateen's text message is being offered to provide context to the subsequent conversation. *Id.*

iii.      "Your mom I'd [sic] worried and so am i"

Ms. Salman's text message expressing her concern of Mateen's failure to return home falls within Rule 803(3). Fed. R. Evid. 803(3). Here, Ms. Salman expresses her and her mother-

in-law's concern. Ms. Salman's statement that she is worried clearly falls within the then-existing mental and emotional condition. Ms. Salman's reference to her mother-in-law's concern does not move the text message outside the scope of Rule 803(3) because her mother-in-law's concern is not being offered as an explanation for Ms. Salman's concern. The statement is "Your mom I'd [sic] worried" does not provide an explanation for Ms. Salman's source of concern, and is not being offered to prove that Mateen's mother was also worried.

iv.      "You know you work tomorrow right?"

Ms. Salman's text message is admissible because it is non-hearsay, as it is a question and not a statement. *Rivera*, 780 F.3d at 1092. Further, it is not being offered to prove the matter being asserted—that Mateen knew he had work the next day—and as such, does not meet the definition of hearsay. *See* Fed. R. Evid. 801(c). Rather, it is being offered to show that Ms. Salman questioned Mateen as to his plans to attend work the next day.

v.      "You heard what happened" and "I love you babe"

Mateen's text messages are admissible because they are not offered to prove the truth of the matter asserted, but rather to give context to Salman's responses. *See Rivera*, 780 F.3d at 1092. As the Court observed in *Rivera,* without these statements, it is difficult, if not impossible, to understand the context of Ms. Salman's text messages. *Id.*

vi.      "????"; "What happened?!"; "Habibi what happened?!"; and "Your mom said that she said to come over and you never did."

Ms. Salman's text messages are admissible under Rule 803(1) as present sense impressions. Rule 803(1). A present sense impression describes or explains an event or condition, made while or immediately after the declarant perceived it. The context of Mateen's prior text message of "You heard what happened" and Salman's subsequent replies indicating ignorance demonstrate her present sense impression that she has not heard and does not know

14

what is going on or where Mateen was. They are made immediately after Mateen questions her on whether she is aware of what is happening. As such, the text messages fall within the present sense impression exception. As the Eleventh Circuit has explained the "underlying theory of this exception is that the 'substantial contemporaneity of the event and the statement negate the likelihood of deliberate or conscious misrepresentation.'" *See United States v. Scrima*, 819 F.2d 996, 1000 (11th Cir. 1987) (citing *United States v. Peacock*, 654 F.2d 339, 350 (5th Cir. Aug. 1981)). Here, the event is Mateen's text message inquiring if Ms. Salman had "heard what happened." Ms. Salman's immediate responses indicating her present-sense impression of ignorance—beginning 6 seconds after Mateen's text and made over the course of three minutes—negates the likelihood of deliberate or conscious misrepresentation, thereby fulfilling the requirements of Rule 803(1).

Ms. Salman's text messages also constitute excited utterances under Rule 803(2). Fed. R. Evid. 803(2). An excited utterance is a statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused. From the context of the text messages, Mateen's cryptic statements to Ms. Salman combined with his absence from the home at 4:30 A.M. created a stressful situation, as evidenced by the Ms. Salman's repeated and increasingly urgent questioning regarding what had happened.

EVIDENCE TO EXCLUDE

I.    Spending, wealth, and class evidence

    A.    Spending unrelated to the attack, including purchasing jewelry and other luxury items.

The spending evidence the Government has compiled is irrelevant to any element of the charged offenses. Fed. R. Evid. 402. Even if the Court finds this evidence relevant, its probative

value, if any, is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. Fed. R. Evid. 403.

The Eleventh Circuit disfavors wealth evidence, unless it is "directly connected" to the crime. *United States v. Nill*, 518 F.2d 793, 802 (5th Cir. 1975) ("A man's wealth is wholly irrelevant to his guilt or innocence in a criminal prosecution unless the wealth is directly connected to the offense for which he is standing trial."); *see United Bradley*, 644 F.3d 1213, 1271 (11th Cir. 2011) ("Use of a defendant's wealth to appeal to class bias can be highly improper and can deprive that defendant of a fair trial.") (internal quotations omitted). "A long line of cases in the Eleventh Circuit and elsewhere reliably recites the fact that 'it is often difficult to determine whether wealth evidence is intended to appeal to class bias or to establish a fact in issue.'" *United States v. Biddix*, 2015 U.S. Dist. LEXIS 172595, at *9 (M.D. Fla. Dec. 29, 2015) (quoting *United States v. Hope*, 608 F. App'x 831, 838 (11th Cir. 2015)).

