**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

UNITED STATES OF AMERICA

VS.     CASE NO: 6:17-cr-18-Orl-40KRS

NOOR ZAHI SALMAN
_____/

**ORDER**

This cause is before the Court on Defendant Noor Zahi Salman's Motion for Change of Venue, filed on September 1, 2017. (Doc. 106). The Government has filed a Response in Opposition to Defendant's motion. (Doc. 114). Upon due consideration, Defendant's Motion for Change of Venue is denied.

**I.   BACKGROUND**

On January 12, 2017, a grand jury sitting in Orlando, Florida, returned a two-count Indictment against Defendant, Noor Salman. (Doc. 1). Count I charges Defendant with aiding and abetting the attempted provision and provision of material support to a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B(a)(1) and (a)(2). (*Id.*). Count II charges Defendant with obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3). (*Id.*) The Indictment alleges that Defendant aided and abetted her husband, Omar Mateen, in his attempt to provide material support or resources to the Islamic State of Iraq and the Levant (hereinafter referred to as "ISIL" or the "Islamic State"), culminating in the mass murder of forty-nine civilians and the injury of fifty-three civilians at the Pulse nightclub in Orlando, Florida, on June 12, 2016. (*Id.*). Trial shall commence on March 1, 2018. (Doc. 48).

Defendant Salman moves this Court to order a change in the venue for the trial of this case due to the alleged "inherent prejudice" caused by "[t]he continued and constant media coverage, along with Orlando Police Chief John Mina's (Chief Mina) statements [which] have infected this community sufficiently to prejudice a significant portion against Ms.Salman."[1] (Doc. 106, pp. 2–3).

## II.   LEGAL STANDARD FOR CHANGE OF VENUE

Article III of the Constitution of the United States provides that the trial of a criminal case "shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment to the Constitution also guarantees a criminal defendant the right to trial "by an impartial jury of the State and district wherein the crime shall have been committed." *Id.*, amend. VI. However, due process mandates that "[t]he Constitution's place-of-trial prescriptions . . . do not impede transfer . . . to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010). Consistent with this principle, Rule 21(a), Fed. R. Crim. P., provides:

> Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

A defendant is entitled to a change of venue if she can demonstrate actual or presumed prejudice. *Gaskin v. Sec'y, Dep't of Corr.*, 494 F.3d 997, 1004–05 (11th Cir. 2007); *Meeks v. Moore*, 216 F.3d 951 (11th Cir. 2000). The Eleventh Circuit Court of

---

[1] The Defendant does not seek a change of venue due to "actual prejudice" which occurs when "the prejudice actually enters the jury box and affects the jurors. *Heath v. Jones*, 941 F.2d 1126, 1134 (11th Cir. 1991)." (Doc. 106, p. 3). Actual prejudice may only be measured after a jury has been impaneled.

2

Appeals instructs the district court in its presumed prejudice analysis to assess the totality of the circumstances in determining whether the pretrial publicity was sufficiently inflammatory and prejudicial and has saturated the community in which the trial is held. *Price v. Allen*, 679, 1315, 1322 (11th Cir. 2012); *Mills v. Singletary*, 63 F.3d 999, 1010 (11th Cir. 1995). Factors a court is to consider in evaluating the "prejudicial and inflammatory" prong include: (1) whether the publicity contains a confession or admission by the defendant; (2) whether there was official misconduct in influencing the publicity in the case, and (3) whether "invidious personal attacks" against the defendant appeared in the media. *Knight v. Dugger*, 863 F.2d 705, 721–23 (11th Cir. 1988).

As for the saturation prong of the analysis, the court should consider whether "a substantial number of the people in the relevant community could have been exposed to some of the prejudicial media coverage" and whether "the effects of the media saturation continued until the trial." *Heath v. Jones*, 941 F.2d 1126, 1135 (11th Cir. 1991). In *Skilling v. United States*, 561 U.S. 358, 381–85 (2010), the Supreme Court identified four factors pertinent to whether the defendant had demonstrated a presumption of prejudice that supports a change of venue: (1) the size and characteristics of the community where the offense occurred and from which the jury is drawn; (2) the quantity and nature of the media coverage about the accused and whether it included "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; (3) the passage of time between the offense and the trial and whether prejudicial media coverage decreased during that time, and—when evaluating the motion following a verdict—(4) whether the jury's conduct ultimately undermined any potential pretrial presumption of prejudice.

