<pre>
 1                  UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        ORLANDO DIVISION

 3    - - - - - - - - - - - - - - -X
        UNITED STATES OF AMERICA,   :
 4                                  :
                                    :
 5            Plaintiff,            :  Case No.:
                                    :  6:17-cr-18-Orl-40KRS
 6      vs.                         :
                                    :
 7    NOOR ZAHI SALMAN,             :  Orlando, Florida
                                    :  March 12, 2018
 8                                  :
              Defendant.            :  EXCERPT OF MOTIONS
 9                                  :  DOCKET ENTRY 287 AND 295
                                    :
10    - - - - - - - - - - - - - - -X

11              TRANSCRIPT OF EXCERPT OF PROCEEDINGS
               BEFORE THE HONORABLE PAUL G. BYRON
12                  UNITED STATES DISTRICT JUDGE

13

14    APPEARANCES:

15      Counsel for Plaintiff:        Sara Sweeney
                                      James Mandolfo
16                                    Roger Handberg

17      Counsel for Defendant:        Charles Swift
                                      Linda Moreno
18

19

20    Proceedings recorded by mechanical stenography.
      Transcript produced by computer-aided transcription.
21

22    Court Reporter:  Suzanne L. Trimble, CCR, CRR, RPR
                       Federal Official Court Reporter
23                     401 West Central Boulevard, Suite 4600
                       Orlando, Florida 32801
24                     e-mail: trimblecourtreporter@gmail.com

25
</pre>

EXCERPT OF PROCEEDINGS

1

2          THE COURT:  We have two pending motions.  One at

3    docket entry 287, that's the defense motion to preclude

4    certain statements in opening, and then yesterday there was

5    filed a motion in limine at docket entry 295.  I realize the

6    defense may not have had a chance to really review the motion

7    in limine yet.  You may have.  I don't know.  But everyone was

8    here working throughout last week, and it was filed on Sunday,

9    if I'm not mistaken.  At any rate, if you're prepared to

10   discuss the government's motion in limine at 295, which is in

11   part a response to the order I entered docket 216 where I

12   identified certain recordings that either were not addressed

13   or were not addressed fully by both sides, and I gave my view

14   on what I would like to see happen before I ruled on those.

15   So if you're not prepared to deal with 295 right now, we can

16   discuss when the government intends to offer this and pick a

17   time that would make sense to address it.  If you are

18   prepared, we can take a break and come back.  But 287 we

19   should address today if at all possible.

20         Why don't we take a 15-minute break?  We'll come

21   back at 3:00, and you all can let me know how you would like

22   to proceed.  I'm prepared on both.  Thank you.

23         MR. SWIFT:  Your Honor, one other thing.  I have one

24   not necessarily ex parte but sealed motion or sealed hearing

25   regarding a witness and the need for a pseudonym --

1          THE COURT:  Has that been filed?

2          MR. SWIFT:  -- brought to my attention.  I have not

3     filed it.  It was brought to my attention over the weekend,

4     communication I think at this point I think it's easier to

5     make an oral statement to you about the situation on that.

6          THE COURT:  When do you anticipate this person will

7     be testifying, or do you plan to use the pseudonym during

8     opening?  Is that the reason?

9          MR. SWIFT:  I do not plan -- well, I think we can

10    refer to the person generically during opening, but I would

11    anticipate them testifying in the defense case.

12         THE COURT:  All right.  And I believe there were a

13    few witnesses that may fall under that category.  And we can

14    address that.  As long as you both have conferred, I'm happy

15    to use a letter or just a different name or whatever you

16    prefer.  It's fine my by me.  I understand you want to protect

17    the privacy of certain people.  And if you both are in

18    agreement and you both know the true identity of the

19    individuals, which I know you do, then we can proceed in

20    whatever manner you desire.  It could be witness A or it could

21    a name, however I would like to do it.  So we can take that up

22    whenever it's appropriate.

23         All right.  Thank you.  We'll take a 15-minute

24    recess.

25              (Recess at 2:25 p.m., until 3:04 p.m.)

1        THE COURT:  All right.  Thank you.  The parties are

2   present again.  So we have the motion at 287, and we have the

3   one at 295.  Are we prepared to address both?

4        MS. SWEENEY:  I believe we are, Your Honor.

5        MR. SWIFT:  The defense is prepared as well, Your

6   Honor.

7        THE COURT:  Let me start with 287, which is the

8   defense motion.  It's the motion to preclude certain

9   statements in opening.  What I would like to do is -- I know

10  you all have read it.  But my custom is to summarize where I

11  think the points of contention are, then you all correct me if

12  I'm wrong.  It just tends to at times expedite things.

13       All right.  So as I perceive the motion, there are

14  certain topics the defense seeks to preclude under the premise

15  that if a foundation cannot be laid during the course of

16  trial, then it's improper to raise it in opening.  An example,

17  of course, being one of if there's a certain defense, whatever

18  it may be, duress or something of that nature, there has to be

19  a good faith basis to put it forward; otherwise, it cannot be

20  used in opening -- or, entrapment, whatever the theory might

21  be.

22       Here are the topics that I as understand it the

23  defense would like to preclude:

24       Number one is that Mr. Mateen was, quote, targeting

25  a gay club, as opposed to any other venue.

1        Number two, that the suggestion that Mr. Mateen was

2   looking at the website for the Pulse nightclub on June 10,

3   2016, is not corroborated by the forensic analysis of the

4   computers at his home, as well as the IP address.  His

5   individualized IP address at the home allegedly does not

6   access the Pulse website, which would be true regardless of

7   what device he uses, according to the defense.

8        Number three, there's a request to preclude in

9   opening certain spending outside the presence of Ms. Salman,

10  for example whether she was present when he purchased the

11  AR-15 in question, as well as certain ammunition and magazines

12  for the Glock firearm.

13       Number three is discussion of the purchase at

14  Walmart of ammunition for the revolver that was issued through

15  his security company.

16       Next we have the fact that Ms. Salman was added as a

17  payment on death beneficiary on Mr. Mateen's bank accounts.

18       There are some subsets, but that's essentially the

19  topics being addressed in the motion.  The specific payment

20  issue appears on page 7, and it's identified in five bullet

21  points.

22       So what I would like to do is let's take them one at

23  a time.  I've read the defense motion.  We can do it one way

24  or the other.  We can deal with them by just me having the

25  government indicate the areas where there's disagreement

1   versus agreement.

2          So we'll start by targeting of the gay club.  The

3   request in the motion is to preclude discussion in opening

4   statement that that is in fact what Mr. Mateen was doing.

5          MS. SWEENEY:  Your Honor, thank you.  May I begin

6   with kind of a general point, which is that we are aware of

7   our obligations to both the Court and to the defense to

8   present only evidence in opening that we believe will be

9   admissible or properly before the jury, and we don't think

10  it's appropriate for the Court to preemptively limit us in our

11  opening statement.  That being said, I'm happy to address the

12  specific points that are raised in defense motion.

