1

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                  ORLANDO DIVISION

 3   - - - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA,   :
 4                               :  Case No.:
                                 :  6:17-cr-18-Orl-40KRS
 5          Plaintiff,           :
                                 :
 6   vs.                         :  Orlando, Florida
                                 :  March 26, 2018
 7   NOOR ZAHI SALMAN,           :
                                 :  Excerpt of Motion Colloquy Re:
 8                               :  Motion to Dismiss or in the
            Defendant.           :  Alternative Motion for Mistrial
 9                               :  (Doc. 318)
                                 :
10   - - - - - - - - - - - - - - -X

11           TRANSCRIPT OF EXCERPT OF PROCEEDINGS
            BEFORE THE HONORABLE PAUL G. BYRON
12              UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15    Counsel for Plaintiff:      Sara Sweeney
                                  James Mandolfo
16                                Roger Handberg

17
      Counsel for Defendant:      Fritz Scheller
18                                Charles Swift
                                  Linda Moreno
19

20

21   Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.
22

23   Court Reporter:  Suzanne L. Trimble, CCR, CRR, RPR
                      Federal Official Court Reporter
24                    401 West Central Boulevard, Suite 4600
                      Orlando, Florida 32801
25                    e-mail: trimblecourtreporter@gmail.com
```

*2*

1                    P R O C E E D I N G S

2          THE COURT:  Let's me discuss 318.  Docket entry 318

3    was a motion filed this weekend.  I'm just merely stating that

4    for the record.  There's nothing inappropriate with that.

5    Filed this weekend entitled Defendant Noor Salman's Motion to

6    Dismiss or in Alternative Motion For Mistrial.  The motion

7    discusses the rules that have been founded in the *Brady*

8    doctrine, which requires the production by the government of

9    exculpatory information and *Giglio*, which is a case that deals

10   with the disclosure of impeachment information pertaining to a

11   witness.  From the motion it's clear at paragraph 14 and

12   paragraph -- paragraph 14, that on Saturday March 24th the

13   government provided to the defense information concerning

14   Siddique Mateen, which is Omar Mateen's father, indicating to

15   the defense that if the defense intended to call Siddique

16   Mateen to the stand the government will not seek to elicit any

17   of the following information from him but then disclosing this

18   information, which is as follows:

19          That Siddique Mateen was an F.B.I. confidential

20   human source at various points between January 2005 and

21   January 2016.

22          That there had been a consent search conducted at

23   Siddique Mateen's residence on June 12, 2016.  During the

24   consent search money transfers to Turkey and Afghanistan were

25   found.  The dates of the transfers were between March 16,

1   2016, and June 5, 2016.

2              As a result of the discovery of these receipts the

3   F.B.I. opened an investigation.  Mr. Siddique Mateen was not

4   informed and has not been informed by the F.B.I. about the

5   investigation.

6              Further, the government related that on November 1,

7   2012, an anonymous tip indicated Siddique Mateen was seeking

8   to raise between 50 and $100,000 via a donation drive to

9   contribute towards an attack against the government of

10  Pakistan.

11             The government [sic] characterizes the timing of

12  these statements or this disclosure as a *Brady* violation which

13  occurred after the defense had developed its theory of defense

14  and cross-examined various government witnesses.

15             Several pages of the motion deal with defining *Brady*

16  and *Giglio*, as well as the issue of what constitutes

17  materiality, that is the standard for materiality is not

18  necessarily showing that the outcome would be different, which

19  is a correct statement of the law, but rather whether its

20  absence -- in the absence of this material the defendant

21  received a fair trial, which is understood as a trial

22  resulting in a verdict worthy of confidence.

23             We then get into the analysis starting at really

24  page 10, and at page 11 the alleged prejudice, if you will, is

25  articulated by the defense.  The defense contends that despite

*4*

1    the government's e-mail, it still has not provided the defense

2    with reports or documentation concerning Siddique Mateen's

3    conduct, that is the transfer of funds, and that there are two

4    viable theories that the defense could have developed but for

5    the timing of the disclosure regarding Mr. Siddique Mateen.

