1        UNITED STATES DISTRICT COURT
         MIDDLE DISTRICT OF FLORIDA
2             ORLANDO DIVISION

3   - - - - - - - - - - - - - - -X
    UNITED STATES OF AMERICA,    :
4                                :
                                 :
5        Plaintiff,              : Case No.:
                                 : 6:17-cr-18-Orl-40KRS
6   vs.                          :
                                 :
7   NOOR ZAHI SALMAN,            : Orlando, Florida
                                 : March 21, 2018
8                                : 9:00 a.m.
         Defendant.              :
9                                :
                                 :
10  - - - - - - - - - - - - - - -X

11        TRANSCRIPT OF TRIAL VOLUME 13 OF 20
         BEFORE THE HONORABLE PAUL G. BYRON
12            UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15   Counsel for Plaintiff:        Sara Sweeney
                                   James Mandolfo
16                                 Roger Handberg
     Counsel for Defendant:        Fritz Scheller
17                                 Charles Swift
                                   Linda Moreno
18

19

20  Proceedings recorded by mechanical stenography.
    Transcript produced by computer-aided transcription.
21

22  Court Reporter:  Suzanne L. Trimble, CCR, CRR, RPR
                     Federal Official Court Reporter
23                   401 West Central Boulevard, Suite 4600
                     Orlando, Florida 32801
24                   e-mail: trimblecourtreporter@gmail.com

25

# T A B L E   O F   C O N T E N T S

PROCEEDINGS                                                      PAGE

March 21, 2018

TESTIMONY

KIM ROSECRANS
     Direct Examination By Mr. Handberg.............. 5
     Cross-Examination By Mr. Swift.................. 84
SABRINA ABASIN
     Direct Examination By Ms. Sweeney............... 105
     Cross-Examination By Mr. Swift.................. 111
SHAHLA MATEEN
     Direct Examination By Ms. Sweeney............... 114
     Cross-Examination By Mr. Scheller.............. 127
     Redirect Examination By Ms. Sweeney............. 150
ANTHONY COLOSSALE
     Direct Examination By Mr. Mandolfo.............. 151
     Cross-Examination By Mr. Swift.................. 154
JENNIFER SMITH
     Direct Examination By Mr. Mandolfo.............. 156
DANIEL SPRUNGER
     Direct Examination By Mr. Mandolfo.............. 162
     Cross-Examination By Mr. Swift.................. 171
MOHAMMED ELARAJ
     Direct Examination By Mr. Mandolfo.............. 173
STEPHANIE SKVARLA
     Direct Examination By Mr. Mandolfo.............. 177
YESSENIA SANCHEZ
     Direct Examination By Mr. Mandolfo.............. 180
     Cross-Examination By Mr. Scheller............... 182
JASON DURAN
     Direct Examination By Ms. Sweeney............... 186
     Cross-Examination By Mr. Swift.................. 197
STEPHEN BOYCE
     Direct Examination By Ms. Sweeney............... 200

OTHER

Colloquy.........................................102
Colloquy.........................................269

E X H I B I T S

| NO. | MARKED/ADMITTED | PAGE |
|---|---|---|
| Government's Exhibit No. 10A | admitted.......................... | 190 |
| Defendant's Exhibit No. 20 | admitted.......................... | 101 |
| Defendant's Exhibit No. 36 | admitted.......................... | 97 |
| Defendant's Exhibit No. 37 | admitted.......................... | 92 |
| Government's Exhibit No. 304A | admitted.......................... | 11 |
| Government's Exhibit No. 304B | admitted.......................... | 12 |
| Government's Exhibit No. 304C | admitted.......................... | 12 |
| Government's Exhibit No. 304F | admitted.......................... | 80 |
| Government's Exhibit No. 304G | admitted.......................... | 80 |
| Government's Exhibit No. 304I | admitted.......................... | 12 |
| Government's Exhibit No. 304K | admitted.......................... | 11 |
| Government's Exhibit No. 304L | admitted.......................... | 11 |
| Government's Exhibit No. 304M | admitted.......................... | 11 |
| Government's Exhibit No. 304 | admitted.......................... | 8 |
| Government's Exhibit No. 304D | admitted.......................... | 13 |
| Government's Exhibit No. 304N | admitted.......................... | 72 |
| Government's Exhibit No. 304O | admitted.......................... | 61 |
| Government's Exhibit No. 306A | admitted.......................... | 213 |
| Government's Exhibit No. 306C | admitted.......................... | 204 |
| Government's Exhibit No. 311A | admitted.......................... | 250 |
| Government's Exhibit No. 311B | admitted.......................... | 243 |
| Government's Exhibit No. 311C | admitted.......................... | 255 |
| Government's Exhibit No. 311D | admitted.......................... | 260 |
| Government's Exhibit No. 311E | admitted.......................... | 259 |

1              P R O C E E D I N G S

2              THE COURT:  Good morning, ladies and gentlemen.  Are

3     we ready to proceed?

4              MR. HANDBERG:  Yes, Your Honor.

5              THE COURT:  Yes.

6              MS. MORENO:  Yes.

7              THE COURT:  All right.  Let's have the jury, please.

8              COURTROOM SECURITY OFFICER:  All rise for the jury.

9              (The jury entered the courtroom at 9:01 a.m.)

10             COURTROOM SECURITY OFFICER:  Please be seated.

11             THE COURT:  The record should reflect the jury is

12    present.  The parties are present as well.

13             Good morning, ladies and gentlemen.  Welcome back.

14    Has anyone seen, read, or heard any news about the case?  If

15    so, please raise your hand.  We have no affirmative responses.

16    We are ready to go.

17             Mr. Handberg, your next witness, please.

18             MR. HANDBERG:  United States calms Kim Rosecrans.

19             THE COURTROOM DEPUTY:  Please come forward to the

20    witness box and remain standing.  Please raise your right

21    hand.

22                      **KIM ROSECRANS**,

23      called by Government, having been first duly sworn, was

24              examined and testified as follows:

25             THE COURTROOM DEPUTY:  Please have a seat.  Please

1    state your name and spell your last name for the record.

2          THE WITNESS:  My name is Kim Rosecrans.  Rosecrans

3    is spelled R-o-s-e-c-r-a-n-s.

4          THE COURT:  Thank you.  And good morning.

5          Mr. Handberg, you may proceed when you're ready.

6          MR. HANDBERG:  Thank you, Your Honor.

7                    DIRECT EXAMINATION

8    BY MR. HANDBERG:

9    Q    Good morning.  Where do you work?

10   A    I currently work for the F.B.I.

11   Q    And what's your position?

12   A    I am an information technology specialist forensic

13   examiner.

14   Q    All right.  Let's talk about your time before the F.B.I.

15   What was your degree?

16   A    My degree was in applied mathematics and computer

17   science.

18   Q    And what did you do after college?

19   A    After college, I went and worked for a company called

20   Life Cycle Engineering.

21   Q    And what did you do for them?

22   A    I did logistics management.

23   Q    What did you do after working for that company?

24   A    Then I went to the Department of the Army, and there I

25   worked in a program office that was putting together a

1  software -- or actually a system where the Army could do joint

2  fusion.

3  Q    When did you join the F.B.I.?

4  A    I joined the F.B.I. in '98, February.

5  Q    And what was your position at that point?

6  A    At that time, my position was a -- I was a logistics

7  configuration management person in a software development

8  project office.

9  Q    And how long did you do that?

10  A    I did that until October of 2000.

11  Q    And what did you do at that point?

12  A    At that point, I joined the Computer Analysis Response

13  Team unit.

14  Q    And what does the Computer Analysis Response Team unit

15  do?

16  A    We do examinations of electronic and digital storage

17  devices.

18  Q    And what was your position when you first started with

19  that -- are they called CART?

20  A    Yes.  They are typically called CART.

21  Q    What was your first position with CART?

22  A    I was a software tester in the test and evaluation group.

23  Q    And did at some point you become a CART examiner?

24  A    Yes, I did.  After a period of time of having an

25  ancillary duty of forensic examiner in training, I became a

1  full-time forensic examiner in training, and then I became

2  certified as a forensic examiner.

3  Q    And is there any special training you had to become

4  certified?

5  A    Yes.  There is a progression of courses that you have to

6  take that help you understand both computer hardware and

7  software, the operating systems, the file systems.  Then later

8  on I started moving into mobile devices.  And I took training

9  there, both government and commercial, to learn more about how

10 to do examinations of mobile devices.

11 Q    All right.

12         MR. HANDBERG:  Ms. Valente, if we could publish a

13 document that's already in evidence, Government's

14 Exhibit 155E, 121254.

15         (The above referred to exhibit was published.)

16 BY MR. HANDBERG:

17 Q    And are you here to talk about the analysis you did of

18 data on Omar Mateen's cell phone that was found at the Pulse

19 nightclub?

20 A    Yes, I am.

21         MR. HANDBERG:  Your Honor, may I approach the

22 witness?

23         THE COURT:  Yes, you may.

24         MR. HANDBERG:  Thank you, Ms. Valente, on the photo.

25 BY MR. HANDBERG:

1  Q    All right, sir.  I've handed you what's marked as

2  Government's Exhibit 304.

3           What is an IMEI number?

4  A    That's the international mobile equipment identity.  It's

5  a 15-character code that is given to each mobile device.

6  Q    Why don't you pull that microphone a little bit closer to

7  you so we can make sure we hear you.

8  A    Okay.

9  Q    I think it's probably the easiest just to look on that

10 sheet of paper on the outside and see if you see the IMEI

11 number for the phone that you reviewed.

12 A    I do see an IMEI, and it is 357118070425557.  And that's

13 the same as the IMEI on the image that I processed and the

14 report that I processed.

15           MR. HANDBERG:  The United States offers into

16 evidence what's been marked as Government's Exhibit 304.

17           THE COURT:  Any objection to 304?

18           MR. SWIFT:  No objection, Your Honor.

19           THE COURT:  304 is admitted.

20           (Government's Exhibit No. 304 was admitted into

21 evidence.)

22 BY MR. HANDBERG:

23 Q    All right.  You talked about processing the data and

24 generating a report.  What program did you use to do that?

25 A    I used two reports -- or two utilities were used.

1  There's an Android Tool that the F.B.I. developed, and there's

2  a commercial tool that the -- was developed by Cellebrite.

3  And that is the report, I think, that was also sent forward.

4  Q    All right.  So let's talk about Cellebrite.  What type of

5  information is processed by the Cellebrite program?

6  A    The Cellebrite program will go and extract information

7  out of SQLite databases for Android phones.  The categories of

8  information include file systems, analyzed data, data files,

9  timelines.

10  Q    I think you used a phrase -- was it SQL?

11  A    Yes.  SQLite databases.

12  Q    What is that?

13  A    Those are databases that allow the storage of information

14  so that the applications on the cell phones can rapidly access

15  the data and then present the data on the screen for the user

16  of the cell phone.

17  Q    And in processing the data file, did you take steps to

18  make sure that the data was verified?

19  A    Yes.  When I first got the image -- and that's how I

20  received it.  I did not actually receive the phone, but

21  received the image -- I hashed it using an MD5 algorithm which

22  gives it a unique fingerprint.

23  Q    What do you mean by hashed it?

24  A    Well, basically the MD5 algorithm is used to go and

25  provide a -- it's -- as the file is run through the algorithm,

1  a unique signature is provided, and that's 32 characters.

2  Q    And what was the result of this process that you did?

3  A    It verified as what the initial person who created the

4  image -- my MD5 hash and the MD5 hash there were the same.  So

5  that to me means that the hash is valid, and you can move

6  forward with the examination.

7  Q    All right.  Were you able to tell when this phone was

8  activated?

9  A    Yes.  The utility did provide that information.  It was

10 4/13/2016.

11 Q    All right.  And what type of operating system was on the

12 phone?

13 A    It's an Android 5.1.1.  Once again, the utility provided

14 that information.

15         MR. HANDBERG:  Your Honor, may I approach the

16 witness?

17         THE COURT:  Yes, you may.

18 BY MR. HANDBERG:

19 Q    All right.  Sir, I've handed you a number of exhibits.

20 Let's start with the spreadsheets, which are Government's

21 Exhibits 304A, K, L, and M.

22         Did you review those spreadsheets prior to court

23 today?

24 A    Yes.  I did review the spreadsheets prior to court today.

25 I can tell that because I went and initialed and dated the

1    back of each sheet that I had looked at.

2    Q    And what was the purpose of your review?

3    A    Hold on.  Yes.  I'm sorry.

4    Q    What does it signify when you initialed and dated every

5    page?

6    A    That I had looked at the page and had verified the

7    information that was on the page with the software utility

8    report that was provided by Cellebrite.

9    Q    Thank you.

10         MR. HANDBERG:  The United States offers in evidence

11   what's marked as Government's Exhibit 304A, K, L, and M.

12         THE COURT:  Any objection?

13         MR. SWIFT:  No objection, Your Honor.

14         THE COURT:  They are admitted.

15         (Government's Exhibit Nos. 304A, 304K, 304L and

16   304M were admitted into evidence.)

17   BY MR. HANDBERG:

18   Q    What's an URL?

19   A    That is a universal resource locator that provides a --

20   when you go to type a -- for instance, a search in to Google,

21   when you get the response back from Google, it is actually

22   going to point you towards an Internet location.  And that

23   location is in the -- is actually the URL that is provided.

24   Q    And were you asked as part of your examination to take

25   some select URLs and -- that were on Mr. Mateen's phone and

1   find copies of articles and a video?

2   A    Yes, I was.

3   Q    Okay.  And take a look at Government's Exhibits 304B, C,

4   and I.

5   A    Okay.  Yes.  B, C, and I, yes.

6   Q    And by using the URL, were you able to find those items

7   that were accessed Mateen's phone?

8   A    Yes, I was able to do that.

9        MR. HANDBERG:  The United States offers into

10  evidence what's been marked as Government's Exhibits 304B, C,

11  and I.

12       MR. SWIFT:  No objection.

13       THE COURT:  Thank you.  They are admitted.

14       (Government's Exhibit Nos. 304B, 304C, and 304I

15  were admitted into evidence.)

16  BY MR. HANDBERG:

17  Q    Is 304D a screenshot from the video that's Government's

18  Exhibit 304C?

19  A    Say that again.

20  Q    The last one that's up there, 304D to your left --

21  A    Yes.

22  Q    -- is that a screenshot from the video?

23  A    Yes.  That appears to be a screenshot from the video.

24       MR. HANDBERG:  United States offers into evidence

25  what's marked as Government's Exhibit 304D.

1      THE COURT:  D as in Delta?

2      MR. HANDBERG:  Yes, sir.

3      THE COURT:  Any objection?

4      MR. SWIFT:  No objection.

5      THE COURT:  It's admitted.

6      (Government's Exhibit No. 304D was admitted into

7  evidence.)

8      MR. HANDBERG:  Request permission to publish,

9  Your Honor?

10      THE COURT:  Yes.  Go right ahead.

11      MR. HANDBERG:  Thank you.

12      All right.  Ms. Valente, we're going to go to

13  Government's Exhibit 304A, and I would like to go to the last

14  page, which is 187897.  All right.  Let's see if we can divide

15  the column in half.

16      (The above referred to exhibit was published.)

17  BY MR. HANDBERG:

18  Q    All right.  So is this a spreadsheet with some selected

19  activity from Mateen's phone?

20  A    Yes, it appears to be.

21  Q    And how many pages is the spreadsheet?

22  A    This appears to be 76 pages.

23  Q    And is this all of the activity on Mateen's phone?

24  A    No, it is not.

25  Q    The Cellebrite report you were talking about, how long

1   was the Cellebrite report?

2   A    Approximately 5,000 pages.

3   Q    All right.  So let's go -- let's go through the columns

4   so we can see what we're looking at here.  So the first column

5   is called Source.  What does that reflect?

6   A    That was a column that was created by the prosecution

7   team, I suppose, and it -- essentially all of those -- or I

8   would say close to all of those are, in fact, Mateen's new

9   phone.

10  Q    So that's the source of whatever information we're about

11  to see?

12  A    Yes.  That's the source.

13  Q    Are the remainder of the columns items from the

14  Cellebrite report?

15  A    Yes.  The -- the information within, yes, the columns

16  themselves.  As you can see, the Sender in the next column

17  over --

18           MR. HANDBERG:  Let's go to the second column.

19           THE WITNESS:  The Sender, that is obviously not the

20  way in which the Cellebrite report would have put it.  But it

21  would have been a type, and the type would have been web

22  history.

23  BY MR. HANDBERG:

24  Q    And as used by Cellebrite, what is web history?

25  A    Web history is a history of all of the activity that the

1  cell phone had with the Internet.

2          MR. HANDBERG:  All right.  Let's go to the next

3  column.

4  BY MR. HANDBERG:

5  Q    Recipient, what information would be in that column?

6  A    Typically -- and I guess you could also go back to the

7  sender and recipients.  SMS messages would have a sender and a

8  recipient.

9  Q    What's an SMS message?

10 A    That's a simple message system.  That's basically a text

11 message that you can send via your phone.

12 Q    And are we gonna see on this spreadsheet some text

13 messages?

14 A    I believe so, yes.

15 Q    And some phone calls?

16 A    Yes.

17         MR. HANDBERG:  All right.  Let's go to the next

18 column.

19 BY MR. HANDBERG:

20 Q    What is that column?

21 A    That is the time date stamp that Cellebrite extracted

22 from the database.

23 Q    All right.  And is that -- are those dates accurate?

24 A    Yes, they are.

25         MR. HANDBERG:  All right.  Let's go to the next

1   column.

2   BY MR. HANDBERG:

3   Q     And what's that column?

4   A     That's also part of the time date stamp.

5   Q     And are those accurate times?

6   A     Yes, they are.

7   Q     And we see the time ET.  What is ET?

8   A     Eastern time.

9           MR. HANDBERG:  Let's go to the next column.

10          THE WITNESS:  That would be in the body of the

11  actual entry there that Cellebrite has pulled out and presents

12  that information.

13          MR. HANDBERG:  All right.  And let's go to the next

14  column.

15          THE WITNESS:  Self-explanatory, duration.  If there

16  is a duration that Cellebrite could pull out, then it would

17  present the information there.

18          MR. HANDBERG:  All right.  Let's go to the next

19  column.

20          THE WITNESS:  Same thing.  If Cellebrite was able to

21  pull out a status for an entry, then it would put that status

22  there to give you some context.

23          MR. HANDBERG:  All right.  And let's go to the next

24  column.

25  BY MR. HANDBERG:

1    Q    What's that?

2    A    And, once again, if Cellebrite could determine whether

3    something was deleted, it would give you an indication there

4    for context.

5    Q    All right.

6         MR. HANDBERG:  And, Ms. Valente, what I would like

7    to do is for the date, time, and body columns, I would like to

8    focus on the last two rows of this page.

9    BY MR. HANDBERG:

10   Q    All right.  So this is going to put some of the

11   information together.  So looking at the line the second from

12   the bottom, just give us an explanation of what this shows in

13   terms of what was happening on the phone at that date and

14   time.

15   A    Well, Cellebrite was able to determine that on 5/10/2016,

16   at 3:09 and 36 seconds p.m., there was a web history -- and

17   I'm sorry.  You would have to include the sender group for

18   that.  But there was a web history.  And the Cellebrite, in

19   helping to give context to it, helping in ISIS-CBS News

20   ISIS-Google search.

21        MR. HANDBERG:  Ms. Valente, if we can now focus just

22   on the body column of this page.

23   BY MR. HANDBERG:

24   Q    All right.  So in this portion, do we see several

25   different references to ISIS?

1  A    Yes, we do.

2  Q    And is that something that we're gonna see consistently

3  in Government's Exhibit 304A?

4  A    Yes.

5        MR. HANDBERG:  All right.  Ms. Valente, let's go to

6  the prior page --

7  BY MR. HANDBERG:

8  Q    Well, let me ask this.  Is this in reverse chronological

9  order?

10  A    Yes, it is.

11        MR. HANDBERG:  All right.  So let's go to page 75,

12  which is 187896.  And if we could focus on the date, time, and

13  body columns, and let's do the bottom half of the page.

14  BY MR. HANDBERG:

15  Q    All right.  And so one thing I want to have you keep

16  track for us as we're going through is the days where there's

17  a Google search for ISIS.  So do you see a Google search for

18  ISIS on May 20th of 2016?

19  A    Yes, I do.

20  Q    And what's the time of that search?

21  A    2:56 and 42 seconds p.m.

22  Q    Are you looking at the bottom row?

23  A    Oh, no.  The bottom row.  Yes, 12:20 and 46 seconds p.m.,

24  ISIS.

25        MR. HANDBERG:  All right.  Ms. Valente, let's do the

1  same for the top portion.

2  BY MR. HANDBERG:

3  Q    All right, sir.  Do you see any additional searches for

4  ISIS on May 20, 2016?

5  A    At 10:21 p.m., 36 seconds, I see an ISIS Google search.

6  I also see -- well, ISIS is in the body of Google searches

7  that start about at 3 -- 3:07 and go to 3:11.

8  Q    And that's the ISIS acid search?

9  A    Yes, sir.

10        MR. HANDBERG:  Let's go to the prior page,

11  Ms. Valente, page 74, Government's Bates No. 187895.  And if

12  we could, the same thing for the top half of the page.

13  BY MR. HANDBERG:

14  Q    All right.  So now we're on May 21st, 2016.  Do you see

15  any searches for ISIS on that day?

16  A    Yes, I do.  At 6:27 p.m. and 3 seconds -- or 6:27 and

17  59 seconds.  Excuse me.

18  Q    And do you see a reference to ISIS spit face?

19  A    Yes, I do, at 1:01 p.m., 45 seconds, ISIS spit

20  face-Google search.

21  Q    And below that, do you see a reference to a new ISIS

22  video?

23  A    Yes, I do.

24  Q    Could you read that, please?

25  A    "New ISIS video urges French Muslims, terrorize them.  Do

1   not allow them to sleep.  Kill them and spit in their faces

2   and run over them with your cars."

3   Q    Do you also see a Google search for somebody by the name

4   of Abu Waheeb?

5   A    Yes.  I actually see several entries.

6           MR. HANDBERG:  All right.  Ms. Valente, let's go to

7   page 73, 187894.  And on this, let's focus on the bottom half.

8   BY MR. HANDBERG:

9   Q    More ISIS searches on May 21st?

10  A    Yes.  I see an ISIS search -- actually two entries for

11  ISIS-Google search.

12  Q    Do you see one on May 22nd?

13  A    May 22nd, one at 6:15 and 49 seconds and one at 12:14 and

14  54 seconds.

15  Q    And I want to direct your attention to the entry at

16  12:15 a.m. on May 22nd of 2016.  Do you see that one?

17  A    Yes, I do.

18  Q    Could you read that to us, please?

19  A    "Listen.  ISIS spokesman and I could -- a" --

20          THE COURT:  Can you help him, Mr. Handberg?

21          MR. HANDBERG:  Yeah.

22  BY MR. HANDBERG:

23  Q    Abu Muhammad al-Adnani.  And then you can do the rest.

24  A    -- "releases new audio message."

25  Q    Not someone you've ever heard of before?

1   A    No, it's not.

2        MR. HANDBERG:  All right.  Ms. Valente, if we could

3   do the top half of it.

4   BY MR. HANDBERG:

5   Q    See a search for something called jihadology?

6   A    Yes, I do.

7        MR. HANDBERG:  All right.  Let's go to the prior

8   page, page 72, 187893.  Ms. Valente, let's do the bottom half

9   of the document.

10  BY MR. HANDBERG:

11  Q    All right.  So now we've got some entries on May 23rd.

12  Do we see an ISIS search on that date?

13  A    May 23rd, I see two entries that say ISIS-Google search.

14       MR. HANDBERG:  Ms. Valente, let's do the top half of

15  the document now.

16  BY MR. HANDBERG:

17  Q    How about on May 24th, any ISIS searches?

18  A    On May 24th, I see three ISIS searches.

19       MR. HANDBERG:  All right.  Ms. Valente, let's go to

20  the prior page, page 71, 187892.  Let's do the bottom half of

21  the document.

22  BY MR. HANDBERG:

23  Q    Another ISIS search?

24  A    Yes.  I see one entry for it at 4:54 and 32 seconds,

25  ISIS-Google search.

1  Q    All right.  And do you see a reference to Russia?

2  A    Yes.  I see two references to Russia, one at 4:54 and

3  39 seconds and one at 4:54 and 36 seconds.

4        MR. HANDBERG:  All right.  Let's do the top half of

5  the document.

6  BY MR. HANDBERG:

7  Q    More ISIS?

8  A    Yes.  I see two entries for ISIS-Google search, one at

9  10:11 and 25 seconds and one at 10:11 and 09 seconds.

10        MR. HANDBERG:  Ms. Valente, let's go back to

11  page 73, 187894, and just the first row, please.  If we could

12  just do the date, the time, and the body so we can read it.

13  Sorry about that.

14  BY MR. HANDBERG:

15  Q    All right.  What's the body of this one state?

16  A    The body states, "ISIS urges Ramadan attacks in U.S.,

17  Europe in new audio broadcast."

18  Q    And is that one of the articles that you were asked to

19  find that you've -- that you've testified about?

20  A    I believe so, yes.

21        MR. HANDBERG:  All right.  Let's pull up,

22  Ms. Valente, Government's Exhibit 304B, 187925.

23        (The above referred to exhibit was published.)

24  BY MR. HANDBERG:

25  Q    Is this that article?

1   A    Yes, it is.

2   Q    All right.  And what's -- is the headline the same as

3   what you just read?

4   A    Yes, it is.

5        MR. HANDBERG:  Let's go to the next page,

6   Ms. Valente, 187926.  If we could highlight the first

7   paragraph.

8   BY MR. HANDBERG:

9   Q    Sir, if you could just read the first paragraph.

10  A    "A new message from an Islamic State spokesman has called

11  for terrorist followers to carry out attacks in the U.S. and

12  Europe during the Islamic Ramadan celebrations beginning in

13  early June."

14  Q    And that was accessed on Mateen's phone on May 22nd,

15  2016?

16  A    Yes, it was.

17       MR. HANDBERG:  Let's go to page 70, 187891.  Let's

18  do the same three columns we've been doing in the bottom half.

19  BY MR. HANDBERG:

20  Q    So now we've got May 25th.  Any ISIS searches on that

21  date?

22  A    Yes.  There were ISIS searches.  There was one that has

23  the entry ISIS-Google search at 10:14 and 35 seconds.

24       MR. HANDBERG:  All right.  Let's, Ms. Valente, do

25  the top half of the document.

1    BY MR. HANDBERG:

2    Q    ISIL searches?

3    A    Yes.  There are numerous ISIL searches there.

4         MR. HANDBERG:  Let's go to the prior page, page 69,

5    187890.  Let's do the bottom half of the document, please.

6    BY MR. HANDBERG:

7    Q    More ISIS searches?

8    A    Once again, more ISIS searches-Google search.

9    Q    For jihadology, could you just read the description of

10   what the body says for that?

11   A    "A clearinghouse for jihadi primary source material,

12   original analysis and translation service.  A clearinghouse

13   for jihadi primary source material, original analysis and

14   translation service."

15        MR. HANDBERG:  All right.  Let's go to the top half

16   of the document.

17   BY MR. HANDBERG:

18   Q    All right.  So now we're on May 26th of 2016.  Do you see

19   any ISIS searches?

20   A    Once again, I see two ISIS-Google searchs.

21        MR. HANDBERG:  All right.  Let's go to the prior

22   page, Ms. Valente, page 68, 187889.  Let's do the bottom half

23   of the document.

24   BY MR. HANDBERG:

25   Q    More ISIS searches?

1  A    Yes.  I see two ISIS searches at the bottom of the page.

2        MR. HANDBERG:  All right.  Let's go to the top of

3  the page and see if there's any for May 27th of 2016.

4  BY MR. HANDBERG:

5  Q    Do you see any for that date, sir?

6  A    I see three ISIS-Google searchs.

7        MR. HANDBERG:  Let's go to the prior page, page 67,

8  187888.  Let's do the bottom half of the document,

9  Ms. Valente.

10 BY MR. HANDBERG:

11 Q    Do you see a reference to LiveLeak.com?

12 A    I see -- one, two -- three references to LiveLeak.com.

13 Q    All right.  Sir, read the top entry.

14 A    Top entry is, "LiveLeak.com-dead ISIS cell phone shows

15 pics full of ISIS horrors."  In parentheses, sex forts, end

16 parentheses.

17       MR. HANDBERG:  Ms. Valente, let's go to Government's

18 Exhibit 1A, 124828.  And let's highlight the middle paragraph.

19       (The above referred to exhibit was published.)

20 BY MR. HANDBERG:

21 Q    Sir, if you can read that, please.

22 A    "Omar looked at ISIS recruitment videos on YouTube and

23 LiveLink.  He looked at videos of beheadings."

24 Q    So this says LiveLink.  The other says LiveLeak?

25 A    Yes.

1    MR. HANDBERG:  All right.  Ms. Valente, let's go

2   back to Government's Exhibit 304A, 187888.  And let's do the

3   top half of the document.

4        (The above referred to exhibit was published.)

5   BY MR. HANDBERG:

6   Q    Now, do you see a reference to a firearm?

7   A    Yes, I do.  The third from the bottom,

8   .357 Magnum-Wikipedia, the free encyclopedia.

9   Q    One of the spreadsheets you were asked to review for

10  accuracy, did it relate to activity on the phone related to

11  firearms and other attack planning activities?

12  A    Yes.

13       MR. HANDBERG:  All right.  Ms. Valente, let's go to

14  Government's Exhibit 304M, 187906.  And let's highlight the

15  top, if we can, to get the columns.

16       (The above referred to exhibit was published.)

17  BY MR. HANDBERG:

18  Q    Do these columns have the same type of information as the

19  spreadsheet we just saw?

20  A    Yes, they do.

21       MR. HANDBERG:  All right.  And let's go to page 11,

22  187916.

23  BY MR. HANDBERG:

24  Q    And how many -- when does the activity for this

25  spreadsheet start?

1   A     It starts 5/24/2016 at 6:42 and 58 seconds p.m.

2            MR. HANDBERG:  All right.  Let's go to the prior

3   page, Ms. Valente, page 10, 187915.  And if we can highlight

4   the date, time body columns for the bottom half.

5   BY MR. HANDBERG:

6   Q     More entries related to firearms?

7   A     Yes, sir.

8            MR. HANDBERG:  All right.  Let's do the top half of

9   the document, Ms. Valente.

10  BY MR. HANDBERG:

11  Q     Firearms?

12  A     Yes, sir.

13  Q     All right.  Do you see a reference to Bass Pro Shop guns?

14  A     Yes.  Third from the top, shooting, guns, ammo, and

15  accessories, Bass Pro Shops.  There's one down from there,

16  another Bass Pro Shops; one down from there, another Bass Pro

17  Shops.  There are numerous ones.  I'll say that.

18           MR. HANDBERG:  All right.  Let's go to the prior

19  page, page 9, 187914.  And let's do the bottom half of that

20  one, Ms. Valente.

21  BY MR. HANDBERG:

22  Q     More firearm-related entries?

23  A     Yes.

24  Q     Do you see something about St. Lucie Shooting Center?

25  A     Yes, I do.

1  Q    And what's the date of that?

2  A    The date of that is 5/27/2016 at 4:39.  And there are at

3  least two entries.  I believe the SL Shooting Center -- no.

4  Just the -- just the two actually say St. Lucie Shooting

5  Center.

6           MR. HANDBERG:  All right.  Let's go to the prior

7  page, Ms. Valente, page 8, 187913.  Let's do the bottom half

8  of the document.

9  BY MR. HANDBERG:

10 Q    Do you see references to different types of guns?

11 A    Yes, I do.

12 Q    Including an M16?

13 A    Yes, I do.

14           MR. HANDBERG:  All right.  Let's go to the top half

15 of the document.

16 BY MR. HANDBERG:

17 Q    Do you see any references to buying a gun?

18 A    Yes, I do.

19 Q    And what is after the colon for buying a gun?

20 A    Excuse me.  Retail shop versus gun shows.

21           MR. HANDBERG:  All right.  Let's go to the prior

22 page, page 7, 187912.  And let's on this one do the top half

23 of the document.

24 BY MR. HANDBERG:

25 Q    Do you see a reference to a .38 revolver speedloader?

1  A    Yes, I do.

2  Q    What's the date of that?

3  A    The date of that is 5/29.

4       MR. HANDBERG:  All right.  Let's go to the prior

5  page, page 6, 187911.  And let's do the -- let's do the top

6  half of the document.

7  BY MR. HANDBERG:

8  Q    Do you see a reference to revolver killing?

9  A    Yes, I do, middle of the page.

10 Q    What's the date and time on that one?

11 A    5/30/2016 at 12:02 and 10 seconds p.m.

12      MR. HANDBERG:  Let's go to the prior page, page 5,

13 187910.  Let's do the top half of the document.

14 BY MR. HANDBERG:

15 Q    Do you see a reference to firearms in Walmart?

16 A    Yes, I do.

17 Q    And what's the date?

18 A    Two entries.

19 Q    What's the date and time?

20 A    5/31/2016.  And both of them were within 4:59.

21      MR. HANDBERG:  Let's go to the prior page, page 4,

22 187909.  Let's do the top half of this document.

23 BY MR. HANDBERG:

24 Q    More references to Walmart and firearms?

25 A    Yes, sir.

1  Q    And what date?

2  A    6/1/2016.  And down at the bottom of the page, 5/31/2016.

3        MR. HANDBERG:  All right.  Let's go to page 3,

4  187908.  And let's do the bottom part of this document.

5  BY MR. HANDBERG:

6  Q    See any references to an AR-15?

7  A    Yes, I do.

8  Q    What are the dates and times of those?

9  A    The date and time, 6/3/2016 at 1:23 -- both of them were

10 within 1:23.

11        MR. HANDBERG:  All right.  Let's go to the prior

12 page, page 2, 187907.  Let's do the bottom half of the

13 document.

14 BY MR. HANDBERG:

15 Q    Do you see any references to Bass Pro Shops?

16 A    Yes.  I see several references to Bass Pro Shops.

17        MR. HANDBERG:  And let's go to the top of the

18 document.

19 BY MR. HANDBERG:

20 Q    Any references to 9 mm firearm?

21 A    Yes, sir.

22        MR. HANDBERG:  All right.  Last page on this one,

23 page 1, 187906.  Let's do the bottom half of the document.

24 BY MR. HANDBERG:

25 Q    Any references to horsepower of various vehicles?

1    A    Yes, sir.

2    Q    And then any references to states that have gun permits?

3    A    Yes.  I see one -- two entries -- three entries.

4    Q    Why don't you read the Google search?

5    A    "States with most concealed gun permits-Google search."

6              MR. HANDBERG:  All right, Ms. Valente.  Let's go

7    back to Government's Exhibit 304A.  We ended up on May 27th of

8    2016.  So let's go to page 65 -- actually, let's move forward

9    one.  Let's go to page 64, 187885.  Let's do the same three

10   columns we've been doing.  Let's do the top half.

11             (The above referred to exhibit was published.)

12   BY MR. HANDBERG:

13   Q    See any references to the attacks in Paris?

14   A    Yes.  I see towards the lower half of the page,

15   November 2015 Paris attacks-Wikipedia, the free encyclopedia.

16   Q    What date are we talking about here?

17   A    5/27/2016.

18             MR. HANDBERG:  Let's go to the prior page, page 63,

19   page 187884.  And let's just look at the top half of the

20   document.

21   BY MR. HANDBERG:

22   Q    More entries for LiveLeak.com?

23   A    LiveLeak.com, I see -- one, two, three, four, five --

24   five entries.

25             MR. HANDBERG:  All right.  Let's go to the prior

1  page, page 62, 187883.  And let's do the top half of the

2  document.

3  BY MR. HANDBERG:

4  Q    So now we're on May 28th, 2016.  Any ISIS searches on

5  that date?

6  A    Yes, there are.

7  Q    More LiveLeak?

8  A    Yes, there are.

9        MR. HANDBERG:  All right.  Prior page, page 61,

10  187882.  And let's do the top half of the document.

11  BY MR. HANDBERG:

12  Q    References to -- do you see any references to orange

13  jumpsuit ISIS?