Because of this historic disfavor, courts in the Eleventh Circuit have applied a three-step test to determine whether spending evidence is admissible under Rules 402 and 403.

> [T]he unfair prejudice of wealth evidence does not outweigh the probative value if three factors are met: (1) there is other credible evidence, direct or circumstantial, of the illegal activity; (2) the money spent was not available to the defendant from a legitimate source; and (3) the accumulation of great wealth or extravagant spending relates to the period of the alleged illegal activity.

*Biddix*, 2015 U.S. Dist. LEXIS 172595, at *9 (quoting *United States v. Jackson-Randolph*, 282 F.3d 369, 378 (6th Cir. 2002)).

Here, the Government seeks to present evidence of spending unrelated to the Pulse nightclub attack. The Government intends to introduce evidence that Mateen purchased Salman jewelry from Kay Jewelers, Silver and Gold Connection, Express, and Zales; lingerie from Victoria's Secret; and various other items, including a $75 G-Shock Casio watch. Mateen

purchased most of these items himself, but Salman used Mateen's card to purchase some items, including the watch. Salman and Mateen also purchased various items for their son, including an iPad. This spending evidence, however, fails to satisfy the second *Jackson-Randolph* factor, because there is no indication that Mateen acquired this money from an unlawful source.

Moreover, the spending evidence the Government intends to introduce does not directly relate to the crime at all. The Government asserted in its response to Defendant's bill of particulars motion that Salman aided and abetted Mateen in part by "engaging in spending in advance of the attack." But Mateen himself did most of the spending the Government seeks to introduce. It is unclear how Mateen's purchasing items such as jewelry for Salman could possibly constitute Salman's aiding and abetting material support of terrorism. Mateen was the family's sole breadwinner, and the credit cards were in his name.

Even for the items Salman herself purchased, there is no connection between making the purchases and aiding and abetting. To convict Salman of aiding and abetting Mateen's material support of terrorism, the Government must show that she "associated with the criminal venture, participated in it as something [she] wished to bring about, and sought by [her] actions to make it succeed." *United States v. Longoria*, 569 F.2d 422, 425 (5th Cir. 1978). One cannot reasonably interpret Salman purchase of a watch or a piece of jewelry as an effort to make Mateen's provision of material support to ISIS succeed. *See id.* (holding that acceptance of $300 did not "establish in any way" aiding and abetting a conspiracy to distribute marijuana). The defense can find no case in which spending money on items unrelated to an offense constituted aiding and abetting.

Finally, even if the evidence is relevant in some way, the Court should require the Government to omit the "gory details":

> Even if the fact of, and the amount of, extraordinary expenditures might fairly evidence the need for, or disposition of, feloniously acquired wealth, the wealth is needed no more to travel to Aruba or Las Vegas than to travel elsewhere. In other words, the "gory details" of the extraordinary expenditures are typically less probative and more prejudicial than the amount spent or the categories of expenditure (travel, automobiles, clothing and accessories, etc.). In all events, the United States should present evidence in a dignified and straight-forward manner and without undue attention to a sensational or provocative particular that is more likely to trigger an eruption of "class bias" or other prejudice — in whatever form and by whatever label

*Id.* Thus, even if this evidence were directly relevant, the Government should only be permitted to give the amounts and not the details.

B.    WIC Records and Jackson Hewitt Records

These records are irrelevant to any element of the charged offenses. Fed. R. Evid. 402. In *United States v. Love*, the government's theory was that the defendant "created and led the scheme to bomb the federal courthouse in San Diego in order to report his co-conspirators to the [FBI] and receive a financial award," as he was facing mortgage default and employment difficulties. *United States v. Love,* No. 10cr2418-MMM, 2011 U.S. Dist. LEXIS 53213, at *2-3 (S.D. Cal. May 17, 2011). Because of this theory, the court admitted evidence of the defendant's financial difficulty because it showed "more than poverty"—it showed "a specific and immediate financial need." *Id.* at *4 (citing *United States v. Bensimon*, 172 F.3d 1121, 1129 (9th Cir. 1999).