Of course, "prominence [of media coverage] does not necessarily produce prejudice, and juror impartiality does not require ignorance." *Skilling*, 51 U.S. at 360–61 (emphasis in original). Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *United States v. Lindh*, 212 F. Supp. 2d 541, 549 (E.D. Va. 2002) (quoting *Irvin v. Dowd,* 366 U.S. 717, 723 (1961); *see also United States v. Fuentes-Coba*, 738 F.2d 1191, 1194 (11th Cir. 1984) ("[D]ue process requires only that a jury be seated which can put aside any impressions gained from pretrial publicity and render a fair verdict based on the evidence presented in court."). In the final analysis, the burden upon the defendant to support a change of venue is extremely heavy[2]:

> The presumed prejudice principle is rarely applicable, and is reserved for an extreme situation. Where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community, jury prejudice is presumed and there is no further duty to establish bias.

*Gaskin v Sec'y, Dep't of Corr.*, 494 F.3d 997, 1004 (11th Cir. 2007) (emphasis removed) (quoting *Meeks v. Moore*, 216 F.3d 951, 960–61 (11th 2000)). "The key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool." *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003). "Only where voir dire reveals that an impartial jury cannot be impaneled would a change of venue be justified." *United States v. Lindh*, 212 F. Supp. 2d 541, 549 (E.D. Va. 2002) (quoting *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991).

---

[2] *Coleman*, 778 F.2d at 1537.

**III.     DISCUSSION**

Defendant Salman asserts that "[a]mple evidence establishes the existence of negative pre-trial publicity in this case. Specifically, Chief Mina [a local police chief] made repeated disparaging statements and proclamations of Ms. Salman's guilt, which received intense and widespread prejudicial publicity in the local press." (Doc. 106, pp. 4–5). The Defendant argues that Chief Mina's comments "create the very real danger of community saturation, to the point where it is impossible to seat an impartial jury in Orlando." (*Id.* at 5).

**A.     The Orlando Division**

As discussed *infra*, the issue of saturation is viewed in the context of several factors, including the size and characteristics of the community where the offense occurred and from which the jury is drawn. *Skilling v. United States*, 561 U.S. 358, 382 (2010). As the Government correctly points out in its reply, the Middle District of Florida is very large, and the Orlando division consists of five counties: Orange County (population 1,145,956), where the Pulse nightclub shooting took place, Osceola County (population 268,685), Seminole County (population 422,718), Brevard County (population 543,376), and Volusia County (population 494,593), for a total of over 2.8 million people. There is approximately 119 miles between the most southern point in the Orlando Division (Osceola County) to the most northern point in the division (Volusia County). It is within the context of the large, densely populated Orlando division that one must consider pretrial publicity.

### B. Chief Mina's Public Statements

Defendant has identified four statements attributed to Orlando Police Chief Mina. It should be noted that Defendant does not suggest that Chief Mina will be a witness at the trial, and the Government has already produced to Defendant the law enforcement reports prepared in this case along with the evidence the Government will likely rely upon in its case-in-chief. (Doc. 48). The Court will address each of Chief Mina's statements individually.

#### 1. May 30, 2017, Interview

On May 30, 2017, Chief Mina gave an interview to the *Orlando Political Observer* in which he stated:

> Well, I will say that based on the information that I have, that I have received from the FBI, that [Ms. Salman] certainly could have, could knew [sic] about it and could have done something to prevent that, so I, my belief that she needs to be held accountable for those 49 deaths and for all those people that were injured and for this huge tragedy that we had here in Orlando . . . certainly if she knew about what he was capable of planning, and you know, that should be reported immediately to the authorities.

(Doc. 106, p. 7).

Chief Mina is voicing his opinion that Defendant "could have" known about the attacked carried out by her husband and "could have done something to prevent" the attack. This observation is Chief Mina's opinion, which he qualifies by stating "if she knew about what [Mateen] was capable of planning . . . that should be reported immediately to the authorities." The defense attempts to characterize this comment as on par with the law enforcement officer's statement in *Shepherd v. Florida*, 341 U.S. 50, 51 (1951), where the officer advised the media that the accused had confessed. (*Id.* at p. 5). Chief Mina's opinion that Defendant Salman, depending on what she knew about her husband's

intentions at the relevant time, should have alerted authorities is a far cry from telling the media that the defendant had confessed to the crime.