13         The first, as Your Honor noted, is the idea that

14  Mr. Mateen was going to -- was seeking to attack a gay club.

15  We're not going to present that as an argument.  It's not what

16  we need to prove.  Instead, what we need to prove is that this

17  was a terror attack conducted at the direction and control of

18  ISIS on everyday Americans, and that's what we will present to

19  the jury in opening statement.

20         We've never contemplated arguing that Mr. Mateen was

21  targeting a gay club.  In fact, in expert reports that the

22  defense has had since August of 2017, we've included location

23  data showing that Mr. Mateen did first go to Disney Springs

24  and to the area of Eve nightclub.  So this is -- this has

25  never been something that we've argued or presented to anyone

1   about this case.

2          The defense motion does spend a bit of time talking

3   about this idea of casing Pulse.  And, of course, the

4   defendant admitted to the F.B.I. that -- in one of the

5   statements that she made that she and her husband had cased

6   Pulse.  But I want the record to be clear, as well, that in

7   the bond paperwork that the defense filed in California, they

8   too acknowledged that that casing took place of Pulse.

9          So while the other casing has been corroborated

10  substantially by location data and the Pulse casing is not

11  corroborated by location data, which I acknowledge that we

12  don't have that evidence -- to the extent Pulse casing has

13  been introduced as a greater subject in this litigation, it

14  was actually because defense included it in their bond

15  paperwork.  So we do not intend to rely on that, Your Honor.

16         As to the access of the Pulse website on June 10th

17  of 2016, I agree with some of the facts that defense has laid

18  out.  I agree that none of the known IP addresses associated

19  with Ms. Salman or Mr. Mateen accessed that website.  But what

20  I don't agree with is -- and what we intend to present

21  evidence on and discuss with the jury in opening is that,

22  first, Your Honor, there are things known as private browsing.

23  One of them is Google Chrome Incognito, which prevents a

24  record being kept on a user's phone.

25         The second is that Mr. Mateen logs out of his Google

1    account on June 10th.  It's one of the only logouts that he

2    actually has, and it lines up precisely with the time that

3    Ms. Salman said that he showed her a website.  So he logs out

4    of his Google account so nothing would be recorded there.

5           And then, finally, cell phones change IP addresses

6    frequently.  So it's often difficult to tell what the precise

7    IP address associated with the phone is at any particular

8    time.

9           So all of that taken together, Your Honor, we intend

10   to argue to the jury that Ms. Salman did see something that

11   night, and the fact that we can't -- that all we can present

12   is a possibility and the way that it could have happened is

13   absolutely by design, by the design of someone who wanted to

14   prevent others to be able to demonstrate what he had done in

15   the lead up to the attack.

16          Anything on that, Your Honor?

17          THE COURT:  Yes.  Let's me address these in stages.

18   So I don't get too far down field.

19          I'll begin by saying that your initial observation

20   that opening statements are rarely limited without some

21   unusual set of facts is correct.  Opening statements, as

22   you've heard me say to prospective jurors probably 115 times

23   over the last eight days, are not evidence.  They're simply a

24   road map that may or may not be correct.

25          Now, the point made by the defense, of course, is

1   that there are certain arguments that could not be made if

2   they were just factually completely unsupported.  You couldn't

3   make an allegation that Ms. Salman made a statement to the

4   F.B.I. if you had no evidence to support she did.  I mean,

5   there are some parameters obviously, and you're well aware of

6   what they are.  So you're correct.  It's not for me to

7   prejudge what can be offered in opening, since opening is not

8   evidence.  There are some limitations to what is a proper,

9   improper opening, and you're aware of that.

10          In terms of the targeting of the gay club, I think

11  you've made that point clear, that to the extent there's a

12  request by the defense that the argument or inference not be

13  that Mr. Mateen was specifically targeting a gay club to the

14  exclusion of any other place, you don't appear to be making

15  that contention.  The fact that the GPS may have shown him

16  looking at other locations doesn't necessarily rule out that

17  the fact that the Pulse nightclub caters to the LGBTQ

18  community was not perhaps a factor, but it's not a point in

19  your case, as you so clearly point out.  So I believe that's

20  an agreed to point, that highlighting the patronage of Pulse

21  as being largely LGBTQ is not the crux of your case.  I think

22  there's to real disagreement there.

23          In terms of looking at the website, I'll hear from

24  defense if they would like to respond, but there may be a

25  disagreement between the parties over what the evidence proves

1   to be, but the opening statement is not evidence.  It's an

2   outline, and absent some complete lack of foundation, it's

3   rare, I think indeed rare, that a court were to tell a parties

4   what they can and cannot say in opening.

5        Here, you have the description provided by

6   Ms. Sweeney concerning the IP addresses moving frequently in

7   cell phones, as well as the logout, and I'll let the experts

8   determine what they think that means.  That seems to be a

9   proper statement in opening.

10       If there's any additional comment the defense would

11  like to make on that, I'm happy to hear it.  We can go back

12  and forth.

13       MR. SWIFT:  Your Honor, we have -- as I said at the

14  start of the motion, our primary concern was to argue a

15  factual part on the LG -- on the targeting of this gay club.

16  Primarily the government had not listed that as one of its

17  parts.

18       I actually would say they could rely solely on what

19  they allege Ms. Salman's statements are, forensics be to the

20  side, because there is some evidence.  I don't believe that if

21  the government is going to contend that she may have looked at

22  it or there's some evidence, then they are certainly able to

23  refer to that.

24       What I was concerned about was a part where we would

25  target it, which would be inconsistent with any -- the theory

1  that it seemed to me, based on reading the government's

2  reports, that they were putting forward.  So I'm satisfied

3  with that.

4          THE COURT:  All right.  I would also note trial

5  briefs -- I note to some extent the pleadings have discussed

6  what's represented in a trial brief.  That's not the same as a

7  pill of particulars.  That's something really more for my

8  edification.  I don't believe the parties are necessarily

9  bound by it.  It's really designed to help me follow the

10 issues and the theory so I can make sure when the appropriate

11 arguments are made that I'm completely following what the

12 dispute is.

13          Let's turn to about spending.  Some of the arguments

14 are there were certain spending.  The theory, as I appreciate

15 it, is that there was a certain amount of spending by

16 Mr. Mateen.  And this has been the subject by my motion in

17 limine order at docket entry 216.  There was spending by

18 Mr. Mateen in the ten days leading up to the Pulse attack that

19 far exceeded his income.  Some of that spending involves the

20 purchases that are discussed in the defendant's motion.  Some

21 of which may have been outside of Ms. Salman's presence, such

22 as purchasing ammunition for the revolver, the G4S security

23 weapon, purchasing the assault rifle, which the defendant

24 concedes Ms. Salman was aware of since she commented on it in

25 her statements to the F.B.I., post-interview statements.  And

1  there's also the purchase of some Glock ammunition, which

2  apparently occurred when she was not personally present.

3         So the gist is that there were some items that

4  Ms. Salman may not have been present for but was aware of at

5  some point in time, since she referred to when she was

6  interviewed.  And the argument of course is that, if you're

7  unaware of an expenditure, it can't be evidence that you knew

8  that there was extraordinary spending.  This seems to me like

9  argument that will take place into trial and closing

10  arguments.