6            First, that Omar Mateen conspired with his father

7    Siddique Mateen rather than Ms. Salman to commit the acts.

8            Alternatively, the F.B.I.'s purported interviews of

9    Ms. Salman were directed to evading their negligence exercised

10   with their own informant and was replaced with their attempt

11   to find an additional culprit, rather than their own

12   informant.

13           Those two issues are reiterated on page 19 where the

14   government concludes by saying based on the belated disclosure

15   the government has prevented the defense from developing and

16   pursuing alternative and viable theories of defense, including

17   but not limited to the tenants that, one, Omar Mateen and his

18   father, rather than Ms. Salman, conspired to support ISIS, or,

19   two, the F.B.I.'s focus on Ms. Salman was based on its own

20   motive to avoid responsibility of its failure with its own

21   informant, Siddique Mateen, as well as his son.

22           Within the body of the motion are additional facts

23   that were raised by the defense, for example, that the

24   defendant, or the defense rather, would have investigated

25   whether the father had been involved in or knew of the Pulse

*5*

1   attack and that the father's involvement as a cooperating

2   informant and his transfer of money to the two countries

3   identified is relevant to go towards understanding whether

4   Noor Salman needed to create a cover story.  That is the Nemo

5   story that we have heard so much about.

6          Next it's argued that Omar Mateen was searching for

7   tickets to Turkey, which is given some context when we

8   consider the fact that Siddique Mateen was selling -- or

9   sending, rather, money to Turkey, as well as Afghanistan in

10  and around that same time frame.

11         Next the defense points out that the information

12  regarding Siddique Mateen is contrary to Ms. Salman being

13  present and aware of the intended attack on Pulse.

14         Further, it's elaborated that Ms. Salman's need to

15  create a cover story by which Mr. Mateen's mother would be

16  taken off the scent, so to speak, as to why Mr. Mateen was not

17  coming to break fast with her would be impacted by this

18  testimony, particularly in light of the fact that the mother,

19  Mrs. Mateen, indicated that she would have talked to her

20  husband before calling the police, if she believed her son was

21  doing something illegal.

22         Next the defense argues that this information

23  creates some context for why no polygraph was pursued with

24  Ms. Salman.  There was also some observation regarding the .38

25  caliber holster, which is meant to be a different category of

*6*

1    information, but designed to be seen in the light of the

2    disclosure of information that Ms. Salman could not have cased

3    the Pulse nightclub.  I'll take that last, since that's sort

4    of a different category.

5         We start first off with *Giglio*.  *Giglio* is

6    impeachment information of one's own witnesses.  So to the

7    extent the government had intended to call Siddique Mateen and

8    he was on their witness list, on at least two different

9    versions of it until fairly recently, had they intended to

10   call him, then certainly they're required to produce the

11   *Giglio* information that the search of the home resulted in the

12   disclosure of money transfers, which may or may not be

13   criminal.

14        Transferring money is not illegal.  It's

15   transferring it to support terrorism is, and it's not clear

16   whether the purpose of the transfers were known to the

17   government, which perhaps goes to the defense point that the

18   underlying wire transfers should have been disclosed.

19        The salient point, though, is if the government does

20   not call Siddique Mateen as a witness, they have no *Giglio* to

21   produce. You can put anyone on your witness list, your

22   witnesses, the defense witnesses, every potential witness.

23   The sin is one of omission.

24        So if a party fails to put a witness on their list

25   and then wants to call them and the other side objects to

1   prejudice, they're going to have a very hard time overcoming

2   prejudice.  So it's not terribly uncommon for parties to have

3   very exhaustive witness lists, as is the case here on both

4   sides, and yet not call all of the witnesses, which is the

5   case here on both sides.