14  A    Yes.  I see two towards the top of the page and three

15  towards the bottom of the page -- or actually, possibly four.

16  But it's *orang* not -- jumpsuit, not orange.

17  Q    And on the top row, read us the body for the top entry

18  there.

19  A    "Militia gets enraged at ISIS putting people in orange

20  jumpsuits and killing them.  Captives ISIS terrorists --

21  captures ISIS terrorists and then slaughters them all in the

22  same fashion ISIS executes their victims."

23        MR. HANDBERG:  Let's go to the prior page, page 60,

24  187881.  Let's look at the lower half of the document.

25  BY MR. HANDBERG:

1  Q    Do you see a search for the F.B.I.?

2  A    Yes, I see in the middle of the page.

3  Q    And is another one of the spreadsheets you were asked to

4  prepare related to searches on this phone related to law

5  enforcement entities?

6  A    Yes.

7         MR. HANDBERG:  All right.  Ms. Valente, let's pull

8  up a different exhibit.  We're going to go to Government's

9  Exhibit 304K.  Let's go to the first page, 187898.  And let's

10 look at the columns on the top of the document.

11        (The above referred to exhibit was published.)

12 BY MR. HANDBERG:

13 Q    All right, sir.  The same types of information you've

14 been testifying about already?

15 A    Yes, sir.

16        MR. HANDBERG:  All right.  Let's go to page 5 of the

17 document, which is the last page, 187902.  And let's focus

18 on -- yeah, that's great.

19 BY MR. HANDBERG:

20 Q    So when is the latest -- the earliest entry on the

21 spreadsheet?

22 A    The earliest entry is 4:55 and 9 seconds p.m.

23 Q    On what date?

24 A    On 5/27.

25 Q    And the search at that point was what?

1  A    F.B.I.-Federal Bureau of Investigation.

2  Q    So on the top of the document, on 5/28, do you see any

3  Google searches for F.B.I.?

4  A    Yes.  I see four Google searches for the F.B.I.

5         MR. HANDBERG:  All right.  Let's go to the prior

6  page, page 4, 187901.  Let's focus on the lower half of the

7  document.

8  BY MR. HANDBERG:

9  Q    So we've got 5/27, 5/28.  Is there a Google search for

10  5/29?

11  A    There are no Google searches for 5/29.

12  Q    How about for 5/30?

13  A    There's one Google search for 5/30.

14  Q    I'm talking about Google searches for F.B.I. at this

15  point.

16  A    Yes, sir.

17  Q    How about 5/31?

18  A    For 5/31, I see -- one, two, three, four, five, six --

19  seven.

20         MR. HANDBERG:  All right.  Let's do the top half of

21  the document, Ms. Valente.

22  BY MR. HANDBERG:

23  Q    All right.  How about on June 1st?

24  A    On June 1st, I see two F.B.I.-Google search.

25  Q    Could you read us the Google search that's above those

1  two F.B.I. searches?

2  A    Yes.  "Google searches being watched."

3  Q    And what's the row above that?

4  A    The row above that, "My family's Google searching got us

5  a visit from counterterrorism police."

6  Q    And then two entries above that, what's the web history

7  at that point?

8  A    Yes --

9  Q    June 1st, 2016, at 2:40 and 41 seconds.

10  A    Yes.  Yes.  "The NSA might be reading your searches, but

11  your local police probably aren't."

12        MR. HANDBERG:  All right.  And let's go down on the

13  page on May 31st, 2016, at 11:16.

14  BY MR. HANDBERG:

15  Q    Read us the body of that one.

16  A    The bottom of the page?  "Alleged gunman deliberately

17  went off the radar for hours before firing 212 rounds of

18  deadly spree in Houston, say police."

19        MR. HANDBERG:  Ms. Valente, let's go to the prior

20  page, page 3, 187900.  And let's do the bottom part of that

21  document.

22  BY MR. HANDBERG:

23  Q    All right.  All right.  So we had 6/1.  Do you see an

24  F.B.I. Google search on June 2nd?

25  A    No.  I do not see a Google search.  You said 6/1?

1   Q    I said 6/2.

2   A    6/2, no searches on 6/2.

3   Q    How about June 3rd?

4   A    On June 3rd, I see two F.B.I.-Google search entries.

5   Q    What about six -- June 4th?

6   A    Oh, I'm sorry.  There was one on June 3rd and one on

7   June 4th.

8   Q    And what's the entry on the bottom?  What's the title of

9   that?

10  A    The entry on the bottom, "Nine ways you're being spied on

11  every day."

12  Q    And is that one of the articles you were asked to find

13  that was accessed on Mateen's phone?

14  A    Yes, I believe it was.

15          MR. HANDBERG:  All right.  So let's look at

16  Government's Exhibit 304I, and let's go to the second page,

17  187458.  And if we could highlight the top part.

18          (The above referred to exhibit was published.)

19  BY MR. HANDBERG:

20  Q    So the article is called "Nine Ways You're Being Spied On

21  Every Day."

22          MR. HANDBERG:  Actually, if we go and capture right

23  above the photo.

24  BY MR. HANDBERG:

25  Q    All right.  So what's the first way?

1   A     Say that again?

2   Q     Yeah.  So we're gonna look for the nine ways you're being

3   spied on every day.  So you see a reference to license plate

4   readers?

5   A     Yes.  License plate readers would be one of them.

6          MR. HANDBERG:  All right.  Let's go to the next

7   page, 187459, and let's focus on the top part.

8   BY MR. HANDBERG:

9   Q     What's another way?

10  A     Sidewalk and public space cameras.

11         MR. HANDBERG:  All right.  Let's go to the middle of

12  the page.  Let's find the third way.

13         THE WITNESS:  And public transportation.

14         MR. HANDBERG:  And let's go look at the bottom of

15  the document for the fourth way.

16         THE WITNESS:  When you use credit and loyalty cards.

17         MR. HANDBERG:  Let's go to the next page, 187460.

18  BY MR. HANDBERG:

19  Q     And then the next way?

20  A     On the phone.

21         MR. HANDBERG:  All right.  Lower on that page.

22  BY MR. HANDBERG:

23  Q     What's the next way?

24  A     While you watch TV.

25         MR. HANDBERG:  Let's go to the next page, 187461.

1   BY MR. HANDBERG:

2   Q    The next way?

3   A    Sitting at your computer.

4        MR. HANDBERG:  And let's look at the other one on

5   that page.

6        THE WITNESS:  Sending and receiving e-mails.

7        MR. HANDBERG:  All right.  Last page to find the

8   last one, 187462.  It's actually not the last page but the

9   next page, 187462.

10  BY MR. HANDBERG:

11  Q    And the ninth way?

12  A    Surfing the Internet.

13  Q    All right.  Thank you.

14       MR. HANDBERG:  Thank you, Ms. Valente.  Let's go

15  back to Government's Exhibit 304A.  So we've gotten --

16  actually, let's go back to the law enforcement searches.

17  Let's go back to 304K.  And we were on -- let's go to page 3,

18  187900.

19       (The above referred to exhibit was published.)

20  BY MR. HANDBERG:

21  Q    And if you can read the entry for June 5th, 2016, at

22  10:31.  June 5th, 10:31.

23  A    10:31 and 20 seconds?

24  Q    Yes, sir.

25  A    "Gun shop owner reports suspicious man to the police."

1      MR. HANDBERG:  All right.  Let's go to the prior

2  page, page 2, 187899.  So we've gotten through June 4th.

3  Let's look at the bottom half of the document.

4  BY MR. HANDBERG:

5  Q    Any F.B.I. searches for June 5th?

6  A    I see three entries for June -- four entries June 5th.

7  Q    All right.  How about June 6th?

8  A    I see one entry for June 6th.

9  Q    How about June 7th?

10 A    On June 7th, I see seven entries for June 7th,

11 F.B.I.-Google search.

12      MR. HANDBERG:  All right.  Let's look at the top

13 part of the document.

14 BY MR. HANDBERG:

15 Q    How about June 8th?

16 A    June 8th, I see four entries.

17 Q    All right.  And on June 8th, I direct your attention to

18 one of the results from one of those searches at 11:03.  Read

19 us the body for that.

20 A    At 11:03, 26 seconds, "F.B.I. possibly entrapping

21 suspects in ISIS war-Fourth Amendment violations."

22      MR. HANDBERG:  All right.  Last page of this

23 document, page 1, 187898.  Let's look at the lower part of the

24 document.

25 BY MR. HANDBERG:

1  Q    All right.  So we just did June 8th.  Do you see on

2  June 9th?

3  A    I see one entry on June 9th.

4  Q    And it's not about the F.B.I., though?

5  A    It's not about the F.B.I.

6  Q    Okay.  How about June 10th?

7  A    June 10th, I see numerous entries.

8  Q    All right.  And --

9  A    Six of them.

10 Q    I want to --

11 A    Two of them being F.B.I.-Google search.

12 Q    I want to direct your attention to a different topic.

13 Let's look at June 10th, 2016, at 12:39.  Read that search.

14 A    At 12:39 and 59 seconds, "Credit card unusual

15 spending-Google search."

16       MR. HANDBERG:  All right.  Let's go to the top half

17 of the document.

18 BY MR. HANDBERG:

19 Q    Any Google searches for the F.B.I. on June 11th?

20 A    I see one at the bottom of the page.

21 Q    And do you see searches about webcams?

22 A    Right above the F.B.I. Google search, I see Kissimmee

23 webcams in region of Kissimmee, Florida, USA.

24 Q    Do you see any references to Disney and Orlando webcams?

25 A    I see -- one, two, three, four, five, six, seven --

1    seven -- eight on that page -- nine -- nine, I guess.  But, I

2    mean, Disney and Orlando webcams, I see -- one, two, three,

3    four, five -- six.

4    Q    And what date are those searches?

5    A    They were 6/11/2016.

6    Q    All right.

7            MR. HANDBERG:  All right, Ms. Valente.  Let's go

8    back to Government's Exhibit 304A.  Let's go to page 58,

9    187879.  And the same thing, let's focus on the bottom half of

10   the document -- actually, let's focus on the top half.  I'm

11   sorry.

12           (The above referred to exhibit was published.)

13   BY MR. HANDBERG:

14   Q    More ISIS searches on May 28th?

15   A    Yes.  Yes.  I see five ISIS searches in Google search.

16   Q    Do you see a search for ISIS smash head rock?

17   A    I see one at 5:09:19 seconds.

18   Q    9:05 I think you meant to say.

19   A    Yeah, 9:05.

20   Q    Read us the one that's above it, the result from the

21   search.

22   A    "Watch new ISIS execution video crushes man's head with

23   stone."

24           MR. HANDBERG:  All right.  Let's go to the prior

25   page, page 57, 187878.  Let's do the bottom half of the

1    document.

2    BY MR. HANDBERG:

3    Q    Do you see a reference to San Bernadino?

4    A    Yes, I do.

5         MR. HANDBERG:  Let's go to the prior page,

6    page 56 -- actually, let's move ahead.  Let's move to page 55,

7    187876.  Let's do the top half of the document, 187876 --

8    sorry about that -- the top half.

9    BY MR. HANDBERG:

10   Q    All right.  We're on May 30th at this point.  Any ISIS

11   searches?

12   A    Yes.

13        MR. HANDBERG:  Let's go to the prior page, page 54,

14   187875.  I want to do the bottom part of this document.

15   BY MR. HANDBERG:

16   Q    More LiveLeak.com?

17   A    Yes.

18   Q    All right.  And can you read us the bottom entry for that

19   at 9:46 in the morning?

20   A    "LiveLeak.com-Iraqi air strikes versus Daesh."

21        MR. HANDBERG:  Okay.  And let's go to the top part

22   of the document.

23   BY MR. HANDBERG:

24   Q    Do you see any references to the Boston Marathon bombing?

25   A    Yes.

1  Q    And to Tamerlan Tsarnaev?

2  A    Yes.

3        MR. HANDBERG:  Page 53, 187874, bottom half of the

4  document, please.

5  BY MR. HANDBERG:

6  Q    More ISIS searches?

7  A    Yes.

8        MR. HANDBERG:  Prior page, page 52, 187873 --

9  actually, I think we've already seen that on a different one.

10 Let's go to page 51, 187872.  Let's do the bottom half of the

11 document.

12        (The above referred to exhibit was published.)

13 BY MR. HANDBERG:

14 Q    All right.  We're on May 31st, 2016, a new day.  Any ISIS

15 searches?

16 A    Specific ISIS or -- yes.  Yes.  Yes.  Yes.

17        MR. HANDBERG:  Okay.  All right.  Let's go to --

18 let's go to the prior page.  We're on page 50 now, 187871.

19 And let's do the top half of the document.

20 BY MR. HANDBERG:

21 Q    All right.  Now we're on June 1st of 2016.  Any ISIS

22 search?

23 A    Yes.

24 Q    Do you see some references to credit cards?

25 A    Yes.

1  Q    So why don't you read the entry June 1st, 2016, at 1:01?

2  A    "Can you buy a car with a credit card?"

3  Q    Is another one of the spreadsheets that you were asked to

4  do related to searches -- financial searches?

5  A    Yes.

6        MR. HANDBERG:  All right.  So, Ms. Valente, let's go

7  to Government's Exhibit 304L, 187903.  And let's look at the

8  top part of the document.

9        (The above referred to exhibit was published.)

10 BY MR. HANDBERG:

11 Q    I think we've got the drill at this point, but the same

12 information that we've been seeing in the other spreadsheets?

13 A    On the -- on the back of the page, I don't have my

14 initials and date and time stamp.

15 Q    On --

16 A    On the first page.  I mean, it is consistent with what I

17 had seen before, but I just want to point that out.

18       MR. HANDBERG:  All right.  Well, let's do the last

19 two pages.  Let's go to page 3, 187905.  Let's focus on the

20 bottom part of the document.

21 BY MR. HANDBERG:

22 Q    So when is the first entry we see, what date?

23 A    5/21/2016.

24 Q    Do you see Google -- a Google search for pay mortgage

25 with credit card?

1  A    Yes.  Pay mortgage with credit card was at 8:53 and

2  7 seconds p.m.

3  Q    All right.  Do you see a search of "buy a car with credit

4  card"?

5  A    Yes, at 1:01.

6        MR. HANDBERG:  All right.  Let's look at the top

7  half of the document.

8  BY MR. HANDBERG:

9  Q    Searches related to jewelry?

10 A    Yes.

11       MR. HANDBERG:  All right.  Let's go to page 2,

12 187904.  Let's focus on the bottom half of the document.

13 BY MR. HANDBERG:

14 Q    All right.  If you could read the one at June 1st, 2016,

15 at 2:30 and 20 -- 2:30 and 15 seconds, the Google search.

16 A    "Adding child's name to bank account-Google search."

17 Q    And if you can read the one June 1st, 2016, at 2:34 and

18 17 seconds.

19 A    "Adding wife name to bank account-Google search."

20 Q    All right.

21       MR. HANDBERG:  All right.  Ms. Valente, let's go

22 back to Government's Exhibit 304A.  We ended up on June 1st.

23 Let's go to page 47, 187868.  And on this list, focus on the

24 bottom part of the document.

25             (The above referred to exhibit was published.)

1  BY MR. HANDBERG:

2  Q    All right.  We're on June 2nd, 2016.  Any searches for

3  ISIS on that date?

4  A    Yes.

5          MR. HANDBERG:  All right.  Let's go to the prior

6  page, page 46, 187867.  Let's to the bottom half of the

7  document.

8  BY MR. HANDBERG:

9  Q    All right.  See an ISIS search on June 3rd?

10  A    Yes.

11  Q    All right.  And we also see the AR-15 information again?

12  A    Yes.

13  Q    So the other spreadsheets that we looked at, is their

14  information contained within this master spreadsheet?

15  A    Yes.

16          MR. HANDBERG:  All right.  Let's go to

17  Government's -- let's go to page 45, 187866.  Let's do the top

18  half of the document.

19  BY MR. HANDBERG:

20  Q    More references to San Bernadino?

21  A    Yes.

22          MR. HANDBERG:  Let's go to page 44, 187865, and

23  let's go to the bottom part of the document.

24  BY MR. HANDBERG:

25  Q    Another reference to San Bernadino?

1  A    Yes.

2         MR. HANDBERG:  All right.  Let's go to page 43,

3  187864, top half of the document.

4  BY MR. HANDBERG:

5  Q    Read us the top entry at 8:30.

6  A    "U.S. launches air strikes on ISIS from Mediterranean for

7  first time since Iraq War."

8         MR. HANDBERG:  Let's go to the prior page, page 42,

9  187863, bottom part of the document.

10  BY MR. HANDBERG:

11  Q    More ISIS searches?

12  A    Yes.

13         MR. HANDBERG:  Let's go to page 41, 187862.  Let's

14  do the bottom half of the document.

15  BY MR. HANDBERG:

16  Q    Read us the search at 11:49 and 32 seconds.

17  A    Iraqi civilian casualties-Google search.

18         MR. HANDBERG:  Let's go to page 40, 187861.  Let's

19  focus on the bottom half of the document.

20  BY MR. HANDBERG:

21  Q    All right.  And read us the search at 7:21:40 seconds.

22  A    "Baghdadi speech-Facebook search."

23         MR. HANDBERG:  And let's go to the top of the

24  document.

25  BY MR. HANDBERG:

1  Q    And read us the entry at 8:26 and 53 seconds.

2  A    "Islamic State calls for attacks on U.S. during Ramadan."

3  Q    And is that the link for the video that's Government's

4  Exhibits 304F?

5  A    I believe so, yes.

6         MR. HANDBERG:  All right.  Ms. Valente, let's just

7  play -- I don't want to play the whole thing again.  Let's

8  just play the first couple seconds of 304F -- sorry -- 304C.

9  Sorry.  Sorry.  Getting ahead of myself.

10        (The above referred to exhibit was published.)

11        MR. HANDBERG:  That's good.  Thank you.

12 BY MR. HANDBERG:

13 Q    And based on your review of the web history on this

14 phone, was the next entry in the web history consistent with

15 the length of time on this video?

16 A    Yes.  It was approximately a minute.

17 Q    All right.

18        MR. HANDBERG:  Let's go to page 39, 187860.  Let's

19 do the top part of the document.

20 BY MR. HANDBERG:

21 Q    Do you see another reference to Baghdadi speech, full

22 text?

23 A    Yes, I do.

24        MR. HANDBERG:  Let's go to the prior page, page 38,

25 187859.  Let's do the bottom part of the document.

1  BY MR. HANDBERG:

2  Q    We're on June 4, 2016.  Is there an ISIS search on that

3  date?

4  A    Um, yes, at 2:07 and 7 seconds.

5          MR. HANDBERG:  All right.  Let's move forward to --

6  let's move forward to June 5th.  Let's go to 187855.  Let's

7  focus on the bottom part.

8  BY MR. HANDBERG:

9  Q    Do you see a search for Best Buy on that date?

10  A    Yes.

11  Q    Approximately what time?

12  A    6:18 and 36 seconds p.m.

13          MR. HANDBERG:  All right.  And if we could focus

14  on -- there's some text messages above that.

15          THE WITNESS:  Okay.  There's also one at 26 seconds

16  too.

17          MR. HANDBERG:  Okay.  All right.  Let's -- let's

18  look at the first three columns for the Sabrina and Omar text

19  exchange on June 5th, 2016.  Right here.

20  BY MR. HANDBERG:

21  Q    All right.  This is something a little different.  So

22  this is one of these SMS messages you were talking about?

23  A    Yes.

24  Q    All right.  So just using the top row, what do these

25  columns show us in terms of what contact is being made?

1  A    They were SMS messages from Sabrina to Omar, Omar to

2  Sabrina.

3         MR. HANDBERG:  All right.  Then let's look at the

4  next two columns.

5  BY MR. HANDBERG:

6  Q    And does that provide the date and the time and the

7  content of the messages?

8  A    Yes.

9  Q    All right.  So let's just use this as an example.  So

10 does it go from bottom to top in terms of the communication?

11 A    Yes.

12        MR. HANDBERG:  All right.  Let's go back to web

13 history.  Let's show the top half of the document for that

14 page, the same -- I'm sorry -- the same three columns we've

15 been doing.  Sorry about that.  The next three columns.  There

16 we go.  Thank you.

17 BY MR. HANDBERG:

18 Q    Do you see a search for Carrabba's?

19 A    Yes.

20 Q    And what's the date and time of that search -- or one of

21 those searches?  Just give us one.

22 A    It was 6/5/2016 at 7:12 and 11 seconds p.m.

23        MR. HANDBERG:  All right.  Let's go to the prior

24 page, page 33, 187854.  Let's do the bottom half of the

25 document.

1  BY MR. HANDBERG:

2  Q    More ISIS searches?

3  A    Yes.

4  Q    What date are these?

5  A    6/6/2016.

6         MR. HANDBERG:  Let's go to the prior page, page 32,

7  187853.  And let's focus on the top part of the document.

8  BY MR. HANDBERG:

9  Q    And read us one of those entries, the body.

10 A    "Advances on IS strongholds underlines U.S. Russia

11 convergence."

12        MR. HANDBERG:  All right.  Let's go to -- let's go

13 to page 28, 187849.  And let's do the bottom part of the

14 document.

15 BY MR. HANDBERG:

16 Q    On June 7, 2016, please read us the one for 12:30 a.m.

17 A    12:30 a.m.?

18 Q    Yes, sir.

19 A    "Unreal ISIS urges month of jihad in U.S., Obama

20 responds."

21        MR. HANDBERG:  Thank you.  Let's go to the prior

22 page, page 27, 187848.  Let's do the top part of the document.

23 BY MR. HANDBERG:

24 Q    More LiveLeak.com?

25 A    You mean LiveLink?

1   Q    Yeah, I'm trying to say leak.

2   A    Yeah.  Okay.  LiveLeak, yes.

3   Q    LiveLeak.com.  Can you read us the second one for

4   LiveLeak.com?

5   A    "LiveLeak.com-exclusive, five American helicopters filmed

6   landing in ISIS-held territory."

7            MR. HANDBERG:  All right.  Let's do the prior page,

8   page 26, 187847.  Let's focus on the bottom part of the

9   document.

10  BY MR. HANDBERG:

11  Q    More entries for LiveLeak.com?

12  A    Yes.

13           MR. HANDBERG:  All right.  Let's go to the top part

14  of the document.

15  BY MR. HANDBERG:

16  Q    We see a search for ISIL?

17  A    Yes.  Yes.

18  Q    What date is that?

19  A    That is 6/8/2016 at 10:48.

20           MR. HANDBERG:  All right.  Let's go to the prior

21  page, page 25, 187846.  Let's focus on the top part of the

22  document.

23  BY MR. HANDBERG:

24  Q    Another ISIS search?

25  A    Yes.  Yes.

1   Q    Need some water?

2   A    No.  I think I'm okay.

3   Q    Do you see a search for Russia air strikes?

4   A    Yes, I do.

5   Q    All right.  And I want to direct your attention to --

6   there's some text messages on the top.

7            MR. HANDBERG:  So, Ms. Valente, for the text

8   messages on the top, let's start with the first three columns,

9   again, so we can see who's talking.

10  BY MR. HANDBERG:

11  Q    All right.  So who are these text messages we're -- we're

12  going to see, who are they between?

13  A    Omar and Noor.

14  Q    And the entry under -- for Noor has Noor My Love.  Is

15  that something you made up?

16  A    No.  That's something that the utility pulled out.

17  Q    Is that how it was referred to in the phone?

18  A    I believe so in that that's probably one of the columns

19  that was in the actual report.

20           MR. HANDBERG:  All right.  Let's look at the next

21  three columns, date, time, and body.

22  BY MR. HANDBERG:

23  Q    All right.  Let's start with the one at 1:48:56.  What is

24  the body for that one?

25  A    1:48:56.  It's, "Okay.  I have no coupon, babe."

1  Q    And 1:51:50, it's, "LOL a mashallah."

2        So let's do the one above that, 2:15:06.  What's

3  that one state?

4  A    "Getting my car, babe."

5  Q    All right.  And then let's do the one above that at 8:20

6  and 3 seconds.  "Habibi."

7  A    "Habibi, I'm outside."

8  Q    All right.  And the next one?

9  A    "Disney store."

10        MR. HANDBERG:  Okay.  And, Ms. Valente, let's look

11  at the top row.  Let's look at the source sender and

12  recipient.

13  BY MR. HANDBERG:

14  Q    So the next item on the spreadsheet, is that a web

15  history?

16  A    Yes.

17  Q    And what's the search that's done?

18  A    Disney Springs-Google search.

19  Q    At about what time?

20  A    That was at 8:39 and 28 seconds p.m.

21        MR. HANDBERG:  All right.  Let's go to the prior

22  page, page 24, 187845.  Let's look at the bottom part of the

23  document.  We're still on June 8th of 2016.

24  BY MR. HANDBERG:

25  Q    We've seen these searches before.  These are the 9 mm

1  searches we saw before?

2  A    Yes.

3  Q    Another search for ISIS on June 8th?

4  A    Yes.

5        MR. HANDBERG:  All right.  Let's look at the top of

6  the document.

7  BY MR. HANDBERG:

8  Q    On June 9th now, another ISIS search?

9  A    Yes.

10        MR. HANDBERG:  Let's look at the prior page,

11  page 23, 187844.  Let's focus on the top part of the document.

12  BY MR. HANDBERG:

13  Q    If you can read us the body of the second item at 7:13

14  and 29 seconds.

15  A    "New video message from Islamic State, Ramadan, the month

16  of conquests."

17  Q    Thank you.

18        MR. HANDBERG:  Let's go to the prior page, page 22,

19  187843.  And let's do the top half of the document.

20  BY MR. HANDBERG:

21  Q    Are these more references to videos?  Are these more

22  references to videos?

23  A    Yes.  Yes, they are.

24  Q    And videos from the Islamic State?

25  A    Correct.

1    MR. HANDBERG:  All right.  The prior page, page --
2  let's move ahead from that.  I covered that.  Let's go to
3  page 20, 187841.  And let's do the bottom part of the
4  document.
5  BY MR. HANDBERG:
6  Q    See more references to videos from the Islamic State?
7  A    Yes.
8            MR. HANDBERG:  All right.  Let's look at the top
9  part of the document.
10 BY MR. HANDBERG:
11 Q    More ISIL searches?
12 A    Yes.
13 Q    All right.  And at 9:34, does one of the entries read,
14 "ISIS leader al-Baghdadi injured in air strike by U.S. bomber
15 on Syria Mirror online"?
16 A    Yes.
17           MR. HANDBERG:  Let's go to page 18, 187839.  Let's
18 do the top part of the document.
19 BY MR. HANDBERG:
20 Q    More videos from the Islamic State?
21 A    Yes.
22           MR. HANDBERG:  Let's go to the prior page, page 17,
23 187838.  Let's do the top half of the document.
24 BY MR. HANDBERG:
25 Q    Do you see more references to videos from the Islamic

1  State?

2  A    Yes.

3       MR. HANDBERG:  All right.  And, Ms. Valente, let's

4  focus on the second row, and let's focus on the first three

5  columns.

6  BY MR. HANDBERG:

7  Q    All right.  Does this look like another text messages?

8  A    Yes.

9  Q    And from who to who?

10  A    Noor My Love to Omar.

11       MR. HANDBERG:  And let's do the next three columns.

12  BY MR. HANDBERG:

13  Q    So what was the date of that text and the time?

14  A    10/6/2016 at 4:59 and 36 seconds p.m.

15  Q    And the content of that?

16  A    "Babe, you order the tickets."

17       MR. HANDBERG:  Let's go to the prior page, page 16,

18  187837, the bottom part of the document, please.

19  BY MR. HANDBERG:

20  Q    More videos from the Islamic State?

21  A    Yes.

22       MR. HANDBERG:  Let's go to the prior page, page 15,

23  187836, the bottom part of the document.

24  BY MR. HANDBERG:

25  Q    These are news releases from the Islamic State?

1    A    Yes.

2            MR. HANDBERG:  Prior page, page 14, 187835.  Let's

3    do the bottom part of the document.

4    BY MR. HANDBERG:

5    Q    See any references to Istanbul, Turkey?

6    A    Yes.

7    Q    Read us one of those.

8    A    "Cheap flights to Istanbul, Turkey."

9            MR. HANDBERG:  And let's look at the top part of the

10   document.

11   BY MR. HANDBERG:

12   Q    More references to videos from the Islamic State?

13   A    Yes.

14           MR. HANDBERG:  Let's go to page 13, 187834.  Let's

15   look at the bottom part of that document.

16   BY MR. HANDBERG:

17   Q    More videos from the Islamic State?

18   A    Yes.

19           MR. HANDBERG:  Let's go to the prior page, page 12,

20   187833.  Let's focus on the bottom part.

21   BY MR. HANDBERG:

22   Q    More videos from the Islamic State?

23   A    Yes.

24           MR. HANDBERG:  All right.  Ms. Valente, let's --

25   let's go to the text message in the fifth and sixth row.

1    Let's do the first three columns.

2    BY MR. HANDBERG:

3    Q    Who are these text messages between?

4    A    Omar and Noor My Love.

5         MR. HANDBERG:  And let's go to the next two rows.

6    BY MR. HANDBERG:

7    Q    What are the date of these texts?

8    A    6/11/2016.

9    Q    Now, is one of the documents that you were asked to

10   review some selected text messages between Mateen and

11   Ms. Salman?

12   A    Yes.

13        MR. HANDBERG:  Your Honor, may I approach the

14   witness?

15        THE COURT:  Yes, you may.

16        Mr. Handberg, is this a good point for a break, or

17   do you have about 15 minutes before we can take the morning

18   break?

19        MR. HANDBERG:  This would probably be a good time,

20   Your Honor.

21        THE COURT:  All right.  We'll do that.

22        We'll be in recess for 15 minutes.

23        COURTROOM SECURITY OFFICER:  All rise for the jury.

24     (The jury retired from the courtroom at 10:32 a.m.)

25        COURTROOM SECURITY OFFICER:  Please be seated.

1          THE COURT:  Thank you.  We'll be in recess.

2          (Recess at 10:32 a.m., until 10:48 a.m.)

3          THE COURT:  Do we have a sense for the hold up?

4  We're waiting for Ms. Salman.

5          MR. HANDBERG:  I'm sorry.

6          THE COURT:  Anyone know where she is?

7          MS. MORENO:  I wouldn't know, Your Honor.

8          THE COURT:  Is the marshal around here somewhere?

9  We have to wait for her to get here.

10         MR. HANDBERG:  Can I clean up around him?

11         THE COURT:  Yes.

12         (Defendant enters courtroom.)

13         THE COURT:  All right.  Thank you.

14         If we're ready, we can bring the jury in.  Thank

15  you.

16         COURTROOM SECURITY OFFICER:  All rise for the jury.

17         (The jury entered the courtroom at 10:53 a.m.)

18         COURTROOM SECURITY OFFICER:  Please be seated.

19         THE COURT:  Thank you.  The record should reflect

20  the jury has returned, the parties are present.

21         Mr. Handberg, please continue.

22         MR. HANDBERG:  Thank you, Your Honor.

23  BY MR. HANDBERG:

24  Q    All right.  I've handed you what's marked as Government's

25  Exhibit 3040.  Do you recognize that?

1  A    Yes, I do.

2  Q    What is it?

3  A    It is selected text messages between Omar Mateen and

4  Noor Salman.

5  Q    And were you able to verify this information from

6  Mateen's phone that's Government's Exhibit 304?

7  A    Yes.

8        MR. HANDBERG:  The United States offers into

9  evidence what's been marked as Government's Exhibit 3040.

10       THE COURT:  Any objection to 3040?

11       MR. SWIFT:  No, Your Honor.

12       THE COURT:  3040 is admitted.

13       (Government's Exhibit No. 3040 was admitted into

14  evidence.)

15       MR. HANDBERG:  Thank you, Your Honor.

16       We'll go to that one in a moment.  Let's go back to

17  Government's Exhibit 304A.  Let's go to page 11, 187832.  And

18  let's look at the bottom part of the document.  And I want to

19  focus on the entry that's June 11, 2016, at 2:09 in the

20  morning.

21       (The above referred to exhibit was published.)

22  BY MR. HANDBERG:

23  Q    Do you see that entry?

24  A    2:09 in the morning, yes, I do.

25  Q    And is one of the things you were asked to do to see

1    where the next activity on the phone was after that entry?

2    A    Yes, it was.

3    Q    And what was the next activity on the phone?

4    A    The next activity was at 9:00.

5    Q    Was there an activity in between that?

6    A    Yes, there was.  There was an activity at 5:37.

7    Q    All right.  So let's talk about that period of time

8    between 2:09 and 5:37.  Was there anything reflected on the

9    phone during that period of time?

10   A    No, there was not.

11            MR. HANDBERG:  All right.  Let's look at -- may I

12   have one moment, Your Honor?

13            THE COURT:  Yes, sir.

14            MR. HANDBERG:  All right.  Now let's go to 3040 and

15   let's look around that time period.  Ms. Valente, we're gonna

16   go to 3040.  And let's go to page 2, 187918.  All right.  So

17   let's just look at the first two columns for a moment.

18            (The above referred to exhibit was published.)

19   BY MR. HANDBERG:

20   Q    All right.  Is this a color-coded spreadsheet, sir?

21   A    Yes.

22   Q    Okay.  And so when we see green, what is that showing?

23   A    Noor is the sender.

24   Q    And who is the recipient?

25   A    And the recipient is Omar.

1 Q    And when we see blue, what does that signify?

2 A    Omar is the sender and Noor is the recipient.

3         MR. HANDBERG:  All right.  Let's go to the ones on

4 June 11th, 2016, starting at 1:00 in the morning.  And let's

5 look at the message date and time columns.

6 BY MR. HANDBERG:

7 Q    All right.  Let's go from the bottom to the top.  So

8 green means Ms. Salman is sending it to Mr. Mateen; is that

9 right?

10 A    Yes.  Yes.

11 Q    So read the one to the jury at 1:00 at 34 seconds.

12 A    "I told your parents you're paying for Cali with points

13 from PNC and job."

14 Q    And is there a text that follows that from Mateen to

15 Ms. Salman?

16 A    "K."

17 Q    And what time was that?

18 A    That was at 1:00 and 47 seconds a.m.

19 Q    And is there a text after that?

20 A    Yes.

21 Q    What is it?

22 A    "I'll be waiting" with a smiley face.

23 Q    And the date and time on that?

24 A    6/11/2016, 1:38 and 46 seconds a.m.

25 Q    And that was from Ms. Salman to Mateen?

1   A    Yes.

2           MR. HANDBERG:  All right.  Ms. Valente, let's go

3   back to Government's Exhibit 304A.  Let's go to page 10,

4   187831.  Let's focus on the bottom.

5           (The above referred to exhibit was published.)

6   BY MR. HANDBERG:

7   Q    Another ISIS -- Islamic State video?

8   A    Yes.

9           MR. HANDBERG:  Let's go to the prior page, page 9,

10  187830.  Let's do the bottom part.

11  BY MR. HANDBERG:

12  Q    You see a Google search for father son ISIS?

13  A    Yes, I do.

14  Q    And read the entry above that, please.

15  A    "Watch ISIS father says good-bye to suicide bomber son."

16  Q    And what time was that and what date?

17  A    That was 6/11/2016 at 10:24 and 41 seconds a.m.

18          MR. HANDBERG:  Ms. Valente, let's go back to

19  Government's Exhibit 304O, the second page, 187918.  And we're

20  gonna do the text exchanges at the top of that June 11th,

21  2016.  Let's do the message date and time columns.

22          (The above referred to exhibit was published.)

23  BY MR. HANDBERG:

24  Q    All right, sir.  Let's have you start from the bottom and

25  work your way up.  And as you read each text, tell us the date

1  and the -- well, they're all on the same date.  Just tell us

2  the time and then who is sending it to who.

3  A    "What car you have, baby?"  And that was at 10:49.

4         The one above is, "Going to the bank, BRB."  And

5  that was at 10:53.