Here, unlike *Love*, the Government has not alleged that Ms. Salman aided and abetted or obstructed justice for any financial gain. Further, unlike in *Love*, Mateen had just been accepted by the police academy and his financial status was about to increase. Finally, Mateen's death leaves Ms. Salman in a worse financial condition, as Mateen was the sole breadwinner. Even if the Court finds this evidence relevant, its probative value, if any, is substantially outweighed by a

danger of unfair prejudice, confusing the issues, and misleading the jury. Fed. R. Evid. 403. The government is impermissible attempting to appeal to class bias

II.     Purely religious evidence, including videos of Mateen at a mosque and evidence that Salman wore "Muslim" clothes on the morning of June 12, 2016.

The Government seeks to introduce videos of Mateen attending a mosque on the night of June 8, 2016, and the Government has disclosed evidence that Deputy Chief Frank Amandro of the Fort Pierce Police Department believed Salman was wearing "Muslim" clothes when she was ordered out of her house on the early morning of June 12, 2016. Such evidence is completely irrelevant to the charged offenses. Fed. R. Evid. 402. If the Government alleges that practicing Islam preconditions one or increases one's propensity to commit violent acts, there are serious prejudice issues with such a theory. While evidence of Mateen's radical political beliefs may be relevant, the mere fact that he attended mosque is not. Salman's choice of clothing is especially irrelevant, because the Government does not allege that she had extremist political or religious beliefs. Instead, it is an impermissible attempt to appeal to jurors' biases. *See Doe v. NCL (Bahamas) LTD*, No. 11-22230-Civ, 2012 U.S. Dist. LEXIS 167963, at *5 (S.D. Fla. Nov. 27, 2012) ("A reference to Plaintiff's religious belief, including the fact that her father allegedly was a Baptist minister is prejudicial and its low probative value is far exceeded by the danger of unfair prejudice, confusion of the issues, and may mislead the jury."); *United States v. Brown*, 2008 U.S. Dist. LEXIS 51805, at *7 n.5 (S.D. Ga. July 7, 2008) ("[I]t is unfair to . . . inflame juror passions in an effort to convict merely because a defendant is, for example, an Arab Muslim"). As such, this evidence's probative value, if any, is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. . Fed. R. Evid. 403.

III.    Pulse nightclub attack evidence, including the 911 Calls and the Pulse Video.

The defense has offered to stipulate that Mateen's attack on the Pulse nightclub provided material support to ISIL. If the stipulation is not accepted, however, the defense objects to the Pulse nightclub attack evidence under Rule 403. The probative value of the Pulse nightclub evidence is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, and needlessly presenting cumulative evidence. Fed. R. Evid. 403.

A.      The Pulse Video

This Court should exclude the video of the Pulse nightclub shooting under Rule 403, because the Defense has offered to stipulate that Mateen provided material support to ISIL, and the video does not prove anything with respect to Salman. Thus, the graphic video of the Pulse nightclub attack is substantially more unfairly prejudicial than probative. FED. R. EVID. 403.

The defense anticipates that the Government will argue that this Court should admit the video under *United States v. Patrick*, 513 F. App'x 882, 884 (11th Cir. 2013). In *Patrick*, the government charged the defendant with aiding and abetting a stabbing. *Id.* at 884. A video of the assault depicted the defendant himself following the victim off-screen and later showed another person stabbing the victim. *Id.* The defendant argued that the video was irrelevant, because someone witnessed the stabbing and the defendant was willing to stipulate that the stabbing occurred.