The defense quotes the *Orlando Political Observer*'s website in which it touts its readership as including "the most powerful and influential members of the Central Florida Community" as evidence to suggest saturation of Chief Mina's May 2017 interview. However, Defendant offers no evidence of the extent of the *Orlando Political Observer*'s on-line readership, particular as relates to May 2017. Thus, it is impossible to discern whether a handful, hundreds, or thousands of individuals read this online interview, and the Court may not speculate as to this point.

### 2. Orlando Police Department Facebook Page

On January 16, 2017, following the arrest of Defendant Salman, the Orlando Police Department ("OPD") posted on its Facebook page the following:[3]

> Today, the FBI arrested the wife of Pulse Orlando shooter on federal charges of Aiding and Abetting by providing material support to a terrorist organization and Obstruction of Justice.
>
> We are grateful to our federal law enforcement partners, FBI – Federal Bureau of Investigation and U.S. Attorney's Office Middle District of Florida Tampa for bringing this to fruition.
>
> See OPD Chief John Mina's statement below. We will never forget the beautiful lives lost at #Pulse.
>
> #Orlando United.
>
> (by Chief Mina):
>
> Today, the FBI took Noor Salman, the wife of Pulse nightclub gunman Omar Mateen, into custody on charges of Aiding and Abetting by providing material support to a terrorist organization and Obstruction of Justice.

---

[3] The Facebook posting occurred four months before Chief Mina's interview with the *Orlando Political Observer*.

7

> I am glad to see that Omar Mateen's wife has been charged with aiding her husband in the commission of the brutal attack on the Pulse nightclub. Federal authorities have been working tirelessly for more than seven months, and we are grateful that they have seen to it that some measure of justice will be served in this act of terror that has affected our community so deeply.
>
> Nothing can erase the pain we all feel about the senseless and brutal murders of 49 of our neighbors, friends, family members and loved ones. But today, there is some relief in knowing that someone will be held accountable for that horrific crime.

(Doc. 106, pp. 7–8). This Facebook post was liked, as of September 1, 2017, by 520 people and was shared 112 times, (*Id.* at p. 8), out of an Orlando Division population of 2.8 million residents. This means that .023% of the population of the Orlando Division liked or shared the post. [4]

While the defense portrays the Facebook post as highly inflammatory, the first post reports the fact of Defendant Salman's arrest and Chief Mina's tribute to the individuals who died in the attack. This post may properly be described as factual and not within the genre of inflammatory publicity discussed in *Coleman v.* Kemp, 778 F.2d 1487, 1542 (11th Cir. 1985), *cert. denied*, 476 U.S. 1164 (1986).[5] That is, the first post to Facebook

---

[4] 2,800,000 multiplied by .023% is 644—slightly more than the combined number of individuals who liked or shared the post. While it is theoretically possible that a greater number of people read the post than is reflected by those who liked or shared the post, the Court would again have to speculate to reach that conclusion. The defense fails to submit additional data as to the number of people who visited the OPD Facebook page on this date or any other date.

[5] In *Coleman*, pretrial publicity included that the defendant's fingerprints were at the crime scene, law enforcement proclaimed the evidence of guilt to be "overpowering," the defendant was an escapee from prison with a long criminal record, the defendant had confessed, and the defendant was described as remorseless and smirking over the murders he committed. *Coleman*, 778 F.2d at 1538–39.

8

does not comment upon any evidence collected by law enforcement, nor does it reflect an opinion as to Defendant Salman's guilt or innocence.

The second post is no more inflammatory than the first. The second post, apparently placed on the OPD Facebook page the same day, consists of Chief Mina repeating again the fact that Defendant had been apprehended. He then expresses gratitude for the work of federal law enforcement and concludes with his relief that someone will be held accountable for the offense. Chief Mina does not allude to any evidence which may be introduced by the Government, nor does he otherwise offer facts in support of his contention that [Defendant] will be held accountable. Chief Mina's concluding sentence cannot fairly be characterized as "highly inflammatory." By the time of trial, the OPD Facebook post will be 14 months old.