11         So, Ms. Sweeney, what do you make of the argument

12  that spending outside the presence of Ms. Salman is something

13  that should not be argued as evidence of foreknowledge?

14         MS. SWEENEY:  Your Honor, I think this is another

15  one of those situations where the parties have alternative

16  interpretations of different pieces of evidence.  In

17  particular here I would point out two things.  One, Ms. Salman

18  did not admit to the F.B.I. every piece of spending that she

19  was on film for even.  So the idea that, therefore, because

20  she's not on film she couldn't be aware of it I don't think

21  hangs together, given that there are multiple purchases that

22  Ms. Salman does not acknowledge to the F.B.I., including

23  hundreds of dollars at Best Buy, additional jewelry on

24  June 6th, being present on June 8th to buy -- when Mr. Mateen

25  purchased three 30-round magazines or the AR style weapon,

1   being present for the jewelry and purchases at Michael Kors at

2   the Florida Mall for her, and then her own use of her

3   husband's credit card on June 7th, June 10th, June 11th.  She

4   didn't mention any of those things to the F.B.I.

5          So there's no correlation between what she admits to

6   them and the full scope of the truth.  And I think that we

7   should be allowed to present to the jury these additional

8   purchases that were preparation for the attack, and the jury

9   can then decide whether it's circumstantially likely that she

10  was or was not aware of them.

11         THE COURT:  One example perhaps being the purchase

12  of the AR-15, where according to the defense Ms. Salman has

13  not present but later acknowledged being aware that the

14  purchase took place?

15         MS. SWEENEY:  Absolutely, Your Honor.

16         THE COURT:  All right.  That seems to me fair

17  comments.  The parties can argue the varying points and

18  indicate it's linked together or not.

19         MR. SWIFT:  Your Honor --

20         THE COURT:  Yes.

21         MR. SWIFT:  May I be heard on this?  My part on it,

22  and I fully expect there to be evidence on all of these.  What

23  I objected to was the government's characterization in the

24  trial brief and I was concerned this would be on it is that

25  the purchases of the AR-15, the Glock pistol, the ammunition

1   for both, these significant -- the primary weapons used in the

2   portion were joint purchases and there is no evidence of joint

3   purchases.  And that's why I used the language *joint*.  There

4   was certainly -- I mean, in hindsight they are unquestionably

5   Omar Mateen's preparatory steps.  My point is that the only

6   way to say that they are joint purchases at the time is either

7   to say that it's a conspiracy, legally speaking, or to rely on

8   Florida law because as her -- as his spouse, she is jointly

9   and severally liable for the debts, which I do not believe is

10   a proper point inside this to say that it is a joint purchase.

11        I don't -- I'm not looking to preclude evidence, and

12   in fact we'll be talking about those same things.  But I think

13   that joint suggests that she's responsible.  The government

14   wants to argue that she's aware or a part on this part.  If

15   they have evidence of that, then that's proper.  But my

16   concern in the motion was that the idea that these were joint,

17   that somehow they happened together, and there is no evidence

18   that I am aware of that would show that she had foreknowledge

19   of the purchases, approved of the purchases, or otherwise

20   contributed to the purchases.

21        It is not a case, for instance, where if the

22   opposite were true -- notice, I objected to none of the

23   evidence where she is present at the time.  She is present.

24   So even though he is making them on his sole credit card, it

25   could arguably be joint some part.  We'll argue it's not, but

1   it's arguable.  I'm not trying to keep it out on the part or

2   not refer to it.  But, you know, if it were the opposite --

3   Ms. Sweeney referred to some purchases that she made with his

4   credit card.

5          If it were the opposite, if Mateen had gone to the

6   shooting range with her credit card and used it to purchase

7   the rifle, I would say that there's a fair inference that

8   that's joint because he got her credit card and utilized it

9   for it.  But in this case it was the words *joint* as we said at

10  the part to be understood.

11         We don't argue that that isn't part of it, but we do

12  not believe the government in opening or part should be able

13  to characterize that as an act by her or as a joint act of the

14  parties.  They didn't charge a conspiracy where I'm liable for

15  all the acts of the other contributor.  And that's not before

16  the Court.  And so we objected to that part where I noted it

17  may have just been in the defense -- in the government's

18  motion -- you know, trial brief a mistake, but they said *joint*

19  *purchases*, and that's what I objected to.

20         THE COURT:  Thank you.  Let me clarify the point

21  then.  Is the anticipation to describe these acquisitions as

22  jointly undertaken, or simply that it was an expenditure that

23  occurred and that Ms. Salman was either aware of or at some

24  point became aware of?

25         MS. SWEENEY:  Yes, Your Honor, the latter.

1     THE COURT:  I think that resolves that dispute.  I

2 think we have a similar issue with the purchase of ammunition

3 at the Walmart, which is a separate category in the defense

4 motion in limine where it's alleged that the purchase occurred

5 on May 31, 2016, of 200 rounds of .38 caliber ammunition for

6 the weapon that was issued by Mr. Mateen's employer.

7     The contention in part being that the transaction

8 occurred before Mr. Mateen viewed the Islamic State's call for

9 attacks during Ramadan, which video took place on June 4,

10 2016.  Quite frankly, I don't know if I see the connection

11 there because one could certainly plan to commit an attack at

12 some point in time prior to the June 4th call to attack during

13 Ramadan, and that call becomes now a trigger that speeds up or

14 accelerates the timeline or maybe doesn't affect the timeline

15 at all.

16     MR. SWIFT:  Yes, Your Honor.  And I need to make one

17 correction.  While he did look at the video, I later in review

18 parts did find in parts that Mateen looked at a Russia Today

19 article on that same call prior to it.  So to the extent that

20 I argued that he had no knowledge on it -- the only point that

21 I would make in addition on this is that I do not expect the

22 evidence would show that Ms. Salman could have had in any way

23 any knowledge of -- other than a generic -- there are two

24 parts on the idea that he looks at websites and he's training,

25 but everything that is the speed up, that is the talk to this,

1   that apparently gives her knowledge because I do not believe

2   there will be any direct evidence at any time that he told

3   her, *I'm attacking* -- you know, well, there's the part on the

4   website, et cetera, that's on the evening of the 10th.

5          But before that, the part is an inference that she

6   should know or does know based on things that he said, but all

7   of that is after the purchases at Walmart on the -- on

8   May 31st and the change in the bank. So looking at the

9   actions, our view on it is looking -- you know, part on it are

10  looking at the charges, which require for her part to have

11  foreknowledge. She has to know what the offense is going to

12  be. That's absolute on the part. It just couldn't happen

13  there. So these cannot be acts in aiding and abetting at this

14  point because he may be planning, but there will be no

15  evidence she was aware of that.

16         THE COURT: So your point is the acquisition of

17  ammunition that Ms. Salman was unaware of could not be

18  evidence that she joined in his plan or purpose at some level.