6        So a *Giglio* production, to the extent that the

7   information known to the F.B.I. meets that definition, only

8   applies if they intended to call this witness.  The government

9   need not turn over impeaching evidence to the opposing side,

10  nor must the defense turn over impeaching evidence.  They only

11  to have turn over favorable, as well as any information that

12  goes towards any deal that's been cut or similar information.

13       So now if we turn to the issue of *Brady*, whether or

14  not the information concerning Siddique Mateen was favorable

15  to the defense, that goes to the purposes for which the

16  defense claims it was going to be used.

17       The core argument, as I noted on page 11 in footnote

18  4, is that the information would have allowed perhaps the

19  defense to demonstrate two theories, one being that Mr. Mateen

20  conspired with his father rather than Ms. Salman.  I would

21  note first off they're not mutually exclusive concepts.

22  Ms. Noor Salman is not charged with conspiracy.  She's charged

23  with aiding and abetting.  Moreover, Omar Mateen could have

24  conspired with many people or no people.  He could conspire

25  with his father and Noor Salman and other persons known or

8

1    unknown.  She's not charged with that.

2          So assuming for the sake of argument that there was

3    some evidence linking a payment of money over to individuals

4    in Turkey and Afghanistan is consistent with conspiracy in

5    this case, which is a very large gap, or it's a significant

6    leap of faith to draw those two together, it does not affect

7    the alleged culpability of Ms. Salman, that is Noor Salman,

8    who is charged with a separate crime of aiding and abetting

9    and not conspiracy.

10         Just to sum that point up, there could be more than

11   one conspirator and the fact that Mr. Siddique Mateen is

12   theoretically a conspirator -- although, the facts of sending

13   money to third countries is not proof of that -- does not

14   alter or change the dynamic as to Ms. Noor Salman.

15         The next theory is that the F.B.I. somehow focused

16   on Ms. Salman to take pressure away from their failure to

17   exercise control over their own informant Siddique Mateen.

18   That theory is, with all due respect, very attenuated.  There

19   would be no doubt a motion in limine by the government.  If

20   not, then there would be my evaluation as to whether or not

21   attempting to suggest that the government's entire case is

22   constructed to, more or less, frame Ms. Salman to avoid

23   putting Siddique Mateen in a bad light is exceptionally

24   prejudicial and would have to be predicated upon some very

25   strong evidence.  Even if one were to assume that Siddique

1   Mateen was a co-conspirator, an assumption I'm not advocating,

2   but if we were to assume that he was a co-conspirator, that is

3   not evidence that the government is trying to protect him by

4   going after Noor Salman.

5          The evidence as to Ms. Salman's alleged aiding and

6   abetting is based upon the evidence we've all seen, whatever

7   statements she's made to the F.B.I., the information that is

8   used to corroborate the statement, and the inferences to be

9   drawn therefrom.

10         It would be a very rare case indeed that the defense

11  could argue that there was an attempt to frame someone, absent

12  concrete evidence of that fact.  So this mere suggestion that

13  you have an informant and Siddique who has perhaps embarrassed

14  the F.B.I. through his son having been involved in this

15  particular crime is certainly not enough, and no amount of

16  transferring money overseas would change that dynamic.

17         So when we look at the materiality provision,

18  it's -- it falls far from where it needs to be in order to

19  make that a *Brady* disclosure.

20         The government is also not required to anticipate

21  theories that are on the periphery, such as this kind.  In

22  other words, they have to disclose evidence that may be

23  favorable, that is that tends to mitigate the guilt or

24  innocence of Ms. Noor Salman, not that necessarily play into

25  that conspiracy theory that the government is being framed on

*10*

1    the scant assertions that are before me in this motion.