6  Q    And those are from Ms. Salman to Mateen?

7  A    Yes.

8  Q    All right.  What's the next one?

9  A    "Why?"  And that was at 10:53.

10  Q    And who was that between?

11  A    That was from Omar to Noor.

12  Q    All right.  The next one?

13  A    "My ATM card."  And that was at 10:55.

14  Q    And who sent that to who?

15  A    That was from Noor to Omar.

16  Q    What's the next one?

17  A    "Love you."  And that was at 10:56.

18  Q    Sent from who to who?

19  A    That was Noor to Omar.

20  Q    All right.  What's the one above that?

21  A    "Love you too."  And that was at 10:56, and that was from

22  Omar to Noor.

23  Q    Is there one above that?

24  A    "At the bank with Zaki."  And that was at 11:10.

25  Q    And who is that between?

1   A    That's between Noor and Omar.

2         MR. HANDBERG:  All right.  Let's go to the prior

3   page, Ms. Valente, page 1 of Government's Exhibit 3040,

4   187917, same three columns at the bottom, bottom two rows.

5   BY MR. HANDBERG:

6   Q    All right.  So continuing on June 11th, read the one at

7   11:10 and 16 seconds.

8   A    "K.  LOL."

9   Q    And who is that from?

10  A    And that is from Omar to Noor.

11  Q    And then the next one is, "Mashallah.  He's being so

12  good," from Ms. Salman?

13  A    At 11:10.  And that was from Noor to Omar.

14        MR. HANDBERG:  All right.  So let's go back to

15  Government's Exhibit 304A, page 9, 187830.  And, Ms. Valente,

16  let's look at the top part of the document.

17        (The above referred to exhibit was published.)

18  BY MR. HANDBERG:

19  Q    So we see some of the same text messages you just went

20  over?

21  A    Yes.

22  Q    All right.  And any F.B.I. searches above that?

23  A    There's one F.B.I. search above that at 11:02:59 seconds.

24        MR. HANDBERG:  All right.  Let's go to page 8,

25  187629.  Let's focus on the bottom part of the document.

1  BY MR. HANDBERG:

2  Q    Are those the webcam searches we had seen previously in a

3  different exhibit?

4  A    I believe so, yes.

5         MR. HANDBERG:  All right.  Let's go to the top of

6  the document.

7  BY MR. HANDBERG:

8  Q    More ISIS videos?

9  A    Yes.

10        MR. HANDBERG:  Let's go to the prior page, page 7,

11  187828.  Focus on the bottom part.

12 BY MR. HANDBERG:

13 Q    More ISIS videos?

14 A    Yes.

15        MR. HANDBERG:  Let's go to page 6, 187827, and let's

16 focus on the top part.

17 BY MR. HANDBERG:

18 Q    More ISIS videos?

19 A    Yes.

20        MR. HANDBERG:  Let's go to the prior page, page 5,

21 187826.  Let's focus on the top.

22 BY MR. HANDBERG:

23 Q    More ISIS videos?

24 A    Yes.

25        MR. HANDBERG:  All right.  Let's go to the prior

1  page, page 4, 187825.  And let's focus on that -- the first

2  three columns of the last row.

3  BY MR. HANDBERG:

4  Q   All right.  We see something different on this.  We see

5  powering event.  What's a powering event?

6  A   Powering event is when the cell phone is being powdered

7  on.

8  Q   And have -- one of the things you were asked to do is

9  look at the activity on the phone to see when the most recent

10 activity was in connection with that powering event?

11 A   Yes.

12 Q   And what was that time?

13 A   That was five -- I want to say 5:37.  What's that?

14 Q   Would it refresh your recollection if I gave you --

15 A   Yes, if you could refresh my recollection, please.

16     Okay.  Yeah.

17 Q   I've handed you Government's Exhibit 502.  Do not read it

18 out.  Just take a look at it and tell me after you're done if

19 that refreshes your recollection on when the activity -- when

20 the most recent activity prior to the phone being turned on at

21 7:27 was.

22 A   The phone was turned on at 7:27, yes.  And the event

23 before that was 6/11, and that was at 11:27:41 seconds p.m.

24 Q   So prior to 7:27, what was the activity between 7:27 and

25 whatever the prior time was?

1    A    The utility did not determine that.

2    Q    Is there an e-mail around 5:46?

3    A    There is an e-mail around 5:46.

4    Q    And is the time period that it goes -- does it go from

5    5:46 to 7:27?

6    A    Yes.

7    Q    All right.  Thank you, sir.

8         MR. HANDBERG:  Let's go back to -- let's go back to

9    Government's Exhibit 3040, and let's go to the first page.

10   Let's go to 187917.  And we're gonna focus on the text towards

11   the bottom half, and let's do the message date and time.

12        (The above referred to exhibit was published.)

13   BY MR. HANDBERG:

14   Q    All right.  So I want to start with the one at 7:28 and

15   44 seconds on June 11th, 2016.  Is this after the powering on

16   event that we just saw?

17   A    Yes, it is.

18   Q    All right.  And these are all green.  So who is sending

19   to who?

20   A    Noor is sending to Omar.

21   Q    Okay.  So why don't you read them and then tell us the

22   time as you're doing it?

23   A    And she --

24   Q    And start with the one on 7:28:44.

25   A    Right.  "She asked where you were XOXO," and that was at

1   7:28 and 44 seconds.

2           The one above that is, "What time everyone goes to

3   masjid." Is that how you pronounce that?

4   Q   "Masjid."

5   A   "Masjid." Okay. And that was at 7:29 and 45 seconds.

6           And the one above that, "If your mom says -- if your

7   mom calls, Nemo invited you out and Noor wants to stay home."

8   And that was at 7:29 and 46 seconds.

9   Q   I think you missed a say. "If your mom calls say," is

10   that right?

11   A   Yes. Yeah. Okay. "If your mom calls, say Nemo invited

12   you out and Noor wants to stay home."

13           And the one above that is, "New one." And that was

14   at 7:29 and 47 seconds.

15           And the one above that is, "Call your mom. She is

16   worried." And that's at 7:29 and 48 seconds.

17           MR. HANDBERG: All right. So, Ms. Valente, let's do

18   the ones above that through 8:03 p.m.

19   BY MR. HANDBERG:

20   Q   All right. Let's start from the bottom and work our way

21   up.

22   A   Right. "Love you." And that was at 7:29:49 seconds.

23           "Sabrina stopping by." That was at 7:29:50 seconds.

24           "Getting my food to go." That was at 7:29:50

25   seconds.

1       "Told Mom I didn't have the car."  That was at

2  7:29:51.

3       "I told you_," at 7:29:51.

4       "Wanted to stay home, LOL."  That was at 7:29:54.

5       "I'm home, XOXO."  And that was at 8:03:08.

6       MR. HANDBERG:  All right.  So, Ms. Valente, let's go

7  back to Government's Exhibit 304A, page 4, 187825.  And I want

8  to focus on the first three columns of the phone call at

9  10:00.

10      (The above referred to exhibit was published.)

11  BY MR. HANDBERG:

12  Q    We've got something different here.  What does this show

13  us about a telephone call?  What information is provided?

14  A    There is a to and there is a -- or a from and a to.

15  Q    And so --

16  A    It was from Mommy to Omar.

17      MR. HANDBERG:  All right.  Ms. Valente, if we could

18  do the next three columns.

19  BY MR. HANDBERG:

20  Q    What does that information show us?

21  A    At 6/11/2016, 10:00:24 p.m. there was a phone call.

22      MR. HANDBERG:  And let's do the next two columns.

23  BY MR. HANDBERG:

24  Q    And what information is shown there?

25  A    Duration was zero and the status was missed.

1    MR. HANDBERG:  Your Honor, may I approach the

2  witness?

3    THE COURT:  Yes, you may.

4  BY MR. HANDBERG:

5  Q    All right, sir.  I've handed you what's been marked as

6  304N.  Do you recognize that?

7  A    I recognize it as Mateen's calls with parents.

8  Q    And is that another set of information that you were

9  asked to verify from the phone that's Exhibit 304?

10 A    I believe it was, but I don't have my initials and date

11 on this.

12 Q    Do you recall seeing this document before?

13 A    Yes, I do.

14 Q    Does it look to be the same document you had reviewed and

15 initialed previously?

16 A    Yes.

17    MR. HANDBERG:  The United States offers into

18 evidence what's been marked as Government's Exhibit 304N.

19    MR. SWIFT:  Without objection.

20    THE COURT:  It's admitted.

21    (Government's Exhibit No. 304N was admitted into

22 evidence.)

23    MR. HANDBERG:  Request permission to publish,

24 Your Honor?

25    THE COURT:  Go right ahead.

1    MR. HANDBERG:  Ms. Valente, let's go to Government's

2  Exhibit 304N, 187646.  Let's focus on the top part of the

3  document.

4         (The above referred to exhibit was published.)

5  BY MR. HANDBERG:

6  Q    All right.  Let's focus on June 11th, and let's do the

7  call at 7:32.  Do you see that call?

8  A    Yes, I do.

9  Q    All right.  So just give us an example of how -- how this

10  information is presented on the spreadsheet.  What does that

11  show for that row?

12  A    Omar called --

13  Q    Siddique Mateen?

14  A    Yes at 6/11/2016 at 7:32:26 p.m.  Duration was zero?

15  Q    All right.  And the call above it, what does that one

16  show?

17  A    Omar to Shahla --

18  Q    Shahla Mateen?

19  A    -- Mateen.  And that was at 6/11/2016, 7:33:04 p.m., and

20  that was 19 seconds.

21  Q    All right.  And the one above that, is that the one we

22  just went over?

23  A    Yes.

24  Q    All right.  What's that one show?

25  A    Shahla Mateen to Omar.  And that was 6/11/2016,

1  10:00:24 seconds p.m., and that a duration of zero.

2  Q    All right.  How many pages is that exhibit?

3  A    This exhibit is -- this exhibit is two pages.

4  Q    And were those the calls that you were able to find

5  between those three parties?

6  A    Yes.

7  Q    All right.

8        MR. HANDBERG:  Ms. Valente, let's go back to

9  Government's Exhibit 304A, page 4, 187825.  And let's focus on

10 the top portion of the document, the same three columns, date,

11 time, and body.

12       (The above referred to exhibit was published.)

13 BY MR. HANDBERG:

14 Q    We just did the 10:00 missed phone call from Mommy to

15 Mateen.  What's the next entry on the spreadsheet?

16 A    Going in the upward direction, Disney Springs Google

17 search.

18 Q    And what time is that?

19 A    That's 10:27:59.

20 Q    And what's the entry above that?

21 A    Jihadology-Google search, and that was at 10:53:34.

22 Q    And the one above that?

23 A    Disney World-Google search, 11:05:08.

24 Q    What's above that?

25 A    A phone call at 6/12/2016 at 12:16:28 a.m.

1  Q    And the duration of the call?  You might need to look at

2  your spreadsheet in front of you.

3  A    Yeah, I'm gonna have to.

4  Q    Page 4 of the larger spreadsheet.

5  A    Okay.  Excuse me.  Just checking to make sure.

6          Yes, 17 seconds.

7  Q    And who was that call from and to?

8  A    It was from Mommy to Omar.

9  Q    All right.  And then the last item on the top of this

10 spreadsheet, what's that?

11 A    Downtown Orlando nightclubs Google search.  It is at

12 1:33:18.

13 Q    What date?

14 A    6/12/2016.

15         MR. HANDBERG:  All right.  Let's go to -- let's go

16 to page 1, 187822, and let's -- let's focus on top.

17 BY MR. HANDBERG:

18 Q    So what time period are we looking at here on June 12th?

19 A    From 4:29 to 5:05.

20 Q    Do you see another ISIS search?

21 A    Yes, I do.

22 Q    Do you see another search about how to remove bullet

23 lodged in barrel?

24 A    Yes, I do.

25         MR. HANDBERG:  All right.  Let's go back to page 3,

1  187824.  And let's focus on the first three columns at the

2  bottom.

3         THE WITNESS:  At the back of page 3, I do not have

4  my initials and date --

5  BY MR. HANDBERG:

6  Q    All right.  Does it look like the document you reviewed

7  previously?

8  A    It does look consistent with the document that I looked

9  at previously.

10        MR. HANDBERG:  Okay.  And let's go to the first

11  three columns at the bottom.

12  BY MR. HANDBERG:

13  Q    Is one of the things you did for the preparation of this

14  spreadsheet to review some information from Mateen's Facebook

15  account?

16  A    Yes.

17        MR. HANDBERG:  Let's go to the next three columns.

18  BY MR. HANDBERG:

19  Q    Are those some of the postings that Mateen made on his

20  Facebook account?

21  A    Yes.

22  Q    What date are we looking at here?

23  A    6/12.

24  Q    So let's start with the one at 2:00.  What does that one

25  say?

1    A    "America and Russia, stop bombing the Islamic State.  I

2    pledge my allegiance to" --

3    Q    I'll do that one for you.  "Abu Bakr al-Baghdadi."

4    A    Okay.  "May Allah accept me."

5    Q    And so let's read two rows up at 2:29 and 31 seconds.

6    What's that one say?

7    A    "Omar Mateen commented on his.  Allegiance."

8    Q    I think it's "this" not his.

9    A    Oh, yeah, this -- this.  Allegiance.

10   Q    All right.  Read the one above that?

11   A    "Omar Mateen commented on this.  You kill innocent women

12   and children by doing us air strikes.  Now taste the Islamic

13   State revenge."

14   Q    Revenge or vengeance?

15   A    Vengeance.  I'm sorry.

16   Q    Okay.  Read the one above that.

17   A    "Omar Mateen commented on this.  In the next few days,

18   you will see attacks from the Islamic State in the USA."

19   Q    And the one above that.

20   A    "Omar Mateen commented on this.  The real Muslims will

21   never accept the filthy ways of the west."

22          MR. HANDBERG:  Okay.  Let's focus on the top part of

23   the document.  We'll do the texts separately.  Let's just

24   focus on the web history for now.

25   BY MR. HANDBERG:

1  Q    What sort of Google searches are being run at this point?

2  A    Shooting nightclub, shooting Orlando, call news, call

3  Orlando news.

4       MR. HANDBERG:  All right.  Let's go to the prior

5  page, page 2, 187823.  Let's focus on the bottom part of the

6  document.

7  BY MR. HANDBERG:

8  Q    All right.  So we're back to the web history for the

9  phone that you examined; is that correct?

10  A    Yes.

11  Q    All right.  So what type of searches do we see at this

12  point?

13  A    Orlando shooting Google search, November 2015 Paris

14  attacks, France shooting.  I'm not sure how to pronounce that.

15       MR. HANDBERG:  All right.  Let's look at the top

16  half of the document.

17  BY MR. HANDBERG:

18  Q    All right.  If you can read the item at 4:21 and

19  57 seconds.

20  A    "Omar, this is Andy from Orlando Police.  I need to talk

21  with you.  Please answer your phone or call me back.  My

22  number is (321) 235-5300."

23  Q    And what was the time of that?

24  A    That was 4:21:57.

25       MR. HANDBERG:  All right.  And let's go to

1    Government's Exhibit 304N, 187646.  And let's focus on the top
2    two rows.
3              (The above referred to exhibit was published.)
4    BY MR. HANDBERG:
5    Q    And what do we see in the top row?
6    A    A call from Shahla Mateen to Omar.
7    Q    What date and time?
8    A    6/12/2016 were the dates for both of them.  And one was
9    at 4:22:16.  The other one was 4:28:32.
10             MR. HANDBERG:  Your Honor, may I approach the
11   witness?
12             THE COURT:  Yes, you may.
13   BY MR. HANDBERG:
14   Q    All right, sir.  I've handed you what's been marked as
15   Government's Exhibit 304F and G, I believe.  Do you recognize
16   those?
17   A    Yes.
18   Q    What is 304F?
19   A    304F is a trial exhibit.  It is -- doesn't have any more
20   detail than that, other than I have looked at it before and
21   initialed and dated it.
22   Q    Was one of the things you were asked to do as part of
23   your examination to find a voicemail that was left on the
24   phone that's Government's Exhibit 304?
25   A    Yes.

1    Q     And is that that voicemail?

2    A     I believe it is, yes.

3    Q     All right.  And what's Government's Exhibit 304G?

4    A     Hold on.

5          304G is a printout of what was said.

6    Q     And you've listened to 304F previously?

7    A     Yes.

8    Q     Does 304G appear to be an accurate transcription of

9    what's said?

10   A     Yes.

11         MR. HANDBERG:  The United States offers into

12   evidence what's been marked Government's Exhibit 304F and G.

13         THE COURT:  Any objection?

14         MR. SWIFT:  No objection.

15         THE COURT:  304F and G are admitted.

16         (Government's Exhibit Nos. 304F and 304G were

17   admitted into evidence.)

18         MR. HANDBERG:  Request permission to publish,

19   Your Honor?

20         THE COURT:  You may.

21         MR. HANDBERG:  All right.  Ms. Valente, let's pull

22   up 304F.

23         (The above referred to exhibit was published.)

24         MR. HANDBERG:  All right.  Thank you.

25   BY MR. HANDBERG:

1    Q    Sir, if you could read the transcript, 304G?

2    A    304G. "Omar, call me. We are so very worried. I am so

3   worried. Please call me."

4    Q    And were you able to associate an approximate time with

5   that voicemail?

6    A    Yes, I think I did. I want to -- I would like to point

7   to it actually in the record here, but I think it was around

8   3:18, something like that.

9           MR. SWIFT: Objection.

10         THE COURT: Pardon me?

11         MR. SWIFT: Well, I haven't heard the answer. I'm

12   sorry. I'm trying to --

13         MR. HANDBERG: He said 3:18, but it sounded like he

14   was speculating. So I would move to strike that answer.

15         THE COURT: Certainly.

16         If there is a record, sir, that indicates the

17   time -- I think you were looking at one -- if you would just

18   identify the record.

19         THE WITNESS: I'm trying to figure out which one it

20   is at this point.

21         MR. HANDBERG: May I approach, Your Honor?

22         THE COURT: You may.

23         THE WITNESS: I -- I cannot recall right off.

24         MR. HANDBERG: I'll move on, Your Honor.

25         THE COURT: All right. Thank you.

1    MR. HANDBERG:  All right.  So what I want to do now

2  is I want to go to Government's Exhibit 3040, page 1, 187917.

3  Ms. Valente, if we could do the message date and time for the

4  top half.

5        (The above referred to exhibit was published.)

6  BY MR. HANDBERG:

7  Q    All right.  So green is from Ms. Salman to Mateen; is

8  that right?

9  A    Yes.

10 Q    And blue is from Mateen to Ms. Salman?

11 A    Correct.

12 Q    All right.  Let's start with the one at 2:42 a.m. and

13 work your way up.

14 A    "Habibi, where are you?"  And that was at 2:42:24.

15        The next one above that is, "Where are you?"  And

16 that was at 4:27:14.

17        And his response back was, "Everything okay?"  And

18 that was at 4:27:32.

19        The one above that, "Your mom I'd worried and so am

20 I."  And that was at 4:27:59.

21        The one above that, "You know you work tomorrow

22 night, right" -- "or tomorrow, right?"  That was at 4:28:26.

23        And the one above that, "You heard what happened."

24 And that was at 4:28:28.

25        And the one above that is four question marks.  And

1 that was at 4:28:36.

2       The one above that, "What happened?!"  And that was

3 at 4:28:54.

4       The one above that, "I love you, baby."  That was at

5 4:29:21.

6       And the one above that, "Habibi, what happened?!"

7 And that was at 4:29:45.

8       The one above that, "Your mom said that she said to

9 come over and you never did."  And that was at 4:48:14.

10 Q   Thank you, sir.  Everyone will be happy to know that's

11 the end of Government's Exhibit 304A.

12       MR. HANDBERG:  Your Honor, may I approach the

13 witness?

14       THE COURT:  Yes, you may.

15       MR. HANDBERG:  I've changed my mind, Your Honor.  I

16 am done.

17       Thank you, sir.  No further questions.

18       THE COURT:  Thank you very much.

19       Cross-examination?

20       MR. SWIFT:  Yes, Your Honor.

21       Where is the cell phone that was just exhibited?

22       MR. HANDBERG:  Mr. Swift, it's that box right there.

23 You see the brown box in the middle of the table?

24       MR. SWIFT:  Thank you.

25       May I approach, Your Honor --

1        THE COURT:  Certainly.

2        MR. SWIFT:  -- and retrieve the exhibit?

3        THE COURT:  Certainly.

4        MR. SWIFT:  Can I open up the cell phone?

5        MR. HANDBERG:  It's a biohazard, I believe.  So I

6   would be careful about doing that.

7        MR. SWIFT:  It's not sealed or anything.

8        MR. HANDBERG:  Just be careful.  I wouldn't open it

9   from that.

10       MR. SWIFT:  Okay.  I'm just going to use the case.

11  Okay.  Let the record reflect I've retrieved the cell phone.

12                       CROSS-EXAMINATION

13  BY MR. SWIFT:

14  Q    Now, you examined Omar Mateen's cell phone, right?

15  A    I examined the physical image of the cell phone.

16  Q    All right.  And it's a Samsung, correct?

17  A    Correct.

18  Q    And a cell phone is different than a computer, isn't it?

19  A    Yes.

20  Q    In many ways?

21  A    Yes.

22  Q    One of the principle ways it's different from a computer

23  or a desktop computer is it's easily transportable, right?

24  A    Yes.

25  Q    And it's also something I can look at without people

1 being able to read it nearly as easily as, say, a desktop

2 computer if I'm standing with you or beside you, right?

3 A    Yes.

4 Q    In fact, I can sit here and read it, and everybody else

5 can't watch what I'm doing, right?

6 A    Yes.

7 Q    In fact, in your own experience, you see couples, persons

8 sitting out there all the time reading a cell phone, two of

9 them sitting beside each other in their own worlds, correct?

10 A    Yes.

11 Q    Okay.  So the cell phone is very different than a

12 computer not only in how it operates, but in its portability,

13 correct?

14 A    Yes.

15 Q    It also tells you a lot of things that might not be

16 relevant in a computer or a desktop.  It tells you about how

17 it moves, right?

18 A    Yes.

19 Q    And it tells you -- it does that.  We can look at several

20 different things.  If it has a GPS setting attached to it,

21 that will tell us something, right?

22 A    Yes.

23 Q    If some of the apps when you automatically login to them,

24 some of the parts on Facebook or something else tell you

25 something, they're gonna tell you where you're at.  Or they

1  may login when you do it and just automatically update your

2  position, correct?

3  A    Correct.

4  Q    Okay.  And it's also going to login to towers, cell phone

5  towers --

6  A    Correct.

7  Q    -- when it's not operating from an Internet network.  And

8  I'm probably not using a great term of art here.  There's two

9  ways -- let me back up.

10           There's two ways for the cell phone to access the

11  Internet, correct?

12  A    Correct.

13  Q    One is through the cellular data system that you arrange

14  through your provider, correct?

15  A    Correct.

16  Q    The other one is for it to log on to an existing network

17  that has access to the Internet, correct?

18  A    Correct.

19  Q    Okay.  Now, did you examine whether this phone, Mateen's

20  phone, had the ability to log on to existing networks?  Do you

21  remember?

22  A    The information provided by the utility indicated that

23  there were cellular locations being recorded.

24  Q    Yes.  And so he -- yes.  He went to towers, absolutely.

25  Did you look at how his phone was configured, for instance, to

1  log on to any Internet networks?

2  A    No, I did not.

3  Q    So you don't know whether his phone was configured in

4  your report, for instance, when he went home to just log on to

5  the home Internet network?

6  A    Correct.

7  Q    Okay.  Is it fairly common for people to set their phones

8  up to log on to their home networks?

9  A    Yes.

10  Q    Several reasons for that, isn't there?

11  A    Yes.

12  Q    Number one reason is it saves money because you pay when

13  you log on, right?

14  A    Yes.

15  Q    And you have a limited data plan.  So if you're gonna do

16  a lot, log on to your home network, right?

17  A    Correct.

18  Q    Another reason for it is home networks are generally

19  faster?

20  A    Correct.

21  Q    Okay.  And another reason for it is you're inside, you

22  have less cellular parts sometimes in the area, so you will

23  have better reception?

24  A    Yes.

25  Q    But you don't know whether this cell phone was connecting

1   to his home network or not?

2   A    I did not look into that as part of doing the examination

3   that I did.

4   Q    Okay.  You were asked to look for -- to see if there was

5   any indications that he had gone to the Pulse on the phone,

6   weren't you?

7   A    No, I was not.  When I was first given the image to

8   process, I was requested to process the image, generate

9   reports as the utilities would provide, and pass that

10  information on to the case agent and/or the investigative

11  team.

12  Q    Now, was there any time during that period of time that

13  on this cell phone we ever found -- or in your processing

14  it -- any images or information surrounding the Pulse

15  nightclub?

16  A    I believe there were references to the Pulse nightclub in

17  some of the reports, in fact.  304A.

18  Q    Okay.  And when were those reports?

19  A    I do not recall.

20  Q    Well, the part is -- there are some reflected.  You just

21  went over them on the 12th.

22  A    Right.  But I did not specifically recall which ones they

23  were that you might have been referring to.

24  Q    Prior to the 12th, did you find anything about the Pulse?

25  A    I don't have that information.

1 Q    Okay.  Was anybody interested in whether there had been

2 any contact with the Pulse that you recall asking you about

3 that?

4 A    Nobody asked me to --

5 Q    Okay.

6 A    -- look into that.

7 Q    Fair enough.  They didn't ask you.  Maybe they asked

8 somebody else.

9         MR. SWIFT:  I'm gonna return this part right now.

10         Your Honor, may I approach for this part?

11         THE COURT:  Yes, you may.

12         MR. SWIFT:  Okay.  Now, can I have up Government's

13 Exhibit 304A?  And can you -- let's just start with generally.

14 Can we blowup the top three rows?

15         (The above referred to exhibit was published.)

16         MR. SWIFT:  Well, half of them, then.  I see what

17 happens.

18 BY MR. SWIFT:

19 Q    Okay.  When we're looking at this, we're looking at

20 Mateen's phone, right?

21 A    Correct.

22 Q    And so when we see, for instance, a text message from

23 Salman on this report, does it mean Salman is seeing

24 everything on that report?  When I do a text message, do I get

25 to automatically read what the other person is doing on the

1  Internet?

2  A    No.

3  Q    Okay.  So when you see Salman's text messages somewhere

4  in here and web history, it doesn't mean she's seeing what

5  he's doing, does it?

6  A    No.

7  Q    Okay.  Because --

8              MR. SWIFT:  Let's go down to the -- Mateen's new

9  phone in there on the web history on the 12th.  Come down.

10 BY MR. SWIFT:

11 Q    We see in here Mateen's new phone, Noor My Love.  And

12 that's an incoming call, right?

13 A    Yes.

14 Q    But that doesn't mean that she's standing beside him

15 reading his web history, does it?

16 A    Correct.

17 Q    Okay.  So when we see calls, that doesn't necessarily

18 associate that she has anything to do with the web history,

19 does it?

20 A    Correct.

21 Q    Okay.  How about text messages?  Does that associate that

22 she has anything to do with what he's doing on the phone then?

23 A    No.

24 Q    Okay.  Now, the Government asked you about two particular

25 events.

1    MR. SWIFT:  We can take that down for the moment.

2  BY MR. SWIFT:

3  Q    They talked to you about and you testified at some length

4  about looking at a newspaper article about ISIS calling for

5  attacks.  Do you recall that?

6  A    A Internet website, yes.

7  Q    Yes.

8  A    Okay.

9  Q    When I say newspaper article, it's Reuters, right?  It's

10  the Reuters report.  He looks at that for a period of time in

11  a browsing activity.  And they asked you to select that out,

12  correct?

13  A    Okay.

14    MR. SWIFT:  I would like to admit -- before that.

15  BY MR. SWIFT:

16  Q    You had completed a much larger report, some 7,000 pages,

17  correct?

18  A    Approximately in the range of 5,000, yes.

19  Q    5,000?

20  A    Yes.

21  Q    Something in the range of 5,000 with all these entries,

22  all this sort of stuff on it.  And these are exempted out of

23  it.  So you didn't pull out anything that would show what his

24  browser activity was before this report on ISIS or anything

25  afterwards, correct?

1   A    What I did was I used the actual software report to

2 validate what I might have seen in Exhibit A.

3   Q    Right.

4   A    And that had all of the information.

5   Q    Yeah.

6   A    Whereas the report was a selected subset.

7   Q    Did you prepare the report?

8   A    I did not prepare this report, no.

9   Q    So that was prepared for you, and you validated it?

10   A    Yes.

11   Q    Okay.  Why don't we look at the report sheet from which

12 you would have validated that.  Okay?  Would you mind doing

13 that?

14   A    Okay.

15         MR. SWIFT:  Okay.  I would like to enter into

16 evidence Defense Exhibit No. 37, which is an excerpt from his

17 report.

18         MR. HANDBERG:  No objection, Your Honor.

19         THE COURT:  37 is admitted.

20         (Defendant's Exhibit No. 37 was admitted into

21 evidence.)

22         MR. SWIFT:  Okay.  We'll bring it up.  I believe

23 it's 37.  Okay.  If we can go down to about 11260 and

24 highlight the second half of the page, right in that area

25 where you would see that ISIS urges attacks.

1          (The above referred to exhibit was published.)

2          THE COURT:  Mr. Swift, I'm sorry.  I don't believe

3    that can be expanded.  If you have the printed copy, you can

4    always put it on the ELMO to make the text bigger.

5          MR. SWIFT:  I guess that's that I'm going to have to

6    do.

7          THE COURT:  Or you can just read it, whatever you

8    prefer.

9          MR. SWIFT:  Why don't I give it to the witness so

10   that he can --

11         THE COURT:  Oh, here we go.  Ms. Valente has found a

12   way around it.

13         MR. SWIFT:  Excellent.  Can we go ahead and pull

14   that out?  It is page 2021.  There we go.  And I want

15   line 11260, the second half of the page.  And can you increase

16   that in size, or that's as big as it gets?  I think we can see

17   it.

18   BY MR. SWIFT:

19   Q   Okay.  You can see that.  That's the article that you

20   were -- that served as the basis for your entry on the sheet,

21   correct?

22   A   Yes.  Yes.

23         MR. SWIFT:  Okay.  Let's go up.  And what time was

24   that that -- can we go to the left, please?

25   BY MR. SWIFT:

1  Q    And that's at 7:29 p.m. UTC plus zero.  What does that

2  mean, the UTC plus zero in your report -- your original

3  report?

4  A    UTC is -- or UTC stands for -- it's an abbreviation for

5  coordinated universal time.  It's a primary time standard used

6  by the world for controlling time in clocks.

7  Q    When I say Greenwich Mean Time, am I talking about the

8  same thing?

9  A    Yes, sir.

10 Q    So this is the time for -- not having to do a whole lot

11 of things, that's the time in London, correct?

12 A    Yes.

13 Q    And so when we see UTC, then we need to subtract four

14 hours to get the actual time here in Florida, correct?

15 A    Correct.  At this point in time, yes.

16 Q    At this point in time?

17 A    Yes.

18 Q    Daylight savings time, we just mess up?

19 A    Yes.

20      MR. SWIFT:  Anyhow, let's go up -- up the page.  And

21 let's see what he was doing just before that.  Can we go to

22 the left, because web history doesn't show us a lot.

23 BY MR. SWIFT:

24 Q    So we have a Google search at 7:29 -- or at -- yeah,

25 7:29:47, we have a Google search for ISIS, correct?

1    A    Correct.

2         MR. SWIFT:  Let's go up.

3    BY MR. SWIFT:

4    Q    7:29:01, he's at the leading free online dating site for

5    singles and personals, right?

6    A    Correct.

7         MR. SWIFT:  Let's go up above that.

8    BY MR. SWIFT:

9    Q    At 7:28, he's at the leading free online dating site for

10   singles and personals, correct?

11   A    Yes.

12   Q    Okay.  So right before he looked at the ISIS site -- or

13   looked at Reuters and read about this article, he was looking

14   at online dating, correct?

15   A    Yes.

16        MR. SWIFT:  Let's go down.

17   BY MR. SWIFT:

18   Q    He reads -- he's on that site for about a minute,

19   correct?

20   A    Yes.

21   Q    Okay.  So --

22        MR. SWIFT:  And let's go down on what he does right

23   after he gets off that site.  Stop.

24   BY MR. SWIFT:

25   Q    At 7:30:20, he reads about the truth about masturbation

1  myths in everyday health?

2  A    Yes.

3  Q    Now, would you agree with me that those are things that

4  he would be unlikely, on either side of that, to want to do in

5  front of his wife?

6  A    I don't have an opinion on that.

7  Q    You don't have an opinion.  Fair enough.

8          But you would say that, you know, looking at his web

9  search as a whole can give us some context; wouldn't you agree

10 on that?

11 A    I believe so, yes.

12 Q    Okay.  And, you know, when we stick in Noor Salman on

13 that summary exhibit just every once in a while and we don't

14 stick in the context of everything that's going on, it could

15 be misleading, couldn't it?

16 A    Possibly.  I really don't have an opinion on that.

17 Q    I understand.

18 A    Yeah.  It's not a fact --

19 Q    Okay.

20 A    -- brought out by the --

21 Q    Well, your main -- what you did when you prepared your

22 overall report, you put in everything that you found, right?

23 A    Yes.

24 Q    Okay.

25          MR. SWIFT:  Let's go to when he watched the video,

1 which is -- well, I would like to offer Defense Exhibit 36.

2       MR. HANDBERG:  Without objection, Your Honor.

3       THE COURT:  36 is admitted.

4       (Defendant's Exhibit No. 36 was admitted into

5 evidence.)

6       MR. SWIFT:  Thank you, Your Honor.

7       It's page 2823.  Can we increase the size, or is

8 it -- okay.  Excellent.  Thank you.  Let's scroll to the

9 right, please.

10 BY MR. SWIFT:

11 Q   Okay.  And here we have the Abu Bakr al-Baghdadi appears

12 in public for the first time.  That's the beginning of this,

13 correct?  But that's not the video; is that correct?

14 A   I do not believe so, no.

15       MR. SWIFT:  Okay.  Let's scroll down.

16 BY MR. SWIFT:

17 Q   Baghdadi's speech, Facebook; do you see that?

18 A   Yes.

19 Q   That's not yet the video, though, is it?

20 A   No.

21 Q   Okay.  Now we see two new entries.  It's cell tower, and

22 we list something out.  What's that telling us?

23 A   That the utility found a cell location event at that time

24 and made it available for reviewing.

25 Q   Okay.  And based on the utility finding a cell tower at

1   that time, could we give an approximate location of where

2   Mr. Mateen is at the time that he looks at this video?

3   A    You could get the cell tower information, yes.

4   Q    Yes.  And that gives you an approximate location.  We

5   have a -- kind of a circle and with other forensics, we might

6   be able to narrow it down a little more, correct?

7   A    Correct.

8   Q    Okay.  So when we look at that cell tower, that might

9   tell us whether he's sitting beside Ms. Salman and they're

10  viewing it together, mightn't it?

11  A    Yes.

12  Q    From your report, you can't tell that, correct?

13  A    Correct.

14  Q    Same thing with the LiveLink, right?  The Government

15  showed you in her statement where she said he looked at it at

16  LiveLink; do you remember that?

17  A    Yes.

18  Q    Now, did you take any of those LiveLink statements, any

19  of them, and compare where he viewed the LiveLink and compare

20  it to see if Ms. Salman could have actually been with him and

21  seen it at that time?

22  A    No, I did not.

23  Q    Your weren't asked to do that?

24  A    We weren't asked to do that, no.

25  Q    Okay.  Now, I showed you --

1    MR. SWIFT:  We can go ahead and take this one down.

2  BY MR. SWIFT:

3  Q    -- one part where Omar Mateen was looking at a dating

4  site right around the time that he looked at the newspaper

5  report article.

6  A    Yes.  That was on the screen.

7  Q    When you went through -- you prepared a lot of different

8  summary charts from that phone, correct?

9  A    I only provided the report.  The charts, the exhibits

10  here were put together by the -- the case agent and

11  prosecution.

12  Q    Okay.  They put it together.  You just verified it?

13  A    Yes.

14  Q    They put together a lot of charts and whatnot, didn't

15  they?

16  A    Yes.

17  Q    Okay.  And you verified a lot.

18         During your review of the phone in your report, did

19  you note that Mr. Mateen went to a lot of dating sites and

20  pornographic sites and that sort of thing on that phone?

21  A    I did not do any analysis of that --

22  Q    Okay.

23  A    -- nature.

24  Q    Well, I want to put in something.  You weren't asked to,

25  right?