The district court excluded the video, but the Eleventh Circuit reversed. First, the Eleventh Circuit noted that the video was "highly probative on a number of issues of consequence, including whether [defendant] committed an assault or aided or abetted in its commission, whether the victim suffered a serious bodily injury, and whether [defendant's] actions were a proximate cause of those injuries." *Id.* at 887. The only witness to the assault could not reliably testify about it. *Id.* The court reasoned that the videos were "not <u>unfairly</u>

prejudicial because they depict the assault that Patrick is charged with committing." *Id.* at 888 (emphasis in original). Under these circumstances, the district court should have admitted the video. *Id.*

The differences between *Patrick* and the situation here exemplify why the Court should not admit the video in light of the Defense's offer to stipulate. Here, the murders at the Pulse nightclub are not the gravamen of the Government's case against Salman. The Government has charged Salman, not with aiding and abetting murder or assault, but with aiding and abetting material support of terrorism. The video, by its nature, cannot depict Mateen's intent to provide himself as personnel to ISIL.

Unlike in the defendant in *Patrick*, Salman was not present at the scene of the crime, and the Government does not contend that she was. The video provides no evidence that Salman aided or abetted the underlying offense or that she materially supported ISIL herself.[6] At most, the video demonstrates that Mateen murdered people within the Pulse nightclub which establishes the "death occurred" element of material support. This element, however, is not in serious contention. It is without dispute that 49 people died in the attack. More importantly, unlike the "serious bodily injury" element at issue in *Patrick*, the "death occurred" element serves as a sentence enhancement element, not as a root element of the offense. Under these circumstances, excluding evidence showing some of those murders does not, unlike *Patrick*, deprive the Government of the force and effect of its case on key issues.

B.      911 Calls

As previously stated, the Defense has offered to stipulate that Mateen provided material support to ISIL. If this stipulation is accepted or the Court mandates its acceptance, then these

---

[6] Unless the Government intends to contend at trial that Salman knew that Mateen would attack the Pulse nightclub in particular and the details of the attack confirm her involvement, the evidence proves nothing with respect to Salman.

calls have virtually no probative value. Even without the stipulation, however, the Court should exclude the calls, because their cumulative effect and their risk of unfair prejudice substantially outweigh their limited probative value. To establish the predicate offense, the Government need only show that Mateen knowingly provided material support to ISIL and that death occurred.

The 911 calls contain little probative value with respect to Mateen's provision of material support of ISIL. The callers discuss the shooting but do not either identify Mateen as the shooter or provide evidence for Mateen's intent in attacking the nightclub. Instead, the calls are dramatic evidence of the fear of the callers and their obvious distress. The use of such evidence is prohibited by Rule 403. "[T]he primary function of Rule 403 is to exclude evidence of 'scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *Patrick*, 513 F. App'x at 887 (quoting *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983)).

The only material fact addressed by some but not all of the calls is the likelihood is that individuals died during the attack. The scant value of some of the calls to establish persons died as a result of Mateen's alleged material support, does not warrant admission of the calls, because the government has far more direct and less emotional ways to establish this fact. *See King*, 713 F.2d at 631 ("[W]hile prosecutorial need alone does not mean probative value outweighs prejudice, the more essential the evidence, the greater its probative value . . . ."). Because the 911 calls are neither probative nor essential but create a substantial risk of unfair prejudice and are cumulative of other evidence, this Court should exclude them.

IV.    Evidence of Ms. Salman at a shooting range years ago

Evidence that Ms. Salman went with Mateen to a shooting range in 2014 is irrelevant to any element of the charged offenses. Fed. R. Evid. 402. The Government does not allege that Salman herself was involved in the shooting. Moreover, she went to the shooting range well over

a year before the Government alleges that the charged conduct began. Even if the Court finds this evidence relevant, its probative value, if any, is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. Fed. R. Evid. 403.

V.      G4S Records

The G4S Records identified as key evidence on May 12, 2017, consist of Mateen's acknowledgement that he will not use his work weapon for anything other than work-related conduct. On its face, this receipt and acknowledgement was held at the offices of G4S. The firearm receipt and acknowledgement is irrelevant as its existence does not make any element of the offense more probable. Fed. R. Evid. 402. Absent evidence that Salman was aware of the prohibition against personal use of the weapon provided by G4S, the records have no relevance to her mindset. Admission of these records does have the potential to confuse the jury by implying that Mateen's carrying his handgun on the evening of June 11, 2016, should have alerted Salman to the fact that Mateen about to engage in illegal activity.