3. Chief Mina's Twitter Activity

On March 2, 2017, this Court stayed the Order entered by a Magistrate Judge in California granting Defendant Salman bail the previous day. (Doc. 16). On March 1, 2017, Chief Mina tweeted the following:

> I am disappointed that Noor Salman, charged by federal authorities for obstruction of justice and aiding and abetting her husband Omar Mateen in the commission of the brutal attack on the Pulse nightclub, will be released from Federal custody pending a trial.
>
> Nothing can erase the pain we all feel about the senseless and brutal murders of 49 of our neighbors, friends, family members and loved ones. But I have full faith that she will ultimately be brought to justice and I remain grateful to federal authorities, who worked tirelessly on this case for months to see that some measure of justice be served in this act of terror that has affected our community so deeply.

(Doc. 106, p. 9)

9

The defense reports that this tweet was retweeted 117 times and liked and commented on "by multiple individuals." (*Id.*). The number of individuals who liked or commented upon this tweet is presumably meager, otherwise the defense would have included the count in its pleading. The 117 retweets amounts to less than .005% of the population in the Orlando Division. The tweet itself is largely a factual account of the status of the case and Chief Mina's condolences to the Orlando community. Chief Mina's comment that he has full faith that she [Defendant] will ultimately be brought to justice is not inflammatory nor is it sufficiently prejudicial to warrant a change in the venue for this trial. Chief Mina did not comment upon any specific piece of evidence collected during the investigation, nor did he make any disparaging remark concerning Defendant's character. Chief Mina expressed his faith in the justice system following the return of a grand jury indictment in this case.

On March 10, 2017, this Court reversed the order of the Magistrate Judge who had imposed conditions of pretrial release for Defendant Salman. (Doc. 24). That same day, Chief Mina tweeted "Great work by @USAS_MDLF" and retweeting his observation that "I have full faith that Salman will ultimately be brought to justice. Judge revoked her bail." (Doc. 106, p. 9). This tweet was shared 14 times and was liked and commented upon by "multiple individuals." (*Id.*). Chief Mina's comments do not individually or collectively approach the level of prejudicial commentary addressed by Courts in granting a change of venue.

        4.      Media Coverage – Local[6]

On March 10, 2015, the *Orlando Sentinel* reported that Chief Mina was "heartened by the news" that Defendant had been denied bail. (*Id.* at p. 10). The defense next cites an *Orlando Sentinel* article dated March 24, 2017, which purportedly discusses how Chief Mina has traveled to foreign countries to discuss how his department responded to the shooting. (*Id.*). The Court assumes the article referenced by defense counsel does not contain any comment by Chief Mina about the facts of the investigation since no such facts are cited by the defense.[7]

The defense goes on to levy the serious allegation that Chief Mina was interviewed about this case on May 30, 2017, where he allegedly stated that he believes Defendant Salman is guilty. (*Id.* at p. 11). In support of this assertion, Defendant directs the Court to the March 24, 2017 *Orlando Sentinel* article by Mr. Harris which, as previously noted, was not submitted by Defendant. As reflected in footnote 7 of this Order, the Court has independently located an article by Mr. Harris dated March 24, 2017, and Chief Mina is not quoted as opining on Defendant's guilt or innocence. The Court also located news coverage from WFTV 9 dated May 30, 2017;[8] however, that story only summarizes Defendant's motion for change of venue and does not discuss the alleged comment

---

[6] The Defendant fails to attach the news reports for the Court's review.

[7] The Court has located an *Orlando Sentinel* article that appears to be the story referenced by Defendant. *See* David Harris, *Police Chief John Mina Travels the World to discuss Orlando's Response to Pulse Nightclub Massacre*, ORLANDO SENTINEL (Mar. 24, 2017), http://www.orlandosentinel.com/news/breaking-news/os-john-mina-world-travel-20170324-story.html. The story does not discuss the facts of the Pulse case.

[8] *See* Mark Boxley, *OPD Chief's Statements Make Fair Trial for Pulse Gunman's Widow Impossible in Orlando, Filing Claims*, WFTV9 (Sept. 2, 2017), www.wftv.com/news/local/opd-chiefs-statements-make-fair-trial-for-pulse-gunmans-widow-impossible-in-orlando-filing-claims/601823952.

attributed by the defense to Chief Mina concerning the accused's guilt in this matter. It seems that Defendant's claim that "on May 30, 2017 . . . [Chief Mina] told the Orlando community that he believes Ms. Salman is guilty" is unsupported.