19  Even though aiding and abetting does not require assistance in

20  every aspect, just some aspects, you're contention is that

21  purchasing ammunition of which she is unaware, meaning it's

22  not mentioned in the F.B.I. interviews or she's not seen on

23  videotape in the store with him, that that cannot be evidence

24  of foreknowledge and an intent to join in for aiding and

25  abetting.

1          MR. SWIFT:  No.  Actually, there was a lot of

2    ammunition purchases.  So I'm sorry on the part.  Ms. Salman

3    was aware of the ammunition purchase at the Walmart.  Walmart

4    he bought basically two boxes of .38 caliber ammunition.

5          THE COURT:  Right.

6          MR. SWIFT:  She came up while he was doing that.

7    What my point is that in time, at that point that ammunition

8    is for a service revolver that he has, and that she has no

9    foreknowledge at that point.  There would be no evidence to

10   suggest from which any juror or any person could conclude that

11   at this point she is aware of the attack.

12         And the act in furtherance has to be after

13   knowledge.  That was always our point on it.  If there is no

14   knowledge, an ignorant act in furtherance -- and what we do

15   not anticipate the government putting forth, other than

16   generic evidence from her own statements that he had looked at

17   violent videos and made comments, a part -- but everything

18   specific to the attack is afterwards.  Our view on these two

19   acts is that they can't be acts in furtherance or aiding and

20   abetting because there is no foreknowledge.

21         THE COURT:  The timeline between the May 31st

22   purchase of this ammunition for his service revolver, for lack

23   of a better term, how does that line up to the periods of time

24   that Ms. Salman and Mr. Mateen allegedly went to Disney

25   Springs or some other outdoor venue?

1    MR. SWIFT:  It is before.

2    MS. SWEENEY:  Oh, sorry.  It is, Your Honor.  The

3  May 31st is before.  The trip to City Place is June 4th

4  overnight into June 5th.  The trip to Disney Springs is on

5  June 8th.

6    But what I would like to point out, Your Honor, is

7  what defense points out as generic evidence from Ms. Salman's

8  statements, I could not disagree more with that

9  characterization.  What she in fact admits is that being aware

10 for two years leading up to the attack her husband had been

11 looking at violent propaganda on the Internet, and that is

12 borne out by a review of the home computers and of two of his

13 phones, both the phone that he had at the time of the attack

14 and the prior one.

15    And she gave specifics.  It's not generic.  She

16 references that he looks at beheading videos and ISIS

17 recruitment propaganda, and both of those things end up on the

18 home computer and the phones that are at issue.

19    So the idea that there's, there's nothing in her

20 mind when May 31st rolls around is false.

21    THE COURT:  And by this time hadn't the F.B.I.

22 already interviewed Mr. Mateen at his home?

23    MS. SWEENEY:  They had, Your Honor.  That was in

24 2014 -- I'm sorry.  2013 and 2014 there were interviews of

25 Mr. Mateen in his home when Ms. Salman was present.  That is

1   correct.  So that had taken place as well.

2        And then the other thing I would point out is that

3   the statement that Ms. Salman gives to the F.B.I., she voices

4   these things as red flags.  She voices both the Walmart ammo

5   purchase and the adding on the account as a payable on death

6   beneficiary as things that let her know what was coming.

7        Now, again, the government is entitled to argue that

8   she was still holding back in those statements to the F.B.I.

9   and not admitting that just beyond knowing she was actually

10   even participating at that point.  We're allowed to make that

11   argument to the jury.  And I don't think we should be

12   precluded from doing that in opening.

13        THE COURT:  All right.  Thank you.

14        MS. SWEENEY:  Thank you.

15        THE COURT:  I agree that argument -- or, at least

16   that description of the evidence can be provided.  The fact

17   that there are recruitment videos well in advance of

18   purchasing the ammunition where Ms. Salman was present and the

19   fact that at least some jurors may conclude that it's unusual

20   for an individual to buy ammunition for their service

21   revolver, as opposed to having an employer pay for it, are

22   facts that combined with the alleged statements attributed to

23   Ms. Salman that these were red flags, is sufficient to allow

24   it to have a foundation that would cause opening statement to

25   be proper.

1          The PNC Bank falls into the same category, that

2   Ms. Salman was added on the payable on death beneficiary, and

3   this was, of course, before the June 4, 2016, ISIS video

4   calling for attacks on Ramadan, but as indicated there were a

5   number of other Internet viewings by Mr. Mateen that indicated

6   he was at least viewing the ISIS recruitment videos and the,

7   what I would call, propaganda and that these purchases,

8   including the adding of payment on death beneficiary is proper

9   for the jury to consider.  The payment on death beneficiary is

10  on the 1st of June, 2016.

11          So while the parties may disagree and they're

12  certainly are entitled to do so and I appreciate you bringing

13  it to my attention in advance, these various facts now as

14  clarified by the government's response are properly presented

15  to the jury.

16          I find it helpful that we're doing this now because

17  objections in opening statements should be rare.  This is for

18  both sides.  An objection in closing argument should be

19  exceptionally rare.  These are arguments, and they're not

20  evidence.  And to the extent we can avoid interrupting one

21  another I think it makes the most sense.  All right.

22          So the motion in limine is granted in part and

23  denied in part based on the statements and representations by

24  the parties here today.

25          Let's change over now to the government's motion at

1    docket entry 295.  The government's motion at 295 is a motion

2    in limine, and I think some context perhaps matters.  In my

3    order on a number of outstanding motions in limine at docket

4    entry 216 entered some time ago the issue of news clips, 9-1-1

5    calls and a variety of other topics came up.  There was a

6    motion in limine by the defense to preclude certain things or

7    allow certain other things, including statements by Mr. Mateen

8    to this person identified as Nemo, as well as excluding

9    certain video and body camera recordings.

10           And, as you all recall, I went through each of those

11   submissions given to me in camera for review.  I allowed some

12   of the video footage and disallowed others.  So there was an

13   individualized review.

14           In the process of reviewing those materials, there

15   were a few items of evidence, an audio recording of the police

16   speaking about shots being fired, which is attached to the

17   government's motion as Exhibit 4; there were some 9-1-1 calls

18   within the bathroom of the Pulse nightclub attached as

19   Exhibits 1 and 2; and there was a conversation with Mr. Mateen

20   as Exhibit 3.  Those were either not addressed by parties or

21   not fully addressed by the respective parties.  So I gave some

22   guidance saying before it's admitted or discussed, then I want

23   to have advance warning so we can have this conversation we're

24   about to have.

25           The government's motion in limine is a response to

1    that direction on my part.  That's referenced in their motion,

2    and they seek the admission of 9-1-1 calls by two of the

3    victims of the shooting who were in the bathroom.  The calls

4    are fairly short.  The representation by the government -- or

5    the argument is that the calls from people in the bathroom

6    reporting what's happening in realtime follows exceptions to

7    hearsay, present sense impressions and excited utterances, two

8    well-recognized exceptions to hearsay, which due to their

9    reliability allow a statement by an out-of-court declarant to

10   be admitted.