2             If we talk about some of the other issues, why

3    Mr. Mateen might be buying tickets to go to Turkey -- let's

4    assume that the jury knows that his father has sent money to

5    Turkey, and let's assume further that the jury concludes that

6    Mr. Mateen hoped to survive the attack and flee to Turkey.

7             That does not change the dynamic of whether or not

8    Mr. Noor Salman allegedly aided and abetted.  The aiding and

9    abetting occurs at the time aid is provided to Omar Mateen,

10   regardless whether he's successful.

11            So whether he's able to flee, where his father in

12   some theoretical way would hope that he could join him in

13   Turkey, if we take this evidence of payment that many steps

14   forward, is irrelevant to an assessment of whether or not she

15   aided and abetted.

16            In terms of the cover story, the alleged cover story

17   with Mr. Nemo, the evidence is that Noor Salman contacted Omar

18   Mateen's mother who had reached out about breaking fast at

19   Ramadan, not that she reached out to his father.  Regardless,

20   the issue of aiding and abetting is not whether the cover

21   story was necessary or effective.  It's whether it was an

22   intent to aid, whether it was an intent to provide support or

23   encouragement or assistance.  Whether it's successful or not

24   in achieving the goal is not relevant.

25            So whether or not Ms. Omar Mateen's mother,

1    Mrs. Mateen, was deceived by the statement is not dispositive,

2    whether or not Ms. Mateen's mother would have contacted

3    Siddique Mateen, who may have discouraged any police contact,

4    assuming that's the case, is not relevant as to whether or not

5    Noor Salman made this statement in order to lend support to

6    Omar Mateen, which is from what I can glean the government's

7    theory.

8           The issue of whether or not Omar Mateen left with

9    his .38 caliber on his hip, as opposed to a different weapon,

10   comes up when, according to the defense, when in the Rule 29

11   argument the issue of Ms. Salman's statement is being vetted,

12   that is the argument as to whether it's incredible or not is

13   being discussed.  And one of the points that's raised is that

14   he could not have left with his service revolver on his hip.

15   In fact he's found with a 9mm, which is true.

16          And Ms. Sweeney argued or suggested that what the

17   jury could definitely find is that he, that is Omar Mateen,

18   put the work gun in his holster and when he was home and

19   changed that weapon out for another weapon at a later time.

20          Clearly, his .38 caliber holster was found at home,

21   according to the exhibits that have been proffered to me by

22   defense this morning, meaning that it's unlikely that he put

23   his .38 caliber on his hip, but the statement, as I recall it

24   from Mrs. Mateen, which was being discussed, was whether he

25   left with a weapon on his hip, his weapon, which could be

*12*

1    interpreted as the 9mm he bought or could be interpreted as

2    his .38 caliber service revolver.  Regardless, that's argument

3    to me by an attorney at Rule 29.  That's not evidence

4    presented here at court.

5          The government also -- pardon me -- the defense also

6    alludes to the fact that a polygraph was called off because of

7    Siddique Mateen, but to the contrary, the government wanted to

8    offer evidence at trial that a polygraph was being planned,

9    and a trip to Mississippi was being planned, but that it

10   didn't go forward once Ms. Salman retained counsel.

11         As the parties recall, there was no evidence that

12   she was not interested in giving a polygraph.  There was no

13   indication that her attorney said no to a polygraph.  So I did

14   not allow that line of inquiry because it's prejudicial to

15   her, meaning that Ms. Salman had always been willing to give a

16   polygraph, and the fact that the F.B.I. and U.S. Attorney's

17   Office may have unilaterally felt that the retention of

18   counsel made that a moot point was not something the jury

19   could hear because it creates the illusion that -- or the

20   misimpression, I should say, that Ms. Salman didn't want to

21   give a polygraph, that she had lawyered up, but she didn't.

22   She was willing to give it.

23         But the notion that the F.B.I. declined to go

24   forward with the polygraph because of Siddique Mateen, there's

25   no support in the record for that.  That would be pure

*13*

1    conjecture that if he's an informant and he's an informant

2    they'd like to protect, that does not change the dynamic.