1   A    Correct.

2   Q    You could have?

3   A    Yes.

4        MR. SWIFT:  Okay.  So I'm gonna move in at this

5   point Defense Exhibit 20.

6        MR. HANDBERG:  Your Honor, could we approach

7   briefly?

8        THE COURT:  Certainly.

9        (At the bench.)

10       MR. HANDBERG:  Sorry to bother you with this,

11  Your Honor --

12       THE COURT:  Sure.

13       MR. HANDBERG:  -- but this exhibit -- we don't have

14  any objection to any of the dating information in here, but

15  there's a number of references to steroids and searches for

16  steroids which we don't believe to be relevant.  So we have no

17  objection to this document being admitted with the

18  understanding that the steroid references will be redacted.

19  And, you know, he can publish around it today.  We don't have

20  any problem with that.

21       MR. SWIFT:  Yeah.  I will do that.  I'm not

22  interested in it.  At one time, it was.  I just didn't

23  redacted it out.  You can see there's a lot of redactions

24  already because I didn't try and introduce irrelevant stuff.

25       THE COURT:  So you'll need to take care of that and

1  substitute that exhibit for a corrected one before it goes

2  back to the jury.

3         MR. SWIFT:  I will do so.

4         THE COURT:  Thank you.

5         MR. HANDBERG:  Thank you, Your Honor.

6         MR. SWIFT:  Thank you, Your Honor.

7         (In open court.)

8         MR. SWIFT:  Your Honor, we move to admit Exhibit 20

9  with the discussions -- with the redactions agreed to with the

10  Court at the prior sidebar.  We will not publish any page at

11  this point that would be subject to such a redaction.

12         THE COURT:  Thank you very much.

13         Any objection with that stipulation?

14         MR. HANDBERG:  No, Your Honor.  Thank you.

15         THE COURT:  Thank you.  Exhibit 20 is admitted.

16         (Defendant's Exhibit No. 20 was admitted into

17  evidence.)

18         MR. SWIFT:  Can we go ahead and just pull up

19  Exhibit 20, the first page on this?  And can we go ahead and

20  magnify -- just to give the -- to publish the general idea of

21  the exhibit, the top half of the page.

22         (The above referred to exhibit was published.)

23  BY MR. SWIFT:

24  Q    So basically there are tons of searches on his phone in

25  his web history -- or your report found -- I'm not going to

1  categorize it.  Your report found things in his history things

2  about dating sites, correct?

3  A    Correct.

4  Q    And things about escorts?

5  A    That I can't verify one way or the other right now.

6         MR. SWIFT:  Let's go down a little.

7         THE WITNESS:  If, in fact, this is the report, I can

8  repeat what's on the page, but --

9  BY MR. SWIFT:

10 Q    I understand.

11 A    Yeah.

12 Q    You know, your report says what it says.  But these

13 multiple reports certainly don't suggest that Mateen was

14 sharing his phone with his wife a whole lot, do they?

15 A    I have no evidence of that one way or the other.

16 Q    Okay.  So we don't know -- in the end, your report

17 doesn't say that she ever saw anything in that, right?

18 A    Correct.

19         MR. SWIFT:  Okay.  I don't have any further

20 questions at this time.

21         THE COURT:  Thank you.  Any redirect?

22         MR. HANDBERG:  No, Your Honor.  Thank you.

23         THE COURT:  Thank you.

24         Thank you, sir.  You may step down.  You can just

25 leave, yes, the exhibits there.  We'll take care of those.

1   Thank you.  We'll take care of that as well for you, sir.  All

2   right.  Thank you.

3         This is a convenient time for lunch break, ladies

4   and gentlemen.  Then we'll do that.  We'll take a break until

5   1:00.  Thank you.

6         COURTROOM SECURITY OFFICER:  All rise for the jury.

7     (The jury retired from the courtroom at 11:59 a.m.)

8         THE COURT:  Thank you.  The jury has withdrawn.

9         Anything we need to take up before the lunch break?

10  Mr. Mandolfo?

11        MR. MANDOLFO:  I have one issue.  May I approach,

12  Your Honor?

13        THE COURT:  Yes.  Ladies and gentlemen, please be

14  seated.

15        MR. MANDOLFO:  Thank you, Your Honor.

16  Daniel Sprunger, who was the person who did the taxes for

17  Omar Mateen and Noor Salman in 2015, will be testifying this

18  afternoon.  He prepared as part of the taxes what's called an

19  injured spouse form.  I've talked with him and told him not to

20  say that Noor Salman defaulted on her student loans, as we

21  discussed yesterday.  What I -- what he will say is that there

22  was an outstanding balance as to her student loans, which is

23  why they filed this particular form.  But I've instructed him

24  not to say the word "default."  Is that proper and okay?

25        THE COURT:  That seems -- Mr. Swift?

1    MR. SWIFT:  I have no objection to that part.

2  Without having an outstanding balance, the testimony doesn't

3  make sense.

4    THE COURT:  Very good.  Please proceed in that

5  manner.  Thanks for bringing it to my attention.

6    Anything else?  No?  Very good.  See you at 1:00.

7    (Recess at 12:03 p.m., until 1:01 p.m.)

8    THE COURT:  Are we ready for the jury?

9    MS. SWEENEY:  Yes.

10    MR. HANDBERG:  Yes, Your Honor.

11    THE COURT:  All right.  If we could have the jury,

12  please.  Approximately how many more witnesses does the

13  Government have?

14    MS. SWEENEY:  Thirteen, Your Honor.

15    THE COURT:  So we'll be into this tomorrow in your

16  case as well?

17    MS. SWEENEY:  Yes.  I think there's no way we'll

18  finish our case today.

19    THE COURT:  That's fine.  Thank you.

20    COURTROOM SECURITY OFFICER:  All rise for the jury.

21    (The jury entered the courtroom at 1:02 p.m.)

22    COURTROOM SECURITY OFFICER:  Please be seated.

23    THE COURT:  Thank you.  The record should reflect

24  the jury is present.  The parties are present as well.

25    Ms. Sweeney, are you calling the next witness?

1          MS. SWEENEY:  Yes, Your Honor.

2          We call Sabrina Abasin.

3          THE COURT:  All right.  Thank you.

4          THE COURTROOM DEPUTY:  Ma'am, please come forward to

5    the witness box and remain standing.  Please raise your right

6    hand.

7                          **SABRINA ABASIN**,

8      called by Government, having been first duly sworn, was

9                   examined and testified as follows:

10         THE COURTROOM DEPUTY:  Please have a seat.  Please

11   state your name and spell your last name for the record.

12         THE WITNESS:  Sabrina Abasin, A-b-a-s-i-n.

13         THE COURT:  Thank you, ma'am.  Good afternoon.

14         THE WITNESS:  Good afternoon.

15         THE COURT:  You can adjust that microphone to

16   wherever it's comfortable for you.

17         THE WITNESS:  Okay.

18         THE COURT:  And, Ms. Sweeney, when you're ready,

19   please proceed.

20         MS. SWEENEY:  Thank you.

21                      <u>DIRECT EXAMINATION</u>

22   <u>BY MS. SWEENEY</u>:

23   Q    Ms. Abasin, what city do you live in?

24   A    Port St. Lucie.

25   Q    Are you related to Omar Mateen?

1    A    Yes.

2    Q    How are you related to him?

3    A    I'm his sister.

4    Q    Are you married?

5    A    Yes.

6    Q    How long have you been married?

7    A    Eight years.

8    Q    And do you have children?

9    A    Yes.

10    Q    How old are they now?

11    A    Six and four.

12    Q    And do you know -- who is Omar Mateen's wife?

13    A    Noor Salman.

14    Q    All right. And do you see her here in court today?

15    A    Yes.

16    Q    And can you identify her just by a piece of clothing

17 she's wearing?

18    A    A pink jacket.

19        MS. SWEENEY: All right. Your Honor, may the record

20 reflect that the witness has identified the defendant?

21        THE COURT: It does.

22 BY MS. SWEENEY:

23    Q    All right, ma'am. And do Mr. Mateen and Ms. Salman have

24 a child together?

25    A    Yes.

1  Q    So back before June of 2016, how often would you see

2  Omar Mateen in a regular week?

3  A    A few times a week.

4  Q    Okay.

5  A    Two or three, yeah.

6  Q    Okay.  And what kinds of circumstances were those?

7  A    Family get-togethers.

8  Q    And did his -- did Ms. Salman often come with him?

9  A    Yes.

10 Q    Were there times where you saw Ms. Salman, but Mr. Mateen

11 was not around?

12 A    Just -- just his wife, yes.

13 Q    Yes.  What was your relationship with Ms. Salman like?

14 A    We were, like, friends, motherly more because we had

15 kids.

16 Q    And did she ever watch your children for you?

17 A    Yes, she did.

18 Q    And what was your opinion of her as a mother?

19 A    She was a good mother, attentive to her child.  And my

20 kids also loved her.

21 Q    All right.  Now, I would like to ask you a couple of

22 questions about Omar Mateen.  Did you ever hear him discuss

23 violence?

24 A    No.

25 Q    Or him committing an act of violence?

1    A    No.

2    Q    Did you ever hear him discuss terrorism?

3    A    No.

4    Q    Or ISIS?

5    A    No.

6    Q    Or jihad?

7    A    No.

8    Q    Did you ever see him watch any violent videos of any

9    type?

10   A    No.

11   Q    Did Ms. Salman ever tell you that she was concerned about

12   Mr. Mateen committing an act of violence?

13   A    No.

14   Q    Were you ever concerned that he was gonna commit an act

15   of violence?

16   A    No.

17   Q    If you had ever been concerned about something like that,

18   what would you have done?

19              MR. SWIFT:  Objection, speculation.

20              THE COURT:  Can you lay a predicate?  Is there some

21   past history or some basis for --

22              MS. SWEENEY:  Thank you, Your Honor.

23   BY MS. SWEENEY:

24   Q    So, ma'am, if you thought something bad was gonna happen

25   in general, what would you do?

1      MR. SWIFT:  Objection, speculation.

2      THE COURT:  Overruled.

3      THE WITNESS:  What would I do --

4   BY MS. SWEENEY:

5   Q    Yes.

6   A    -- if I did?  I would report it.

7   Q    To who?

8   A    To the police, to the authorities.

9   Q    Okay.  And do you consider acts of violence bad?

10  A    Acts of violence?

11  Q    Yes.

12  A    Yes.

13  Q    Okay.  I'm sorry.  I know that was a little bit of a

14  silly question.

15  A    I'm sorry.  I'm just trying to understand you.

16  Q    It's fine.  It's fine.  All right.  And then on -- I

17  would like to focus your attention on June 11th of 2016.

18  Okay?

19  A    Okay.

20  Q    Do you remember that night?

21  A    Yes.  It's --

22  Q    What did you do that evening?

23  A    I believe I was home.

24  Q    Okay.  Now, if I told you that the Pulse nightclub attack

25  took place on the morning of June 12th of 2016, does that

1  refresh your recollection of what you did on June 11th?

2  A    I'm sorry.  I don't follow the question.

3  Q    All right.  So do you remember the night before the Pulse

4  nightclub attack?

5  A    The night of June 11th?

6  Q    Yes.

7  A    Yes.  I briefly remember the night before.

8  Q    Sorry.  Where did you go that evening?

9  A    Oh.  That evening, I went to mosque, yes.

10 Q    Okay.  And what were you doing at mosque?

11 A    Oh.  We -- it was the holy month of Ramadan.  So we go to

12 break fast and pray.

13 Q    Now, that evening, did you communicate with Ms. Salman?

14 A    I did, yes.

15 Q    And what did you -- how did you communicate with her?

16 A    Through text message.

17 Q    Okay.  And what were you -- what were the two of you

18 texting about?

19 A    It was in regard to my son's shoes and if she was going

20 to come to the masjid that evening.

21 Q    What did she tell you?

22 A    No.  Omar would be going to dinner with Nemo.

23 Q    Okay.  And what did she say about herself?

24 A    She didn't say anything.

25 Q    Okay.  She just said Omar was going to dinner with Nemo?

1    A    Yes.

2          MS. SWEENEY:  Okay.  Your Honor, may I have just a

3    moment?

4          THE COURT:  Yes, you may.

5          MS. SWEENEY:  Thank you, ma'am.

6          Thank you, Your Honor.  No further questions.

7          THE COURT:  Thank you.  Any cross-examination?

8          MR. SWIFT:  Briefly.

9                        <u>CROSS-EXAMINATION</u>

10   <u>BY MR. SWIFT</u>:

11   Q    Now, you had testified that you knew Noor, correct?

12   A    I do know Noor, yes.

13   Q    Yes.  And she was your brother's wife --

14   A    Yes.

15   Q    -- correct?

16          Now, and she baby-sat for you as well, correct?

17   A    Yes.

18   Q    How often?

19   A    A few times a week.  It depended when we had to run

20   errands or -- yeah.

21   Q    So if you needed a baby-sitter, she was your baby-sitter

22   of choice?

23   A    Yes.

24   Q    Did you trust her with your children?

25   A    I did trust her.

1  Q    Did you consider her to be a peaceful person?

2  A    Yes.

3  Q    Did you ever hear her express any political beliefs?

4  A    No.

5  Q    Not to comment on somebody's religiosity, but part of it,

6  did you have an opportunity through getting to know her

7  whether she actively practiced the faith of Islam?

8  A    She -- Noor was more modern.

9  Q    More modern?

10 A    She was a little bit more modern, yeah.

11 Q    Did she go to masjid very often?

12 A    No.

13 Q    Okay.  Did she enjoy secular holidays?

14 A    Secular holidays like eat and --

15 Q    No, not like the religious holidays of Islam, but U.S.

16 holidays like Halloween, Christmas?

17 A    Oh, yes, she did.

18 Q    Yes, she did.  When your family would get together, who

19 would Noor spend her time with?

20 A    She was more with kids.

21 Q    She would go with the kids?

22 A    Kids, mm-hm.

23 Q    Would you describe her as simple?

24 A    Simple, yes.

25 Q    Did you see her on the day of the 12th?  June 12th, did

1   you ever see Noor?

2   A    The 12th?

3   Q    June 12th.

4   A    Not the 12th, no.  The day before.

5   Q    No.  That was June 11th, to refresh your recollection.

6   The day of the Pulse nightclub shooting, you remember the

7   day -- that day, correct?

8   A    That day, when the F.B.I. brought her?

9   Q    Yes.  Did you see her then?

10  A    Yes, I did.

11  Q    How did she appear to you?

12  A    She looked tired, you know, like drained.  She had

13  bags -- dark bags under her eyes, and her eyes were irritated,

14  red.  Upset.

15  Q    Did she express any concern for her son?

16          MS. SWEENEY:  I object, Your Honor, calls for

17  hearsay.

18          THE COURT:  I'll allow it.

19  BY MR. SWIFT:

20  Q    Did she express any concern for her son?

21  A    Yes, she did.

22  Q    Was she afraid that her son would be taken?

23  A    Yes.

24          MR. SWIFT:  No further questions.

25          THE COURT:  Any redirect?

1    MS. SWEENEY:  No, Your Honor.  Thank you.

2    THE COURT:  Thank you, ma'am.  You may step down.

3  You're excused.

4    THE WITNESS:  Thank you.

5    THE COURT:  Your next witness, please.

6    MS. SWEENEY:  We call Shahla Mateen.

7    THE COURTROOM DEPUTY:  Ma'am, please come forward to

8  the witness box and remain standing.  Ma'am, please raise your

9  right hand.

10                    **SHAHLA MATEEN**,

11   called by Government, having been first duly sworn, was

12              examined and testified as follows:

13    THE COURTROOM DEPUTY:  Please have a seat.  Ma'am

14  please state your name and spell your last name for the

15  record.

16    THE WITNESS:  My last name is Mateen, M-a-t-e-e-n.

17    THE COURT:  Thank you, ma'am.  Ma'am, you can adjust

18  that microphone to where it's comfortable for you.  So you can

19  pull it closer if you need to.  Thank you very much.

20    Ms. Sweeney, you may proceed when you're ready.

21    MS. SWEENEY:  Thank you.

22                   DIRECT EXAMINATION

23   BY MS. SWEENEY:

24  Q    Good afternoon.

25  A    Good afternoon.  Good afternoon everybody.  I want to --

1  Q    I'm going to stop you.  I have to ask you questions.

2  Okay?

3        All right.  Where are you from, ma'am?

4  A    I'm coming from Port St. Lucie.

5  Q    Okay.  And I might just repeat a few things that you say

6  just to be sure I understood you.

7        Did you say you're from Port St. Lucie?

8  A    We come from Port St. Lucie, yes, ma'am.

9  Q    Okay.  Are you married?

10 A    Yes, I am married.

11 Q    All right.  And do you have children?

12 A    Yes, I do.

13 Q    And who is your son?

14 A    Omar Mateen.

15 Q    Okay.  And do you have a daughter named Sabrina?

16 A    Yes, ma'am.

17 Q    Okay.  Now, your son Omar Mateen, was he married?

18 A    Yes, ma'am.

19 Q    And who was he married to?

20 A    Noor.

21 Q    Do you see her here today?

22 A    Right now?

23 Q    Yes.

24        THE COURT:  She wouldn't be in this box, ma'am.  She

25 would be over in that part of the courtroom (indicating).

BY MS. SWEENEY:

Q   Do you see her?  Okay.  Do you need a tissue?  There's some right there if you need some.  Can you tell what piece of clothing she's wearing?

A   She has a pink --

Q   A pink jacket.  Okay.

     MS. SWEENEY:  Your Honor, may the record reflect that the witness has identified the defendant?

     THE COURT:  It does.

BY MS. SWEENEY:

Q   Okay.  Now, ma'am, do Mr. Mateen and Ms. Salman have a child together?

A   Yes, ma'am.

Q   Okay.  Now, before June of 2016, how often did you see Omar Mateen in a regular week?

A   On most on the day they're off, on the days off, on the days he's off.

Q   Okay.  So on the days he was off?

A   Yeah.

Q   Do you mean off from work?

A   From work, yeah.

Q   Okay.  How often did you see Noor Salman?

A   Around the same time.

Q   Okay.  Around the same time?

A   Around the same time.

1  Q    Okay.  And how would you describe your relationship with
2  Omar Mateen and Noor Salman?

3  A    As a family and mother, natural -- I mean, natural.

4  Q    I'm sorry.  I didn't understand.  What did you say?

5  A    Natural relationship, like as a son and daughter-in-law.

6  Q    Are you saying "natural relationship"?

7  A    Yeah.

8  Q    So you had a natural relationship with your son and
9  daughter-in-law?

10  A    Yeah.

11  Q    Okay.  Now, as for their child, who was primarily
12  responsible for taking care of their child?

13  A    Their child, Noor.

14  Q    Okay.  Ms. Salman did that?

15  A    Yeah.

16  Q    Okay.  Now, I would like to ask you a couple of questions
17  about Omar Mateen.  Did you ever hear him discuss committing
18  an act of violence?

19  A    No.

20  Q    Did you ever hear him discuss terrorism?

21  A    No.

22  Q    Did you ever hear him discuss ISIS?

23  A    No.

24  Q    Or jihad?

25  A    No.

1    Q    Did you ever see him watching any violent videos?

2    A    No, ma'am.

3    Q    All right. So did Ms. Salman ever tell you that she was

4    concerned that her husband might commit an act of violence?

5    A    No.

6    Q    Were you ever concerned?

7    A    No.

8    Q    Let me just finish, just so we're sure we are --

9    A    Sorry.

10    Q    It's okay.

11        Were you ever concerned that Mr. Omar Mateen might

12    commit an act of violence?

13    A    No.

14    Q    If you thought that something bad was gonna happen, if

15    you thought an act of violence was gonna occur, what would you

16    do?

17    A    I would --

18        MR. SCHELLER: Your Honor, objection.

19        THE COURT: The objection is overruled.

20    BY MS. SWEENEY:

21    Q    Let me repeat the question, okay?

22        If you thought an act of violence was gonna occur,

23    what would you do?

24    A    I would talk with my husband and report him.

25    Q    Report to who?

1  A    To the police or F.B.I.

2  Q    Now I would like to direct your attention to June 11th of

3  2016.  Do you remember that day?

4  A    Yeah.

5  Q    Okay.  Did you see Mr. Mateen that day, Mr. Omar Mateen

6  that day?

7  A    Yes, ma'am.

8  Q    When did you see him?

9  A    He came and after work, just like one second and then

10  just leave.

11  Q    Okay.  So I'm just gonna repeat what you said to make

12  sure I understand what you said.  He came after work one

13  second.

14  A    Yeah.

15  Q    And then he left.

16  A    He left, yeah.

17  Q    Okay.  Do you remember about what time that was?

18  A    I would say maybe 3:30 probably.

19  Q    Okay.  Around 3:30?

20  A    Around 3:30.

21  Q    Okay.  And after he left, did you get an invitation to go

22  to the mosque that evening?

23  A    Yes, ma'am.

24  Q    And what was the invitation?

25  A    Just for dinner, dinner.

1  Q    And was it a special time of the year?

2  A    Yes, ma'am.

3  Q    And what was it?

4  A    Ramadan.

5  Q    Okay.  Ramadan, okay.  Excuse me.

6       After you got that invitation, what did you do?

7  A    I called.  About 5:00 I called Omar.

8  Q    Okay.

9  A    No response.

10 Q    Okay.

11 A    To ask him if he go for dinner.  Then I called Noor.  And

12 Noor said because of the boy, he's sleeping early, 9:00, he

13 cannot go, and she will not go, and Omar is invited to Nemo's

14 house.

15 Q    Okay.  So let me just break down what you said.  So first

16 you called Mr. Omar Mateen, right?

17 A    Yes.

18 Q    Okay.  But you didn't get him on the phone?

19 A    Yes.

20 Q    Okay.  So then you called Ms. Salman; is that right?

21 A    Right.

22 Q    All right.  And she told you that she was gonna stay home

23 because her son was gonna go to sleep early?

24 A    Yes, mm-hm.

25 Q    Okay.  And that Mr. Omar Mateen was out at dinner with

1  Nemo?

2  A    Yeah.

3  Q    Okay.  All right.  And then later that evening, after you

4  spoke to Ms. Salman but before you went to the mosque, did you

5  speak to Mr. Omar Mateen on the phone?

6  A    Yes.  I call back before, close -- close to dinner.  I

7  call him, and he call me, and we spoke.  He said he's not

8  gonna go.  He's invited to Nemo's house for dinner.

9  Q    Okay.  So you spoke to him, and he said he wasn't going

10  to mosque, and he was invited to Nemo's house for dinner?

11  A    Yes, ma'am.

12  Q    Okay.  All right.  So then did you go to the mosque that

13  evening?

14  A    Yes, ma'am.

15  Q    Okay.  And what happened at the mosque?

16  A    I went to -- I saw Nemo's mom.  I said -- we say hi to

17  each other.  I said, Oh, Omar is invited to your house.  She

18  said, No, Nemo is not in town, because her son is out of town.

19  Q    How did you feel when you heard that?

20  A    I feel, like, sad.  I feel sad and embarrassed.  I said

21  he lie.

22  Q    So you thought your son had lied to you?

23  A    Yeah.

24  Q    So did you speak anymore with Nemo's mom that evening?

25  A    Oh, no, because it was a very hectic time.

1  Q    Very hectic time?

2  A    Very hectic.

3  Q    All right.  So what did you do after you left mosque?

4  A    After I left mosque, it was like about maybe 10:00 or

5  10:30.  I was so tired and my asthma wasn't too good.  I just

6  came from overseas, like two days before, and I was -- I call

7  Omar -- I came home, I called Omar.  I said I want to ask him

8  where he was.  I leaved him a message.  I said, "It's an

9  emergency.  Can you come over?"  I was so tired, and I was --

10  I think my machine -- and I take my inhaler.  I went to the

11  bed -- I mean, just lay down waiting for him.  He doesn't -- I

12  mean, I went to sleep.

13  Q    Okay.  Let me stop you for just a minute.  I'm sorry.  So

14  I just want to repeat back a little bit of what you just said.

15         When you left mosque you tried to call Mr. Mateen,

16  correct?

17  A    Right.

18  Q    But you weren't feeling very well either, correct?

19  A    Right.

20  Q    And you said you just returned from a trip overseas?

21  A    Yes.

22  Q    So you were tired?

23  A    Yes.

24  Q    Where were you overseas?

25  A    Mexico --

1  Q    Mexico.

2  A    -- for a business trip.

3  Q    So you called your son, and you left him a voicemail

4  message?

5  A    Yes, ma'am.

6  Q    And you said that you told him that it was an emergency?

7  A    Yeah.

8  Q    But then you laid down, and you fell asleep?

9  A    I was actually waiting for him.

10 Q    You were waiting for him.

11 A    Waiting for him to come and ask him why that happened,

12 but I wait forever.  I got up.  It was too late.  It was like

13 4:00.  Everybody is in the house.

14 Q    And, sorry.  So you said it was about 4:00 and what

15 happened?

16 A    So people were asking for Omar.  So we got up, and they

17 were looking for Omar.  I got worried.  I said, What is going

18 on?

19 Q    Who was looking for Omar?

20 A    I mean, the police and F.B.I., everybody.

21 Q    Okay.  And so what did you do?

22 A    I was home by myself because everybody went to somebody

23 else house.  I called my husband.  I don't know how many times

24 I called him.  He said they don't have news, don't get the

25 news.  We are waiting.  We are waiting.  Then I called him I

think about that time. I said, Please call us. Everybody is
waiting. Everybody is worried. And then I called Noor. I
said, I am not sure that I talk to her because I was in shock.
I was in panic. I was very condition. I don't know if I
talked to her, and she probably told me that Omar is -- I
don't know.

Q   Okay. So let me -- so after you woke up, you called your
son again?

A   When people -- when I saw the people in the house.

Q   Looking for him?

A   Looking for him, yeah.

Q   Okay. But you didn't know what had happened to him?

A   No.

Q   Okay. And at that point you left him a voicemail
message, correct?

A   Yes, ma'am.

Q   And did you listen to a copy of that voicemail message
before court today?

A   Yes, I did.

Q   Okay. So you've heard that, and that voicemail message
is you talking?

A   Yes, ma'am.

Q   Okay. And then you called Ms. Salman, but you're not
sure if you spoke to her or not?

A   I am not.

1    MR. SCHELLER:  Your Honor, I don't -- I've been
2  allowing leading to go for a while now, but I don't think --
3  I'm gonna object to that last question.
4    THE COURT:  Sustained.
5  BY MS. SWEENEY:
6  Q   Can you say again what -- I think you answered.  Just so
7  that it's clear, I'm sorry, what do you remember about
8  speaking to Ms. Salman?
9  A   I am not sure.  Did I talk to her?  I text to her.  I
10  leave a message for her, "Where is Omar?" because I was
11  worried.  I said, How is he doing?  I just want to check with
12  her.
13    MS. SWEENEY:  Your Honor, may I have one moment?
14    THE COURT:  Yes, you may.
15    MS. SWEENEY:  Thank you, ma'am.  I don't have any
16  further questions, Your Honor.
17    THE COURT:  Thank you.
18    MR. SCHELLER:  Your Honor, may I approach briefly?
19    THE COURT:  Yes.
20    (At the bench.)
21    MR. SCHELLER:  Thank you, sir.  There's a couple of
22  things I want to memorialize, you know, if there's ever an
23  issue in the future why I didn't, you know, object to a number
24  of leading questions.  It was because of the language
25  difficulty.

1      THE COURT:  Yes.

2      MS. SWEENEY:  Which is why I was leading.  I was not

3  intending --

4      MR. SCHELLER:  No. This is not about you.  This

5  is -- I think the Judge understands.

6      THE COURT:  I understand.  No, it was quite clear

7  that for Ms. Mateen English is her second language.  I can

8  follow her, if I'm listening intently.  Sometimes that doesn't

9  always translate well with the jury, so --

10     MR. SCHELLER:  I thought it was appropriate.  That's

11  what I'm trying to say.

12     THE COURT:  What Ms. Sweeney was doing was to repeat

13  what she was saying in order to make sure that she understood

14  and also for the benefit of the jury.  I understood it, and I

15  understood why you didn't object.

16     MR. SCHELLER:  Yeah.  So I'm gonna say I may have to

17  do the same thing now with restatement.

18     THE COURT:  That would be fine.

19     MS. SWEENEY:  That's fine.

20     MR. SCHELLER:  Thank you.

21     THE COURT:  Thank you.

22     (In open court.)

23     MR. SCHELLER:  May I cross, Your Honor?

24     THE COURT:  Yes, you may.

25  ////

CROSS-EXAMINATION

 BY MR. SCHELLER:

Q    Good afternoon.

A    Good afternoon.

Q    Now, I want to go over some of the things that
Ms. Sweeney had discussed with you.

         You saw your son Omar Mateen two to three times a
week?

A    On his days off, the days when he is off most.

Q    When you say "his days off," it's the days he's off of
work, right?

A    Yeah.

Q    So every day he's off of work he comes to your house?

A    Not every day.

Q    Most days?

A    He was off like something two -- once a week, two times a
week, but they have things to do there themselves.  You know,
they do their own things.

Q    And he would come to your house, and he would often bring
his son when he came?

A    Yeah, but he came with his son.

Q    And you also spoke to him on the phone, correct?

A    Yeah.  We spoke on the phone.

Q    Okay.  Now, on the day of the shooting, we're gonna go
now to the Pulse shooting, so you saw him at your house at

1    about 3:30, 4:00?

2    A    About three or four, yeah.

3    Q    Three or four, and he had just left work; is that right?

4    A    Yes, he left from work.

5    Q    He had work that day from 7 to 3:00 p.m., right?

6    A    Yeah.

7    Q    Okay. Was he acting strange in any way?

8    A    No. Very, very normal.

9    Q    Very, very normal?

10    A    Very, very normal.

11    Q    Okay. You had just gotten back from Mexico, right?

12    A    Yes, yes.

13    Q    Okay. And so he wanted to see you, right?

14    A    Yeah.

15    Q    You didn't think -- you didn't notice anything out of the

16 ordinary?

17    A    I wish we knew. We wish we knew.

18    Q    But you couldn't know because of the way he was acting.

19 There was no way for you to know, right?

20    A    I didn't understand. Sorry.

21    Q    I'm sorry. You said you wish you knew.

22    A    Yeah.

23    Q    I said there was no way for you to know because he was

24 acting so normal.

25    A    Yeah.

1    Q    Right?

2    A    Right.

3    Q    And he deceived you, right?

4    A    What is that?

5    Q    He deceived you?

6    A    What does that mean?

7    Q    He lied to you or he tricked you, yes?

8    A    Yes.

9    Q    And you believed that he also tricked Noor Salman, right?

10         MS. SWEENEY:  I object, Your Honor.  I object to

11   that question.

12         THE COURT:  The objection is?

13         MS. SWEENEY:  That calls for the witness'

14   speculation.

15         THE COURT:  Sustained.

16   BY MR. SCHELLER:

17   Q    Now, Ms. Sweeney asked you about my client's relationship

18   with her son.  Okay.  So I want to ask you some questions that

19   weren't asked.

20         You said that Noor Salman mainly raised your

21   grandson, right?

22   A    Yeah.

23   Q    Yes?

24   A    Yes, yes.

25   Q    Okay.  But you would say that Noor Salman is a very good

1  mother to her son, right?

2  A    Yes, we say.

3  Q    She's very devoted to her son, right?

4  A    What does *devoted*?

5  Q    Devoted, committed?

6  A    Yes.

7  Q    She's very committed to her son?

8  A    Yes, yes.

9  Q    Her son is her number one priority?

10 A    Yes, ma'am -- yes, sir.

11 Q    And because of Noor Salman's relationship with her son,

12 her son has done very well?

13 A    Yeah.

14 Q    Right?

15 A    Right.

16 Q    He's very smart, right?

17 A    He's very smart.

18 Q    Yeah.  And she was even considering putting him into

19 school that summer of the Pulse shooting, right?

20 A    Yes.

21 Q    To get him started early, right?

22 A    Right.

23 Q    And they could not because he was so smart he had to

24 start in the fall, right?

25 A    Okay.

1   Q   And that was because of Noor, right?

2   A   (Speaker nods head up and down.)

3   Q   I'm sorry.  Do you want some water, ma'am?

4   A   That's fine.  Thank you.

5   Q   If I'm going too fast, please let me know.

6   A   No.  That's fine.

7   Q   Now, Noor is very childish, right?

8   A   Yes.

9   Q   She's very much -- yes?

10   A   Yes, she is.

11   Q   She's very much like a child, right?

12   A   Mm-hm.

13   Q   And she likes to play with your grandchildren, right?

14   A   Grandchildren, yeah, right.

15   Q   I'm sorry.  Is that a yes, ma'am?

16   A   Yes, sir.

17   Q   She likes to spend most of her time with them?

18   A   With the kids, yeah.

19   Q   And you love her, but you've told her she needs to be

20 more mature, right?

21   A   I told her, yes.

22   Q   Yeah.  You've told her she needs to grow up, right?

23   A   Yeah, I told her.

24   Q   You told her, right?  Yeah.  You actually even texted her

25 that, right?

1    A    Yeah.

2    Q    You sent her a text, "Noor, you need to grow up" because

3    she's very naive, right?

4    A    She is.

5    Q    And she's very innocent, right?

6    A    Right.

7    Q    Yes?

8    A    Yeah.

9    Q    And she trusts others very much, right?

10   A    Yes, right, correct.

11   Q    Now, Noor is not very religious, right?

12   A    No, she's not.

13   Q    Okay.  And her family is from Palestine?

14   A    Yes, sir.

15   Q    Yeah.  Her parents are from Palestine?

16   A    Yes.

17   Q    And you were a little bit concerned when Omar was going

18   to marry Noor because she was from Palestine, right?

19   A    Right.

20   Q    And because you know that people -- people from Palestine

21   are not -- are more liberal, right?

22   A    What is *liberal*?

23   Q    They're not as strict in the practice of their Muslim

24   faith, right?

25   A    I, I --

1   Q    From your experience?

2   A    No, I don't know about that.

3   Q    Okay.  Noor would only go to the mosque occasionally,

4   right?

5   A    Very few.

6   Q    Very few?

7   A    Yeah.

8   Q    Right.  Right.  And she would not wear -- she would not

9   wear traditional Muslim clothing?

10  A    No.

11  Q    Right?

12  A    No, right.

13  Q    She would wear jeans often?

14  A    Yes.

15  Q    Right?

16  A    She's more American.

17  Q    She's more American.

18  A    Yeah.

19  Q    Exactly.  Thank you.

20          Now, I want to ask you some questions about the

21  night of June 11th.  I'm sorry to bring you back there, but --

22  A    No, no.  That's fine.

23  Q    So on June 11th you just got back from your trip to

24  Mexico, right?

25  A    Right.

1  Q    And you decided you were gonna go to this event at the

2  mosque around 5:00 p.m.?

3  A    Around seven, I think.

4  Q    I'm sorry.  Seven?

5  A    Yeah.

6  Q    Okay.  So you call Noor Salman to invite her, Omar, and

7  Noor's child, right?

8  A    Right.

9  Q    And you actually wanted to bring all of your

10 grandchildren to the event?

11 A    Yes.

12 Q    Right?

13 A    Yes, sir.

14 Q    That was what was important to you, to bring your

15 grandchildren?

16 A    Yes.

17 Q    Right?  Is that true?

18 A    That's true, yes.

19 Q    And when you called Noor Salman and she said Omar is with

20 Nemo, right?

21 A    Yes, sir.

22 Q    And she said she wanted to stay with her child?

23 A    With her child.

24 Q    Right.  And that wasn't unusual for you, for Noor to want

25 to stay with her child, right?

1   A    It happened sometimes.

2   Q    Sometimes?

3   A    Yeah.

4   Q    But do you take that as --

5   A    No.

6   Q    You weren't surprised?

7   A    No.  I wasn't surprised.

8   Q    Okay.

9   A    Because the baby has a schedule, like 9:00 it go to bed.

10   Q    Yeah.  And as you said, Noor was always committed to her

11 son, right?

12   A    You mean in talking, communicating?

13   Q    Committed to her son.

14   A    Yes.

15   Q    Now, you actually called -- then you called Omar, and he

16 basically told you the same thing?