VI.     Mateen's statements in his call to 911 during the attack.

The U.S. Supreme Court has made clear the Sixth Amendment Confrontation Clause bars statements by "those who 'bear testimony'" against a criminal defendant when those persons are unavailable for cross examination. *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) (quoting *Crawford v. Washington*, 541 U.S. 36, 51 (2004)). In each of *Crawford* and *Davis*, the Court found that, historically, it and other courts have defined testimony as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* (internal quotations omitted). In so finding, the Court focused in large part on the declarant-caller's purpose in making the statements during the call notwithstanding that it also considered the recipient-operator's purpose in eliciting the statements and the nature of the reported events as either

ongoing or past.  *Id.* at 828 (noting the caller's "primary purpose was to enable police assistance to meet an ongoing emergency").

In the 911 call context, lower courts since *Crawford* likewise have centered their analyses on the declarant-caller's purpose in making statements to a 911 operator when determining the testimonial nature of those statements.  *See, e.g.*, *United States v. Young*, No. CR 10-00923 (C) SJO, 2013 U.S. Dist. LEXIS 200369, at *6 n.1 (C.D. Cal. Nov. 22, 2013) ("The circumstances also indicate that the information provided to the 911 operator was primarily meant to assist police in responding to this ongoing emergency."); *People v. Moscat*, 777 N.Y.S.2d 875, 878 (N.Y. Crim. Ct. 2004) ("[T]he court finds that a 911 call for help is not 'testimonial' in nature"); *Bartee v. State*, 922 So. 2d 1065, 1070-71 (Fla. 5th Dist. Ct. App. 2006) (considering whether "reasonable person" in declarant's shoes would "have been aware that the statements in response to the [questioner] would be available for later use in prosecuting").  At least one court has expressly noted that "there may be specific information bearing upon the caller's motive to bear testimony that might make application of *Crawford*[] . . . appropriate."  *United States v. Hinton*, 423 F.3d 355, 361 n.4 (3d Cir. 2005).  And even where the circumstances surrounding the statements in question do not demonstrate the declarant's purpose in making the statements, certain categories of out-of-court statements elicited in response to questioning, such as "unsworn confessions" and the like, have historically remained inadmissible "against anyone but the confessor."  *See Crawford*, 541 U.S. at 52.

Here, the circumstances surrounding Mateen's call to 911, the subsequent calls made to Mateen, and Mateen's Facebook posts, as well as the statements themselves, demonstrate Mateen's testimonial purpose.  Mateen commences the calls with—and repeats throughout—a mantra in place of his name, saying "[m]y name is I Pledge Allegiance to (unidentifiable name)

of the Islamic State." Notwithstanding the Negotiator's attempts to draw from Mateen information about the shooting itself, Mateen persists in explaining his reasoning for carrying out the shooting, and what he intends for the shooting to accomplish. Mateen's statements serve only to document his acts in support of the Islamic State: the calls constitute a drawn out confession that amounts to testimony barred by the Confrontation Clause. [7] Mateen's contemporaneous Facebook posts bolster this conclusion, as they demonstrate further his intent to publicize and record his acts.

CONCLUSION

For the foregoing reasons, Ms. Salman respectfully requests that the court grant the above motion in its entirety.

Respectfully submitted,

By: /s/ Charles Swift
Charles D. Swift, Pro Hac
Texas Bar No. 24091964
*Pro Hac* Attorney for Noor Salman
833 E. Arapaho Rd., Suite 102
Richardson, Texas 75081
(972) 914-2507

Linda Moreno
Linda Moreno, P.A.
Florida Bar No. 0112283
Attorney for Noor Salman
511 Avenue of the Americas, No. 312
New York, New York 10011
(813) 247-4500

---

[7] Portions of Mateen's confession are clearly false, including his claims that he was wearing a protective vest, had placed bombs outside the nightclub, and had associates in the vicinity.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the Defendant's Omnibus Motion in

Limine was sent by CM/ECF delivery on November 13, 2017 to all counsel or parties of record

on the service list.

By: /s/ Charles Swift
Charles D. Swift, Pro Hac
Texas Bar No. 24091964
*Pro Hac* Attorney for Noor Salman
833 E. Arapaho Rd., Suite 102
Richardson, Texas 75081
(972) 914-2507