The Defendant further asserts that the "number of news articles implying Ms. Salman's guilt are many." (Doc. 106, p. 13). Defendant Salman points to a number of news articles by the *Orlando Sentinel* covering "the victims, the shooter, the investigation, the survivors, the reaction, the politics, and the commentary."[9] (Doc. 106, p. 13). One would assume that the articles found on the *Orlando Sentinel* website referenced by Defendant contain stories implying Defendant Salman is guilty. Yet, while the defense shoulders a heavy burden in seeking a change of venue, Defendant elects not to provide a single specific quote from the *Orlando Sentinel* articles connected to the internet address that she cites in her motion. If a smoking gun of adverse pretrial publicity were among the articles written by *Orlando Sentinel's* journalists, one would expect Defendant to direct the Court to that material.

     5.    Media Coverage – National

The Defendant cites to a newspaper article appearing in the *Los Angeles Times* on June 15, 2016, before Defendant was arrested.[10] (Doc. 106, p. 12). The defense quotes two comments appearing in the *Los Angeles Times*:

> As Salman moved to the center of attention in the criminal investigation Wednesday, she was pilloried in social media

---

[9] The Defendant directs the Court to www.orlandosentinel.com/news/puls-orlando-nightclub-shooting (last visited Dec. 5, 2017).

[10] *See* Jenny Jarvie & Rong-Gong Lin II, *Here's What We Know About Nor Salman, the Widow of the Orlando Gunman*, L.A. TIMES (Jun. 15, 2016), http://www.latimes.com/nation/la-na-orlando-noor-salman-20160615-snap-story.html.

> and in print after investigators said they were looking into what role, if any, she played in the shooting rampage.

(*Id.*). However, Defendant omits the balance of the paragraph which reads "Did she help Mateen plan it or help scout the location, the Pulse nightclub?" The second quote selected by the defense reads:

> The front page of the New York Post was dominated by a picture of Salman and a headline: "She could have saved them all." The paper [] went on to call Mateen a "monster" and describe Salman as "attuned to his desire for mass bloodshed."

(*Id.*).

The quote, if one includes the parenthetical information omitted by Defendant in her brief, reads: "The paper [*New York Post*], **never known for subtlety** . . . ." (emphasis added). The *Los Angeles Times* goes on to summarize a Facebook post from a woman residing in Missouri who was anti-Defendant Salman and others described as "more sympathetic" to Defendant.[11] Neither the United State Attorney's Office nor state and federal law enforcement are quoted in the story as having discussed the facts of the case.

The Defendant maintains that "much of the information contained in police and FBI reports found its way into the press in the days following the attack." (*Id.* at p. 13). Despite this broad assertion, the defense cites only to the news accounts concerning text messages sent between Mr. Mateen and Defendant during the Pulse attack. (*Id.*). The defense claims the following news outlets covered the story of Defendant and the decedent having exchanged text messages: *Palm Beach Post*, reporting Mateen texted

---

[11] The *Los Angeles Times* quotes one negative Facebook post by the individual from Missouri and also quotes Defendant's neighbor describing her as a good mother and good neighbor, along with positive descriptions by Defendant Salman's mother and her father-in-law.

13

Defendant to ask if she had been watching the news followed by "*I love you, babe,*" dated June 16, 2016; *The New York Times*, reporting Mateen texted "*I love you, babe,*" dated June 17, 2016; *NBC News*, reporting Defendant asked Mateen where he is, and in reply Mateen asks "Do you see what's happening?," to which Defendant replies "No," and Mateen states "I love you, babe," dated June 17, 2016, and *The Telegraph*—a paper in the United Kingdom—reporting on June 17, 2016 that Mateen texted Defendant "*I love you, babe.*" (*Id.* at fn. 24). The defense argues that the text message exchange reported in the news omits important queries, including Defendant Salman asking Mateen "What happened?!" and saying "Your mom said that she said to come over and you never did." The lack of context, argues the defense, is misleading and incorrectly feeds into a misapprehension of Defendant "Salman's foreknowledge of the horrific shooting, thereby exposing the jury pool in Orlando to prejudice grounded in misleading media accounts." (*Id.* at p. 14).