11           The second issue, when we get past hearsay, is

12   whether or not those statements have relevance and whether or

13   not the relevance is outweighed by the prejudicial affect.  In

14   this regard the government contends that the calls from the

15   individuals within the bathrooms are relevant to show that

16   Mr. Mateen was holding hostages for a portion of the attack

17   and are necessary to explain his attempted provision or

18   provision of material support for Islamic State, as well as

19   demonstrating what was happening in parts of the Pulse

20   nightclub, which are not visible from the interior cameras or

21   from the body cameras of the police responding.  So that's the

22   gist of the argument.  We'll take them one at a time.

23           What's the defense position on these 9-1-1 calls?

24           MR. SWIFT:  I would like to deal with them each

25   individually because I look at each one of them as somewhat

1  different on the part.  We object to Exhibit A and B as both

2  cumulative and unduly prejudicial.  If you look through the

3  transcripts in proving it's Islamic State, Islamic State is

4  never mentioned during this period of time in either of those

5  transcripts.  It is mentioned in the third transcript.  That

6  makes it a different kettle of fish, if we will.

7         But these don't forward on.  They don't identify

8  Mr. Mateen, et cetera.  They basically paint a very horrible

9  picture of people bleeding to death, which is certainly going

10 to have an emotional impact, but there is an extraordinary

11 amount of evidence that people died during it, which is really

12 all I can see that these could be offered for.

13        Specifically, you're going to get 64 different

14 pieces of evidence regarding the attack.  Six photos of bodies

15 staring out, including three of this bathroom area, which will

16 prove that people bled to death in there because they are in

17 puddles of blood.

18        We are going to hear, the government purposes, from

19 four different survivors, plus two -- of deceased, six

20 responding officers, including -- and we'll get to that.

21        I think that's important to the last tape because

22 we're gonna hear from the detective himself on it, who will

23 establish -- by the way, the detective who was on duty there

24 would establish everything, along with the hostage negotiator,

25 that they need in the corner to be truthful on the matter.

1          The detective will testify, and there is no

2    contradicting evidence, that he eye-witnessed seeing Mateen

3    shooting.  He engaged him in fire.  He chased him into a

4    bathroom.  They withdrew because of a belief of explosives and

5    that he was relieved, but he will ID Omar Mateen as the

6    shooter.  After that, the combination of many photos of

7    Mr. Mateen's body found there, I think we're getting now to

8    the cumulative point.

9          He will -- we will also have for the purpose of the

10   ISIS this Court has already admitted the hostage negotiator

11   once over already.  So the -- oh, I forgot to mention.  We'll

12   also put on a broadcaster who spoke with Mr. Mateen when he

13   was into this period of time and will provide substantially

14   the same evidence on his reasons for doing this.

15         So we'll have the speaking with the hostage

16   negotiator, the speaking with the broadcaster, and now the

17   speech inside the bathroom, which is overheard on the 9-1-1

18   call because it has some relevance.

19         On the first two, these really don't establish

20   anything more of value.  This Court has -- you know, we

21   offered to stipulate to this.  The Court said the government

22   can prove its case.  But there has to be a limit here, Your

23   Honor, where something that is not in serious contention on

24   part.

25         Now, you know, we've raised some --

1      THE COURT:  Let me interrupt you just for a second.

2  The first exhibit, Exhibit No. 1, is a victim going by the

3  name of Angel who is recounting the fact that he is wounded in

4  the bathroom, and that he's calling for help, essentially.

5      MR. SWIFT:  Yes.

6      THE COURT:  And he doesn't speak much about -- in

7  fact, says nothing about the number of people shooting weapons

8  or any particulars as to what exactly is happening, other than

9  he's been shot and other people have been shot.

10     Let's distinguish that from Exhibit 2.  Exhibit 2

11  the caller is simply identified as *caller*.

12     MR. SWIFT:  Yes.

13     THE COURT:  Exhibit 2 is also in the bathroom and

14  states that he or she is a victim, has been shot and then goes

15  on to say -- I need to find it, but basically says, *They are*

16  *shooting the place up*, meaning more than one.

17     There has been a contention by the government that

18  in part the evidence that there's more than potentially one

19  attacker or at least Mr. Mateen was representing there was

20  more than one attacker is relevant to understand some of the

21  subsequent actions of law enforcement, why they went about

22  interviewing the way they did, or why they were motivated to

23  take certain steps to interview Ms. Salman, particularly when

24  the initial statements were different than the final

25  statements, according to them.

1          MR. SWIFT:  Well --

2          THE COURT:  So to the extent that this second

3 exhibit gives some details that the police are hearing from a

4 person inside the club that there are multiple shooters, which

5 is what Mr. Mateen is also saying, doesn't that go to that

6 point?  Setting aside the first one, which is just a victim --

7 not to minimize it -- but a victim describing what they were

8 going through.

9          MR. SWIFT:  It would go to that point if it were

10 relevant.  That was a relevant point for Your Honor.  It's a

11 relevant point for Your Honor to determine under the

12 circumstances is it reasonable to admit?  You know, is there

13 an exception to the Fourth or the Fifth Amendment?

14          That's not for the jury's consideration.  The jury's

15 consideration on the part here is looking at the techniques or

16 what happened with Ms. Salman, do they think that her

17 statement is trustworthy, not --

18          THE COURT:  Does it matter, though, if the argument

19 by the defense -- I'm not trying to preempt your arguments,

20 but if the argument is generically described as going to the

21 credibility of her statements or the veracity of what she's

22 said or veracity of what's recounted or attributed to her, if

23 those are in part the arguments that will be made, that either

24 the statements were not reliable because of either pressure or

25 cognitive issues or whatever it may be or that the recording

1    by the F.B.I. agent is not accurate because it's not video or

2    audio tape recorded, so if that's part of the argument,

3    doesn't the -- and if the duration of the interview goes

4    towards the truthfulness of the statements --

5                MR. SWIFT:  Right.

6                THE COURT:  -- then doesn't the prosecution have the

7    ability to introduce why the interviews carried on as long as

8    they did?

9                MR. SWIFT:  One doesn't follow the other.  That

10   might be on why she was initially -- that we went to the

11   house, which is of extraordinarily low value, you know, the

12   part on this, I guess, we went to the house, to the jury in

13   the part.  There was no interview for the period of time until

14   after Mr. Omar Mateen is actual -- the F.B.I. -- is dead.

15   They know that he's dead when they started.  They know that

16   there were no co-conspirators or other persons there.

17               THE COURT:  How would they know that, other than

18   hindsight now?

19               MR. SWIFT:  Oh, the officers on the scene.

20               THE COURT:  Well, my point is this:  And I don't

21   want to get too far into the weeds, but if you have Mr. Mateen

22   saying, *There are others outside that are going to attack when*

23   *the police show up*, which is one of his recorded statements,

24   why would the police be convinced at the time they're

25   interviewing Ms. Salman that there were no additional

1  perpetrators?  In other words, people could have left the

2  scene seeing the police presence.  They simply don't know.

3  They now know, but they may not have at the time known, which

4  may go to the timing or the duration of the interview.

5           MR. SWIFT:  I go on the part that it was seven hours

6  later by the time -- by the time this interview takes place.