3            The focus here is what Ms. Salman did or did not do.

4    If there are other parties who may be culpable, that's an

5    issue for another day, but that's not, in my view, *Brady* or

6    *Brady* violation.

7            For those reasons I denied the motion to dismiss and

8    the motion for mistrial, which both hinge on the same

9    argument, that she was denied a fair trial as a result of the

10   timing of the disclosure of what's characterized as *Brady*

11   evidence and that the lack of so-called *Giglio* material was

12   similarly something that deprived her of the ability to make

13   tactical decisions, which focused around whether or not

14   Mr. Siddique Mateen may also have involvement.

15           He may or may not.  There's no evidence before me to

16   show that he does, but the larger point is it doesn't change

17   the dynamic that this trial is not about Siddique Mateen.

18   It's about Noor Salman.

19           Mr. Scheller.

20           MR. SCHELLER:  No, I just -- I was --

21           THE COURT:  I thought you were gonna say something.

22           MR. SCHELLER:  I was.  Now can I speak?

23           THE COURT:  Yes.

24           MR. SCHELLER:  Your Honor, may I approach the

25   podium?

*14*

1        THE COURT:  We're not relitigating this, just so you

2   know that.  I'm expressing my ruling.

3        MR. SCHELLER:  I'm not relitigating this.  But, you

4   know, one of the -- one of the experiences that I've had at

5   the appellate level is the issue of waiver, and so I'm not

6   gonna relitigate anything.  I understand the Court's ruling.

7   The Court has ruled.  At the same time, though, I do need to

8   make a record for appellate review.

9        THE COURT:  Wasn't that what your brief was for?

10       MR. SCHELLER:  Your Honor, I assumed that I was

11   gonna have a chance to argue it today.  Think about this.  I

12   found out about this on Sunday.  I wrote something to bring it

13   to the Court's attention before the presentation of our

14   defense.  You know, I --

15       THE COURT:  I don't require the benefit of argument

16   on everything every lawyer files.  In fact, I rarely take

17   argument on matters that lawyers file.

18       MR. SCHELLER:  I understand.

19       THE COURT:  I typically resolve it on the pleadings,

20   based my own analysis of the case.

21       MR. SCHELLER:  Right.  And I just had some --

22   there's a couple of things.  I'll make it brief, Your Honor.

23   I do know that if I don't bring these facts to the Court's

24   attention, and I know the Court has ruled, it's gonna be --

25   I'm gonna be hit with waiver if this ever goes up on appellate

1   review, and that is something that the U.S. Attorney's Office

2   constantly raises in my cases, and so I've --

3           THE COURT:  They certainly cannot argue waiver to

4   any argument made in the pleading because that is before me.

5           MR. SCHELLER:  Right.

6           THE COURT:  So there's no reason.  There's no need

7   nor is there a reason to reiterate what I've already read.  If

8   you've got something I haven't seen --

9           MR. SCHELLER:  That's it.  That's it.  And I just

10  wanted to clarify a couple of things too.  There was a

11  misstatement of facts that I needed to clarify, too, because I

12  can see that rearing its ugly head against me.

13          THE COURT:  All right.

14          MR. SCHELLER:  There was an argument about the

15  amended scheduling order.  There was a scheduling order in

16  this case.  There was a requirement of *Giglio* for all

17  prospective witnesses.  I think in the motion it said 14 days

18  after, you know, the order.  It was actually 14 days before

19  trial.  It wasn't read carefully.  That's my mistake.

20          THE COURT:  Well, you read from what the standard

21  is.  We modified it for this case due to the number of

22  disclosure obligations -- or perhaps not.  Maybe the standard

23  even says that.  I haven't looked at that in a while.

24          MR. SCHELLER:  That's absolutely -- so it should

25  have just said what the scheduling order -- if I had more

1   time, I would have put in that it was 14 days before the first

2   day of trial.  They were required to present any *Giglio* as to

3   prospective witnesses.