17   A    Yes, sir.

18   Q    Okay.  And you didn't think it was odd because you

19 considered Nemo a special friend to Omar, right?

20   A    I thought.

21   Q    Pardon?

22   A    I thought.

23   Q    You thought.

24         MR. SCHELLER:  Okay.  I'm just gonna repeat that,

25 Your Honor.

BY MR. SCHELLER:

Q    You thought that Nemo and Omar were special friends, right?

A    Right.

Q    You had heard Omar tell you in the past that Nemo and him -- Nemo and Omar had gone out together for dinner and other things, right?

A    Not other things, just like that was the second time he said -- he mentioned his name.

Q    Okay.  Now, when you met Nemo's -- when you met Nemo's mom and she told you that Nemo wasn't in Florida, you said you were ashamed, right?

A    I was -- I was surprised.

Q    You were surprised.  You said you also felt embarrassed.

A    Yes, yeah.

Q    Did you call Omar right away?

A    Not right away because I couldn't.  That time was really hectic.  I thought he might go with some other friend.  He doesn't want to tell us, you know.

Q    Yeah.

A    He want to use Nemo's name.  But I didn't call right away.

Q    And this was about 8:00, 8:30?

A    8:00, yeah.  That was hectic time, dinner, pray, everything the same time, very hectic.

1  Q    Okay.  And then you got home about -- I think you got

2  home around midnight?

3  A    Midnight, yeah.

4  Q    So from that time, from 8:00 to midnight, you never went

5  back and called or spoke to Nemo's mom, right?

6  A    No.

7  Q    And during that time, from eight to midnight, you never

8  called Omar, correct?

9  A    When it come 10:00 I call.

10  Q    Okay.

11  A    Because we came from the masjid 10:00, I think 10:00 or

12  10:30.

13  Q    So you got back and then you called, right?

14  A    When I called when like --

15  Q    Okay.

16  A    -- got done.

17  Q    Okay.

18  A    Because I didn't -- I didn't take my phone inside.

19  Q    And he didn't answer?

20  A    No.  I didn't took my phone inside of the masjid.

21  Q    Now, you were disappointed that Omar lied, and you wanted

22  to speak to him directly and find out why, right?

23  A    Just to come -- I want to find out.  Because he's a grown

24  man, he has his own life.  I don't want to be interfere in

25  their life, the mother.  I don't want to be nosey for their

1  life, but I said this time this is unusual.  Yeah, I just left

2  the message.  I said, *Can you call?  Emergency.  It's an*

3  *emergency.*

4  Q    Emergency, and the emergency was you wanted to talk to

5  him?

6  A    Find out why you say that.

7  Q    Right.

8  A    Especially in this month.

9  Q    Right, because you wouldn't have forced Omar to go to the

10 mosque that night, right?

11 A    No.

12 Q    No. And you wanted your grandchild to go?

13 A    Yes.

14 Q    But if he said he didn't want to go, that would have been

15 okay, right?

16 A    Right.

17 Q    Right.  You were going to the mosque that day to the

18 event with your daughter anyway?

19 A    Right.

20 Q    Right?  She was with you, right?

21 A    Right.

22 Q    Now, we had questions about Noor Salman being married to

23 Omar and their relationship.  So I want to ask you a few

24 questions.  This wasn't Omar's first marriage, right?

25 A    No, this wasn't.

1 Q   Okay.  He was married before?

2 A   Before, yes.

3 Q   And that ended in divorce?

4 A   Divorce.

5 Q   Okay.  And that was an arranged marriage?

6 A   No, no, love.

7 Q   It was a love marriage?

8 A   It was.

9 Q   Okay, not an arranged marriage.  Okay.  And that marriage

10 didn't work out, right?

11 A   Didn't work out, right.

12 Q   And do you remember when -- do you remember his first

13 wife's name?

14 A   Sitora.

15 Q   Sitora.

16 A   Yeah.

17 Q   I'm going to use "Sitora."  Do you remember when the

18 marriage ended?

19 A   2009 I think.

20 Q   Okay.  And do you remember the events when the marriage

21 ended?  You know, how the marriage ended, do you remember

22 that?

23 A   We don't -- we don't know.  The same thing.  They have

24 their life.  They have their --

25 Q   Do you remember that her parents actually came down from

1  New Jersey to pick her up?

2  A    Yes.

3        MS. SWEENEY:  I'm going to object to the relevance,

4  Your Honor.

5        THE COURT:  Let's have a quick sidebar.  I'm

6  anticipating I know where this is going, but I want to be

7  sure.

8        (At the bench.)

9        THE COURT:  Can you proffer where you're heading?

10       MR. SCHELLER:  Yeah.  So there was a marriage --

11  they brought up constantly she's not the victim of domestic

12  violence.  This first marriage was the parents actually had to

13  come down and save her because of the abuse and the fact that

14  they thought she was in a hostage situation.

15       THE COURT:  Does this witness know that?

16       MR. SCHELLER:  I believe so because she was there at

17  the events when the parents came.  I've interviewed witnesses.

18  I was actually -- we actually interviewed -- People

19  interviewed the ex-wife, who also gave a press conference, by

20  the way, and describes the day that her parents came to do a

21  rescue mission, and then Omar was supposed to -- they were

22  supposed to go to her house and pick her up.  They go to

23  his -- he drives to his house.  She comes out and the

24  parents -- it's a pretty --

25       THE COURT:  So the point is there have been text

messages introduced with the way that they have a close

relationship, "Noor my love," "I love you, babe," all those

terms of endearment being used in the text messages back and

forth.  I doubt that was an accidental.  And I'm not critical

of this.  It's a relevant piece of evidence that the

relationship is close, and one might infer they are

communications between people who are close.

          The point that Mr. Scheller, I assume, is making is

that if this witness can corroborate a prior domestic abuse

situation, that goes to what their expert says, that he

interviewed her about domestic abuse.  That makes it a

corroborating event.  So why would that not be relevant?

          MS. SWEENEY:  So two things, Your Honor.  The first

is that the fact that Omar Mateen may have been involved in a

prior abusive marriage, it's basically 404(b) used for an

inappropriate purpose that he was abusive in this marriage.

That is number one.  Number two is their expert didn't rely on

any of this information to corroborate what Ms. Salman said to

him.  So I don't see why it's relevant now.  And one more

thing.  I'm sorry.

          THE COURT:  Yes.  Go ahead.

          MS. SWEENEY:  And for their expert, the abuse, the

only reason it's relevant is he says it's a factor that

contributes to false confession.

          THE COURT:  Right.

1      MS. SWEENEY:  So the nature of the abuse or any of

2   that and whether it actually happened is not relevant to

3   anything but that point.

4      THE COURT:  Let me reverse that logic a little bit.

5   If the expert says that one of the factors that goes towards

6   the propensity of a false confession is an abusive

7   relationship in the past, along with the other factors he

8   spoke about at the *Daubert* challenge, then he's going to

9   testify, I believe, that he relied upon an interview of

10  Ms. Salman in which she relates this information.  If in fact

11  a prior marriage ended in abuse, isn't that corroborating?

12     MS. SWEENEY:  Your Honor, I think it's basically

13  404(b).

14     THE COURT:  Unless you're stipulating that she was

15  abused in this relationship, which I doubt you are.

16     MS. SWEENEY:  No, Your Honor, but this is -- the

17  404(b) prevents the use of evidence for this purpose.

18     THE COURT:  Actually, it goes to motive, intent,

19  opportunity, plan, and lack of mistake.  That is that Omar had

20  a motive to be abusive in this relationship.  He had an intent

21  to do so, a plan, an opportunity.

22     MS. SWEENEY:  They can be -- I mean, they're totally

23  different relationships.  You know, abusing one person doesn't

24  lead to abuse of another person.

25     THE COURT:  404(b) evidence is often introduced in a

1   drug case where a drug trafficking incident outside the one at

2   trial.  So it doesn't have to be the same facts.  It has to be

3   substantially similar.

4           MS. SWEENEY:  And being offered for an appropriate

5   purpose --

6           THE COURT:  Right.

7           MS. SWEENEY:  -- which I don't think his motive --

8           THE COURT:  All right.  I understand the argument.

9   Folks, I understand the argument.

10          I disagree with the position taken by the government

11  in this regard.  You may inquire.

12          See if the witness understands.  Please take it in

13  little steps.  If she doesn't have knowledge of this, she

14  doesn't have knowledge.

15          MR. SCHELLER:  I'm going to back up if she

16  doesn't -- I mean, if she's gonna deny it, I'm not gonna --

17          THE COURT:  Okay.

18          MR. SCHELLER:  -- make this an extrinsic trial.

19          THE COURT:  Very good.

20          MR. SCHELLER:  All right.

21          (In open court.)

22  BY MR. SCHELLER:

23  Q   Sorry about that.  Thank you.  I want to go back for a

24  second.

25          So Omar's first wife's name is Sitora, right?

1  A    Yes, sir.

2  Q    And their marriage ended?

3  A    Yes, sir.

4  Q    And when their marriage ended, her parents came down to

5  pick her up?

6  A    Yes, sir.

7  Q    Right?

8  A    Right.

9  Q    And they wanted to take her back with them?

10 A    Yes.

11 Q    Okay.  And when that event happened, they came by your

12 house?

13 A    Yes.

14 Q    Do you remember?

15 A    I remember.

16 Q    Yeah.  And they said their daughter was being held

17 hostage by your son, remember?

18 A    Can you repeat it, please?

19 Q    They said that they had to take their daughter back with

20 them because she was being held against her will by your son?

21 A    No.  They just said, "We're gonna take our daughter."

22 They didn't say anything.

23 Q    They didn't say anything?

24 A    They didn't say anything.

25 Q    They didn't say anything about --

1　A　They were very quiet, very pleasant.  They just came and

2　took her.  That's all.

3　Q　And they took her back?

4　A　Take her back.

5　Q　Okay.  And how long did that marriage last?

6　A　When that --

7　Q　That first marriage, yeah.

8　A　2009.

9　Q　Pardon?

10　A　2009 ended.

11　Q　2009.  When were they married?

12　A　They were married -- they were together maybe one year.

13　Q　One year?

14　A　I think so.

15　　　　MR. SCHELLER:  All right.  Judge, I'm gonna move to

16　a different area.

17　　　　THE WITNESS:  I think so.

18　　　　THE COURT:  All right.  Thank you.

19　　　　MR. SCHELLER:  Thank you.

20　　　　THE WITNESS:  I'm not sure about the date.

21　BY MR. SCHELLER:

22　Q　Okay.  All right.  Now, Ms. Sweeney asked you a question

23　about if you knew something bad was gonna happen, what would

24　you do.  Do you remember that?

25　A　Yeah.  If something bad like this big thing happen --

1    Q    What would you do?

2    A    -- big tragedy, I would report it to the police or the

3    F.B.I.

4    Q    What your answer was, you would tell your husband first,

5    right?

6    A    Well both.

7    Q    Yeah.

8    A    Because we working both, yeah.

9    Q    Yeah.  So you would go to your husband first, if you

10   thought something bad was gonna happen, right?

11   A    No, the police and the F.B.I.

12   Q    Okay.  So --

13   A    We both have because we both work -- has to work.

14   Q    You would go after you talked to -- I just want to be

15   clear, with your husband you would go to the F.B.I., right?

16   A    To the police.

17   Q    Okay.  And Ms. Sweeney had asked you about threats, had

18   you ever heard Omar make any violent statements.  Do you

19   remember that?  You've never heard Omar make any violent

20   statements, right?

21   A    Statement, no.

22   Q    Okay.  Have you heard him make any threats?

23   A    No.

24   Q    Okay.  Have you heard of any information that he's made

25   threats in the past?

1    A    No.

2    Q    Do you remember in 2013 when the F.B.I. was interviewing

3    Omar about threats that he had made?  Do you remember that?

4    A    In his house?

5    Q    Yes.

6    A    Yes.

7    Q    Okay.  And the F.B.I. was investigating Omar for threats,

8    statements he had made at his work, right?

9    A    That part I wouldn't -- I didn't hear because they were

10   talking with my husband.

11   Q    Okay.  So your husband actually went over while they were

12   interviewing Omar?

13   A    They were, yeah, Omar, my husband, and the F.B.I.

14   Q    F.B.I.

15   A    Yeah.

16   Q    And so your husband -- but that, that wasn't an

17   investigation of your husband, was it?

18   A    No, no.

19   Q    Okay.  Your husband had nothing to do with it?

20   A    Nothing to do with it, no.

21   Q    Okay.  But your husband went over there because he had a

22   previous relationship with the F.B.I., right?

23   A    I -- I -- I don't know.

24   Q    Well, so --

25   A    He never told me that.

1  Q    Well, when that happened with Omar, was Omar a child?

2  Was he under 18 years old when he made those threats?

3  A    I mean, those kind of --

4  Q    Let me rephrase it.  When that happened, that was in

5  2013.  Okay?

6  A    Okay.

7  Q    So Omar was an adult, right?

8  A    Right.

9  Q    Okay.  And your husband is not a lawyer, is he?

10  A    No, he's not.

11  Q    Okay.  But your husband knew the F.B.I. agents that were

12  talking to Omar, right?

13  A    I'm not sure about that.

14  Q    Okay.  You're not sure about that?

15  A    I'm not sure about that.

16  Q    Let's talk about the night -- the night after the Pulse

17  shooting.  Okay?

18  A    The night after shooting?

19  Q    Yeah.  The day after the shooting.

20  A    All right.

21  Q    All right.  And at some point your son-in-law -- well,

22  let me start in the beginning.

23        You knew that Noor was brought to the F.B.I. office,

24  right?

25  A    Yes, right.

1  Q    Okay.  And at some point your son-in-law went to pick up
2  your grandson?
3  A    Right.
4  Q    And your grandson, that's Noor's son, right?
5  A    Correct.
6  Q    Okay.  But Noor did not come back with your grandson,
7  right?
8  A    She came.
9  Q    She came, but she did not come -- isn't it fair to say
10 she came back much later in the day?
11 A    If I'm honest with you, if you're asking me after the
12 tragedy, I was shock.  I don't remember exactly.
13 Q    Okay.  Do you recall that she came back?
14 A    She came back I think after -- after Zaki came.
15 Q    Did she come back around 10:00 at night, late at night?
16 A    Late at night, yeah.
17 Q    Yeah.
18 A    Late at night.
19 Q    And she was tired, right?
20 A    She was tired.  She was in shock.  You can tell.
21 Q    She was in shock, yeah.  She was extremely cold?
22 A    Yeah.  She was cold.  I touch her.
23 Q    And the one thing she wanted to see -- or the one thing
24 she wanted right away was to see her son, right?
25 A    Right, yeah.

1    MR. SCHELLER:  Your Honor, can I have one moment?

2    THE COURT:  Yes, you may.

3    MR. SCHELLER:  Your Honor, no further questions.

4  Thank you, ma'am.

5    THE COURT:  Thank you.  Redirect.

6    MS. SWEENEY:  Yes, just briefly.  Thank you.

7                    REDIRECT EXAMINATION

8   BY MS. SWEENEY:

9  Q    Ma'am, when you were speaking to Mr. Scheller, he asked

10  you about why you wanted to speak to your son after that night

11  in mosque, and you said that you wanted to speak to him

12  because you wanted to know why he would say that.  I think

13  then you said especially this month?

14  A    Yes, exactly.

15  Q    What did you mean by that?

16  A    This month is really a very special month, like peace.

17  It's a good month.  You have to do good stuff, good thing.

18  Q    You mean during Ramadan, right?

19  A    Yes.

20  Q    And, ma'am, did Ms. Salman ever tell you that Omar Mateen

21  was abusing her?

22  A    No.  She never pointed it to me.

23    MS. SWEENEY:  Thank you.  Nothing further, Your

24  Honor.  Thank you.

25    THE COURT:  Thank you, ma'am.  You may step down.

1  Thank you very much.

2  THE WITNESS:  Thank you, sir.

3  THE COURT:  Thank you.  Your next witness, please.

4  MR. MANDOLFO:  The United States calls

5  Anthony Colossale.

6  THE COURTROOM DEPUTY:  Sir, please come forward to

7  the witness box and remain standing.  Please raise your right

8  hand.

9  **ANTHONY COLOSSALE,**

10  called by Government, having been first duly sworn, was

11  examined and testified as follows:

12  THE COURTROOM DEPUTY:  Please have a seat.  Please

13  state your name and spell your last name for the record.

14  THE WITNESS:  Anthony Colossale, C-o-l-o-s-s-a-l-e.

15  THE COURT:  Thank you, sir.

16  You may proceed when you're ready.

17  MR. MANDOLFO:  Thank you, Your Honor.

18  <u>DIRECT EXAMINATION</u>

19  <u>BY MR. MANDOLFO</u>:

20  Q    Good afternoon.

21  A    Good afternoon.

22  Q    I'm going to direct your attention to June 6th of 2016.

23  Where were you working?

24  A    Best Buy.

25  Q    What did you do at Best Buy?

1  A    I sold cameras, appliances, and video games.

2  Q    What was your title at that point?

3  A    Lifestyle specialist we called it.  Salesman.

4  Q    While you were working that day, did you have any

5  interaction with who you later learned to be Omar Mateen and

6  Noor Salman?

7  A    Yes.

8  Q    Can you please tell the jury what happened?

9  A    They came in.  They were looking at a camera, an iPad,

10  and they were also looking at a Nintendo DS, mostly focused

11  around buying something for their child.  They ended up going

12  with the iPad instead of the Nintendo, and they also bought a

13  digital camera to take pictures, which she said was going to

14  be oriented around her child, taking pictures of her child.

15  Q    And during the interaction, who did you talk with mostly?

16  A    Mostly Noor Salman.  I don't think I spoke to Omar at

17  all.

18  Q    And where was he while you were talking with Noor Salman?

19  A    Just kind of wandering around the different departments.

20  Q    And approximately how much time did you spend with

21  Noor Salman?

22  A    Um, probably 30 to 40 minutes.

23  Q    Did she seem to understand the concepts that you were

24  discussing about the different cameras and the different

25  electronics?

1  A    Absolutely, yes.

2  Q    Did you find her -- did she in any way indicate that she

3  didn't understand what you were saying to her?

4  A    No.

5  Q    And did they make purchases that day as you just

6  mentioned?

7  A    What was that?

8  Q    Did they make purchases at Best Buy that day that you

9  mentioned?

10 A    Yes.  Yes.  I rang them up.

11        MR. MANDOLFO:  Your Honor, I would like to publish

12 Exhibit 226, which is already in evidence.

13        THE COURT:  Okay.

14        MR. MANDOLFO:  May I publish it, Your Honor?

15        THE COURT:  Yes.  Go right ahead.

16        MR. MANDOLFO:  It's Bates No. 90242.  And if we

17 could please highlight the date.

18        (The above referred to exhibit was published.)

19 BY MR. MANDOLFO:

20 Q    What date is this?

21 A    June 6, 2016.

22        MR. MANDOLFO:  And if we could please highlight the

23 purchase.

24 BY MR. MANDOLFO:

25 Q    What did they purchase?

1  A    The first item is a case for an iPad mini.  The second

2  item is a -- the actual iPad mini 4.  The third item is a

3  64-gigabyte memory card.  The next item is a Nikon DSLR camera

4  that came with a lens.

5  Q    What was the total amount for the purchase?

6  A    With tax, $1,250.76.

7        MR. MANDOLFO:  And could we please show which credit

8  card was used?  Yes.  Thank you.

9  BY MR. MANDOLFO:

10 Q    Could you please read the credit card and the name on the

11 credit card?

12 A    It was an AMEX, Omar Mateen.

13        MR. MANDOLFO:  No further questions.  Thank you.

14        THE COURT:  Thank you very much.

15        Any cross-examination?

16                    CROSS-EXAMINATION

17 BY MR. SWIFT:

18 Q    So just to understand --

19 A    Yes.

20 Q    -- a couple came in?

21 A    Mm-hm.

22 Q    At the time when you first talked to the F.B.I., you

23 didn't even remember the transaction, did you?

24 A    No, until I saw the video.

25 Q    Yeah, you hadn't.  Couple comes in, husband, wife.  Wife

1   is interested in getting something for her son, some

2   electronics, right?

3   A     Mm-hm.

4   Q     Learning stuff, some way to learn, or anything?  Or how

5   did we choose an iPad; do you remember?

6   A     Well, there's a few different types of iPads.  So I think

7   we discussed that the smaller one would be best for her son at

8   that time.

9   Q     Okay.  So she chooses the small one because it's good for

10   her son?

11   A     Yes.

12   Q     And she wants to get pictures of her son?

13   A     Yes.

14           MR. SWIFT:  No further questions.  Thank you.

15           THE WITNESS:  You're welcome.

16           THE COURT:  Thank you very much.

17           Any further questions?

18           MR. MANDOLFO:  No, Your Honor.  Thank you.

19           THE COURT:  Thank you, sir.  You're excused.  You

20   may step down.

21           THE WITNESS:  Thank you.

22           THE COURT:  Thank you.

23           Your next witness, please.

24           MR. MANDOLFO:  United States calls Jennifer Smith.

25   I believe she also goes by Jennifer Byrnes Smith.

1      THE COURTROOM DEPUTY:  Please come forward to the

2  witness box and remain standing.  Please raise your right

3  hand.

4                        **JENNIFER SMITH**,

5    called by Government, having been first duly sworn, was

6              examined and testified as follows:

7      THE COURTROOM DEPUTY:  Please have a seat.  Please

8  state your name and spell your last name for the record.

9      THE WITNESS:  Jennifer Smith.  It's S-m-i-t-h.

10      THE COURT:  Thank you, ma'am.

11      You may proceed when you're ready.

12      MR. MANDOLFO:  Thank you, Your Honor.

13                  <u>DIRECT EXAMINATION</u>

14  <u>BY MR. MANDOLFO</u>:

15  Q    Good afternoon.

16  A    Good afternoon.

17  Q    Where do you work?

18  A    Currently?

19  Q    Yes.

20  A    I work for Bank of America currently.

21  Q    How long have you worked for Bank of America?

22  A    This is my fifth week.

23  Q    Prior to working for Bank of America, did you work for

24  another bank?

25  A    Yes, sir.

1  Q    What was that bank?

2  A    PNC.

3  Q    Now, I'm gonna direct your attention to June 13 of 2016.

4  Where were you working on that date?

5  A    PNC Bank.

6  Q    What were you doing for PNC Bank at that time?

7  A    I was -- I was a relationship manager, which is --

8  Q    What does a -- sorry.

9  A    -- I'm sorry -- a platform --

10 Q    Go ahead.  What does a relationship manager do?

11 A    It is a platform associate who opens accounts, answers

12 phones, maintenance.

13 Q    On that particular date, did you answer telephone calls?

14 A    Yes, sir.

15 Q    And did you have a conversation with a person who you

16 learned to be named Noor Salman?

17 A    Correct.

18 Q    Can you tell the jury about -- I'm gonna withdraw that.

19         Prior to taking that phone call, did you speak with

20 co-workers about an incident that had happened the day before?

21 A    Correct.

22 Q    What was that?

23 A    I had come into work that morning, and they were -- my

24 manager and another co-worker who had worked at my branch for

25 a long time were talking about what -- the incident that had

1  happened and saying that the family used our branch.  So the

2  father and I believe the sisters possibly used our branch and

3  said -- they were just talking about, you know, what had

4  happened and what was going on and all of that.

5  Q    And the incident you're referring to was the nightclub

6  shooting from June 12th of 2016?

7  A    Correct.

8  Q    And did you receive a phone call from Noor Salman?

9  A    Correct.

10 Q    Can you please tell the jury about that phone call?

11 A    I answered the phone.

12        MR. SWIFT:  Objection, calls for a narrative.

13        MR. MANDOLFO:  I can break up the questioning.

14        THE COURT:  Yes.  If you would, please.  That would

15 be more appropriate.

16 BY MR. MANDOLFO:

17 Q    Can you please -- what happened when you answered the

18 phone?

19 A    I stated, "Thank you for calling PNC.  This is Jennifer.

20 How may I assist you today?"

21 Q    What did she say in response?

22 A    The person said to me that they had some questions

23 regarding an account.  And so I said, "How may I help you?"

24 The person said, "I need to know how I can access my husband's

25 account.  They won't release his body."

1  Q    After she said that, what did you do?

2  A    So I continued the conversation -- well, she was speak --

3  she was talking to me.  So I let her talk.  And she was

4  explaining to me why she needed to know how to get access to

5  the account and that she didn't have -- his wallet was with

6  him, so she didn't have any money.  So she needed to know how

7  she could get some money or access the account.  So I kind of

8  pieced it together at that point who I was speaking to and

9  what was going on.

10 Q    Let me stop you there.  After you pieced it together,

11 what did you do next?

12 A    So I asked her if I could place her on a hold.  I went to

13 my manager's office and explained to her what I thought it was

14 going on or who I thought was on the phone.

15 Q    Who did you think was on the phone?

16 A    That it was his wife on the phone.

17 Q    When you say "his," you mean Omar Mateen?

18 A    Correct.

19 Q    Why did you go to your manager at that point?

20 A    Because they were talking about it that morning, and it

21 was just -- I just wanted to make sure that I was doing

22 everything that I was supposed to be doing.  So I just went

23 into the office, told her what was going on, told her what

24 questions she was asking me regarding the account.  She said

25 follow the procedure just like you would if anybody else was

1  asking about it.

2  Q    Let me stop you there.  After you spoke with your

3  manager, what did you do next?

4  A    So then I returned to my office, got on the phone again

5  and then answered her questions.

6  Q    And what was her question?

7  A    How to access the account when someone was passed away.

8  Q    When you say "the account," whose account are you

9  referring to?

10  A    His account.

11  Q    "His" being Omar Mateen's?

12  A    Correct.

13  Q    And what did you tell her she could do to access

14  Omar Mateen's account?

15  A    I told her what the policy was.  So not that -- it would

16  just be the policy for anyone who was trying to access

17  someone's account who had passed away.

18  Q    What was that?

19  A    So you would need a death certificate and a driver's

20  license.  You would also have to be listed as the beneficiary

21  on the account or an owner on the account to be able to access

22  the account.  And I did say a death certificate, correct?  Did

23  I say that?  Yes?

24  Q    Yes.  Did she say anything about the police not releasing

25  the body?

1    A    Correct.

2    Q    What did she say?

3    A    She said that the police would not release his body and

4    his wallet was with him.  He had just gotten paid that Friday

5    before.  So she didn't have any way to get money to feed her

6    child.

7              MR. MANDOLFO:  No further questions.  Thank you.

8              THE COURT:  Thank you.  Any cross-examination?

9              MR. SWIFT:  Just one moment, Your Honor.

10             No questions.

11             THE COURT:  Thank you.

12             Thank you, ma'am.  You're excused.  Thank you very

13   much.

14             Your next witness, please.

15             MR. MANDOLFO:  Daniel Sprunger, Your Honor.

16             THE COURTROOM DEPUTY:  Please come forward to the

17   witness box and remain standing.  Please raise your right

18   hand.

19                      **DANIEL SPRUNGER,**

20     called by Government, having been first duly sworn, was

21             examined and testified as follows:

22             THE COURTROOM DEPUTY:  Please have a seat.  Please

23   state your name and spell your last name for the record.

24             THE WITNESS:  Daniel Sprunger, S-p-r-u-n-g-e-r.

25             THE COURT:  Thank you, sir.  You can adjust that

1  microphone to where it's convenient for you.  So if you need

2  to slide it forward, that would be great.  Thank you very

3  much.

4        You may proceed when you're ready.

5                  <u>DIRECT EXAMINATION</u>

6  <u>BY MR. MANDOLFO:</u>

7  Q    Good afternoon.

8  A    Good afternoon.

9  Q    Where do you work?

10 A    Currently?

11 Q    Yes.

12 A    At a property management company in West Palm Beach.

13 Q    And in March of 2015, where did you work?

14 A    I worked at Jackson Hewitt.

15 Q    What is Jackson Hewitt?

16 A    It's a tax preparation office, and we do accounting and

17 bookkeeping.

18 Q    And in March of 2015, did you prepare Omar Mateen and

19 Noor Salman's taxes?

20 A    I did.

21        MR. MANDOLFO:  Your Honor, may we publish

22 Exhibit 207, which is already in evidence?

23        THE COURT:  Yes, you may.

24        (The above referred to exhibit was published.)

25 BY MR. MANDOLFO:

1  Q    Prior to today, did you review Exhibit 207, which would

2  be the taxes that you prepared for Omar Mateen and

3  Noor Salman?

4  A    I did.

5  Q    And were those taxes related to 2011 through 2015?

6  A    Yes.

7  Q    When you prepare taxes for a client, what types of

8  documents do you ask for?

9  A    We want to get their ID to make sure they are who they

10  say they are, all income documentation, and any potential

11  deductible items if they itemize.

12         MR. MANDOLFO:  I'm going to ask to highlight the

13  upper left-hand corner of this particular document, which is

14  Bates No. 90892.

15  BY MR. MANDOLFO:

16  Q    Were these the documents that were prepared for

17  Noor Salman and Omar Mateen?

18  A    Yes.

19         MR. MANDOLFO:  And if we could please highlight the

20  upper right-hand side of this particular document.

21  BY MR. MANDOLFO:

22  Q    Where it says "filing status, married filing joint," what

23  does that mean?

24  A    Married filing joint means they're married, and they're

25  accepting the responsibility of the documentation and the tax

1   return.  So if there's a refund, they're both entitled.

2   Q    And in the preparation materials for their taxes, did it

3   specify a specific account where the refund would be deposited

4   into?  And when I say "account," I mean bank account.

5   A    Yes.

6        MR. MANDOLFO:  I'm now gonna please put up Bates

7   No. 90899.  If we could highlight where it says "refund."

8   BY MR. MANDOLFO:

9   Q    What is this?

10  A    That's where -- the routing and account number, and it

11  identifies it as a checking account and that there is a

12  refund.

13  Q    So if there's a refund, this is the account where it

14  would be deposited, correct?

15  A    That is correct.

16       MR. MANDOLFO:  Can we please -- withdrawn.

17  BY MR. MANDOLFO:

18  Q    Did they use this same bank account to accept IRS refund

19  deposits in years 2012, 2013, 2014, and 2015?

20  A    Yes.

21       MR. MANDOLFO:  Now can we go to Bates No. 90894?  If

22  we could highlight the middle portion, please.

23  BY MR. MANDOLFO:

24  Q    What is this?

25  A    This is a print screen, how you can check on the IRS's

1  website the status of what your refund is.  It also identifies

2  that this -- when it has potentially been either mailed out or

3  deposited.

4  Q    And what is the date that the IRS tax refund will be

5  deposited according to this document?

6  A    That's June 15, 2016.

7         MR. MANDOLFO:  Now, if we can please publish

8  Exhibit 201I.  Your Honor, this is already in evidence, and

9  I'm just going to show a portion of it.

10        THE COURT:  All right.  Thank you.

11        MR. MANDOLFO:  It will be Bates No. 63282

12  through 63284.  If we can highlight -- let's start with the

13  names.

14        (The above referred to exhibit was published.)

15  BY MR. MANDOLFO:

16  Q    If you could read just the first two names for me,

17  please.

18  A    That's Omar S. Mateen and Noor Salman.

19        MR. MANDOLFO:  And if we could please show the upper

20  left-hand corner to show which bank account it is.  Upper left

21  where it says PNC Bank.  Thank you.

22        And if we can show the upper right-hand side,

23  please.

24  BY MR. MANDOLFO:

25  Q    What are the last four digits of that primary account

1   number?

2   A    7433.

3         MR. MANDOLFO:  And then if we could please go to

4   Bates No. 63283.

5         If we can highlight the deposit from the IRS on

6   June 15th.

7   BY MR. MANDOLFO:

8   Q    How much was that deposit -- direct deposit into the PNC

9   account for?

10  A    $4,124.72.

11        MR. MANDOLFO:  Thank you.  You can take that down.

12  BY MR. MANDOLFO:

13  Q    As part of preparing Omar Mateen and Noor Salman's taxes,

14  did you assess how much their annual income was?

15  A    Yes.  That is based off their W-2 and any other

16  additional income.

17  Q    And would that be found in their taxes?

18  A    Absolutely.

19        MR. MANDOLFO:  Can we please go to Bates No. 90898,

20  please.  And if we can highlight line 37.

21  BY MR. MANDOLFO:

22  Q    What is this?

23  A    That is the adjusted gross income of 29,995.  That would

24  be the income for that year.

25  Q    And prior to coming here today, did I ask you to look at

1  their income in previous years for when you had prepared taxes

2  for them?

3  A    Yes.

4  Q    And was this particular income consistent with the prior

5  years?

6  A    That is correct.

7         MR. MANDOLFO:  Can we please go to Bates No. 90899?

8  And can we highlight the occupation which is on the bottom of

9  the page, please.

10 BY MR. MANDOLFO:

11 Q    And what is the stated occupation for Omar Mateen?

12 A    That's officer.

13 Q    And what about for Noor Salman?

14 A    Housewife.

15 Q    Did Omar Mateen or Noor Salman provide any other form of

16 income other than Omar Mateen's employment with his company,

17 G4S?

18 A    No.

19 Q    Did they have any stocks or bonds or anything else they

20 would derive any other form of income that you saw?

21 A    No.

22         MR. MANDOLFO:  Can we please go to Bates No. 90909.

23 BY MR. MANDOLFO:

24 Q    What is this?

25 A    That is a W-2.

1     MR. MANDOLFO:  And if we can please highlight the

2  bottom left-hand side, please.

3  BY MR. MANDOLFO:

4  Q    And when you say the W-2, whose W-2 is that?

5  A    That would be Omar's W-2.

6  Q    What was the wages, tips, and other compensation, Box 1?

7  A    29,995.12.

8     MR. MANDOLFO:  Can we please go to Bates No. 90907?

9  BY MR. MANDOLFO:

10  Q    This is called an injured spouse allocation form,

11  correct?

12  A    Correct.

13  Q    And the reason that this was filled out is because --

14     MR. SWIFT:  Objection.  Sidebar.

15     THE COURT:  All right.  Come up, please.

16     (At the bench.)

17     THE COURT:  This is in evidence.  So what's the

18  objection?

19     MR. SWIFT:  He's about to go into to prevent her

20  student loan debt from being collected.

21     MR. MANDOLFO:  I discussed this prior to us going on

22  break.  I said I was going to say that there was an

23  outstanding balance.  I've instructed him not to say the word

24  "default."  That's why I was leading him through this part.

25     MR. SWIFT:  Okay.  Yeah.

1          THE COURT:  Very good.

2          (In open court.)

3          THE COURT:  Please continue.

4          MR. MANDOLFO:  Thank you.

5    BY MR. MANDOLFO:

6    Q    I'll repeat the question.  The injured spouse allocation

7    form was filled out in this instance because of Noor Salman's

8    outstanding student loan balance, correct?  And just yes or

9    no?

10   A    Yes.

11   Q    In preparing Noor Salman and Omar Mateen's taxes, did you

12   ever meet with both of them?

13   A    I have in the past.

14   Q    And are you also family friends with the Mateens?

15   A    I am.

16   Q    When you would meet with Noor Salman -- approximately how

17   many times would you meet with Noor Salman?

18   A    It would just be once a year.

19   Q    And when you would meet with her, did you talk with her?

20   A    I would talk with both, absolutely.

21   Q    And did you explain these financial concepts, such as the

22   injured spouse allocation form?

23   A    Yes.

24   Q    And as part of that, did she seem to have any problems

25   understanding these accounting concepts that you would discuss

1   with her?

2   A    No.

3   Q    In fact, she would have to attest to the accuracy of the

4   documents in order to submit them to the IRS, correct?

5            MR. SWIFT:  Objection, leading.

6            THE COURT:  Sustained.  Please rephrase the

7   question.

8   BY MR. MANDOLFO:

9   Q    In order for someone to submit documents to the IRS, what

10  steps must they do in order to get a tax refund?

11  A    Well, before the tax refund can be electronically filed,

12  there has to be signatures.  Both would have to sign off.

13  Q    As an accountant, would you ever allow documents to be

14  submitted to the IRS if you felt someone did not understand

15  what they were signing?