Excluded from Defendant's summary of news outlets covering the exchange of text messages is Defendant's interview with *The New York Times* on November 1, 2016.[12] Defendant Salman, accompanied by counsel, told *The New York Times* that she received a text message from Mateen the morning of the attack in which he asked her "Did you see what happened? She texted back that she had not." (Goldman, *supra* note 12). Mateen replied, "I love you babe." (*Id.*). Defendant Salman did not include in her

---

[12] *See* Adam Goldman, *Orlando Gunman's Wife Breaks Silence: "I Was Unaware,"* N.Y. TIMES (Nov. 1, 2016), https://www.nytimes.com/2016/11/02/us/politics/orlando-shooting-omar-mateen-noor-salman.html.

14

interview with *The New York Times* the text message exchanges which her defense counsel now claim contributed to a false narrative concerning her foreknowledge.

The Defendant also asserts that she is prejudiced by the *Orlando Sentinel* due to its reporting that she "told investigators that she drove him to the site of the massacre, Pulse nightclub, at least once before."[13] (Doc. 106, p. 14). However, in her interview with *The New York Times*, Defendant Salman states she accompanied Mateen to Orlando in the months before the shooting but had no idea he was checking out Pulse for a future attack. (Goldman, *supra* note 12). These two statements are not necessarily inconsistent. In both instances it is reported that Defendant drove with her husband to Orlando prior to the attack, and in neither case does the journalist report Defendant admitted to knowing the Pulse nightclub was the intended target.[14]

### C.    JUROR QUESTIONNAIRES

On April 20, 2017, the Court entered an Amended Scheduling Order which, *inter alia*, established July 3, 2017, as a deadline for the parties to submit a proposed juror questionnaire. (Doc. 48). Following consultation with counsel for Defendant and for the Government, the Court prepared a juror questionnaire which is twenty-seven pages in length and contains seventy-six questions to assist the parties in selecting a jury in this case. The Court thereafter directed the Clerk of Court to summons 1000 potential jurors

---

[13] *See* Del Quentin Wilber & Rene Stutzman, *Federal Grand Jury Investigating Orlando Nightclub Rampage*, ORLANDO SENTINEL (June 15, 2016), http://www.orlandosentinel.com/news/pulse-orlando-nightclub-shooting/os-orlando-shooting-omar-mateen-investigation-20160615-story.html.

[14] The Defendant discusses in her *New York Times* interview a number of other topics, including that she knew her husband watched jihadist videos, knew he had been interviewed twice by the FBI in 2013, and knew that the FBI "let him go." (Goldman, *supra* note 12).

15

to complete the questionnaire. Out of 1000 summons, 646 individuals came to the courthouse and completed their questionnaires, sixty-four were undeliverable, four recipients had moved to another district, and 117 were excused due to age, disqualification, or were outside of the United States. The Court has provided the attorneys with the 646 questionnaires and has ordered counsel to confer and to create a matrix listing potential jurors who should be excused from service in this case. The Court will review the matrix and will meet with the attorneys well in advance of trial to discuss any additional challenges for cause.

## IV.   CONCLUSION

Events such as the Pulse nightclub shootings generate public interest, and media sources cover and comment upon many aspects of such events. As the United States Supreme Court stated in *Skilling v. United States*, "prominence [of media coverage] does not necessarily produce prejudice, and juror <u>impartiality</u> does not require <u>ignorance</u>." *Skilling*, 561 U.S. 358, 360–61 (2010) (emphasis in original). The pretrial publicity in this case does not contain references to a confession or an admission of guilt by Defendant Salman, nor has the media or law enforcement engaged in invidious personal attacks against Defendant.[15]

Moreover, there has been no showing of official misconduct designed to influence the publicity this case has received. *See Knight v. Dugger*, 863 F.2d 705, 721–23 (11th 1988). Certainly, the defense portrays Chief Mina's Facebook posts and tweets as prejudicial and inflammatory, but this overstates the nature and impact of Chief Mina's

---

[15] The single exception is the *New York Post*, which the *Los Angeles Times* describes as never being known for subtlety.

observations. Chief Mina expressed his displeasure at Defendant obtaining pretrial release and his satisfaction with the revocation of those conditions. He also voiced his confidence in the work of the FBI and the efficacy of the American system of justice. Chief Mina also qualifies his statements by saying "certainly **if she knew** about what [Mateen] was capable of planning, and you know, that should be reported immediately to the authorities." (Doc. 106, p. 7) (emphasis added). This is a far cry from disparaging the accused, disclosing incriminating evidence, or the other forms of extreme rhetoric that warrants a change of venue. *United States v. Lehder-Rivas*, 955 F.2d 1510, 1524 (11th Cir. 1992) (characterizing defendant as a "narco-terrorist" and "kingpin" is insufficient to trigger a finding of presumed prejudice).