7  These statements are being made at the very early beginning.

8  I don't think that the -- any of the witnesses are going to

9  suggest that the reason -- well, you know, I will give this to

10  Your Honor.  If they say that the reason that they're

11  interviewing Ms. Salman is because they believe that she was

12  actually at the Pulse, she was one of the *theys*, based on

13  grabbing her now at the home, then I will concede that it's

14  relevant.  It's relevant to that.  But I don't think that the

15  agents are ever going to say that.  They found her at home in

16  her night clothes.  I don't think that it really bears on it

17  and it is so remote that what we sit on there, if we go on the

18  part -- they want to play just the part.  Let's look at the

19  part.  If what it's being offered for is that they are

20  shooting, okay, let's enter that.  Why are we entering about

21  the injuries to my stomach?  Why are we interviewing all of --

22  you know, we are searching out of it.  Let's enter they are

23  shooting, which could easily also refer to the police which

24  are involved in a gun battle with Mr. Mateen.  But if that's

25  the purpose of it, let's just enter that part, and I'll live

1    with that.

2           The same thing really goes true to a cumulative

3    analysis when we get to Exhibit C.  You know, how many times

4    do we need to do this in part on it?  The government has far

5    better evidence than this.

6           THE COURT:  We'll stay one at a time.  I do

7    appreciate your point.  Let me turn back to the government.  I

8    understand what you're saying.

9           Ms. Sweeney, it's my impression that -- I am

10   sensitive as you saw in my order on the motions in limine when

11   I addressed this that audio recordings from people who are

12   fearing for their lives, rightfully so, and some of whom are

13   in the process of -- you know, they're grievously injured and

14   bleeding and may actually be in the process of dying is

15   extraordinarily emotionally charged.  There's going to be a

16   lot of emotionally charged evidence in the case.  It's just

17   the nature of the case.  I'm not critical of that.

18          But there's a limit to how much is necessary to

19   prove the case, and my concern is it doesn't appear there's

20   any dispute there were hostages held because it was well known

21   that there were people in the bathroom, hence the bodies found

22   in the bathroom, for example, which there will be images of.

23   So it's clear that there were hostages being held.  In fact,

24   Mr. Mateen in his statement, Exhibit 3, is talking to people

25   who have their cell phones and telling them to put it down and

1  stop texting and the like.  So it's clear he's got people

2  under his control.  That comes from his audio.

3       These recordings have a different perspective, which

4  is of a person who is in what would be a horrifically

5  terrifying spot.  And maybe that's the point, that it's a

6  terrorist organization.  The point is to strike terror, and

7  this is evidence of terror.  That may be exactly why you're

8  offering it.  I don't know how many of these would be

9  necessary to make that point.

10       The second exhibit, No. 2, is the first time that

11  the caller is saying, They are shooting at the club, which a

12  reasonable inference would mean *they* meaning multiple

13  shooters, particularly when you take it in context of

14  Mr. Mateen's statements moments later that are recorded in

15  Exhibit 3, where he speaks of people with vests, people

16  planning to attack, and snipers and so forth.  So I see that.

17       Is that part of what the argument will be that this

18  terrorism requires terror?  Is that necessary?  Or is it just

19  simply that if it's a terrorist organization it doesn't matter

20  if you were trying to inflict terror, which is pretty obvious

21  from the scope of the attack.

22       MS. SWEENEY:  Thank you, Your Honor.  So taking Your

23  Honor's point, we will not seek to admit Exhibit A.  Yes, this

24  case involves a lot of emotionally charged evidence, but as --

25  and I can't remember the name of the case as I stand here, but

1     there was a case that was cited and that we discussed during

2     the motion in limine hearing that says basically, you know,

3     when you're talking about terrorism, there's, there's no way

4     to not make at least some of the evidence charged, and I think

5     that goes to your point about terror.  It's not so much that

6     it's necessary, you know, for the statute that we prove terror

7     but in this case with the type of material support that was

8     provided, terror is the result of it, and it in fact was the

9     goal of what Mr. Mateen was doing.

10          So focusing on Exhibit B or Exhibit 2 to the

11     government's most recently filed motion, I agree with Your

12     Honor on the reference to, *They are shooting up the club*, and

13     then further on, and this is on the fifth page of the

14     document, the caller at the end there indicates, *I can hear*

15     *him putting more in the gun*.

16          I mean, this is, this is an ongoing attack.  It's

17     something that is lengthening out, where people are being held

18     in this way, and there's -- there's not many -- yes, I agree

19     with you.  That may be obvious to all of us now.  But there

20     are not many recordings that demonstrate that.

21          Again, too, the reference to *they* in this recording

22     and to all of the things and what we're gonna talk about in

23     the next exhibit --

24          THE COURT:  She's not referring to police because

25     she's saying, *Send police quickly.*

1      MS. SWEENEY:  Yes.  She does want police to come.

2   The thing is these references to other people, Your Honor,

3   ultimately it's not that Ms. Salman, anybody is going to say

4   Ms. Salman is in the club.  The problem is she, seemingly in

5   accordance with the defendant, introduces a third person into

6   this mix.  She introduces this specter of Nemo, this specter

7   of a co-conspirator that is not her.

8          And so at the point that the officers are hearing at

9   the club that there are multiple people involved, including if

10  you look at the third statement, Mr. Mateen says that some of

11  his co-conspirators are playing dead in the club waiting for

12  police to come in so they can begin attacking them.  And then

13  you combine that with Ms. Salman introducing the idea of

14  someone else being part of what's going on, this does go to

15  the reasonableness of police conduct, and the defense has

16  already indicated that they intend to relitigate voluntariness

17  in front of this jury.

18         THE COURT:  Well, they're allowed to do that because

19  it goes to the weight.

20         MS. SWEENEY:  I completely agree.  But then I feel,

21  Your Honor, it's relevant that the police were acting

22  reasonably, rationally, fairly and in accordance with the

23  situation they were dealing with.  So we should be allowed to

24  present that as well.

25         THE COURT:  All right.  Exhibit No. 1 will not be

1   allowed.  Exhibit No. 2 will be permitted since the veracity

2   and voluntariness of the post-interview statement by the

3   F.B.I. is called into question, some context is necessary.

4   And I think this particular recording gives the context,

5   particularly when there may be some concern by the F.B.I. in

6   the hours that follow the attack that there could be other

7   individuals out there.  I don't know if -- I certainly don't

8   think the defense would agree that the reference to Mr. Nemo

9   or this Nemo character was as a co-conspirator, as opposed to

10  somebody who was a friend of Mr. Mateen's who Ms. Salman

11  allegedly believed he was with at the time.

12         So that's going to be obviously a point in dispute

13  between the parties.  There are going to be many points in

14  dispute and many pieces of evidence interpreted through

15  different optics.  But this piece of evidence, Exhibit 2, goes

16  to understanding the hours following the Pulse attack and what

17  the police were doing and whether they were acting reasonably

18  and whether the period of time they interview Ms. Salman makes

19  sense or seems extraordinary.

20         Let's turn now to Exhibit 3, which is the

21  conversation with Mr. Mateen.  In this conversation the

22  government contends in terms of hearsay -- relevance we'll

23  talk about in a moment -- in terms of hearsay that the

24  statement by Mr. Mateen is not being offered for the truth of

25  the matter.  In fact, there are a number of instances within

1   it that Mr. Mateen is not being truthful.  For example, he

2   wasn't wearing a suicide vest.  There were no other people

3   apparently wearing a suicide vest.  There were no other people

4   within the club that were his co-conspirators that were laying

5   in wait and the like.

6        The argument is that since the statements are not

7   offered for the truth, they're not hearsay, which is --

8   obviously, that's the hallmark of hearsay.  It has to be

9   offered for the truth of the matter.

10       It's offered, this statement, to demonstrate the

11  nature and scope of his attempted provision and provision of

12  material support and the reasonableness of law enforcement

13  response to the attack.

14       In terms of the confrontation clause, I've addressed

15  this largely in docket 216 where I spoke about statements to

16  the hostage negotiator and whether those were interrogation or

17  to an emergency response.  So I passed judgment on that

18  particular issue concerning the confrontation clause.

19       So let's talk, if we can, about the relevance.  When

20  you get to the statement, the audio statement, it does

21  demonstrate that there are people in the bathroom.  Mr. Mateen

22  is aware that they were there.  He's giving them directions

23  about using their phone or not using their phone.  He's having

24  conversations with some of the people who are being held who

25  he's not going to harm because they happen to be African

1   American.  And he also then in substance is speaking on the

2   phone with what I assume is the hostage negotiator saying many

3   of the things that are covered in some of the other

4   recordings, which is the air strikes need to stop and

5   indicating that this is being done in the name of the Islamic

6   State and the like.

7           On page 14 of the document Mr. Mateen also is

8   discussing the fact that there are others outside who will

9   attack at any time and so forth, much of which we've covered a

10  moment ago.

11          So help me understand why this recording would not

12  be relevant, assuming that it's admissible.  Mr. Swift, I'll

13  start with you.

14          MR. SWIFT:  It is relevant.  I'm not going to -- on

15  that one I said on my part is cumulative because it also has a

16  prejudicial effect.  You know, inside this we have a

17  significant amount of evidence.  So where we -- we are going

18  to hear from the officers.  You heard during the suppression

19  hearing from the officers that the situations that caused them

20  to do what they did.  Okay, we're hearing from them in the

21  part on that.  That's not gonna be contradicted.

22          We are going to hear from the hostage negotiator,

23  all the same testimony as far as the material support

24  provision, same stuff again.  We are going to hear from a

25  broadcaster, same stuff on the material support provision.  We

1  will hear from the OP commander, same stuff on what was

2  happening and why we pulled people back and what we did.

3      So all of this evidence -- if this was the only

4  evidence there's not a -- the 403 balancing test would be

5  clearly outweighed.  The problem I have with each piece of

6  these evidence, Your Honor, is they're not in a vacuum on the

7  part.

8      So what I would say is, you know, the Court -- maybe

9  the government needs to make a decision, as Your Honor has

10  said to me on some things.  How many times do you need to hit

11  the horse on the part on this?

12      And, you know, the government, as I'm pointing out

13  to Your Honor, will be calling, putting in 64 pieces of

14  evidence, survivors, relatives of deceased, responding

15  officers, et cetera.  If this is what we need, why do we need

16  the responding officers' testimony to testify about all of

17  that?

18      THE COURT:  What do you think about pages ten

19  forward?  In other words, the first several pages of the

20  transcript, one through nine, involve Mr. Mateen speaking with

21  other people in the bathroom, telling them to put down their

22  phone or an unidentified male talking about the number of

23  people in the bathroom.  That seems to be covered by

24  Exhibit 2, which I just allowed.

25      Picking up at page 10, that's the first conversation

1   by Mr. Mateen where he is, again, talking about being in

2   support of ISIS, but the context is necessary, even though it

3   is a bit repetitive, because when you flip over to page 14,

4   that's when for the first time he's talking about the number

5   of people that are outside, meaning that there are other

6   alleged co-conspirators.

7           So it seemed like pages 10 and 14, and perhaps not

8   those in between, would establish that point, that he's

9   speaking to the negotiator.  It's a bit cumulative, but it

10  gives context for page 14, which says there are people

11  outside.

12          I'm trying to avoid conversations where there is

13  threatening communications to people in the bathroom, which we

14  already know from Exhibit 2.  I'm trying to avoid too many of

15  the same things being said.  In Exhibit 2 you have somebody in

16  the bathroom who has been shot.  He's talking about other

17  people being in there.  It's well known people are being held

18  from Exhibit 2.

19          This exhibit is designed, as I understood from the

20  motion, to establish that there were allegations by Mr. Mateen

21  that there were others involved and to demonstrate his support

22  of Islamic State, and pages 10 and 14 speak to that, where the

23  balance of it --

24          MR. SWIFT:  I would agree with that, Your Honor.

25          THE COURT:  Ms. Sweeney, why would we need the

1  testimony from people saying -- you know, his conversation,

2  Mateen's conversation to people saying, *Well, you're African*

3  *American; you've had slavery; that's bad enough*; or, *You must*

4  *have had Muslims in your family,* or other comments of that

5  kind, when that's really more, you know, Mr. Mateen's comment

6  that, *When a white person goes into church and shoots black*

7  *people, confederate flags go up*?  What does that have to do

8  with anything?

9       MS. SWEENEY:  Your Honor, I am certainly fine with

10  that concession.  What I would ask is this:  Is that on page 3

11  there's a portion about midway through the page in which

12  Mr. Mateen is saying, *Hello, yeah, I've got a suicide vest on;*

13  *I've got some people; going to blow up the whole fucking room;*

14  and then he says, *Don't talk on the phone or text; I'm gonna*

15  *say that one more time;* during that portion, Mr. Mateen is not

16  speaking to the police negotiator.  This is a fake phone call

17  that he's engaging in.

18       You see that it directly follows a previous call

19  with police negotiator Brennan who is asking him about a vest.

20  If you recall the call, the part at the end where he says, *You*

21  *know, it's like people off to a wedding*.  He's mentioned the

22  word *vest* prior to the beginning of this recording and the

23  police negotiator says to him, *What kind of vest do you have?*

24       THE COURT:  Right.

25       MS. SWEENEY:  And that's his response.  So then what

he's doing here is actually sending misinformation through the victims out to the police, but he's not on the phone.

THE COURT:  Right.

MS. SWEENEY:  So I would ask for that piece to be in.  Your Honor, on page 10, you are correct that this is mostly -- comprises one of the calls with the police hostage negotiators.

THE COURT:  Mr. Swift, this is not a presidential debate.  You don't get to stand that close.

MR. SWIFT:  I'm sorry.  I don't have that.  I was just seeing.

MS. SWEENEY:  Oh, I'm sorry.

THE COURT:  I didn't realize you didn't have a copy.

MR. SWIFT:  I got it.

THE COURT:  I don't mean to make light of a very serious situation, but you were getting awfully close.

MS. SWEENEY:  Sorry.  I didn't even know you were there, Mr. Swift.  I apologize.

On page 14, Your Honor, that, again, is a fake phone call that Mr. Mateen is engaging in.  So, I mean, I agree.  I would agree, Your Honor.

What I would actually ask to play, just to shorten things a little bit, is on what I want to demonstrate at least is that the victim does pick up some of the police negotiator calls, and I would suggest the one on page 3 at the top, it's

1   very short.  It's only about 27 seconds long, but it

2   demonstrates that this, the person who made this recording is

3   in the bathroom where Mr. Mateen is engaging in these calls;

4   and then the little piece on page 3, as well, about 55 seconds

5   long, where he's again discussing the suicide vests, but on a

6   fake call; and then the portion on page 14 in which he's

7   engaging in a much longer kind of fake, one-sided

8   conversation.  We would be fine with that limitation, Your

9   Honor.

10          THE COURT:  So 3 and 14?

11          MS. SWEENEY:  Yes.

12          THE COURT:  Skipping 10 because cumulative --

13          MS. SWEENEY:  Yes, Your Honor.

14          THE COURT:  -- and what the other side will be.

15          MS. SWEENEY:  Yes, Your Honor.

16          THE COURT:  All right.

17          MR. SWIFT:  Your Honor --

18          THE COURT:  Mr. Swift.

19          MR. SWIFT:  -- in the part -- what I was gonna say,

20   too is, I think just to the part, we will stipulate to the

21   extent on the calls when these are played that these are words

22   of Omar Mateen that were recorded in a bathroom at this time

23   and place, just it starts with that stipulation.  Playing the

24   words of Omar Mateen I cannot -- you know, does not have a

25   prejudicial affect.  Even if it's cumulative, at some point

1  it's not prejudicial, you know, on that part.  Omar Mateen's

2  words are relevant.

3        THE COURT:  So 3 and 14 you agree with?

4        MR. SWIFT:  Three and 14, and I don't think we even

5  need to do the preamble to try and show that.  I will give a

6  stipulation where the Court instructs the jury that these are

7  recordings made of Mr. Mateen in the bathroom at the time that

8  they are recorded.

9        THE COURT:  All right.  That sounds reasonable.

10        MS. SWEENEY:  Thank you, Your Honor.

11        THE COURT:  Thank you.  So you all will amend your

12  transcript and the recording accordingly?

13        MS. SWEENEY:  Yes, Your Honor.

14        THE COURT:  Okay.  Thank you.

15        The last piece of information is the radio traffic,

16  Exhibit 4, which is essentially an officer saying, *Shots*

17  *fired*, et cetera, which we know from body cameras -- body

18  cameras pulling up to the scene, dash cameras, and the like.

19        So help me to understand why the radio traffic is

20  relevant.  There's going to be a lot of images of what's going

21  on outside and it's quite chaotic.

22        MS. SWEENEY:  Yes, Your Honor.  This particular

23  officer is on the government's witness list, Officer Adam

24  Gruler.  These are the -- this is the recording of the moments

25  when he hears firing begin.  And so with him we were intending

1    to play this to demonstrate what his response was, that there

2    was in fact this, this immediate reaction to the terrorist

3    attack that Mr. Mateen was engaging in.  It's not -- the

4    entire clip is two minutes long, but there's spaces of

5    silence.  It's not -- it's probably 15 seconds of recorded

6    words.  It's maybe a little more than that, but not very much.

7          THE COURT:  All right.  Thank you.  That makes

8    sense.

9          MS. SWEENEY:  Thank you.

10         THE COURT:  Mr. Swift.

11         MR. SWIFT:  Yeah.  I think if the defense were to

12    cross-examine him and say that, Hey, you didn't actually --

13    you weren't really there, or you didn't really hear that, or

14    you didn't really respond, none of which I can assure the

15    Court will happen, then as a prior statement -- you know,

16    prior consistent statement, it would be relevant.

17         THE COURT:  Right.

18         MR. SWIFT:  It's a police transcript on the part.

19    He is going to testify to this.  It is not -- it is

20    cumulative, until -- unless its veracity on the matter is

21    contested, at which point it would be very relevant.

22         THE COURT:  All right.  The point is really taken.

23    I would allow it.  It will set the stage for his testimony,

24    and perhaps it's the initial introduction of the police as to

25    what's happening.  And I think it conveys better perhaps than

1   his own testimony can of what's happening in realtime, and the

2   amount of confusion and the speed with which this thing is

3   evolving is going to have some bearing on subsequent actions.

4   I will allow it.

5          I think that covers everything that we have.  Is

6   there anything that I missed?

7          MS. SWEENEY:  No, Your Honor, thank you, not from

8   the government.

9          MS. MORENO:  May I have a moment, please, Your

10  Honor?

11         THE COURT:  Yes, ma'am.

12         MS. MORENO:  Nothing further, Your Honor.

13         THE COURT:  All right.  Thank you all.

14         In terms of just for clarity's sake, in terms of 295

15  the motion in limine is granted in part and denied in part, as

16  set forth in my order and the parties are aware of, Exhibit 1

17  is not allowed.  Exhibit 2 is allowed.  Portions of Exhibit 3

18  are allowed.  And Exhibit 4 is allowed.

19         All right.  Thank you all very much.  I'll see you

20  back on Wednesday morning.  Thank you.

21         I'm sorry.  Before we break, duration of your

22  opening statements, have you given it some thought?

23         MS. SWEENEY:  Your Honor, we would ask for

24  50 minutes.

25         THE COURT:  50 minutes?

1          MS. SWEENEY:  Yes, 5-0.

2          THE COURT:  All right.  As I said before, I'm not

3    trying to shorten the amount of time you take.  I just want to

4    be able to give you heads up.  If you think you need more than

5    50 minutes, take more than 50 minutes for both sides.  I'm not

6    a believer in any case and this case is no exception, to the

7    fact that the parties should be able to have enough time for

8    opening and closing.  I just don't think I should limit you

9    and explain the case, unless your request is just ridiculous.

10          But 50 minutes, an hour, more than an hour, whatever

11   you need, I just want to be able to give you the ten-minute

12   warning.  I have no -- I don't believe in curtailing that part

13   of your case.

14          MS. SWEENEY:  Thank you, Your Honor.

15          MS. MORENO:  I don't think that I'll need more than

16   50 minutes either, Your Honor.

17          THE COURT:  All right.  Both sides have an hour.

18          MS. MORENO:  Thank you.

19          THE COURT:  You both have an hour, 9:00 a.m. on

20   Wednesday.  Thank you very much.

21          (WHEREUPON, this excerpt was concluded.)

22

23                        *   *   *

24

25

1          <u>CERTIFICATE OF REPORTER</u>

2

       I certify that the foregoing is a correct transcript of the
3      record of proceedings in the above-entitled matter.

4
        _/s/ Suzanne L. Trimble_____
5       Suzanne L. Trimble, CCR, CRR, RPR                Date
        Official Court Reporter
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25