4         The polygraph issue, just one set of facts -- I

5   thought it was in the motion.  I agreed with the Court's

6   ruling on the polygraph.  Just for clarification, Ms. Salman

7   did not hire counsel until June 20th.  The polygraph was

8   actually canceled June 18th.  So it wasn't based on

9   polygraphs.  That seems to be a misapprehension that's been in

10  this case.  The other facts that --

11        THE COURT:  But the jury only knows that she was

12  willing to give a polygraph and that the F.B.I. did not pursue

13  that.  That's all they know.  The rest is what we all know

14  about timing and events that occurred outside the presence of

15  the jury.

16        MR. SCHELLER:  And I agreed with the Court's ruling

17  on the polygraph.  I just am clarifying facts, again.  If

18  you've been in front of the Eleventh Circuit like I have --

19        THE COURT:  I've argued in front of them 17 times.

20        MR. SCHELLER:  No.  But I mean from the defense

21  perspective I need to preserve things.

22        THE COURT:  I've sat on the Eleventh Circuit.  I

23  know that you do.

24        MR. SCHELLER:  Okay.  Also I wanted to advise the

25  Court that Mr. Mateen's attorney, Todd Foster, is now aware

1    he's under criminal investigation.  Mr. Foster had met -- he

2    had never been informed of that until I informed him.  That's

3    because of the Fifth Amendment rights that attached,

4    obviously, to Mr. Mateen based on the criminal investigation,

5    and I, you know, ethically had to let his attorney know,

6    especially if we were gonna call him as a witness.  So he does

7    know that.

8            So the additional facts that he informed me is he

9    did have multiple meetings with the government and Mr. Mateen.

10   Mr. Foster, he wasn't informed at any time that he was --

11   Mr. Mateen was under criminal investigation.  We have never

12   received any reports of those interviews.

13           THE COURT:  It will depend on -- I would imagine it

14   would depend on when the determination of an investigation may

15   have opened occurred versus when he was being interviewed.

16           MR. SCHELLER:  Right.  Just we have -- I think it's

17   just in an abundance of caution, we have not -- this

18   September 25, 2018, e-mail is the only information that we

19   have received.  So I don't know when the investigation

20   started.  I don't know when the wire transfers were made.

21           The other evidence we would have brought out --

22           THE COURT:  Let me say this.  The way I perceive the

23   Saturday disclosure, when the government elected not to call

24   Mr. Mateen as a witness, I don't know if they ever planned to

25   in seriousness or not or put him on the witness list.  But a

1    reasonable interpretation of that e-mail was anticipating that

2    the defense may call him, and while they don't have to

3    disclose impeaching evidence, they did not want to have that

4    level of surprise, one would think, in light of some of the

5    other history.  That level of surprise may have been viewed by

6    me as a negative.  So I think they got preemptive, and were

7    telling you that if he's called, these things exist, but we

8    won't cross him, much as occurred with the Nemo rulings I

9    made.

10           MR. SCHELLER:  Your Honor, I disagree respectfully

11   with your interpretation.  I mean, there was the precipitating

12   events is Thursday the 22nd I made a specific *Brady* request as

13   to Mr. Mateen.

14           THE COURT:  All right.

15           MR. SCHELLER:  The other facts that we would have

16   pursued -- again, these are theories of defense that we

17   haven't been able to investigate, but there was other facts

18   that at the time we didn't think were terribly probative, but

19   are now extremely probative in light of the government's

20   disclosure.

21           One of them was that we're aware from our client

22   that Mr. Mateen and -- Omar Mateen and his father only spoke

23   in Farsi in her presence.  She does not speak Farsi.

24           THE COURT:  How could the government disclose that

25   to you if they don't know that?

1     MR. SCHELLER:  I'm not talking about -- I'm saying

2  this is one of the additional lines.  The idea is not that --

3     THE COURT:  Let's stay focused on what matters here.

4  You are alleging there's a *Brady* violation by the government.

5  They can't disclose to you that which they do not know, right?

6  A, it has to be favorable to your case, and it has to be

7  something in their knowledge, not yours.

8     If you became aware that Mr. Omar and Mr. Siddique

9  Mateen only spoke in Farsi, which your client presumably does

10  know, that's information you have.  How would they know that?

11     MR. SCHELLER:  Well, Your Honor, if you remember,

12  before I made that statement I said there were lines of

13  investigation we did not pursue.

14     THE COURT:  But it doesn't matter if they weren't

15  pursued.  It has to be stemming from a Brady violation, not

16  what you hypothetically would have done, if you could do it

17  over.

18     MR. SCHELLER:  Okay.  Let me phrase it this way:

19  The defense would have been, if we had had these facts, that I

20  understand that the agreement or the scheme or the aiding and

21  abetting occurred between Omar Mateen and his father, okay,

22  and that she did not have knowledge of it, she did not

23  participate in it --

24     THE COURT:  What scheme?  What, aiding and abetting?

25     MR. SCHELLER:  That any kinds of discussion,

1    knowledge, agreement, aiding and abetting occurred between

2    Omar Mateen and his father, and she did not have knowledge of

3    it.   The Farsi, what I said, it becomes more probative now at

4    this point.

5            THE COURT:   Doesn't it have to first be evidence

6    there was agreement?   First off, let's go back to what

7    matters.   This case is about Noor Salman, not about Siddique

8    Mateen.   Everything you're saying is indicative of if true and

9    if all of the additional layers of supposition could be borne

10   out with evidence, that somehow there's a co-conspirator not

11   charged, that has absolutely nothing to do with an aiding and

12   abetting case.

13           MR. SCHELLER:   It does if our defense in this case

14   has been she did not have knowledge, and she wasn't

15   participating in the aiding and abetting.

16           THE COURT:   So her statement to the F.B.I. would

17   just evaporate as a result of these comments?

18           MR. SCHELLER:   As it's borne out, Your Honor, and

19   it's under *Kyles v. Whitley*.   The standard is what would a

20   reasonable attorney do with a piece of evidence, and this is

21   what I'm arguing now.   If we know that -- if we know these

22   facts --

23           THE COURT:   The facts being that he gave money to

24   Turkey and Afghanistan and an anonymous tip in 2012 accused

25   him of trying to raise money to wage some sort of assault

1    against the government of Pakistan, which first off the

2    question becomes how would that even remotely be admissible?

3    The anonymous tip doesn't come in, right?  That's hearsay.

4    How would that possibly come in?

5            MR. SCHELLER:  It's not about -- under *Brady* it's

6    about the ability under the Sixth Amendment to provide a

7    defendant with an adequate defense, and we cannot look at this

8    issue within the prism of a mere trial.  Also, it goes back to

9    what lines of investigation would have been pursued, what

10   avenues, what facts would have been developed?

11           So when I go back and I talk about the theories,

12   that whole thing about Farsi, I understand that the government

13   didn't know that, but it takes -- this was just an example of

14   when you get this information how a fact that seems benign or

15   not probative all of a sudden becomes terribly probative.  It

16   goes to her defense, if they are talking to her -- talking in

17   front of her in Farsi.

18           THE COURT:  And what evidence is there of that, or

19   would there be of that?  Short of Ms. Salman testifying, who

20   would put that on?  Mr. Mateen is dead.  Siddique Mateen is

21   apparently a target of an investigation or under

22   investigation.  And Ms. Salman would have to choose between

23   her right to remain silent or testify, They spoke in front of

24   me in a language I don't understand.

25           MR. SCHELLER:  Exactly.  But, Your Honor, she has an

*22*

1  absolute right to testify or not to testify.

2          THE COURT:  Then she --

3          MR. SCHELLER:  If we develop this theory, that

4  impacts her ability to testify.  That impacts her choice to

5  testify.  So it's highly relevant.

6          THE COURT:  What do you think is missing?  I'm sorry

7  to cut you off, but we are in fact relitigating this.  So let

8  me just finish with this one thought.  What you have are two

9  pieces of information that you're portraying as *Brady*.  One is

10  that an anonymous tip in 2012 says Siddique Mateen is trying

11  to raise money for Palestine.  Okay.  That's four years before

12  this and is uncorroborated, apparently, particularly since the

13  F.B.I. continued to work with him for another four years.  The

14  second piece of evidence is he sent money to Turkey and

15  Afghanistan, to some locations.  From that there's a

16  conspiracy with Omar Mateen that left Noor Salman in the dark.

17          MR. SCHELLER:  No, Your Honor.  What the government

18  has always said is that -- and they put the family on to say

19  they were unaware of this whole -- of his activities, what is

20  an area of investigation, and it's difficult now because I'm

21  talking about areas of investigation that could have been

22  pursued.  If that tip happened four or five years ago, what it

23  shows is the radicalization of Omar Mateen potentially

24  occurred with his father rather than Ms. Salman, and so --

25          THE COURT:  No one is saying that Ms. Salman

1   radicalized him.  The only thing that's been presented by the

2   government is that she knew that he was becoming radicalized.

3           MR. SCHELLER:  Right.  But the defense is, and I

4   misstated or I stated it inarticulably, they've always

5   proclaimed in the beginning that she had knowledge of what he

6   was up to, but the family didn't.  And you know, our defense

7   is, obviously, that she didn't aid and abet.  I mean,

8   that's -- and that she didn't have knowledge.  What it's

9   showing, though, is like you -- I don't want to relitigate

10  this, and so I'm trying to be as brief as I can.  What it

11  shows is if the family was aware --

12          THE COURT:  Why would the family be aware if

13  Mr. Siddique Mateen -- you've established Siddique Mateen was

14  present when his son was being interviewed by the F.B.I.  He's

15  aware the F.B.I. was interviewing the son.  You've established

16  he was an informant regarding other people in the community

17  for a number of years.  So he's aware.  He apparently

18  describes his son's statements about being a member of a

19  number of jihadi groups or terrorist organizations as stupid.

20  So that's all in front of the jury.

21          What's lacking, other than the payments to Turkey or

22  Afghanistan for some unspecified reason?

23          MR. SCHELLER:  Your Honor, one of the payments to

24  Turkey occurred a week before the shooting, which indicates --

25  which potentially -- I want to be careful -- could potentially

**24**

1   indicate Siddique Mateen's knowledge.  The government offered

2   no facts that Ms. Salman was aware of this transfer to Turkey

3   or, or the facts that Omar Mateen had purchased a one-way

4   ticket to Turkey.  Again, that goes to our defense because

5   it's keeping her --

6            THE COURT:  Had he purchased a ticket?  I think he

7   looked online for flights.

8            MR. SCHELLER:  I mean, he went online to look for

9   the -- I apologize.  He went online.  He went online to look

10  for the ticket.  Once again, that shows -- it supports the

11  defense that she was kept in the dark.

12           THE COURT:  All right.  I don't think I agree with

13  that assessment, but I appreciate your point.  Your record has

14  been made.  We'll reconvene tomorrow morning at 9:00.

15           (WHEREUPON, this excerpt concluded.)

16                            *   *   *

17

18                   CERTIFICATE OF REPORTER

19

20  I certify that the foregoing is a correct transcript of the
    record of proceedings in the above-entitled matter.

21

    _/s/ Suzanne L. Trimble_____          4/23/18_
22  Suzanne L. Trimble, CCR, CRR, RPR           Date
    Official Court Reporter
23

24

25