16  A    No.

17  Q    On June 13th of 2016, did you receive a phone call from

18  Noor Salman?

19  A    I did.

20  Q    Why did she call you?

21  A    Checking on the status of the refund.

22  Q    What did you tell her?

23  A    I told her it normally takes, with the injured spouse,

24  three to four months, and we always encourage them to contact

25  the IRS.  But I have in the past contacted the IRS on their

1  behalf because I prepared the return.

2          MR. MANDOLFO:  No further questions.  Thank you.

3          THE COURT:  Thank you.  Any cross-examination?

4                     CROSS-EXAMINATION

5  BY MR. SWIFT:

6  Q    You did the taxes for the entire Mateen family, didn't

7  you?

8  A    I did, yes.

9  Q    For Omar's father and his mother?

10  A    Yes.

11  Q    And Omar's sister and her husband?

12  A    Yes.

13  Q    And then for Omar and his wife?

14  A    Correct.

15  Q    And Omar was the one who made money?

16  A    Correct.

17  Q    So when we have tax questions, it's his W-2, correct?

18  A    Correct.

19  Q    And it's a pretty simple tax return on his, correct?

20  A    Correct.

21  Q    Yes.  So we would just go through, we fill it out, and

22  not intensive like it's a business or anything like that,

23  correct?

24  A    Correct, yeah.

25  Q    Yeah.  And he would come in with his spouse to sign it,

1  correct?

2  A    Yes, at times.  And I say that because I was a full-time

3  bookkeeper also.  So I would prepare the return, and they

4  could come in if they couldn't be in at the same time to sign.

5  Q    Okay.  So let me understand.  You would prepare it so

6  that they could sign it split apart?

7  A    If -- if they needed to, yes.

8  Q    So he could take it home for her to sign, right?

9  A    Only the one signature page.

10 Q    Okay.  The one signature page he could take home for her

11 to sign?

12 A    Correct.

13 Q    Yes.  And when it's a joint return, both have to sign,

14 right?

15 A    Correct.

16 Q    Okay.  And the primary taxpayer was Omar?

17 A    Correct.

18 Q    So he was the first one to sign, et cetera, and his wife

19 signs as she's his wife?

20 A    Correct.

21         MR. SWIFT:  No further questions.

22         THE COURT:  Thank you.  Any redirect?

23         MR. MANDOLFO:  No, Your Honor.  Thank you.

24         THE COURT:  Thank you.

25         Thank you, sir.  You're excused.

1          Your next witness, please.

2          MR. MANDOLFO:  Yes, Your Honor.  Mohammed Elaraj.

3          THE COURTROOM DEPUTY:  Please come forward to the

4   witness box and remain standing.  Please raise your right

5   hand.

6                     **MOHAMMED ELARAJ**,

7     called by Government, having been first duly sworn, was

8                  examined and testified as follows:

9          THE COURTROOM DEPUTY:  Please have a seat.  Please

10  state your name and spell your last name for the record.

11         THE WITNESS:  Mohammed Elaraj.  Last name is

12  E-l-a-r-a-j.

13         THE COURT:  Thank you, sir.

14         You may proceed when you're ready.

15         MR. MANDOLFO:  Thank you, Your Honor.

16                   <u>DIRECT EXAMINATION</u>

17  <u>BY MR. MANDOLFO</u>:

18  Q    I want to direct your attention to June 7th of 2016.

19  Where were you working?

20  A    Urban Appeal.

21  Q    What is Urban Appeal?

22  A    It's a retail clothing store.

23  Q    Where is it located?

24  A    In Fort Pierce, 2531 South U.S. 1, Fort Pierce.

25  Q    And while you were working at Urban Appeal, did you come

1  into contact with a person by the name of Noor Salman?

2  A    Yes.

3  Q    Can you tell us what happened when you initially met

4  Noor Salman?

5  A    I was trying to help her to see what she -- if she needs

6  anything, if she needs any help.

7  Q    What did she say to you?

8  A    At the beginning, she said no.  Then she was looking in

9  the store.  Then she -- she got close to the cash register

10  where I was and she start watching -- at watches.  She liked a

11  watch, and she stepped a little bit away from me.  She made a

12  phone call.  And then she said, um --

13  Q    Let me stop you there.  Who was she with?

14  A    By herself.

15  Q    And when you were -- what happened after she made the

16  phone call?

17  A    Oh.  She -- she said if I can -- she can see the watch.

18  So I hand her the watch.  She tried it on.  And then she said,

19  Where are you from?  She asked where I was from.  I told her I

20  was born in Panama, but my family is from Palestine.  And

21  she's like, Oh, I'm from there.  And then we kept talking to

22  each other.  She said that is that okay if she used her

23  husband's credit card.

24  Q    Let me stop you there.  Is someone allowed to use someone

25  else's credit card normally?

1    A    No.

2    Q    What did you say in response to her?

3    A    When -- because she's -- for example, I don't know her,

4    but because she's Arabian, I got a little bit intimidated.

5    And I told her normally we can't do that.  And then she said,

6    I don't know what's wrong with him.  Maybe he's happy because

7    of Ramadan started, this and that.  And he told me that it's

8    okay to -- to spend something if I want to do -- if I want to

9    buy something for myself.

10   Q    When you're say "him," are you referring to Noor Salman's

11   husband?

12   A    Yeah.  She was referring to her husband.

13   Q    What happened after that?

14   A    Then I decided to do it.  I just -- I'm like if it's a

15   stolen credit card or something, I will end up paying it.  But

16   I just didn't know what to say.  I was a little bit shy.  And

17   I'm like, go ahead.

18   Q    So you allowed her to use her husband's credit card?

19   A    Yes.

20   Q    And what happened after that?

21   A    After that, because I was -- I didn't know her well or

22   anything, I just stared at the credit card -- I mean, the

23   name, just in case something happened, I would remember the

24   name of the person if they called to say it was a stolen

25   credit card or something.  And a few days later, I saw that

1   name on the news.  I went back on the receipts to check if it

2   was the same person and, yes, it was that person.

3   Q    And that person was Omar Mateen?

4   A    Yes.

5   Q    All right.

6            MR. MANDOLFO:  No further questions.  Thank you.

7            THE COURT:  Thank you.  Any cross-examination?

8            MR. SWIFT:  No questions.

9            THE COURT:  All right.  Thank you, sir.  You may

10  step down.  Thank you very much.

11           THE WITNESS:  Thank you.

12           THE COURT:  Thank you.  Your next witness, please.

13           MR. MANDOLFO:  The United States calls

14  Stephanie Skvarla.

15           THE COURTROOM DEPUTY:  Please come forward to the

16  witness box and remain standing.  Please raise your right

17  hand.

18                    **STEPHANIE SKVARLA**,

19    called by Government, having been first duly sworn, was

20               examined and testified as follows:

21           THE COURTROOM DEPUTY:  Please have a seat.  Please

22  state your name and spell your last name for the record.

23           THE WITNESS:  Stephanie Skvarla, S-k-v-a-r-l-a.

24           THE COURT:  Thank you very much.

25           You may proceed when you're ready.

1   MR. MANDOLFO:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3   BY MR. MANDOLFO:

4   Q    Good afternoon.

5   A    Hello.

6   Q    I'm going to direct your attention to June 10th of 2016.

7   Where were you working?

8   A    Express.

9   Q    And what is Express?

10  A    It's a men's and women's clothing store.

11  Q    What particular Express clothing store did you work at on

12  that day?

13  A    The Jensen Beach location.

14  Q    While you were working, did you come in contact with a

15  person you learned to be Noor Salman?

16  A    I did.

17  Q    Can you tell the jury how you initially met Noor Salman

18  on that date?

19  A    I was working at the store.  I'm the store manager there.

20  And I was assisting customers.  There was a customer that

21  needed my help in the back, and it ended up being -- and we

22  shopped together.  She asked some questions about clothing,

23  picking things out, and I helped her like I would any other

24  customer.

25  Q    Who was she with?

1   A    Her son.

2   Q    Did she have her husband with her?

3   A    No.

4   Q    Did she give you any reasons as to why she was purchasing

5   the clothing?

6   A    She mentioned she was meeting her husband in Miami for a

7   trip, and he was letting her shop for some items for that

8   trip.

9   Q    So she didn't mention anything about Ramadan?

10  A    No.

11  Q    And did she make any purchases?

12  A    Yes.

13  Q    And do you remember what she bought?

14  A    To my recollection, I believe -- I know it was some sale

15  items from the back of our store.  If I recall correctly, it

16  was some jeans and some boots, maybe a couple of other items.

17          MR. MANDOLFO:  Can we publish Exhibit 9D,

18  Your Honor?  It's already in evidence.

19          THE COURT:  You may.

20          MR. MANDOLFO:  It's Bates 0015396.  Can we highlight

21  the Express receipt?  It's the third over.  Thank you.

22  Hopefully we can see it.

23          (The above referred to exhibit was published.)

24  BY MR. MANDOLFO:

25  Q    And does this refer to the purchase that was made at

1  Express?

2  A    Yes.

3  Q    And how do you know that?

4  A    It has our company logo all over it.  It's the same

5  layout that we typically see with our cashier and transaction

6  numbers.

7        MR. MANDOLFO:  I have no further questions for this

8  witness, Your Honor.

9        THE COURT:  Thank you.

10       Any questions by the defense?

11       MR. SWIFT:  No questions, Your Honor.

12       THE COURT:  Thank you, ma'am.  That's all for you.

13 Thank you very much.  You're excused.

14       Your next witness, please.

15       MR. MANDOLFO:  United States calls Yessenia Sanchez.

16       THE COURTROOM DEPUTY:  Ma'am, please come forward to

17 the witness box and remain standing.  Please raise your right

18 hand.

19                    **YESSENIA SANCHEZ**,

20   called by Government, having been first duly sworn, was

21             examined and testified as follows:

22       THE COURTROOM DEPUTY:  Please state your name and

23 spell your last name for the record.

24       THE WITNESS:  Yessenia Sanchez, S-a-n-c-h-e-z.

25       THE COURT:  Thank you, ma'am.  Ma'am, you can adjust

1    that microphone so it's close enough where we can hear you.

2    It moves on the desk.  There you go.  Make yourself

3    comfortable.

4            You may proceed when you're ready.

5            MR. MANDOLFO:  Thank you, Your Honor.

6                    DIRECT EXAMINATION

7    BY MR. MANDOLFO:

8    Q    Good afternoon.

9    A    Hi.

10   Q    I'm going to direct your attention to June 6th of 2016.

11   Where were you working?

12   A    At Piercing Pagoda.  But that day I was working at the

13   store called Silver and Gold Connections.  It's the same

14   company.

15   Q    What did you do at Silver and Gold Connections?

16   A    I sold jewelry.  I pierced ears.  That's pretty much the

17   job description.

18   Q    And when you were working that day, did you come in

19   contact with a person by the name of Noor Salman?

20   A    Yes.

21   Q    How did you initially meet Noor Salman?

22   A    She approached the kiosk with her family to buy jewelry

23   from me.

24   Q    When you say she went to buy jewelry, how did you know

25   she wanted to buy jewelry?

1  A    Because she was -- she told me, like, she wanted pieces

2  just to look at, and she asked me to show her a few pieces.

3  Q    And how many pieces did you show her?

4  A    Between, like, three or four pieces, I believe.

5  Q    And did she pick out any pieces to purchase?

6  A    Yes.

7  Q    And do you remember what they were?

8  A    I believe one of them was a gold necklace.  Another one

9  was a charm.  And I'm not sure on the third item.

10        MR. MANDOLFO:  Your Honor, may I publish

11 Exhibit 227, which is already in evidence?

12        THE COURT:  Yes.  Go right ahead.

13        MR. MANDOLFO:  It's Bates No. 88862, please.

14        (The above referred to exhibit was published.)

15        MR. MANDOLFO:  If we can highlighted just the left

16 side.

17 BY MR. MANDOLFO:

18 Q    Is this the company where you worked at that time?

19 A    Yes.

20 Q    And if you could please -- if you see the name underneath

21 the store number --

22 A    Mm-hm.

23 Q    -- what is that?

24 A    Omar Mateen.

25 Q    And did Noor Salman have her husband with her on that

1   date?

2   A    Yes.

3   Q    What was he doing while Noor Salman was picking out

4   jewelry?

5   A    He was standing away from the kiosk on the phone the

6   whole time.

7          MR. MANDOLFO:  No further questions.  Thank you,

8   Your Honor.

9          THE COURT:  Thank you.

10          Any cross-examination?

11          MR. SCHELLER:  Very briefly.

12                   <u>CROSS-EXAMINATION</u>

13  <u>BY MR. SCHELLER</u>:

14  Q    Good afternoon.

15  A    Good afternoon.

16  Q    Just a few questions.  But I'm a lawyer, so that means

17  like 50.

18          On that day, how long did the -- how long did your

19  encounter with Noor Salman last?

20  A    No more than an hour.  Probably more than 20 minutes.

21  Q    Twenty minutes.  And you're in a kiosk?

22  A    Mm-hm.

23  Q    So like in the middle of the mall between the stores?

24  A    Yes.

25  Q    Okay.  And so she actually -- when you say 20 -- so it's

1    20 minutes to an hour?

2    A    Yes.

3    Q    So she actually spent some time going over the different

4    jewelry, right?

5    A    Yes.

6    Q    Okay.  And she would probably pick up a piece and put it

7    down and look at another piece, right?

8    A    Yes.

9    Q    Okay.  And did she seem -- she seemed excited about the

10   purchase?

11   A    She --

12   Q    She was involved, right?

13   A    She was involved, yes.

14   Q    Okay.  And then Omar Mateen was on the phone to the side?

15   A    Yes.

16   Q    Okay.  And then at some point, he came over and he picked

17   out a gold charm, right?

18   A    I don't remember exactly if he's the one that picked it

19   out.  I just know that they picked out a charm.

20   Q    Do you remember being interviewed by law enforcement on

21   6/17/16?

22   A    Yes.

23   Q    Okay.  So June 17th -- I'm sorry.  June 17, 2016.  And

24   that you informed the officers --

25            MR. MANDOLFO:  I'm going to object.  That's not the

1   proper way to read from the report.  He needs to show it to

2   her and see if it refreshes her recollection.

3          MR. SCHELLER:  I haven't asked -- I haven't even

4   gotten to that point.

5          THE COURT:  Let's just ask if the witness discussed

6   this issue, and then you can go through the normal steps.

7          MR. SCHELLER:  I was going to.

8          THE COURT:  I understand.

9   BY MR. SCHELLER:

10  Q    So do you recall telling the officers that at some point,

11  Omar Mateen walked over to pay for the jewelry?

12  A    Yes.

13  Q    Okay.  And do you recall that you told the officers that

14  he also picked out a gold charm at that time that was

15  purchased?

16  A    I could have.  I honestly don't remember.  It's been a

17  while.

18  Q    Okay.  If I showed you a copy of the report of your

19  interview, would that help you recall?

20  A    Yes, I guess.

21         MR. SCHELLER:  May I approach?

22         THE COURT:  Yes, you may.

23  BY MR. SCHELLER:

24  Q    I'm showing you -- read that, read it to yourself, the

25  bottom line.  You got it?

1 A    Mm-hm.

2 Q    Did reading this help refresh your memory?

3 A    A little bit.  He might have had an influence on which

4 one he might have chosen as far as the gold charm came.

5 Q    That's good.  So he may not -- he may have come over at

6 some point and talked about what gold charm she should select?

7 A    Possibly, yes.

8          MR. SCHELLER:  No further questions.  Thank you.

9          THE COURT:  Thank you.

10         Any additional questions for the witness?

11         MR. MANDOLFO:  No, Your Honor.  We would just ask

12 that whatever was shown to the witness, it be marked for

13 identification purposes for appellate reasons.

14         THE COURT:  Certainly.  That's the 302, the F.B.I.

15 report of interview, I'm assuming?

16         MR. SCHELLER:  Yes.  Yes.  I'll mark it.  What

17 exhibit number are we on?

18         THE COURT:  45 I believe is next.

19         MR. SCHELLER:  I'll just mark it for identification

20 as 45, Your Honor.

21         THE COURT:  Fair enough.  Thank you.

22         Thank you, ma'am.  That's all the questions we have

23 for you.  You're excused.

24         Next witness, please.

25         MR. MANDOLFO:  United States calls Jason Duran.

1    THE COURTROOM DEPUTY:  Please come forward to the

2  witness box and remain standing.  Please raise your right

3  hand.

4                      **JASON DURAN**,

5    called by Government, having been first duly sworn, was

6              examined and testified as follows:

7         THE COURTROOM DEPUTY:  Please state your name and

8  spell your last name for the record.

9         THE WITNESS:  Jason Duran, D-u-r-a-n.

10        THE COURT:  Thank you very much.

11        You may proceed when you're ready.

12                 <u>DIRECT EXAMINATION</u>

13 <u>BY MS. SWEENEY</u>:

14 Q    Good afternoon.

15 A    Good afternoon, sir.

16 Q    Where do you work?

17 A    I'm an F.B.I. task force officer.

18 Q    And what is -- do you work for another agency as well?

19 A    Yes, sir.  I work for the Florida Highway Patrol.

20 Q    What do you do on the F.B.I. task force?

21 A    On the F.B.I. task force, I investigate domestic

22 terrorism.

23 Q    With regard to the Florida Highway Patrol, what type of

24 duties do you have?

25 A    For the Florida Highway Patrol, I'm assigned to criminal

1    investigations.  So I do driver's license fraud, odometer

2    fraud, and any fraud committed against the state of Florida.

3    Q    I'm just going to ask you to pull the mic up a little bit

4    and speak a little bit slower just so she can take the --

5    record it all.  Okay?

6    A    Yes, sir.

7    Q    As part of this investigation, were you asked to review

8    certain driver's licenses records?

9    A    I was, sir.

10           MR. MANDOLFO:  May I approach the witness,

11   Your Honor?

12           THE COURT:  Yes, you may.

13           THE WITNESS:  Thank you.

14   BY MR. MANDOLFO:

15   Q    If you could take a moment, look at those, and tell me

16   what they are after you've reviewed them.

17           THE COURT:  What exhibits are these, Mr. Mandolfo?

18           MR. MANDOLFO:  10A.

19           THE COURT:  10A.  Thank you.

20           MR. MANDOLFO:  We've admitted 10, which is a subset.

21   This is the full set, 10A.

22           THE COURT:  Thank you.

23   BY MR. MANDOLFO:

24   Q    Have you reviewed them?

25   A    Yes.

1  Q    What are they?

2  A    There is a certified driver's license record for the

3  state of Florida.

4  Q    For which person?

5  A    This is gonna be for Noor Salman.

6           MR. MANDOLFO:  Your Honor, the United States would

7  offer into evidence Exhibit 10A.

8           THE COURT:  Any objection to 10A?

9           MR. SWIFT:  I would like to sidebar, because I would

10 like a proffer to relevance.

11          THE COURT:  All right.  Thank you.

12          (At the bench.)

13          THE COURT:  All right.

14          MR. MANDOLFO:  So the part of her statements that

15 she had just gotten her driver's license, these are driver's

16 license records.  He's gonna explain that she had a learner's

17 permit prior to this date and she got her driver's license on

18 June 8th.  When you look at the license, it says replaced.  So

19 it's vague.  So we need to have a witness explain that it

20 wasn't that the driver's license was replaced.  It's that she

21 got a new driver's license.

22          Up to this point on June 8th, she could never drive

23 alone.  She had a learner's permit.  This witness will provide

24 the context for the jury to understand it.

25          MR. SWIFT:  I never understood this part.  So I

1    objected because I never understood what was going on from the

2    records.  I have no problem.

3           MR. MANDOLFO:  I'll tell you why, if I can.

4           THE COURT:  Let me just ask this.  For the learner's

5    permit, aren't there stages, like, within a certain period of

6    time you must be within daylight hours, then it graduates to

7    where you can drive alone until you get your full license, or

8    am I mistaken about that?

9           MR. MANDOLFO:  That's not what this witness has told

10   me.  You have to take -- what's important is that on opening,

11   the defense opening said that she renewed her driver's

12   license.  That's factual incorrect.  What she did is she got a

13   driver's license for the first time on June 8th.  She had a

14   learner's permit prior to that date.  So it needs to be put

15   into context that she couldn't have -- she needed a driver's

16   license to drive alone after Omar Mateen was going to die.

17          MR. SWIFT:  Well, I would not agree with that.

18          MR. MANDOLFO:  I'm not gonna ask him that, but that

19   is the --

20          MR. SWIFT:  She also needed one to take her son to

21   school.

22          MR. MANDOLFO:  Another argument --

23          THE COURT:  Don't talk to each other.

24          MR. MANDOLFO:  I'm sorry.

25          THE COURT:  The other thing, though -- and I don't

1   know if this witness can speak to it, but I'm just

2   recalling -- and probably incorrectly -- from my own children

3   that when you get a learner's permit, there is a stage where

4   you can drive alone.  It's how long you have it.  But at some

5   point in time, you can drive yourself around with a learner's.

6   Maybe I'm wrong.

7           MR. MANDOLFO:  Maybe that's a fair line of

8   cross-examination.  But the point is that she did get her

9   driver's license on June 8th.

10          THE COURT:  Understood.

11          MR. MANDOLFO:  Thank you.

12          THE COURT:  Thank you.

13          (In open court.)

14          THE COURT:  Thank you.  Please proceed.

15          MR. MANDOLFO:  Thank you.

16          THE COURT:  I think you're offering 10A at this

17  point in time.

18          MR. MANDOLFO:  Yes.  We're offering 10A into

19  evidence.

20          THE COURT:  Any objection to 10A?

21          MR. SWIFT:  No objection.

22          THE COURT:  10A is admitted.

23          (Government's Exhibit No. 10A was admitted into

24  evidence.)

25          MR. MANDOLFO:  May we publish 10A, Your Honor?

1          THE COURT:  Yes, you may.

2          MR. MANDOLFO:  May we publish Bates No. 186294?

3          (The above referred to exhibit was published.)

4   BY MR. MANDOLFO:

5   Q    What is this?

6   A    That is a Florida identification card.

7   Q    Can you tell the jury what a Florida identification card

8   is?

9   A    A Florida identification card is simply a form of

10  identifying through the state of Florida of who -- what your

11  identity is and who you are.

12  Q    Does an identification card give you the legal right to

13  drive a car?

14  A    It does not.

15  Q    When was this ID card issued?

16  A    This ID card was issued on 2/23 of 2012.

17  Q    And who is it for?

18  A    Noor Salman.

19  Q    When you're saying Noor, it's N-o-o-r, correct?

20  A    That's correct.

21         MR. MANDOLFO:  Can we please publish Bates

22  No. 186340?  Thank you.

23  BY MR. MANDOLFO:

24  Q    What is this?

25  A    I'm going to reference the page number, because this here

1    is just a DAVID printout, and this is just showing me a

2    Class E, but it's not defining whether it's a Class E

3    learner's or if it's a Class E driver's license.

4    Q    Was there another document in there that would provide

5    you information as to when she received a learner's permit?

6    A    Yes, there would be, sir.  I would have to go through the

7    packet and locate it.

8          Sir, if I can guide you to a page number --

9    Q    Yes.

10   A    -- of 186308.

11         MR. MANDOLFO:  May we publish that, please?

12   BY MR. MANDOLFO:

13   Q    What is this?

14   A    This here is gonna be a synopsis or a screenshot of her

15   total driver's license record history, as well an

16   identification card history.

17   Q    And when did Ms. Salman receive a learner's permit to

18   drive?

19   A    The learner's permit was issued on 2/23 of 2012.

20   Q    What does a learner's permit allow a driver to do?

21   A    Under the state of Florida, a learner's permit, you're

22   required to drive with a licensed 21-year-old driver to the

23   closest seat possible to the driver.  And depending on your

24   age frame, it's certain hours.  So if you're 16 through 17 --

25   16 years of age to 17 years of age, you can drive up to

1    10:00 at night with a licensed drive; 17, 18, moves it back to

2    11:00.  And the older you are, the later you can drive.  But

3    you're required to have a licensed 21-year-old driver to the

4    right-hand side at all times.

5    Q    So if you have a learner's permit, you cannot drive

6    unless there is someone with a driver's license there with

7    you, correct?

8    A    That is correct.

9    Q    Did there come a time when Noor Salman went to get a

10   driver's license where she could -- called a Class E driver's

11   license?

12   A    That is correct.

13        MR. MANDOLFO:  And I'm now going to publish, please,

14   186288.

15   BY MR. MANDOLFO:

16   Q    What is this?

17   A    This is a score sheet for a road test.

18   Q    And did the defendant pass the road test on June 7th of

19   2016?

20   A    She did not.

21   Q    Now, a road test, is that just that driving test?

22   A    No.  That's a practical application where you're actually

23   behind the vehicle, and there's a state examiner to the right

24   of you grading you on your performance of the actual driving

25   test.

1   Q    Did she go back the next day, on June 8th of 2016, to

2   take the road test again?

3   A    That is correct, sir.

4           MR. MANDOLFO:  Can we publish 186284?

5   BY MR. MANDOLFO:

6   Q    What is this?

7   A    This is the driving record reflecting six -- June 8,

8   2016, and that is with a successful pass.

9   Q    And after this, did she receive a driver's license that

10  would allow her to drive alone?

11  A    That's correct.

12          MR. MANDOLFO:  And can we publish 186276?

13  BY MR. MANDOLFO:

14  Q    And what is this?

15  A    This is gonna reflect her DAVID photo showing that she

16  has a Class E driver's license.

17  Q    So prior to June 8th of 2016, she could not have driven

18  alone, correct?

19  A    That is correct.

20  Q    Why does it say "replaced" on the DAVID driver's license

21  there on June 8th of 2016?

22  A    The reason it says replaced, sir, is when you're issued a

23  Class E learner's permit or learner's license, it is a

24  license.  So when you get issued a Class E driver's license,

25  the actual driver's license within itself changes.  So for law

1 enforcement purposes, a Class E learner's license is yellow on

2 the top, and a Class E driver's license is green on the top,

3 so that a law enforcement official can identify it quickly by

4 just looking at the driver's license itself.

5 Q   And to be clear, what the defendant got on June 8th of

6 2016 as far as her license, that was not a renewal, correct?

7 A   Correct.  That was a new issuance of a driver's license.

8 Q   And after this point, she could drive alone?

9 A   That is correct.

10        MR. MANDOLFO:  Now, can we pull up Exhibit 6, which

11 is Bates No. 186378?

12        (The above referred to exhibit was published.)

13 BY MR. MANDOLFO:

14 Q   What is this?

15 A   This is a Class E driver's license.

16 Q   For who?

17 A   For Noor Salman.

18 Q   Why does it say it's issued on 2/23 of 2012?

19 A   The reason it states that is because that was when the

20 Class E learner's license was issued.

21 Q   And why does it state that it was replaced on June 8th of

22 2016?

23 A   That was when she was issued a Class E driver's license.

24        MR. MANDOLFO:  And I neglected to ask one question.

25 I apologize, Ms. Valente, but can we please pull up -- may I

1  have one moment, please -- 186308.

2  BY MR. MANDOLFO:

3  Q    In looking at the documents, when was the expiration date

4  for the defendant's learner's permit?

5  A    I can't touch the screen, correct?  Just I can track?

6          THE COURT:  You can touch the screen.

7          THE WITNESS:  Okay.

8          THE COURT:  Yes, you can touch it.  Sorry.  I didn't

9  know you were speaking to me.

10          THE WITNESS:  Sorry, Your Honor.

11          THE COURTROOM DEPUTY:  You've just got to push a

12  little bit.

13          THE COURT:  There you go.

14          THE WITNESS:  May I pull up the actual learner's

15  permit itself --

16  BY MR. MANDOLFO:

17  Q    Yes.

18  A    -- in the packet?  And then I can get the page number.

19  Q    Yes.

20          MR. MANDOLFO:  This is the final question,

21  Your Honor.

22          Your Honor, I'm going to withdraw the question.

23  Thank you.

24          THE COURT:  Well, if you look at your Exhibit 10, on

25  the first page, I think it shows the learner's permit with its

1  expiration date.  Expiring -- the reason I want you to follow

2  up is you've already highlighted and circled the expiration

3  date on this form, and I don't believe that's accurate.  So

4  let's go back to the actual record that the officer is looking

5  for.

6          It might be quicker if we just pull up Exhibit 10,

7  first page.  The officer can tell us if that's the learner's

8  permit.

9          Is that it?

10         THE WITNESS:  This would not be a replacement.  This

11  is the actual driver's license, Your Honor.

12         THE COURT:  I see.  Thank you very much.

13         MR. MANDOLFO:  If we look at 186308, in the middle

14  of the page where it says "expiration date."

15         THE WITNESS:  That date there is going to be

16  reflecting of the Class E driver's license, not the learner's

17  permit.

18         MR. MANDOLFO:  Okay.  I have no further questions,

19  Your Honor, about this.

20         THE COURT:  All right.  Thank you very much.

21         Any cross-examination?

22                     <u>CROSS-EXAMINATION</u>

23  <u>BY MR. SWIFT</u>:

24  Q    Just so I understand your testimony, we don't know when

25  her driver's license -- when her learner's permit was going to

1  expire, do we?  Right?

2  A    That is correct.  Well, we have it on the file, but I

3  would have to find it, sir.

4  Q    Okay.  Number two on it is, Ms. Salman, prior to getting

5  her Class E driver's license, had to drive with a person who

6  was 21 and an adult, had a valid driver's license that had to

7  be in the car with her, right?

8  A    Yes, sir.

9  Q    So it's very natural for these people -- people who are

10 trying to acquire the skills to practice, right?

11 A    Yes, sir.

12 Q    In fact, that's why you have a permit, to practice?

13 A    Correct.

14 Q    Okay.  So if she were seen driving to Walmart with her

15 husband, she could easily be practicing, right?

16 A    Correct.

17 Q    Okay.  Now, she wouldn't be able to drive her son to

18 school, for instance, in -- if she had a learner's permit

19 without someone else present in the car; is that correct?

20 A    That is correct.

21 Q    So to transport children, to do anything, she needs a

22 valid driver's license, right?

23 A    That is correct.

24 Q    Okay.  Were you aware that Ms. Salman had registered her

25 son for school?

1  A    No, sir.

2          MR. SWIFT:  I don't have any further questions.

3  Thanks.

4          THE COURT:  Any redirect?

5          MR. MANDOLFO:  No, Your Honor.  Thank you.

6          THE COURT:  Thank you.

7          Thank you, sir.  You may step down.

8          Does the Government have a short witness, or would

9  this be a proper time for the afternoon break?

10         MS. SWEENEY:  This would be a proper time for the

11 afternoon break.

12         THE COURT:  All right.  Thank you, ma'am.

13         We'll take a 15-minute break.

14         COURTROOM SECURITY OFFICER:  All rise for the jury.

15     (The jury retired from the courtroom at 2:53 p.m.)

16         THE COURT:  All right, folks.  The jury has

17 withdrawn.  We'll be in recess 15 minutes.

18          (Recess at 2:53 p.m., until 3:16 p.m.)

19         THE COURT:  If you would bring in the jury, please.

20         COURTROOM SECURITY OFFICER:  All rise for the jury,

21 please.

22         (The jury entered the courtroom at 3:16 p.m.)

23         COURTROOM SECURITY OFFICER:  Please be seated.

24         THE COURT:  Thank you.  The record should reflect

25 the jury has returned.  The parties are present.

1           And your next witness, please.

2           MS. SWEENEY:  We call Stephen Boyce, Your Honor.

3           THE COURTROOM DEPUTY:  Please come forward to the

4    witness box and remain standing.  Please raise your right

5    hand.

6                         **STEPHEN BOYCE**,

7      called by Government, having been first duly sworn, was

8                examined and testified as follows:

9           THE COURTROOM DEPUTY:  Please have a seat.  Please

10   state your name and spell your last name for the record.

11          THE WITNESS:  Stephen Boyce, B-o-y-c-e.

12          THE COURT:  Thank you, sir.

13          You may proceed when you're ready.

14          MS. SWEENEY:  Thank you, Your Honor.

15          Your Honor, may I just have leave to approach this

16   witness at will?

17          THE COURT:  Yes.

18          MS. SWEENEY:  Thank you.

19                    <u>DIRECT EXAMINATION</u>

20   BY MS. SWEENEY:

21   Q    Mr. Boyce, who do you work for?

22   A    I work for the F.B.I.

23   Q    How long have you worked for the F.B.I.?

24   A    I've worked for the F.B.I. since 2015.

25   Q    What's your current position?

1  A    I'm an IT specialist, information technology specialist,

2  in the counterterrorism division.

3  Q    Where physically do you work?

4  A    Washington, D.C.

5  Q    Is that the same position that you were in in June of

6  2016?

7  A    No.

8  Q    What were you doing then?

9  A    I was an information technology specialist forensic

10 examiner.

11 Q    And where was that?

12 A    In Miami, Florida.

13 Q    And so is that part of the CART program?

14 A    Yes, that is the CART, the computer analyst response

15 team.

16 Q    And in the position that you were in June of 2016, what

17 were your duties?

18 A    My duties were to acquire data, whether that be in the

19 lab or on scene, and present it to investigators or analysts

20 for their review.

21 Q    When you say data, data from where?

22 A    Mobile devices, computers, anything electronic.

23 Q    Mr. Boyce, what is your educational background?

24 A    I have a bachelor's of science in information technology

25 and master's of science in cyber security.

1  Q    What kind of training have you received from the F.B.I.

2  and from elsewhere about digital forensic analysis?

3  A    So I'm an industry certified, GX certified forensic

4  examiner as well as countless of F.B.I. courses and industry

5  courses and certifications.

6  Q    So did you participate in the investigation of the Pulse

7  nightclub shooting?

8  A    Yes.

9  Q    How did you participate?

10 A    I examined several mobile devices and tablets.

11 Q    I'm gonna approach and show you Government's Exhibit 306

12 that's already in evidence.

13        All right, sir.  Do you recognize Government's

14 Exhibit 306?

15 A    Yes.

16 Q    What is that?

17 A    That is a cellular device.

18 Q    And did you examine that device?

19 A    Yes, I did.

20 Q    Okay.  So in looking at that phone, did you generate a

21 report of what was on that phone?

22 A    Yes.  Upon acquiring the data, I generated an examination

23 report.

24 Q    And how long was that report?

25 A    I believe somewhere around, like, 2,000 pages or more.

1   Q    Now, and as part of the report that you generated, was

2   there something that was called a timeline?

3   A    Yes.  As a part of the overall report, a section was the

4   timeline.

5   Q    And what is a timeline in this context?

6   A    So a timeline, what it does is take all the dates and

7   times in the device and put it in chronological order so that

8   you can understand day by day, time by time what is going on

9   on the specific device.

10  Q    All right.  So I'm sorry.  I'm going to be picky.  Can

11  you be like halfway between where you were and where you are

12  now?

13  A    Yes.

14  Q    I'm sorry.  Thank you.

15           Okay.  So in your -- did you review the timeline of

16  this phone with respect to dates and times that the phone was

17  used?

18  A    Yes, I did.

19  Q    And as a general matter, what was the range of dates over

20  which this phone was used?

21  A    Approximately April of 2016 to June of 2016.

22  Q    And in reviewing the timeline on those dates, did you

23  note usage between midnight and 4:30 a.m.?

24  A    Yes.

25  Q    And approximately how many days of usage and did you note

1  between midnight and 4:30 a.m. on the phone?

2  A    Approximately 20 different dates.

3  Q    Okay, sir.  So I've handed you what's been marked as

4  Government's Exhibit 306C.

5        Is that something that you reviewed prior to coming

6  to court today?

7  A    Yes.

8  Q    And what is it?

9  A    That is a -- selected phone calls from the device.

10 Q    Okay.

11       MS. SWEENEY:  Your Honor, I move Government's

12 Exhibit 306C into evidence.

13       THE COURT:  Any objection?

14       MR. SWIFT:  No objection, Your Honor.

15       THE COURT:  306C is admitted.

16       (Government's Exhibit No. 306C was admitted into

17 evidence.)

18       MS. SWEENEY:  Can we start with page 00187947?

19       (The above referred to exhibit was published.)

20       MS. SWEENEY:  All right.  So it's gonna be on the

21 screen, and you have a paper copy, too.  Whatever is easier

22 for you to refer to is fine.

23       So let's start about midway down the page.  Well,

24 actually -- I'm sorry.  Let's actually start at the top at

25 first.  Let's start with the first three columns.  Thank you.

1  BY MS. SWEENEY:

2  Q    In looking at this, is some of this data that you

3  obtained from your analysis of the cell phone?

4  A    Yes.

5  Q    Okay.  So what is the first column?

6  A    The first column is the device.

7  Q    What is this device identified as?

8  A    Salman's new cellular phone.

9  Q    Okay.  So then in the sender and recipient columns,

10 what's the type of data that appears in those columns?

11 A    So those are phone numbers and, in some of them, the

12 name, the display name which has been put into the context --

13 or the contacts on the specific device.

14 Q    So, for instance, in the first row where it says

15 "recipients" and there's a phone number and then the word

16 "Omar" appears, that is how the user of the phone saved that

17 contact?

18 A    Correct.

19      MS. SWEENEY:  Can we look at the next five columns?

20 Thank you.

21 BY MS. SWEENEY:

22 Q    All right.  And then, sir, as to the date and time, did

23 that also come from your analysis?

24 A    Yes.

25 Q    And then as to Status, what is that column?

1  A    That is whether it was outgoing from the device or coming

2  into the twice.

3  Q    All right.  And then the next column, Deleted, what does

4  that indicate?

5  A    That means if the system or the user deleted that

6  specific attribute, if you will.

7  Q    And as to the ones that we're looking at right now, were

8  those deleted?

9  A    No.

10  Q    And then finally, what's in the Duration column?

11  A    So duration would be for phone calls, and it's how long

12  it lasted, whether it's a phone call or a video call.

13          MS. SWEENEY:  Can we now look at the couple of calls

14  in the middle of the page?  Let's do the columns Sender,

15  Recipients, Date, and Time.  That's good.  Thank you.

16  BY MS. SWEENEY:

17  Q    All right, sir.  I would like to focus your attention on

18  the call that is the second one from the top.  Do you see that

19  call?

20  A    Yes.

21  Q    All right.  So in the Sender column, is that the phone

22  number of the phone that you reviewed?

23  A    Yes.

24  Q    All right.  So -- and that -- just to be clear, is that

25  number (772) 812-5527?

1  A    Correct.

2  Q    And then who was -- who received that call?

3  A    A number of (772) 812-5560 with a display name of Omar.

4  Q    So sorry.  I'm sorry.  I actually mean the row just

5  underneath that one.  So the third row from the top of the

6  selected portion, who was the recipient of that call?

7  A    Mom-in-law, phone number (772) 418-7417.

8  Q    All right.  And what date was this call received?

9  A    June 11th, 2016.

10 Q    And what time?

11 A    At 5:51 p.m.

12        MS. SWEENEY:  All right.  And then can we look at

13 the same area of the page for the last three columns?

14 Perfect.

15 BY MS. SWEENEY:

16 Q    And so continuing, you can see the 5:51 we were just

17 looking at.  Was this an outgoing or an incoming call?

18 A    Yes.  This was an outgoing call.

19 Q    All right.  And then was this call deleted from the

20 phone?

21 A    Yes.

22 Q    Did this call have a duration associated with it?

23 A    Yes.  Two minutes -- or actually, that's actually two

24 seconds.

25 Q    So in looking at it, is 2 in the minutes or the seconds

1  column?

2  A    That is in the -- I believe that's the minutes.

3  Q    So the first set of zeros would be if the call was

4  extended for more than an hour?

5  A    Correct.

6  Q    Okay.  And then the second set of digits is minutes?

7  A    Correct.

8  Q    Okay.  And then the last one is seconds?

9  A    Correct.

10  Q    Okay.

11        MS. SWEENEY:  All right.  So let's go back to the

12  section we were just looking at, the columns Sender,

13  Recipients, Date, and Time, in the same area of the page.  A

14  little higher.  There you go.  Perfect.  That's perfect.  I'm

15  sorry, Ms. Valente.  Can you get the time, too?  I'm sorry.

16  BY MS. SWEENEY:

17  Q    Okay, sir.  We were discussing the call that was at

18  5:51 p.m., correct?

19  A    Correct.

20  Q    So just above that call, so later in time, are there two

21  calls, both at 5:54 and different seconds, to Omar?

22  A    Yes.

23        MS. SWEENEY:  Can we now go to the four columns at

24  the end of the page, including the time?

25  BY MS. SWEENEY:

1  Q   All right.  In looking at those two calls at 5:54, are

2  those outgoing or incoming calls?

3  A   Those are outgoing.

4  Q   And are they deleted?

5  A   Yes, they are.

6  Q   And how long do those calls last?

7  A   Three seconds.

8         MS. SWEENEY:  All right.  I'm sorry.  So going back

9  out and going just a little bit higher on the page, we're

10 going to do the three columns Sender, Recipients, Date, and

11 Time.  Perfect.

12 BY MS. SWEENEY:

13 Q   Okay.  So, again, at -- so now we're -- we've got the

14 5:51, the two calls at 5:54.  We're gonna look at the one

15 right above that at 6:14 p.m.  Who was the sender on that

16 call?

17 A   Mom-in-law.

18 Q   All right.  And then so that was calling Ms. Salman's

19 phone, correct?

20 A   Correct.

21 Q   All right.  And that happened at 6:15 p.m.; is that

22 correct?

23 A   Correct.

24 Q   I'm sorry.

25 A   6:14:05 p.m.

1  Q    Thank you.  And above that, is there then a call from

2  Ms. Salman to her mother-in-law?

3  A    Correct.

4  Q    All right.  And then finally, let's just continue.  Up

5  above that, are there two calls at 2:40 and 2:41 a.m. from

6  Ms. Salman to Omar on the same -- I'm sorry -- on the next

7  day, on 6/12?

8  A    Correct.

9  Q    All right.  And then above that, is there an incoming

10  call from Ms. Salman's mother-in-law?

11  A    Yes.

12        MS. SWEENEY:  Okay.  So let's look at the last four

13  rows again for that section of the page.  Perfect.

14  BY MS. SWEENEY:

15  Q    So at 6:14:05 when Ms. Salman's mother-in-law called her,

16  was that call answered or missed?

17  A    It was missed.

18  Q    So then at 6:14 and 59 seconds, did Ms. Salman return the

19  call?

20  A    Yes.

21  Q    And how long did that phone call last?

22  A    A minute and 59 seconds.

23  Q    Okay.  And then at 2:40 a.m. when Ms. Salman called her

24  husband, what were the durations of those calls?

25  A    Four seconds and three seconds.

1   Q    And then at 4:23 a.m., there was an incoming call from

2   Ms. Salman's mother-in-law.  And how long did that call last?

3   A    Three minutes and four seconds.

4   Q    All right.  I would like to then just ask you to take a

5   step back and not look at anything specific on this page, but

6   in looking at the document in front of you, how many pages

7   does it comprise?

8   A    Eight pages.

9   Q    Okay.  And what is the earliest date that you see on the

10  chart?

11  A    April 19th, 2016.

12  Q    Does that appear on the eighth page of the document?

13  A    Yes.

14  Q    Is that consistent with the dates that you saw on the

15  timeline that you reviewed as the primary use of the phone?

16  A    Yes.

17  Q    And then what is the latest in time date that appears on

18  the chart?

19  A    The latest date is June 12th, 2016, and the time is

20  4:34 a.m.

21       MS. SWEENEY:  Okay.  I would like to go to

22  page 00187951.

23  BY MS. SWEENEY:

24  Q    And, sir, on this page, what are the range of dates that

25  appear on this particular page?

1 A    May 25th, 2016, to June 1st, 2016.

2          MS. SWEENEY:  Ms. Valente, can we focus on the

3 Sender and Recipient columns starting at the bottom first?

4 BY MS. SWEENEY:

5 Q    So, Mr. Boyce, what I would like you to do is, all of

6 the -- who are all of the people that you see as entered --

7 having been entered on Ms. Salman's phone on this part of this

8 page?

9 A    Starting from left to right, Sabrina, Mom-in-law, Omar,

10 Sabrina Jaan.

11 Q    So do they then repeat after that?

12 A    Yes.

13 Q    Okay.  So you've said the three that appear various

14 times?

15 A    Correct.

16          MS. SWEENEY:  Okay.  And let's look at the top half

17 of the page.

18 BY MS. SWEENEY:

19 Q    Okay.  In looking at that, what names do you see in the

20 Sender or Recipient columns on this part of the page?

21 A    Ekbal Salman, Omar, Sabrina.

22 Q    And then they repeat, correct?

23 A    Correct.

24          MS. SWEENEY:  Thank you, Ms. Valente.

25 BY MS. SWEENEY:

1  Q   Agent, I've handed you what's been marked as Government's

2  Exhibit 306A; do you recognize that?

3  A   Yes.

4  Q   Is that a portion of the analysis that you did of

5  Ms. Salman's cell phone?

6  A   Yes.

7        MS. SWEENEY:  Your Honor, I move Government's

8  Exhibit 306A into evidence.

9        THE COURT:  Any objection to 306A?

10        MR. SWIFT:  No objection.

11        THE COURT:  It's admitted.

12        (Government's Exhibit No. 306A was admitted into

13  evidence.)

14        MS. SWEENEY:  So in this one, let's start on the

15  last page, which is 00187945.

16        (The above referred to exhibit was published.)

17  BY MS. SWEENEY:

18  Q   Agent, how many pages total is this chart?

19  A   Eighteen pages.

20  Q   All right.  And what's the earliest date that appears on

21  the 18th page that we're looking at now?

22  A   April 15th, 2016.

23  Q   Okay.  And so, again, is that consistent with your review

24  of the phone?

25  A   Yes.

1    MS. SWEENEY:  So let's start at the top of the page.

2   Let's do the first three columns.  Perfect.

3   BY MS. SWEENEY:

4   Q    So in looking at this, is the first column the same

5   column -- same first column that we saw on the last chart that

6   we looked at?

7   A    Yes.

8   Q    All right.  And in the Sender column, what appears there?

9   A    Web history.

10  Q    Okay.  And so if that's in that column, does that

11  indicate that it's web history that you recovered from the

12  phone?

13  A    Correct.

14  Q    Okay.  And as to recipients, what would appear there?

15  A    There is no recipients, as it's not a communication or

16  text message.

17  Q    So if it were a phone call or a text message, who would

18  be listed in the Recipients column?

19  A    The destination or who it's going to.

20       MS. SWEENEY:  Can we look an at the next three

21  columns?

22  BY MS. SWEENEY:

23  Q    All right.  In looking at this, is date and time the same

24  as what we looked at in the other chart that we already

25  reviewed?

1    A    Yes.

2    Q    And what appears in the body section?

3    A    The content or what is known as the web heading.

4    Q    And what is the web heading that we see here?

5    A    Driver's license and motor vehicle services of Vero

6    Beach, Florida, DMV.org.

7              MS. SWEENEY:  Okay.  And then can we look at the

8    last three columns?

9    BY MS. SWEENEY:

10   Q    As to those last three columns, Agent, Status, Deleted,

11   Duration, are those the same as what we looked at on the

12   previous chart?

13   A    Yes.

14             MS. SWEENEY:  So on this page, I would like to look

15   at the -- begin by looking at the last row.  Let's focus on

16   date, time, and body.

17   BY MS. SWEENEY:

18   Q    All right, sir.  So looking at that row, what day did

19   this activity occur on?

20   A    April 15th, 2016.

21   Q    And what time did it happen at?

22   A    2:29 p.m.

23   Q    And what is the body of the activity?

24   A    Should there be minimum age for children to shoot at gun

25   ranges.

1    MS. SWEENEY:  All right.  And then can we focus on

2 the same three columns in the middle portion of the page?

3 Perfect.

4 BY MS. SWEENEY:

5 Q    Let's look at the activity on 4/18/16 at 3:09 p.m.; do

6 you see that?

7 A    Yes.

8 Q    What's the body of that history on the phone?

9 A    Wife defends her small engagement ring in emotional

10 Facebook post against her shamers, Michael Baisden.

11 Q    All right.  And then looking above that, do you see --

12 what time does the -- what time do the three prior entries

13 appear at?

14 A    1:24 a.m. on April 21st.

15    MS. SWEENEY:  And let's go to the next page now,

16 00187944.

17 BY MS. SWEENEY:

18 Q    So, Agent, is this page 17 of 18?

19    MS. SWEENEY:  I'm sorry.  I'm going to ask you to

20 look at page 17 of 18.  I'm sorry.

21    So let's start at the bottom and look at those three

22 columns again.

23 BY MS. SWEENEY:

24 Q    All right.  So, Agent, what date does this show activity

25 on?

1    A    May 18th, 2016.

2    Q    And what times?

3    A    Starting from 12:16 a.m. to 12:30 a.m.

4    Q    And what does -- what do all of the -- what does all of

5    the web history relate to?

6    A    EBay, G-shock watches.

7    Q    And in looking at the rest of the page that you have in

8    front of you, does the activity continue to be about G-shock

9    watches and other watches?

10   A    Yes.

11   Q    Okay.  And in looking at it, when does the activity end

12   on -- what time does the activity end on May 18th in the a.m.

13   hours?

14   A    The activity ends at 2:34 a.m.

15        MS. SWEENEY:  Ms. Valente, can we focus on the top

16   half?  Thank you.

17   BY MS. SWEENEY:

18   Q    Agent, does that show the 2:30 -- I think you said 2:34?

19   A    Yes.  Correction, yeah.  2:32.

20   Q    Okay.  So it ended at 2:32 a.m., in the a.m. hours?

21   A    Correct.

22   Q    And then did it continue -- did the same type of activity

23   continue on 5/18 in the p.m. hours of the day?

24   A    Yes.

25        MS. SWEENEY:  And so let's next go to the -- the

1    previous page, page 16 for you.  For us it will be 00187943.

2    And we can just focus on the top half, Ms. Valente.

3    BY MS. SWEENEY:

4    Q    So, sir, I'm looking at the whole page.  Again, do all

5    the entries on this page relate to watches?

6    A    Yes.

7    Q    And are we still in the p.m. hours of 5/18 of 2016?

8    A    Yes.

9         MS. SWEENEY:  And let's go to the page 15 of 18,

10   which is 00187942.  And we can focus on the top half of the

11   page, Ms. Valente.

12   BY MS. SWEENEY:

13   Q    So, again, Agent, on this entire page, does the activity

14   still relate to watches?

15   A    Yes.

16   Q    And are we still in the p.m. hours of May 18th of 2016?

17   A    Yes.

18        MS. SWEENEY:  Next we'll go to 14 of 18, 187941.

19   And let's start with the bottom half of the page.

20   BY MS. SWEENEY:

21   Q    Okay.  Agent, does the activity related to watches

22   continue on the bottom part of this page?

23   A    Yes.

24   Q    And does it -- does it end here?

25   A    Yes.

1  Q    At what time?

2  A    10:51 p.m.

3  Q    On May 18th?

4  A    Correct.

5       MS. SWEENEY:  Okay.  So then let's look at what's

6  just above that.

7  BY MS. SWEENEY:

8  Q    What date is the activity just above that?

9  A    June 1st, 2016.

10 Q    And what time does that activity take place?

11 A    2:34 p.m.

12 Q    And what is the body of the web history on that date and

13 time?

14 A    The headline of that specific one is adding people to

15 account.  And that was done on a Google search.

16 Q    All right.  And then looking up -- let's look at the

17 activity on 6/1 at 2:36 p.m. and 50 seconds.  Do you see that?

18 A    Yes.

19 Q    And what's the body of that activity on Ms. Salman's

20 phone?

21 A    Husband tried adding me to his bank account a year ago.

22 We were denied.  Would we be successful if we tried again?

23       MS. SWEENEY:  Now can we look at the top half,

24 Ms. Valente?

25 BY MS. SWEENEY:

1    Q    All right. And, Agent, looking at this, does the web

2    activity on this date continue in a similar vein about bank

3    accounts and finances?

4    A    Yes.

5    Q    And what's the last time that's on this page?

6    A    2:45 p.m.

7        MS. SWEENEY: All right. And we're gonna go to

8    page 13 of 18, which is 187940. I would like to look at the

9    three columns we've been looking at, last two rows. That's

10    fine. Where you are is fine, too. Thank you.

11    BY MS. SWEENEY:

12    Q    All right. So focusing on the last two rows of this, on

13    6/1/16 at 2:45 and 21 seconds p.m., what was searched for --

14    I'm sorry. What was the web history?

15    A    Does one spouse's bad credit affect a joint bank account?

16    And that's on budgeting money.

17    Q    All right. And does the same thing appear in the next

18    row?

19    A    Yes.

20    Q    What time was that at?

21    A    4:30 p.m.

22    Q    Is that also on June 1st?

23    A    Yes.

24        MS. SWEENEY: Now we're gonna go to page 7 of 18.

25    We're gonna skip some pages. We're going to 187934. All

1 right.  I would like to start with the rows in the middle of

2 the page, but this time let's do the Sender, Recipient, Date,

3 and Time columns in the middle of the page.

4 BY MS. SWEENEY:

5 Q    All right.  So, Agent, I'm going to focus your attention

6 beginning at 11:24 a.m. and continuing to 11:43 a.m.  Do you

7 see that?

8 A    Yes.

9 Q    I'm sorry.  We'll go through 11:45 a.m.  So those four

10 text messages that are there, who are those text messages

11 between?

12 A    Between the user of the device, this specific device that

13 I examined, and Omar.

14 Q    Okay.  And the first two messages that are sent at that

15 time, who are they sent by?

16 A    At what time?

17 Q    So the 11 -- the two text messages that are at 11:24.

18 A    The user of this specific phone number that I examined.

19 Q    All right.  And then who sends the next two text

20 messages?

21 A    Omar to this phone number.

22         MS. SWEENEY:  Okay.  And can we look now,

23 Ms. Valente, in that same area, Date, Time, and body for those

24 text messages?

25 BY MS. SWEENEY:

1   Q    All right.  And so the one at 11:24, what does that text

2   message read?  Sorry, 11:24 and 26 seconds.

3   A    "Can I get sunglasses?"

4   Q    And what's the next one?

5   A    "175."

6   Q    So are those the two text messages that were sent by

7   Ms. Salman to Omar Mateen?

8   A    Yes.

9   Q    And the next two, are those the two that were from

10  Mr. Mateen to Ms. Salman?

11  A    Yes.

12  Q    And what does he say?

13  A    "Yes," smiley face, and "Okay."

14       MS. SWEENEY:  Ms. Valente, let's go back to the

15  Sender, Recipient, Date, and Time columns just a little bit

16  above where we were, same general area, just a little higher.

17  Thank you.  I'm sorry.  I think you might still have to go a

18  little higher.  Perfect.

19  BY MS. SWEENEY:

20  Q    So now I would like to focus your attention, Agent, on

21  the text messages that are at 1:00 a.m. and 34 seconds,

22  1:00 a.m. and 47 seconds, and 1:38 a.m.  Do you see those

23  three?

24  A    Yes.

25  Q    Okay.  So the first one, is that from Ms. Salman to

1   Mr. Mateen?

2   A    Yes.

3   Q    The second one, is it from Mr. Mateen to Ms. Salman?

4   A    Yes.

5   Q    And then the one after that, is it from Ms. Salman to

6   Mr. Mateen?

7   A    Yes.

8        MS. SWEENEY:  Now, Ms. Valente, if we can go in that

9   same area, just a couple of columns over.  That's perfect.

10  BY MS. SWEENEY:

11  Q    All right.  So looking at the one at the bottom, the one

12  that's at one minute and 34 seconds, can you read that text

13  message?

14  A    "I told your parents you're paying for Cali with points

15  from PNC and job."

16  Q    And what's the reply from Mr. Mateen?

17  A    "K."

18  Q    And what does Ms. Salman reply at 1:38 a.m.?

19  A    "I'll be waiting," smiley face.

20       MS. SWEENEY:  All right.  And now let's look at the

21  top three rows.  And for this, if we can do Sender,

22  Recipients, Date, Time, and body.

23  BY MS. SWEENEY:

24  Q    So, Agent, in looking at these, these calls are 6/11

25  between 5:51 and 5:54.  Are these the same -- three of the

1  same calls that we previously discussed on the other chart?

2  A    Yes.

3  Q    Okay.  So the calls we looked at before are also on this

4  chart?

5  A    Yes.

6        MS. SWEENEY:  Okay.  Let's go to the next page,

7  which is page 6 of 8, 00187933.  All right.  Let's look at the

8  bottom row, the Sender, Recipient, Date, and Time columns.

9  Thank you.

10 BY MS. SWEENEY:

11 Q    So, Agent, does this text message follow just after the

12 three calls that we've previously spoken about?

13 A    Yes.

14 Q    Okay.  And is it from Ms. Salman to Mr. Mateen?

15 A    Yes.

16 Q    And it's on 6/11 at 5:55?

17 A    p.m., correct.

18        MS. SWEENEY:  All right.  Can we look at the Date,

19 Time, and body?  No, that's fine.  Perfect.  Thank you.

20 BY MS. SWEENEY:

21 Q    I know it's a little small, but can you read what the

22 text message is?

23 A    "If your mom calls, say Nemo invited you out and Noor

24 wants to stay home."

25 Q    All right.  So what's the status of that message?

1  A    The status of that message is sent.

2  Q    And is it deleted?

3  A    Yes.

4  Q    All right.  So, Agent, in looking at the duration, is

5  there a duration that's filled in for this text message?

6  A    Not at all.

7  Q    Okay.  On the screen, do you see a duration filled in?

8  A    Three seconds.

9  Q    Okay.  And on the version in front of you, is that

10 duration still there?

11 A    Not anymore.

12 Q    Okay.  So what did you do to that duration?

13 A    That is a single line out with my initials.

14 Q    All right.  Was that an error on the chart?

15 A    Yes.

16 Q    All right.  And similarly, in the row above this one, is

17 there another text message that appears mistakenly with a

18 duration?

19 A    Yes.

20 Q    Okay.  So did you also cross out that duration?

21 A    Correct.

22 Q    Okay.

23        MS. SWEENEY:  All right.  Now, if we can just take a

24 look at the date, time -- if we can look at these -- the

25 couple of columns we were just looking at with a few more

1  messages in them, maybe that bottom set of messages.  That's

2  perfect.

3  BY MS. SWEENEY:

4  Q    Okay.  So above the message that we just saw, what is the

5  message that appears above that?

6  A    "She asked where you are, XOXO."

7  Q    Is that message also deleted?

8  A    Yes.

9  Q    What is the message that's just above that?

10  A    "Love you."

11  Q    Is that message also deleted?

12  A    Yes.

13  Q    Are all of those messages sent at 5:55 p.m. and various

14  seconds?

15  A    Can you repeat that?

16  Q    Are all of them sent at the time stamp that is 5:55 p.m.,

17  but they have different seconds?

18  A    Correct.

19  Q    Okay.  And then above that, are there two phone calls

20  that we previously discussed?

21  A    Yes.

22  Q    And those phone calls, who are those between?  And you

23  can look on the chart in front of you if that's easier.

24  A    Okay.  So the phone calls are between the user of this

25  phone number and Mom-in-law.

1   Q    All right.  And then after those phone calls -- so the

2   second phone call begins at 6:14 and 59 seconds, correct?

3   A    Correct.

4   Q    And it lasts for about two minutes?

5   A    Correct.

6   Q    And then what's the next entry on the chart after that?

7   A    Sent text message.

8   Q    Okay.  And what is the text of the text message?

9   A    "Call your mom.  She's worried."

10  Q    And is that message deleted?

11  A    Yes.

12  Q    And is that sent from Ms. Salman to Mr. Mateen?

13  A    Yes.

14        MS. SWEENEY:  I would like to go briefly to

15  Government's Exhibit 3040, which we discussed earlier today.

16  I would like to take a look at 00187917.  Can we focus on the

17  green set of text messages, the body in the middle of the

18  page, the large green set.  And actually the dates and times,

19  too.  Thank you.  That's perfect.

20        (The above referred to exhibit was published.)

21  BY MS. SWEENEY:

22  Q    So in looking at these text messages, Agent -- and I know

23  you haven't seen -- you haven't seen this exhibit before?

24  A    No.

25  Q    In looking at this, do you see some of the same text

1  messages that we were just discussing?  For instance, do you

2  see one that says, "If your mom calls, say Nemo invited you

3  out and Noor wants to stay home"?

4  A    Yes.

5  Q    All right.  Do you see one as well that says, "She asked

6  where you were, XOXO"?

7  A    Yes.

8  Q    And so you have Government's Exhibit 306A in front of

9  you.  Looking at the bottom of page 6, can you see the order

10 that those text messages were sent from Ms. Salman's phone?

11 A    Yes.

12 Q    Does it match the order that appears here?

13 A    No.

14 Q    And do the -- do the times match?

15 A    No.

16 Q    Okay.  So which -- which times are later, the ones on

17 Ms. Salman's phone or the ones on Mr. Mateen's phone?

18 A    The ones in front of me on Mr. Mateen's phone.

19      MS. SWEENEY:  Let's go back to Government's

20 Exhibit 306A.  And we're going back to page 7, 0018793 -- no.

21 I'm sorry.  Hang on -- 00187933.

22      (The above referred to exhibit was published.)

23      MS. SWEENEY:  All right.  Let's look in the middle

24 of the page, the -- let's do the recipients, date, time, and

25 body columns.  A little higher.  Little more.  Perfect.

1   I'm sorry.  One more column over.  Okay.  Thank you.

2  BY MS. SWEENEY:

3  Q    All right.  So, Agent, have you seen -- what kind of

4  activity are we seeing here?

5  A    You're seeing communication activity.

6  Q    All right.  And are there multiple recipients who are

7  receiving texts?

8          MR. SWIFT:  Objection, leading.

9          THE COURT:  Overruled.

10  BY MS. SWEENEY:

11  Q    Are there multiple recipients who are receiving texts?

12  A    There are multiple recipients receiving -- yes.

13  Q    All right.  And do you know what type of program this

14  comes from?

15  A    Not -- not from looking at this.

16  Q    Okay.  Is this a capability that cell phones have in your

17  experience?

18  A    Yes.

19  Q    To send group text messages?

20  A    Correct.

21  Q    Okay.  So I'm looking at the one at the bottom.  What

22  time is it sent at?

23  A    6:57 p.m.

24  Q    On June 11th?

25  A    Correct.

1    Q    And is Ms. Salman -- or is the name Noor included among

2    the recipients?

3    A    Yes.

4    Q    Are there many other recipients there as well?

5    A    Yes.

6    Q    Is Omar or Omar Mateen one of them?

7    A    On 6/11?

8    Q    Yes.

9    A    No.

10   Q    All right.  And what is the text message that is sent?

11   A    That is sent or received?

12   Q    I'm sorry.  What is the text message that appears there?

13   A    Salman Noor.

14   Q    So that word that's there, does it have an N?  Could the

15   word on Salam -- Salam Noor?

16   A    Yes.

17   Q    Okay.  So did Ms. Salman send or receive this text

18   message?

19   A    Received.

20   Q    So let's look at the next one on up on -- at

21   6:57:49 seconds.  What is written there?

22   A    "Y'all should come -- come to masjid inshallah --

23   inshallah.  The new one invited us."

24   Q    Okay.  And what's the text message that appears above

25   there?

1    A    "It's good for Zaki and the boys.  No excuse."

2           MS. SWEENEY:  All right.  Now let's go to the top of

3    the page.  Let's start with the sender and recipient for the

4    first two rows -- I'm sorry.  And date and time.

5    BY MS. SWEENEY:

6    Q    Okay.  So are these two messages both from the person

7    entered in as Sabrina Jaan?

8    A    Yes.

9    Q    And what day and time are they sent at?

10   A    They're sent June 11th, 2016, and from 7:22 p.m.

11   Q    Thank you.

12          MS. SWEENEY:  And, Ms. Valente, can we look at the

13   same two rows, Date, Time, and body columns?

14   BY MS. SWEENEY:

15   Q    All right.  What are those?

16   A    At 7:22 and 37 seconds, it says, "Salam, are you going to

17   masjid?"

18          And at 7:22 and 47 seconds, it and says, "Please

19   bring Horoon Crocs."

20   Q    And again, that word that you read as Salman, does that

21   have an N in it?

22   A    No.

23          MS. SWEENEY:  Okay.  All right.  Let's go -- now

24   we're gonna look at page 5, 187932.  All right.  Now let's

25   look at the bottom three rows of the chart.  I'm sorry.  Let's

1 do the bottom -- let's do the bottom three, Sender, Recipient,

2 Date and Time.  All right.  Let's look at the top one that

3 appears on the part that we've called out.

4 BY MS. SWEENEY:

5 Q    Is that from Ms. Salman to Sabrina Jaan?

6 A    Yes.

7 Q    And is that at about 7:24 p.m.?

8 A    Yes.

9 Q    So is that shortly after the ones that we just looked at?

10 A    Yes.

11         MS. SWEENEY:  Okay.  Let's now look at Date, Time,

12 and the content.

13 BY MS. SWEENEY:

14 Q    All right.  What is the content of that text message from

15 Ms. Salman to Sabrina?

16 A    "No.  Omar went to Nemo for dinner.  He was invited."

17         MS. SWEENEY:  All right.  Now let's go to the middle

18 kind of section of this page.  I'm sorry.  The Date, Time, and

19 body columns.  Perfect -- no.  A little higher.  That's good.

20 BY MS. SWEENEY:

21 Q    All right.  So, Agent, does there -- what happens at

22 about 12:47 p.m.?  What kind of activity do we begin seeing on

23 the phone at that point?

24 A    You see some Google searches for a biker jacket woman.

25 Q    I'm sorry.  I said -- did I say the time wrong?  I said

1    12:47 p.m.

2    A    Yeah.  What's displayed here is a.m.

3    Q    And what's the date?

4    A    Can you rephrase that question?

5    Q    What date does it appear is related to this activity?

6    A    12 June -- June 12th, 2016.

7    Q    Okay.  And so for the rest of this page, is there

8    activity that's consistent with shopping for biker jackets or

9    jackets in general?

10   A    Yes.

11   Q    And on this page, what's the time of the last activity?

12   A    So the time of the last activity is 12:56 a.m.

13            MS. SWEENEY:  All right.  Let's now go to page 4,

14   which is 00187931.  Ms. Valente, we can just focus at the top

15   with the same three columns.

16   BY MS. SWEENEY:

17   Q    Does the activity on this page continue to be consistent

18   with shopping for biker jackets or other kinds of jackets?

19   A    Yes.

20   Q    What is the time stamp of the last activity that's on

21   this page?

22   A    1:09 a.m.

23            MS. SWEENEY:  Let's go on to page 3, which is

24   187930.  Ms. Valente, we can again just focus on the same

25   three columns at the top.

1  BY MS. SWEENEY:

2  Q    Agent, on this page, does the activity continue to be

3  consistent with shopping for biker jackets or other kinds of

4  jackets?

5  A    Yes.

6  Q    What is the time stamp of the last entry on this page?

7  A    1:16 a.m.

8       MS. SWEENEY:  Page 2 of 18, 187929.  Ms. Valente, we

9  can just, again, just focus on the top.

10  BY MS. SWEENEY:

11  Q    Agent, again, on this page, does the activity continue to

12  be consistent with shopping for a biker jacket or other kind

13  of jackets?

14  A    Yes.

15  Q    What's the time stamp of the last web history on this

16  page?

17  A    1:22 a.m.

18       MS. SWEENEY:  All right.  Let's go to the first

19  page, 187928.  Let's focus on the same three columns, the

20  bottom half of the page.

21  BY MS. SWEENEY:

22  Q    So, Agent, through about halfway up on this page, is the

23  activity, again, consistent with shopping for leather biker

24  jackets?

25  A    Yes.

1   Q    What's the last time stamp associated with web history

2   that appears on this phone?

3   A    1:32 a.m.

4          MS. SWEENEY:  All right.  Now let's focus on the

5   first three phone calls that appear on the page.  Let's start

6   with the Sender, Recipient, Date, and Time columns.  I'm

7   sorry.  The phone calls that first appear above the web

8   history section about halfway down the page.  Perfect.

9   BY MS. SWEENEY:

10   Q    All right.  So, Agent, here do we see -- are these some

11   of the same calls that we previously discussed, calls around

12   2:40 and 2:41 a.m. to Omar Mateen?

13   A    Yes.

14   Q    On the top section, the section we have pulled out, is

15   that a text message?

16   A    Yes.

17          MS. SWEENEY:  All right.  So now let's look at those

18   same three columns, just Date, Time, body, Status and Deleted.

19   BY MS. SWEENEY:

20   Q    All right.  So what's the text message that Ms. Salman

21   sends at approximately 2:42 a.m.?

22   A    "Habibi, where are you?"

23   Q    All right.  And then, Agent, in looking at the deleted

24   column on this text message on the screen, it says, yes.  Is

25   that correct?

1  A    Correct.

2  Q    All right.  In reviewing this chart prior to your

3  testimony, what did you determine about this text message?

4  A    That it may not have been deleted.

5  Q    Okay.  So did you find that it wasn't deleted?

6  A    Correct.

7  Q    And then have you made a change in ink with your initials

8  to the version in front of you?

9  A    Yes.

10  Q    Okay.

11        MS. SWEENEY:  All right.  So then let's -- so I'm

12  gonna step away from this for a second.  I would like to pull

13  up something that's already been admitted.  I would like to

14  pull up Government's Exhibit 1B, 124832.  Okay.  Let's focus

15  on the bottom quarter of the page.  Perfect.

16        (The above referred to exhibit was published.)

17  BY MS. SWEENEY:

18  Q    Agent, do you see the last sentence on that page that

19  begins "when I"?

20  A    Yes.

21  Q    Can you read that sentence?

22  A    "When I got a text message from Omar at 4:00 a.m., I knew

23  that he did what he said he was going to do."

24  Q    Okay.  All right.

25        MS. SWEENEY:  So then now let's go back to

1  Government's Exhibit 306A, 187928.  All right.  Let's focus on

2  the top half of the page, Sender, Recipient, Date, and Time.

3          (The above referred to exhibit was published.)

4  BY MS. SWEENEY:

5  Q    Okay.  So, Agent, let's start at -- let's start at

6  4:23 a.m. and 18 seconds.  Who is that call from?

7  A    Mom-in-law.

8  Q    All right.  And then the next row up, what's the call

9  that occurs after that -- I'm sorry.  I'm sorry.

10         The next row up, is that a call or a text message?

11 A    That is a phone call.

12 Q    All right.  At 4:27 a.m. and 11 seconds?

13 A    That is a text message.

14 Q    Is that text message from Ms. Salman to Mr. Mateen?

15 A    Yes.

16 Q    And the row above that, is that another text message?

17 A    Yes.

18 Q    Until we get to the top two rows, are all of the

19 communications that we see there text messages?

20 A    Yes.

21 Q    And are they between Ms. Salman and Mr. Mateen?

22 A    Yes.

23         MS. SWEENEY:  Okay.  So let's now go to the Date,

24 Time, Body, Status, and Deleted columns for those same rows.

25 I'm sorry.  Ms. Valente, if we can start -- you can just start

1    from the top.  Perfect.

2    BY MS. SWEENEY:

3    Q    Okay.  So can you -- beginning at 4:27:11 a.m., what's

4    the -- 4:27 a.m. and 11 seconds, what's that text message?

5    A    That is a sent text message.

6    Q    And so Ms. Salman sent that text message?

7    A    Correct.

8    Q    And what is it?

9    A    "Where are you?"

10   Q    All right.  Is the next one a sent or received message?

11   A    Received.

12   Q    And what does it say?

13   A    "Everything okay?"

14   Q    Okay.  After that, are there two sent text messages?

15   A    Yes.

16   Q    What do they say?

17   A    "Your mom I'd worried and so am I.  You know you work

18   tomorrow, right?"

19   Q    And then is there another received text message?

20   A    Yes.

21   Q    What does it say?

22   A    "You heard what happened."

23   Q    And then after that, are there two sent text messages?

24   A    Yes, a series of question marks and then, "What

25   happened?!"

1  Q    And then is there another received text message?

2  A    Yes.

3  Q    What does it say?

4  A    "I love you, babe."

5  Q    And then what are the two sent text messages that appear

6  after that?

7  A    "Habibi, what happened?!"  Sent.  And, "Your mom said

8  that she said to come over and you never did."  And that was

9  also sent.

10 Q    And in looking at those, all the text messages that we

11 just reviewed, are any of these deleted?

12 A    No.

13        MS. SWEENEY:  Your Honor, could I have just a

14 moment?

15        THE COURT:  Yes, ma'am.

16 BY MS. SWEENEY:

17 Q    All right.  So, Agent, did you also review records that

18 were received from Google in this case?

19 A    Yes.

20 Q    And did you -- through your review, did you learn that

21 Mr. Mateen had a Google account?

22 A    Yes.

23 Q    Okay.  So I would like to start by talking to you about

24 an exhibit that's already admitted, which is Government's

25 Exhibit 312.

1    MS. SWEENEY:  Can we pull up from that

2  Exhibit 187409?

3  BY MS. SWEENEY:

4  Q    All right.  So, Agent, what is Google Chrome?

5  A    Google Chrome is a web browser that allows a user to

6  access the Internet and view -- whether it be web pages,

7  communicate with people on e-mail.  It's a browser.  It's a

8  middleman to allow the user to get out to access these things

9  stored all over the world.

10  Q    And what is -- is there a mode in Google Chrome called

11  incognito mode?

12  A    Yes.

13  Q    What is that?

14  A    Incognito mode is for the user's privacy protection.

15  What it does is allow the user -- prevent third parties from

16  possibly putting things like tracking cookies onto the

17  specific device, as well as may not retain web browsing

18  history at the end of that specific session.

19  Q    All right.  Can you use Google Chrome in incognito mode

20  on a cell phone?

21  A    Yes.

22  Q    All right.  So on this page, does Google publish

23  information about how incognito mode works?

24  A    Yes.

25  Q    In looking at what's in front of you, is that what this

1  is?

2  A    This is just the privacy notice for Google.

3  Q    About Google Chrome?

4  A    Correct.

5  Q    Okay.  What was the date on which this privacy notice was

6  in effect?

7  A    September 1st, 2015.

8  Q    All right.  And is this the privacy notice that also

9  covers June 10th, 11th, 12th of 2016?

10 A    Yes.

11       MS. SWEENEY:  All right.  Let's go -- within this

12 privacy notice, let's go to page 187441.

13       I'm sorry.  I read that wrong, Ms. Valente.  It's

14 187411.  Can we focus on the bullet point that's the second

15 from the bottom?

16 BY MS. SWEENEY:

17 Q    All right.  Agent, can you read the first two sentences

18 of this bullet point to the jury?

19 A    "If you sign into Chrome browser, Chrome OS, or an

20 Android device that includes Chrome as a pre-installed

21 application with your Google account, this will enable

22 synchronization feature.  Google will store this information

23 such as history, bookmarked URLs, as well as an image and a

24 sample of text from the bookmarked page, passwords, and other

25 settings on Google servers in association with your Google

1 account."

2       MS. SWEENEY:  All right.  And now let's go to

3 page 187415.  All right.  And let's focus in on the section

4 that says "Information stored on your system when you use

5 Chrome."  Let's start at the top couple of lines.

6       MR. SWIFT:  Objection, leading on the part.  This is

7 in evidence.  We're reading a document from the website to a

8 jury through a so-called expert on the thing.  If he would

9 like to testify --

10       THE COURT:  I understand the objection.

11       What's the purpose of reading this into the record

12 since it's in evidence?

13       MS. SWEENEY:  Your Honor, the jury will then know

14 about how this works at this time.

15       THE COURT:  What evidence is there that anyone in

16 this case read this?

17       MS. SWEENEY:  No.  There's none that anyone -- would

18 you like us to approach?  There's none that anyone read it,

19 Your Honor.  Instead, this explains how it works.  And Google

20 Chrome was used on the home computer.

21       THE COURT:  Why can't the witness just tell us that

22 without reading all this text.  We've already heard about how

23 incognito works.

24       MS. SWEENEY:  Yes, Your Honor.

25       THE COURT:  So we're repeating it.

1          MS. SWEENEY:  Yes, Your Honor.

2          THE COURT:  All right.  Let's move on.

3          MS. SWEENEY:  Yes, Your Honor.

4          I'm going to approach with Government's

5   Exhibit 311B.

6   BY MS. SWEENEY:

7   Q    All right, sir.  In looking at Government's Exhibit 311B,

8   is this some of the records that you reviewed from

9   Mr. Mateen's Google account?

10  A    Yes.

11         MS. SWEENEY:  All right.  I move into evidence

12  Government's Exhibit 311B.

13         THE COURT:  Any objection to 311B?

14         MR. SWIFT:  No objection.

15         THE COURT:  311B is admitted.

16         (Government's Exhibit No. 311B was admitted into

17  evidence.)

18         MS. SWEENEY:  All right.  I would like to go to

19  104292.  Let's start at the top of the page.

20         MR. SWIFT:  May I approach for a moment, Your Honor?

21         THE COURT:  Yes, you may.

22         Good opportunity for you to stretch if you'd like to

23  stand up.

24         (At the bench.)

25         MR. SWIFT:  The testimony that's being elicited is

1  from a different expert.  That was part of Ms. Ogden.

2          MS. SWEENEY:  He's just testifying to records at

3  this point and what the records show.

4          MR. SWIFT:  Okay.  If you're just doing the records.

5  But we're going in how much longer on this?  Because you've

6  gone through the Google Chrome that Ogden relied on.

7          THE COURT:  This is a login, logout.  This is

8  different than incognito.  This is showing --

9          MS. SWEENEY:  Yes.  Logins and logouts from the

10  account.

11          THE COURT:  Okay.  Thank you.

12          (In open court.)

13          THE COURT:  All right.  Please continue regarding

14  311B.

15          MS. SWEENEY:  Ms. Valente, that's 104292.

16          (The above referred to exhibit was published.)

17  BY MS. SWEENEY:

18  Q    All right.  Agent, looking at the top, what is the name

19  that is associated with this Google account?

20  A    Omar Mateen.

21          MS. SWEENEY:  All right.  And then let's go down a

22  little bit showing the top portion of the chart that appears.

23  BY MS. SWEENEY:

24  Q    All right.  So, Agent, in looking at the last row of this

25  chart, what is cataloged by this chart?

1    A    Type.

2    Q    And what types appear there?

3    A    Logout and login.

4    Q    All right.  And then in the first column, what appears

5    there?

6    A    Time.

7    Q    All right.  And does what's entered there include date

8    and time?

9    A    Correct.

10   Q    And then as to the center column, what are the -- what

11   appears there?

12   A    IP addresses, which are numbers.

13   Q    Numbers that do what?

14   A    Numbers that is -- that is assigned by the -- either it

15   be -- if it's a cellular or a home Internet service, it's an

16   IP address assigned by the subscriber.

17   Q    Okay.  And in looking at the page -- now, do you have the

18   whole page in front of you?

19   A    Yes.

20   Q    Okay.  So in looking at it, how many logouts appear on

21   this page?

22   A    Two.

23   Q    Okay.  So let's look at the one that appears first in

24   time on the page.  What day and time does that occur?

25   A    June 10th, 2016, at 143522 minus UTC.

1    Q    Okay.  And what is UTC?

2    A    Universal Coordinated Time.

3    Q    Okay.  So in Eastern Time, do you know what time that

4    would be?

5    A    I would have to see what -- there's different offsets of

6    UTC.  So in Eastern Standard Time, depending on Daylight

7    Savings Times, it might be either minus four or minus five.

8    That's not delineated here.

9    Q    So in looking at the date there, June 10th of 2016, do

10   you know if that's Eastern Standard or Eastern daylight time?

11   A    Yeah.  That's during Daylight Savings Time.

12   Q    Do you know how many hours you would subtract from UTC at

13   that point?

14   A    At that time, you would do minus, I believe, four.

15   Q    Okay.  So what time would this be?

16   A    So for this, this would be 2:35.

17   Q    Okay.  So that's what time appears there presently,

18   correct?

19   A    Correct.

20   Q    What time is that in Eastern Time?

21   A    2:35.

22   Q    What time appears there, Agent.  Is it UTC or Eastern

23   Time that's appearing?

24   A    UTC.

25   Q    Okay.  So if you wanted to change that into Eastern Time,

1   what time would it be?

2   A   2:35.

3   Q   Okay.  Agent, what time is that that's there?  What is

4   1435?  Is that military time?

5   A   Yes.

6   Q   Okay.  So is that 2:35?

7   A   So that's 1435.  So you want me to convert that to a.m.

8   or p.m.?

9   Q   No.  I want you -- okay.  So what time is it in a.m. or

10  p.m.?

11  A   It's 2:00 p.m.

12  Q   And 2:35 p.m.?

13  A   Correct.

14  Q   Okay.  And that's UTC time?

15  A   Correct.

16  Q   So what time is 2:35 p.m. UTC time in Eastern Time?

17          THE COURT:  Let's go with 10:35 a.m.

18          MS. SWEENEY:  Does that sound right?

19          THE WITNESS:  Yeah.  That sounds right.

20  BY MS. SWEENEY:

21  Q   All right.  Sorry.  Sorry.  All right.  And so in looking

22  at that, after that time, is there another login?

23  A   Yes.

24  Q   And is that approximately an hour later, at 11:30?

25  A   Correct.

1    Q    Okay.  And then after that, is there a subsequent logout

2    one minute later?

3    A    Yes.

4    Q    Okay.  And so those are the only logouts that appear on

5    this page?

6    A    Correct.

7    Q    All right.  And then let's go -- actually, Agent, if you

8    can just look through, when is the next logout that occurs on

9    these records?

10   A    In chronological order on this sheet?

11   Q    So how many pages is this document?

12   A    Four.

13   Q    And on which page do you see the next log out appear?

14   A    Page 3.

15   Q    Okay.  So on all of page 2, are all of the entries that

16   appear there logins?

17   A    Yes.

18          MS. SWEENEY:  So on page 3, let go to 104294.  Let's

19   look at the top part of the page.  Perfect.

20   BY MS. SWEENEY:

21   Q    So, Agent, that log out there, on what date does it

22   occur?

23   A    The 18th of April 2016.

24   Q    Are there any other logouts that you see on that page?

25   A    No.

1          MS. SWEENEY:  Okay.  And then let's go to page 4,

2     104295.  And let's focus on the bottom part of the page.

3     BY MS. SWEENEY:

4     Q    So, Agent, are there two logouts that appear on there as

5     well?

6     A    Yes.

7     Q    Are there any other logouts on this page?

8     A    Just two.

9     Q    Okay.  Just those two.  And what dates do those occur on?

10    A    February 22nd and January 4th.

11         MS. SWEENEY:  Okay.  All right.  Now I would like to

12    take a look at Government's Exhibit 313 that's already in

13    evidence.  It is page 104357.  All right.  And let's focus on

14    the first quarter of the page.

15    BY MS. SWEENEY:

16    Q    All right.  So, Agent, in looking at the very last entry

17    that you can see on there, on what date does that occur?

18    A    June 12th.

19    Q    I'm sorry.  The last one on the bottom of the callout.

20    A    June 10th.

21    Q    Okay.  And does it occur around 10:19 in the morning?

22    A    Yes.

23    Q    And then what is the next period of activity that appears

24    on this document?

25    A    Google map activity.

1 Q    And on what day is that?

2 A    The 12th of June.

3 Q    Okay.  And what are the -- what is this document?  Can

4 you -- oh, you can see it.  What is this?

5 A    Google search history events.

6 Q    Is this related to Mr. Mateen's Google account?

7 A    The Google account thisandthat86@gmail.com account.

8 Q    And is that Mr. Mateen's account that you reviewed?

9 A    Yes.

10 Q    I'm gonna show you Government's Exhibit 311A.  All right,

11 sir.  Do you recognize Government's Exhibit 311A?

12 A    Yes.

13 Q    What is that?

14 A    These are Google records for Mateen searches.

15        MS. SWEENEY:  Your Honor, I move Government's

16 Exhibit 311A into evidence.

17        THE COURT:  Any objection?

18        MR. SWIFT:  No objection.

19        THE COURT:  It's admitted.

20        (Government's Exhibit No. 311A was admitted into

21 evidence.)

22        MS. SWEENEY:  So let's start with page 187801.

23 Let's start at the bottom of the page, just the date and time

24 and event columns.

25        (The above referred to exhibit was published.)

1  BY MS. SWEENEY:

2  Q    Agent, is this the first row -- or the first page -- I'm

3  sorry -- the last page of this document?

4  A    Yes.

5  Q    Okay.  In looking at the last row, do you see ISIS

6  referenced there?

7  A    Yes.

8  Q    All right.  And does this indicate that someone did a

9  Google search for ISIS?

10  A    Yes.

11  Q    All right.  And then take a look at the page in front of

12  you.  And does every other row on this page reference ISIS?

13  A    Just about.

14         MS. SWEENEY:  Okay.  So let's go a few pages forward

15  in the document, 187792.  All right.  Let's look at the top

16  half of the page.

17  BY MS. SWEENEY:

18  Q    All right.  Agent, what's the date on this activity that

19  we're looking at?

20  A    December 2nd, 2015.

21  Q    Okay.  And do you see activity here that's related to

22  San Bernadino?

23  A    Yes.

24         MS. SWEENEY:  All right.  We're gonna jump forward a

25  couple more pages, 00187776.  Let's look at the last two rows

1    here as well.

2    BY MS. SWEENEY:

3    Q    Agent, what date is this activity on?

4    A    January 2nd, 2016.

5    Q    And is this chart in chronological order?

6    A    Yes.

7    Q    So the pages that we've skipped, do they fall between the

8    dates that we've looked at?

9    A    Yes.

10   Q    Okay.  And what are these two rows?

11   A    They're search -- they're Google search -- searches.

12   Q    And what website was the person looking at?

13   A    Twitter and jihadology.net.

14   Q    Okay.  In looking at that page, if you can locate it in

15   front of you -- it's the one that at the bottom says 187776.

16   Do you have that?  Does every other entry on that page

17   reference ISIS?

18   A    Several.

19          MS. SWEENEY:  Okay.  Let's go to 187767.  All right.

20   And let's look at the bottom half of this page.

21   BY MS. SWEENEY:

22   Q    All right.  Agent, what date are we on now?

23   A    January 26th, 2016.

24   Q    All right.  And do you see the activity that's at

25   1:32:31 a.m.?

1  A    Yes.

2  Q    Okay.  And what is that activity?

3  A    Could you zoom in a little?

4  Q    I think it's actually in the call -- let's make sure

5  we're talking about the same thing.  I'm sorry.

6          So, Agent, do you see the row that is two from the

7  bottom?

8  A    Yes.

9  Q    And do you see the time is 1:32 a.m. 31 seconds?

10  A    Yes.

11  Q    What is that activity?

12  A    It's a Google search.

13  Q    And what's it for?

14  A    Abu Waheeb.

15          MS. SWEENEY:  All right.  Let's go to 187747.  And,

16  Ms. Valente, if we can just do the top of the page.

17  BY MS. SWEENEY:

18  Q    Agent, if you can find that in front of you -- or let's

19  just look at this portion that we're looking at.  Does every

20  entry that we are looking at reference either ISIS or

21  jihadology?

22  A    Yes.  ISIS, ISIL, and jihadology.

23          MS. SWEENEY:  Okay.  Let's go to page 187740.  And

24  let's look at the top half of the page.  Okay.

25  BY MS. SWEENEY:

 1   Q    And in looking at this, Agent, do you see activity at the

 2   bottom of the callout that references San Bernadino?

 3   A    Yes.

 4        MS. SWEENEY:  All right.  And then let's look at the

 5   bottom half.  And, Ms. Valente, let's just do those two

 6   columns again.  Sorry.  Thank you.

 7   BY MS. SWEENEY:

 8   Q    In looking at that, do you see activity as well that

 9   relates to 2015 France attacks?

10   A    Yes, on Wikipedia.

11   Q    And on what date does both the San Bernadino and the

12   France attacks history take place?

13   A    June 3rd, 2016.

14        MS. SWEENEY:  All right.  And let's go to 187738.

15   And let's look at the last couple of rows on this page.

16   BY MS. SWEENEY:

17   Q    So, Agent, what is this last entry that we see here?

18   What date and time is it at?

19   A    June 4th, 2016.

20   Q    And what is it?

21   A    It's a video.

22   Q    And can you read the subject of the video that's part of

23   the web address?

24   A    "Islamic State calls for attacks on West."

25        MS. SWEENEY:  I'm going to show the agent what's

1  been marked as Government's Exhibit 311C.

2  BY MS. SWEENEY:

3  Q    All right.  Agent, is this another portion of Google

4  records for Mr. Mateen?

5  A    Yes.

6  Q    And did you review this prior to your testimony today?

7  A    Yes.

8       MS. SWEENEY:  Your Honor, I move Government's

9  Exhibit 311C into evidence.

10       THE COURT:  Any objection?

11       MR. SWIFT:  No objection, Your Honor.

12       THE COURT:  It's admitted.

13       (Government's Exhibit No. 311C was admitted into

14  evidence.)

15       MS. SWEENEY:  If we can go to page 187811.  All

16  right.  Let's look at the top couple of columns on this

17  page -- the top couple of rows on this page.  Perfect.

18       (The above referred to exhibit was published.)

19  BY MS. SWEENEY:

20  Q    So, Agent, is this again activity from Mr. Mateen's

21  Google account?

22  A    Yes.

23  Q    And that first row that appears there, what date and time

24  was that activity at?

25  A    May 29th, 2016.

1   Q    And what was the activity that appeared there?

2   A    Search for Florida rules on buying gun.

3        MS. SWEENEY:  Let's go to 187808.  Let's, again,

4   look at the top couple of rows on the page.

5   BY MS. SWEENEY:

6   Q    All right.  Agent, what date does this activity take

7   place on?

8   A    May 31st, 2016.

9   Q    And what is the activity that is in the first row -- the

10  first entry?

11  A    Search for three-day wait rifle.

12       MS. SWEENEY:  Let's go to 187805.  Let's start on

13  the bottom half of the page.

14  BY MS. SWEENEY:

15  Q    All right.  So, Agent, let's start with the first

16  activity that you see on June 1st of 2016.  What is that

17  activity?

18  A    On June 1st, it says, Search for can you use credit card

19  at ATM.

20       MS. SWEENEY:  All right.  And let's go up a couple

21  of rows from that.  Let's go up two rows from that.

22  BY MS. SWEENEY:

23  Q    What was searched for there -- or what was viewed there?

24  I'm sorry.

25  A    Some sort of blog about can you buy a car with credit

1  card.

2  Q    Okay.  And then the top two rows on this -- the callout,

3  what do they relate to?

4  A    Jewelry.

5        MS. SWEENEY:  All right.  Let's look at the top half

6  of the page.

7  BY MS. SWEENEY:

8  Q    All right.  Agent, do we see at the bottom -- starting at

9  the bottom, are there additional searches for jewelry?

10  A    Yes.

11  Q    What is the entry -- the second entry on the page?

12  A    From the top?

13  Q    I'm sorry.  From the bottom.  Sorry.

14  A    The second entry is, "Can I use -- can I use security gun

15  for other job?"

16  Q    And what is the date and time of that activity?

17  A    June 1st, 2016.

18  Q    And at what time?

19  A    10:53.

20  Q    p.m.?

21  A    p.m.

22        MS. SWEENEY:  Let's go to 187803, and let's start at

23  the bottom.

24  BY MS. SWEENEY:

25  Q    Starting from the bottom, Agent, what is the first

1   activity that we see there?

2   A   Google search for Treasure Coast Mall.

3   Q   And then the activity above that, what do the next

4   several rows relate to?

5   A   Jewelry.

6   Q   And then above that, what are the last two rows related

7   to?

8   A   Best Buy.

9   Q   And what dates do those -- does that activity appear on?

10   A   June 5th, 2016.

11   Q   And what times are those -- what's the range of times for

12   that activity?

13   A   5:58 p.m. to 7:11 p.m.

14        MS. SWEENEY:  I'm gonna approach the witness with

15   what's been marked as Government's Exhibits 311D and E.

16   BY MS. SWEENEY:

17   Q   Let's start with Government's Exhibit 311E.  Is that a

18   chart of Mr. Mateen's Google activity?

19   A   Yes.

20   Q   And did you review that prior to your testimony today?

21   A   Yes.

22        MS. SWEENEY:  Your Honor, I move Government's

23   Exhibit 311E into evidence.

24        THE COURT:  Any objection?

25        MR. SWIFT:  No, Your Honor.

1      THE COURT:  It's admitted.

2      (Government's Exhibit No. 311E was admitted into

3  evidence.)

4  BY MS. SWEENEY:

5  Q    All right.  So, Agent, let's just look at the chart for a

6  moment first.  What is the earliest date that appears on the

7  chart?

8  A    May 16th, 2016.

9  Q    And what's the latest date that appears on the chart?

10  A    June 9th, 2016.

11      MS. SWEENEY:  All right.  Let's go to page 00187819.

12  And let's zoom in on the top of the half of the document.

13  BY MS. SWEENEY:

14  Q    Agent, can you describe the middle -- the activity that

15  takes place on June 1st?  What is that?

16  A    June 1st, there was activity on Forbes.com looking at

17  fee-only planning with the web subject of never -- never add

18  your child's name to your bank account.  Here's why.

19      MS. SWEENEY:  All right.  Thank you, Ms. Valente.

20  BY MS. SWEENEY:

21  Q    Can you also take a look at Government's Exhibit 311D?

22  Is that also activity from Mr. Mateen's Google account?

23  A    Yes.

24      MS. SWEENEY:  Your Honor, I move Government's

25  Exhibit 311D into evidence.

1    THE COURT:  Any objection?

2    MR. SWIFT:  No objection, Your Honor.

3    THE COURT:  It's admitted.

4    (Government's Exhibit No. 311D was admitted into

5  evidence.)

6  BY MS. SWEENEY:

7  Q    All right.  Agent, what's the earliest activity that

8  appears on this chart?

9  A    December 3rd, 2015.

10 Q    And after that entry, what's the next entry on the chart

11 in terms of date and time?

12 A    January 29th, 2016, at 11:44 a.m.

13 Q    And then after that, what's the next entry that appears?

14 A    May 27th, 2016, at 5:39 p.m.

15     MS. SWEENEY:  All right.  Let's go to page 18718.

16 Let's look at the -- I'm sorry.  187818.  Sorry.  Let's look

17 at the first several searches on the page.

18 BY MS. SWEENEY:

19 Q    Agent, I'm going to direct your attention to the first

20 one we see in the callout.  What is that search for?

21 A    On December 3rd?

22 Q    I'm sorry.  On the top of the callout, what is that one?

23 A    A search for Fort Pierce F.B.I.

24 Q    And what day and time did that occur?

25 A    May 27th, 2016.

1  Q    At 5:39 p.m.?

2  A    Correct.

3        MS. SWEENEY:  All right.  And let's look at the

4  additional searches at the top.

5  BY MS. SWEENEY:

6  Q    All right.  And let's start with the activity on 5/30.

7  Do you see that?

8  A    Yes.

9  Q    And what was that search for?

10 A    Can police interview for buying a gun legally?

11 Q    And then on 5/31, what type of activity took place on

12 that day?

13 A    Another Google search.

14 Q    What was it for?

15 A    Turn on microphone Android.

16       MS. SWEENEY:  Let's look at page 187817.  And let's

17 start at the very bottom.

18 BY MS. SWEENEY:

19 Q    So, Agent, what's the next search after the one we just

20 looked at?

21 A    The next entry or search?

22 Q    I think they're one and the same.  Is the one at the

23 bottom the next search and entry?

24 A    Yes.

25 Q    Okay.  And what is that for?

1  A    Turn on microphone Android F.B.I.

2        MS. SWEENEY:  Let's go to 187816.  And let's look at

3  the top of the page.

4  BY MS. SWEENEY:

5  Q    All right.  And, Agent, what's the activity -- what's the

6  date on the activity we're looking at now?

7  A    June 5th, 2016.

8  Q    And what is the -- on the top of the callout, what's the

9  first entry that appears there?

10 A    A search for gun store suspicious.

11 Q    All right.  Did you also review records that the

12 government received from Facebook?

13 A    Yes.

14 Q    And did you review those related to both Mr. Mateen's

15 Facebook account and Ms. Salman's?

16 A    Yes.

17       MS. SWEENEY:  All right.  We're gonna start with

18 Government's Exhibit 310B, which is already admitted.  So I

19 would like to start with 187955 -- wait.  Can you take that

20 down?

21       All right.  Thank you.  I'm sorry.  187955.  All

22 right.  And can we zoom in on the top of the page.

23       (The above referred to exhibit was published.)

24 BY MS. SWEENEY:

25 Q    All right, Agent.  So are these searches from

1  Mr. Mateen's Facebook account?

2  A    Yes.

3  Q    Okay.  So starting at the top, what's the first entry

4  that we see there?

5  A    From the top of the callout?

6  Q    Yes.

7  A    June 12th, 2016, a search for Pulse Orlando.

8  Q    All right.  And then going down from there, do you see

9  other references to Pulse Orlando and to shooting?

10  A    Yes.

11        MS. SWEENEY:  Okay.  Let's move a little bit -- a

12  couple of rows down on the page to kind of the center top.

13  That's perfect.

14  BY MS. SWEENEY:

15  Q    All right, Agent.  On 6/4 of 2016, what activity do you

16  see on here?

17  A    Baghdadi speech.

18  Q    And what time was that at?

19  A    7:21 a.m.

20  Q    All right.  And is that followed by several searches on

21  various dates for the F.B.I.?

22  A    That's after.

23  Q    Yes.  It came later in time.

24  A    Yes.

25  Q    The F.B.I. searches came later in time?

1 A    The F.B.I. searches, the dates are before the Baghdadi.

2 Q    Sorry.  I think I was trying to say the same thing.

3 Sorry.  Okay.  So they came before the search for Baghdadi

4 speech?

5 A    Correct.

6      MS. SWEENEY:  Okay.  Let's go a little bit further

7 down the page.

8 BY MS. SWEENEY:

9 Q    All right.  And do you see searches here again for

10 F.B.I.?

11 A    Yes.

12 Q    And I would like to focus your attention on the 9/11/2014

13 search.  Do you see there Moner Abusalha?

14 A    Yes.

15      MS. SWEENEY:  All right.  And let's go to 187956,

16 the second page of this.  Let's start at the bottom.

17 BY MS. SWEENEY:

18 Q    All right.  Agent, what's the earliest activity that we

19 see there?

20 A    January 11th, 2013.

21 Q    All right.  And what is the activity that takes place on

22 4/28 of 2013?

23 A    There's two activity entries there.

24 Q    Okay.  And what is the first one?

25 A    The first one is Tamerlan.

1  Q    And what's the second one?

2  A    Tamerlan Tsarnaev -- and I can't pronounce the first

3  name -- is innocent.

4  Q    Okay.  I think it's Dzokhar.

5  A    Dzokhar.

6         MS. SWEENEY:  Okay.  Let's look at the top of the

7  page.

8  BY MS. SWEENEY:

9  Q    All right.  And there do you see additional activity in

10  2013 and 2014?

11  A    Yes.

12  Q    And does some of that include searches related to the

13  F.B.I.?

14  A    Yes.

15  Q    All right.

16         MS. SWEENEY:  Thank you, Ms. Valente.

17         I would like to show Government's Exhibit 310D,

18  which is already in evidence.  Let's start with page 144950,

19  and let's start at the top.  And you can do just half the

20  page, Ms. Valente.  Perfect.

21         (The above referred to exhibit was published.)

22  BY MS. SWEENEY:

23  Q    All right.  So who is the -- what is the name that is

24  associated with this Facebook account?

25  A    The name is first Noor, no middle initial recorded here.

1  And the last name Zahi.

2  Q    All right.  And let's -- and at the top of this document,

3  is there a date range that is provided?

4  A    Yes.

5  Q    And what is that?

6  A    June 12th, 2014, to June 13th, 2016.

7        MS. SWEENEY:  Let's go to the next page, 152213.

8  Let's focus on the center of the page.

9  BY MS. SWEENEY:

10 Q    All right.  Agent, do you see a reference to removed

11 friends?

12 A    Yes.

13 Q    What are friends in terms of Facebook?

14 A    Either of the two users have the ability of being friends

15 on Facebook where one may have requested the other.  And if

16 one -- if the one that requested the specific friend accepts,

17 they become friends on Facebook.

18 Q    All right.  And below here, do we see -- what are removed

19 friends?

20 A    It appears friends that are removed.

21       MS. SWEENEY:  Okay.  And so let's then look slightly

22 below removed friends.

23 BY MS. SWEENEY:

24 Q    All right.  And then is there a list of friends that

25 appear?

1  A    Yes.

2  Q    Okay.  And just on the removed friends portion, let me

3  just ask you one more question.  Is anybody by the name

4  Omar Mateen listed among the removed friends?

5  A    No.

6         MS. SWEENEY:  Okay.  So let's go on the screen to

7  152215.

8  BY MS. SWEENEY:

9  Q    Now, Agent, we skipped a page, but with the -- do you

10  have that in front of you?

11  A    No, ma'am.

12  Q    Okay.  One second.

13         So in taking a look at the exhibit, we skipped

14  page 152214.  Can you take a look at that page?  Does that

15  page also contain friends?

16  A    Yes.

17  Q    All right.  Then in looking at 152215, do you see the

18  name Omar Mateen on that page?  It's towards the -- it's in

19  the bottom half of the page.

20  A    Yes.

21  Q    Okay.  So does that indicate that Noor Zahi and

22  Omar Mateen are friends?

23  A    Yes.

24         MS. SWEENEY:  Let's also look at Government's

25  Exhibit 310E, which is already in evidence, first page, 45666.

1   All right.  Let's start at the top.

2             (The above referred to exhibit was published.)

3   BY MS. SWEENEY:

4   Q    What's the name on it account?

5   A    First name Omar, last name Mateen.

6   Q    All right.  And similarly, does this have a date range at

7   the top?

8   A    Yes.

9   Q    And what is that date range?

10  A    January 1st, 2004, to January 12th -- or actually

11  June 12th, 2016.

12            MS. SWEENEY:  Okay.  Let's go to the next page,

13  45882.  And let's look at the bottom.  I'm sorry.  Can we get

14  that -- the darker text on -- perfect.

15  BY MS. SWEENEY:

16  Q    Does this page start with a list of removed friends --

17  I'm sorry.  On the bottom of the page, does the list of

18  removed friends begin?

19  A    Yes.

20  Q    Okay.  And that document -- that document -- I've just

21  handed it to you -- Government's Exhibit 310E, does it contain

22  several following pages of removed friends?

23  A    Yes.

24  Q    Okay.  And are the friends of Omar Mateen listed a few

25  pages in?

1     MS. SWEENEY:  And let's just go to 45892.

2  BY MS. SWEENEY:

3  Q    And is the list of friends in the middle of that page?

4  A    Yes.

5  Q    And is Noor Zahi among the friends listed there?

6  A    Yes.

7     MS. SWEENEY:  I would like to show the witness two

8  additional exhibits, but I believe we should have a sidebar.

9     THE COURT:  Why don't we take that up after I

10  discharge the jury for the evening, and we'll pick up with

11  this tomorrow morning.  So we can stay after and continue

12  talking, and then we'll resume with this direct examination in

13  the morning.

14     MS. SWEENEY:  Yes, Your Honor.

15     THE COURT:  Ladies and gentlemen, we'll break for

16  the evening.  We'll be back tomorrow morning at 9:00 a.m.

17     COURTROOM SECURITY OFFICER:  All rise for the jury.

18     (The jury retired from the courtroom at 4:58 p.m.)

19     THE COURT:  Thank you.  Please be seated.  The jury

20  has withdrawn.

21     Should the witness be present for this discussion or

22  no?

23     MS. SWEENEY:  He does not need to be, Your Honor.

24     THE COURT:  All right.  You'll be back tomorrow

25  morning at 9:00 a.m.  See you then.

1          THE WITNESS:  Thank you.

2          THE COURT:  You can leave everything there, and

3 we'll take care of it.

4          All right, folks.  How can I help you?

5          MS. SWEENEY:  Your Honor, I am going to tender to

6 the Court two pictures that the Government would like to

7 introduce from the Facebook accounts.

8          THE COURT:  All right.  Were these on the exhibit

9 list?

10          MS. SWEENEY:  No.  I added them this morning,

11 Your Honor.  So that's why you don't have a copy.  I was gonna

12 tender this as Government's Exhibit 310F.

13          The purposes of the two pictures from the

14 government's perspective is that both of them show that

15 Ms. Salman did, in fact, have a wedding ring and an engagement

16 ring prior to the trip to Kay Jewelers in which a band was

17 purchased.

18          I believe the witness yesterday,

19 Ms. Rose Von Bretzel, was asked whether she noticed that

20 Ms. Salman had a wedding ring already or an engagement ring,

21 and she didn't know, I think creating a question.  In

22 addition, I think it's relevant in any event because it does

23 demonstrate the need to buy an additional ring was not related

24 to the lack of a -- of a ring before that.

25          MR. SWIFT:  I have no objection as long as they're

1    published as to when, where they we were posted on Facebook

2    and not simply stuck up, that they come in as a -- in the full

3    context of where they were and the comments and the rule of

4    completeness is posted completely.

5              THE COURT:  Okay.  It could be simple to stipulate

6    to, but you all can present your evidence how you like.  So it

7    will be allowed if there's no objection to anything about the

8    pictures themselves.  They don't seem to be particularly

9    prejudicial, and you don't seem to be arguing that point.

10             MR. SWIFT:  No.  I just want rule of completeness.

11   Since it's published out of Facebook, that it's published as a

12   whole.

13             THE COURT:  So how would you anticipate this coming

14   in, Mr. Swift?  Would you want Ms. Sweeney -- I don't think

15   witness -- the current witness who's on the stand, does he

16   generate these documents or no?

17             MS. SWEENEY:  He doesn't, Your Honor.  But these are

18   business records, and he's prepared to testify to the -- the

19   document itself is four pages, two pictures and then it's

20   followed by a page that explains when it was posted and any

21   additional tags.  I don't see any on the first one.  And on

22   the second one, there is a tag that's there.  So I think that

23   we've already accomplished what Mr. Swift is asking for.

24             THE COURT:  I'm sorry.  They show when they're

25   uploaded.  They don't necessarily show when they're taken.

1          MS. SWEENEY:  No.  Just when uploaded.

2          THE COURT:  All right.  I'll leave that to you all

3    to decide if there needs to be some further development as to

4    the timing of the picture versus when was uploaded, if that's

5    relevant at all.  I have no idea.  I'll leave that up to you

6    all to discuss if necessary.

7          Let me hand these back to you, Grace, to give back.

8    Thank you very much.

9          How many more witnesses do you have after the agent

10   that's on the stand now, just to get a sense for timing for

11   tomorrow?  We have ample time.

12         MS. SWEENEY:  Yes.  We have three.  One of them is

13   lengthy and will take quite a while.  So I think we were a

14   little hasty in saying we'd be done Thursday morning.

15         THE COURT:  That happens.

16         MS. SWEENEY:  I think we may take quite a bit of the

17   day tomorrow.

18         THE COURT:  That's fine.  We can deal with any post

19   government motions we need, and then we'll take up the defense

20   case starting Monday morning.

21         MS. SWEENEY:  All right.  Thank you, Your Honor.

22         THE COURT:  Very good.  I'll see you all tomorrow

23   morning.  Thank you very much.

24         MR. SCHELLER:  Your Honor, after the Government

25   rests tomorrow, depending on the part of the day, since we're

1  having jury instructions on Friday, I wondered if we could

2  also do the Rule 29 arguments --

3              THE COURT:  That would be fine.

4              MR. SCHELLER:  -- at that time.

5              THE COURT:  That would be fine.  So it's not rushed

6  at the end of the day.  Absolutely.  That's fine.  We'll be

7  here anyway.

8              MR. SCHELLER:  I'm sorry?

9              THE COURT:  We'll be here anyway.

10             MR. SCHELLER:  Thank you.

11             THE COURT:  Thank you.  Have a good evening.

12         (WHEREUPON, this matter was concluded at 5:03 p.m.)

13

14                          *   *   *

15

16                  CERTIFICATE OF REPORTER

17

18  I certify that the foregoing is a correct transcript of the
    record of proceedings in the above-entitled matter.

19

20   _/s/ Suzanne L. Trimble_____          5/17/18
     Suzanne L. Trimble, CCR, CRR, RPR          Date
21   Official Court Reporter

22

23

24

25