Similarly, while the defense points to a news account of Chief Mina having traveled to other states and countries to discuss his agencies response to the Pulse attack, this factual statement is neither prejudicial nor inflammatory. *Spivey v. Head*, 207 F.3d 1263, 1270 (11th Cir. 2000). Defense counsel states in the motion that Chief Mina was interviewed on May 30, 2017 and "told the Orlando community that he believes Ms. Salman is guilty." (Doc. 106, p. 11). However, as discussed in detail in this Order, the record citation provided by the defense does not corroborate this statement by counsel, neither does the WFTV 9 story, aired on May 30, 2017, located by the Court.

The Defendant's reference to the *Los Angeles Times* story, dated June 15, 2016, does not tip the analysis in favor of the defense. The *Los Angeles Times* story is nothing if not balanced. The two quotes selected by Defendant create the impression of more biased coverage, but that is due to the omission of critical language from both quotes which the Court previously commented upon. Similarly, Defendant's generalized

17

reference to the *Orlando Sentinel* having printed a number of stories—the precise number is not identified by the defense—on a number of topics related to the Pulse attack does not justify a change in venue. This is due in part to the failure of the defense to identify prejudicial or inflammatory reporting in those stories, as opposed to mere factual accounts which are not presumptively prejudicial.

      To the extent that Defendant avers that "leaked" text message exchanges that occurred between Mateen and Defendant Salman lack context and have created a misimpression as to her foreknowledge of the attack, the Government directs the Court to consider Defendant Salman's *New York Times* interview. The Defendant shared the same subset of text messages with the journalist who interviewed her that she now contends is prejudicial. For the same reason, Defendant's contention that a news story reporting that she accompanied Mateen to Orlando prior to the attack is not inconsistent with her *New York Times* interview. In neither instance is it reported that Defendant Salman came to Orlando specifically to select the nightclub as a target. In fact, Defendant Salman's interview includes her admission to having observed Mateen watching jihadist videos, knowing that Mateen had been interviewed twice by the FBI in 2013, and knowing that the FBI let him go. (Goldman, *supra* note 12).

      Turning to the issue of whether pretrial publicity has saturated the community, the Court notes that the mere volume of new coverage is not determinative. In *United States v. De La Vega*, 913 F.2d 861, 865 (11th Cir. 1990), the defense submitted 330 news articles which were "largely factual in nature," and the Court concluded this was insufficient to presume prejudice in Miami-Dade county. Here, Defendant has cited to a significantly smaller number of articles, even including stories covered in other states and

in the United Kingdom. The Defendant has not attempted to show the number of individuals who may have viewed the OPD Facebook page or Chief Mina's Twitter account, and the volume of likes, shared posts, and re-tweets reflects significantly less than .05% of the 2.8 million people residing in the Orlando Division. Simply put, the defense has not carried its burden of showing that the quantity and nature of the media coverage about the accused or this case, in view of the size of the Orlando Division, constitutes saturation of the community.

The Court finds that the pretrial publicity in this case does not satisfy the prejudicial and inflammatory prong of the analysis, and the volume of coverage does not rise to the level of saturation. The Defendant has failed to demonstrate that "so great a prejudice against the defendant exists in the . . . district that the defendant cannot obtain a fair and impartial trial here." Fed. R. Crim. P. 21(a). Additionally, the Court has put in place mechanisms designed to identify jurors who should be excused from service in this case, including the use of a detailed questionnaire—crafted with input from counsel for the Government and the Defendant—and the use of individual voir dire when jury selection commences on March 1, 2017.

Wherefore, for the foregoing reasons, Defendant Noor Zahi Salman's Motion for Change of Venue on the grounds of presumed prejudice (Doc. 106) is **DENIED.**

**DONE AND ORDERED** in Orlando, Florida on December 6, 2017.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties